ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRAIG M. HOWARD | : |
| Plaintiff, | : |
| | : Case No. 1:CV-01-0797 |
| v. | : (Judge Yvette Kane) |
| | : |
| LIBERTY LIFE ASSURANCE | : |
| COMPANY OF BOSTON, | : |
| LIBERTY MUTUAL GROUP | : |
| | : |
| Defendant. | : |

FILED
HARRISBURG, PA
JUN 19 2002
MARY E. D'ANDREA, CLERK
Per_____

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant, Liberty Life Assurance Company of Boston (referred to herein as "Liberty Life") hereby submits its Proposed Findings of Fact:

1) On May 5, 2000, Plaintiff Craig M. Howard executed a disability claim form (Exhibits D-1 p. 242).

2) Mr. Howard stated on that form that he was an employee of Hershey Medical Center, that his illness had begun on October 30, 1996 and that he had last worked on January 2, 2000 (Exhibit D-1, p.242)

3) An Attending Physician's Statement was provided with Mr. Howard's application. This statement listed the diagnosis as "pain" and described his condition as a recurrent right-L-45 herniated disc and right L5 Radiculopathy. (D-1 p. 243) On the back of the Attending Physician's Statement, in the section titled "Physical Impairment," the category "Class 4" was completed. That category referred to a moderate limitation of functional capacity and stated that the individual was capable of clerical\administrative activity (D-1 p. 243).

In a document which requested information regarding Mr. Howard's training-education and experience, also submitted by him to Liberty Mutual, he stated that his job title was staff assistant with the Hershey Medical Center. He said that his tasks/duties were medical claims biller (D-1 p. 247).

4) By letter of May 12, 2000, Felicia Boyd, a Disability Case Manager employed by Liberty Life acknowledged receipt of Mr. Howard's claim for Long-Term Disability benefits and advised him that she was actively reviewing his claim. Ms. Boyd stated that she was seeking additional medical information from Dr. Powers and she requested that Mr. Howard complete certain authorizations and other documents. (D-1 p. 240)

5) By letter of May 12, 2000, Ms. Boyd wrote to Dr. Powers, requesting copies of his office notes, treatment notes, consultation reports and operative reports from January 1, 2000 to the present (D-1 p. 239).

6) In a Claimant Information Form completed by Mr. Howard, he identified the following Physicians as his current health care providers: Andrew Wren, family practice; Stephen Powers, Neurosurgeon and Dan Gelb, Orthopedic Surgeon (D-1 p. 229)

7) By letter of February 25, 2000, Dr. Powers wrote to Dr. Wren with regard to Mr. Howard's condition. In this letter, Dr. Powers stated that he had seen Mr. Howard on February 25, 2000 and that he was doing 100% better. He stated that he had minimal right pain at that time and that this was only when he has straight leg freezing beyond about ninety degrees. He said that there was no radiating pain into the leg, that strength and in his dorsal flexion and eversion of the right foot is normal and that the incision has healed well. Dr. Powers stated that he was going to allow Mr. Howard to return to work part-time (4 hours a day) beginning March 6, 2000 for three weeks and that he may return to full-time work after March 27, 2000. (D-1 p.220).

8) By letter of May 5, 2000, Dr. Powers again wrote to Dr. Wren relating to Mr. Howard. In this letter, Dr. Powers stated that he had seen Mr. Howard on May 5, 2000 and that Dr. Powers did not think that he was in any shape to return to any type of activity which required extended sitting. He said that he understood that he had been laid off from his job in the billing office at Hershey. (D-1 p. 219)

9) Dr. Powers goes on to state that Mr. Howard may, in his opinion, return to work where he can sit and stand frequently but that this did not fit with his current job description. He recommended that he be followed up in Anesthesia Pain Clinic, indicating that he might benefit from seeing Dr. Blackall, their psychologist. He said that he was releasing Mr. Howard from his care. (D-1 p. 219).

10) By letter of March 24, 2000, Dr. Powers wrote to Dr. Wren regarding Mr. Howard's condition. Dr. Powers stated that he had seen Mr. Howard on March 24, 2000 and that, though he was free of leg pain on that date, he was now having bad back pain which he had had for a long period of time. He said that he had referred him to the Anesthesia Pain Clinic at Hershey Medical Center and that Mr. Howard was going to be starting physical therapy. (D-1 p. 216)

11) Mr. Howard apparently told Dr. Powers on March 24, 2000 that he was planning to apply for disability and he asked whether the doctor would support this. The doctor stated that he felt that he has a chronic low back pain problem which is somewhat separate from the disc problem. He states that, in essence, he would support some limited disability in this case because of continued pain. He said that he would see Mr. Howard again within six week s to reevaluate him for a final visit. (D-1 p. 216)

12) On July 12, 2000, Felicia Boyd engaged in a conversation with Debra Redfern, a registered nurse with MDS Services, an organization of medical professionals employed by Liberty Mutual. (D-1 p. 187)

13) During this conversation, Ms. Redfern advised Ms. Boyd that she had reviewed the file and its findings. She noted that Mr. Howard could not sit for prolonged periods of time. She noted that he had been released to part-time work on March 6, 2000, that on March 27, 2000, he had been released full-time but as of February 2, 2000, during a follow up visit with his doctor, the doctor had stated he had been doing 100% better. She also noted that as of May 25, 2000, Mr. Howard had been released to full-time work with restrictions and limitations of ability to move around frequently (change positions). During this conversation,

it was noted that there was no information to support a claim of total disability from Mr. Howard's own occupation. (D-1 p. 187)

14) Ms. Redfern conducted a review of the medical information and provided written notes relating to her review of it. Her notes are set forth in the claim file. (D-1 pp. 181-186)

15) By letter of July 25, 2000, Ms. Boyd wrote to Mr. Howard advising him that, based upon Liberty Life's review of the medical information on file, he did not meet the definition of disability as defined in the Group Disability Plan. She stated that, therefore, his claim for Long-Term benefits had been denied. (D-1 pp. 171-175)

16) In her letter of July 25, 2000, Ms. Boyd states, *inter alia* that the current medical information that Liberty Life has obtained does not demonstrate sufficient functional limitations to prevent him from performing all of the material and substantial duties of his occupation as a Staff Assistant. The report reviews medical information provided, including information contained in the reports of Dr. Powers. The letter also advises Mr. Howard of his rights under ERISA. (D-1 pp. 171-175)

17) By letter of July 24, 2000, Dr. Powers wrote to Ms. Boyd regarding Mr. Howard. In this letter, Dr. Powers described Mr. Howard's condition and stated that he is unable to sit for extended periods of time (more than five minutes or so at a stretch), and as such, he is incapable of working even a clerical or sedentary type job which requires his staying at a single work station. The doctor says that he would consider Mr. Howard to be entirely disabled at this time from returning to any type of work activity and that he did not expect his condition to improve and in fact, expected it to worsen. (D-1 p. 166)

18) Dr. Power's report of July 24, 2000, was provided by Ms. Boyd to Debra Redfern of MDS. This report was discussed by Ms. Redfern and Ms. Boyd on August 10, 2000. The memorandum of this conversation states that the information provided by Dr. Powers does not support Mr. Howard being totally disabled in his own occupation. It also notes that there were no objective medical records to support the

claim. A determination was made that a FCE (Functional Capacity Evaluation) would be set up and that a pharmacy check would be conducted. (D-1 p. 161)

19) The pharmacy check was requested on August 10, 2000. (D-1 pp. 156-158)

20) The pharmacy check was completed by August 21, 2000. (D-1 p. 131-139; pp. 145-148; p. 155 )

21) Liberty Life requested that Dr. Powers provide a prescription for an FCE. This authorization was not provided until September 8, 2000 and Liberty Life requested the FCE on September 8, 2000.

22) The FCE was cancelled by Liberty Life at the request of Mr. Howard because he advised Liberty Life that he had undergone an FCE and that he would provide a copy of this FCE report to it. (D-1 p. 129)

23) Mr. Howard made a complaint to the Pennsylvania Department of Insurance regarding the handling of this claim by Liberty Life. Liberty Life responded to this complaint by letter of Paula Colello dated October 6, 2000. (D-1 pp. 118-120)

24) As stated in Ms. Colello's letter, Mr. Howard's claim for Long-Term disability benefits was denied and, during the pendency of this appeal of that denial, Liberty Life received a copy of a letter of Dr. Powers dated July 24, 2000. In that report, Dr. Powers had stated that he had considered Mr. Howard disabled at this time from any type of work activity-even a clerical or sedentary type job which would allow for frequent change of position. The letter goes on to state that, "…given that these restrictions were now more significant than previously reported, our office requested that Mr. Howard attend a Functional Capacity Evaluation (FCE) to further clarify his physical/functional capacity…" (D-1 pp. 118, 119)

25) Ms. Colello's report states that delays in scheduling the FCE took place as the result of the inability to obtain a prescription for them. The letter states that Liberty Life's representatives contacted Dr. Powers office on August 10, 2000 to obtain a prescription for the FCE. When this call was not returned that

office was contacted again on August 23, 2000 and it was reported on that date that Dr. Powers would be out of the office until August 25, 2000. Liberty Life was advised that either Dr. Powers or his physicians assistant would contact Liberty Life regarding the prescription for the FCE. On September 8, 2000, Liberty Life again contacted Dr. Powers to follow up on the request and, on that date, a prescription for the FCE was received by fax and, the FCE was scheduled for September 20, 2000. (D-1 p. 119)

26) Ms. Colello further states in this letter that Liberty Life was advised by Mr. Howard that he would be unable to attend the FCE on September 20, 2000 because he would be out of town that day visiting his family. He had also said that he had recently had an FCE performed by the Social Security Administration and he requested that this information be provided instead of his attending another FCE. Despite numerous promises by Mr. Howard to provide that FCE report, it had not been received as of October 6, 2000. (D-1 pp. 119, 120)

27) There was no further inquiry from the Pennsylvania Department of Insurance regarding this claim, after Ms. Colello's letter was sent to that department.

28) On October 18, 2000, a letter was received by Mary Kay Bednar, Chief Financial Officer of the Hershey Medical Center. She states in this letter that it is not possible for a billing clerk to remove themselves from a work space for five to ten minutes hourly which she states that the work flow is designed for maximum efficiency and that a staff person being absent from the cubicle multiple times throughout the day does not meet that requirement for productive employment. She states that Mr. Howard is unable to serve in his previous position at the Hershey Medical Center. (D-1 p. 112)

29) During a conversation which took place on July 24, 2000, Ms. Boyd had explained to Mr. Howard that a determination of disability from one's own occupation is based upon his own occupation in the national economy and not upon his own job.

30) Because the report of the FCE referred to by Mr. Howard was never received, an FCE was scheduled by Liberty Life to take place on November 6, 2000. The FCE was rescheduled to November 9, 2000. (D-1 p. 93)

31) On November 20, 2000, Liberty Life received a copy of the Functional Capacity Evaluation. Under the section entitled Results, the reports states as follows: " the results of this evaluation indicate that Craig M. Howard is best suited for sedentary and/or light work category (8 hour day) (U.S. Department of Labor) His maximum occasional lifts were thirty-one and twenty-one pounds. His sitting tolerance was demonstrated on an occasional basis & required frequent positional changes. He tolerated standing and walking on a frequent basis. Mr. Howard presents himself as deconditioned as for the Kaach Steping testing results. Finally, Mr. Howard, Mr. Howard demonstrated several inconsistencies with today's testing: Two of three tasks had inappropriate horizontal strength changes and one of five tasks was rated at minimal effort (less than 16 pounds). Group strength testing was invalid and inconsistent with three of ten trials exceeding 20% for coefficients of variation, and two of two positive R & G scores. (D-1 p. 79)

33) It was the opinion of this evaluation team that these results represent Mr. Howard's minimal capabilities and not his maximal capabilities. (D-1 p. 79 [entire FCE report is set forth at D-1 pp. 67-80]

34) On November 21, 2000, Ms. Boyd reviewed the results of the FCE with Ms. Redfern. It was noted during this conversation that Mr. Howard was capable of doing sedentary/light duty work with frequent position changes. It was also noted that he gave only minimal effort during the FCE and that it was the opinion of the evaluation team that the FCE represented Mr. Howard's minimal capabilities and not his maximum capabilities. It was also noted during this conversation that Mr. Howard is able to work 8 hours a day with frequent positional changes but demonstrates standing/walking tolerance. It was suggested that a copy of the results of this FCE be sent to Mr. Howard's doctor for his review. (D-1 p. 66)

35) On November 28, 2000, a copy of Mr. Howard's Functional Capacity Evaluation report was sent to Dr. Powers. A typographical error in the letter transferring this report was corrected by a letter sent on the following date. (D-1 pp. 55, 56)

36) On December 28, 2000, Felicia Boyd received a letter from John C. Dowling, Esquire, advising of his representation of Mr. Howard. Mr. Dowling provided with his letter a copy of Dr. Powers' letter of July 24, 2000 and other documentation. All of these documents were already contained in the file of Liberty Life. (D-1 pp. 30, 31)

37) By letter of January 3, 2001, Richard Edkins, Liberty Life's Claim Manager, wrote to Mr. Dowling regarding this case. In that letter, Mr. Edkins acknowledged receipt of Mr. Dowling's letter of December 19, 2000 and the materials enclosed with that letter. Mr. Edkins also noted in this letter that a copy of the Functional Capacity Evaluation report had been forwarded to Dr. Stephen Powers on November 28, 2000 with a letter requesting that he review the results and if he disagreed provide medical documentation in support of Mr. Howard's claim. Mr. Edkin notes that, as of January 3, 2001, Liberty Life had not received a response from Dr. Powers. He stated that, as of January 3, 2001, the initial decision to deny benefits remained unchanged and that the file would be referred to Liberty Life's Appeals Unit for a review (D-1 p. 29)

38) An Appeal Referral Sheet of January 3, 2001 states that the analysis and recommendation of the appeals unit was that the previous decision to deny the claim remained unchanged. It states that the FCE dated November 9, 2000 states that the claimant is capable of performing light/sedentary occupations for eight hours. It states that MDS has reviewed the file, that the FCE report was sent to the attending physician and that there had been no comments by that physician. (D-1 p. 28)

39) On January 17, 2001, Chuck Johnson, a Liberty Life Appeal Review Consultant sent another copy of the Functional Capacity Evaluation report to Dr. Powers' office. In his letter transmitting the report, Mr. Johnson asked Dr. Powers for his comments on the results and he asked him to provide any additional objective findings. (D-1 p.26)

40) By letter of January 17, 2001, Mr. Johnson wrote to Mr. Dowling, advising him of the status of the claim. Mr. Johnson stated in his letter that a copy of the Functional Capacity Evaluation report had been sent to Dr. Stephen Powers on November 28, 2000 and that there had been no response to that report. Mr. Johnson goes on to state that, in order to provide a thorough review, Liberty Life faxed another copy of the Functional Capacity Evaluation to Dr. Powers office on January 17, 2001 and that it asked for a response by January 31, 2001. (D-1 pp. 24, 25)

41) In his letter of January 17, 2001, Mr. Johnson also asked Mr. Dowling if he wished to submit any additional medical information relating to the treatment of Mr. Howard. He asked that, if additional records were to be submitted, they provided to Liberty Life or that Liberty Life be notified of Mr. Dowling's intent to submit additional medical records. Mr. Johnson noted that, if the company did not receive any additional medical documentation by January 31, 2001, it must render its determination based upon the information currently contained in Mr. Howard's file. (D-1 pp. 24, 25). No additional documents were submitted by Mr. Dowling.

42) Liberty Life nonetheless attempted to follow up with Dr. Powers. A note to the file dated February 23, 2001 states that there was a discussion with the claimant's nurse, Jamie, and that the doctor wanted $250.00 for comments on the FCE. This note states that Liberty Life was waiting to hear from the attorney.

43) The claims file contains a memorandum dated February 7, 2001 from Edward P. Crouch, M.D., Liberty Life's Medical Director, Disability Products.

44) This note states that Dr. Crouch called Dr. Powers' office and spoke with his nurse. This nurse stated that she was not sure that Dr. Powers would speak with Dr. Crouch without an authorization. Dr. Crouch states in this note that if they did not have an authorization he would assure that they would obtain a copy of such a document as copies of authorizations were already contained in Liberty Life's records. This note further indicates that Dr. Crouch gave Dr. Powers' nurse his telephone number and offered to provide his cell phone number. Dr. Crouch was told to call back on Monday (apparently referring to Monday, February 12, 2001). (D-1 p.4)

45) In a memorandum to the file recorded by Dr. Crouch states that he called Dr. Powers office on Monday, February 12, 2001 and that he left a message asking Dr. Powers to return the call. The doctor states that no call was received from Dr. Powers. He notes that Dr. Powers, the attending physician had not responded to the request to comment regarding the independent evaluation or to discuss the case with him. (D-1 p. 3)

46) By letter of February 28, 2001, addressed to John Dowling, Esquire, Mr. Johnson advised Mr. Dowling that Liberty Life had completed its review of his request for reconsideration and it had determined that it was unable to alter its original decision to deny his benefits. (D-1 a-d) (P-4 - I-IV)

47) In his letter of February 28, 2001, Mr. Johnson referred to the review of the records provided by Mr. Dowling, the request for additional records and the fact that no additional medical documentation had been received. The letter also referred to the attempts by Dr. Crouch to attempt to schedule a time convenient for Dr. Powers to discuss Mr. Howard's condition and the fact that there had been no response from Dr. Powers' office to discuss the patient or schedule a time to discuss the patient. (P-4 – I-IV)

48) Mr. Johnson also notes in this letter of February 28, 2001 that Mr. Howard's occupation, as a Staff Assistant, is considered sedentary and that no heavy lifting is involved. He stated that he has the ability to modify positions or activities based upon physical need and that it has been determined that Mr. Howard has the physical functional capacity to perform the material and substantial duties of his occupation and that he therefore does not meet the definition of disability under the terms of Penn State's Geisinger's Disability Policy and that no benefits are payable.

## CONCLUSIONS OF LAW

Liberty Life Assurance Company of Boston (refer to herein as "Liberty Life") hereby requests that the Court enter the following conclusions of law.

I. **CONCLUSIONS OF LAW RELATING TO SCOPE OF REVIEW**

1. The Policy written pursuant to the Plan provides the following definition of disability:

   You are eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability, you are unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an injury or sickness; and

2. The Policy written pursuant to the Plan specifically provides:

   **Section 7 – General Provisions**

   Interpretation of the Policy

   We shall possess the authority, <u>in our sole discretion</u>, to construe the terms of this plan and to determine benefit eligibility hereunder. Our decisions regarding construction of the terms of this plan and benefit eligibility shall be conclusive and binding. (D-1 p.42)

3. The appropriate standard of review of a decision by a claims administrator to deny benefits is determined by referring to the language of the plan itself. <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 109 S.Ct. 948 (1989).

4.     The appropriate standard of review in §1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 at 115.

5.     If the plan does grant such discretionary authority, the "arbitrary and capricious" standard of review applies. Id.; see also Courson v. Bert Bell NFL Player Retirement Plan, 214 F.3d 136, 142 (3rd Cir. 2000) (stating "[w]here the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan, the denial of benefits is reviewed under the arbitrary and capricious standard"); Luby v. Teamsters Health, Welfare & Pension Trust Funds, 944 F.2d 1176 (3d Cir. 1991); Friess v. Reliance Standard Life Ins. Co., 2000 WL 1751079 *4 (E.D. Pa.) (Nov. 28, 2000) (stating "[u]nder Firestone, when a plan grants its administrator discretion authority, courts should limit review of the administrator's decision to abuse of discretion . . . The Third Circuit has subsequently held that when the language of a plan gives the administrator discretionary authority, courts must apply the arbitrary and capricious standard of review").

6.     Based upon the clear language of the Plan, Liberty Life is provided the express discretionary authority to determine a participants entitlement to benefits.

7.     Liberty Life's decision to deny Plaintiff Long Term Disability benefits must be reviewed under the arbitrary and capricious standard.

8.     In Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3rd Cir. 2000), the Court adopted the "sliding scale" approach which could require a heightened arbitrary and capricious standard. This heightened standard takes into account any conflict of interest which may exist when an insurance company which both insures and administers benefits. Id. at 378.

9. The Court addressed the issue concerning the standard to be applied by courts when reviewing a denial of a request for benefits, under an ERISA plan by an insurance company which both determines eligibility for benefits and pays those benefits out of its own funds. Id.

10. The Court adopted the "sliding scale" approach. Under this approach, a Court, in determining whether a discretionary decision-maker abused his or her discretion, can consider as a "factor" whether any potential conflict of interest existed. Id. at 392.

11. In its determination of whether a conflict of interest exists, a Court

> may take into account the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company. For example, a court can consider whether the insurance contract is fixed for a term of years or changes annually, and whether the fee paid by the company is modified if there are especially large outlays of capital by the insurer. Another factor to be considered is the current status of the fiduciary. Our previous cases, . . . which hold that an employer fiduciary is not conflicted, generally assume that the company is stable and will act as a repeat player: The presumed desire to maintain employee satisfaction is based in this premise.

Id.

12. In its application of a potential conflict of interest, "the 'arbitrary and capricious' standard may be a range, not a point . . . [it is] more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is." Id. at 392-93 (alteration in original).

13. The Court, in remanding the matter to the district court, instructed that

> [T]he District Court may take evidence regarding the conflict of interest, and ways in which the conflict may have influenced the decision, and then determine whether, considering the conflict, the decision was "arbitrary and capricious."

Id. at 395.

14. The Court in Pinto allows for the taking of additional evidence to determine the degree of arbitrary and capricious standard to be applied.

15.  In <u>Friess v. Reliance Standard Life Ins. Co.</u>, <u>supra</u>, the Court stated that "[t]o arrive at the proper standard of review, the district court must make a finding on the extent to which conflicts of interest warrant increased scrutiny." <u>Freiss</u>, 2000 WL 1751079 at *6.  "[T]he arbitrary and capricious standard cannot be abandoned even in the presence of a conflict that threatens to seriously bias the administrator's decision.  Rather, the intensity of review should increase in proportion to the intensity of the conflict.  The Third Circuit instructed district courts to 'consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review.'" <u>Id.</u> at *5.

16.  In the present case, Liberty Life determines eligibility for benefits to plan participants and pays those benefits out of its own funds.

17.  This Court has considered evidence submitted by the parties concerning the alleged conflict of interest incurred by Liberty Life.

18.  This Court finds that any alleged conflict of interest of Liberty Life is <u>de</u> <u>minimis</u>.

19.  This Court finds that a deferential standard of review is to be applied in this case.

20.  Under any arbitrary and capricious standard, "a plan administrator's interpretation of a plan may be disturbed "'only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law." <u>Abnathya v. Hoffman La-Roche, Inc.</u>, 2 F.3d 40, 45 (3rd Cir. 1995) (quoting <u>Adamo v. Anchor Hocking Corp.</u>, 720 F.Supp. 491, 500 (W.D.Pa. 1989).

21.  A decision is supported by "'substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision.'" <u>Courson</u>, 214 F.3d at 142.

22.  "'This scope of review is narrow, and 'the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits.'" <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 439 (3rd Cir. 1997).

23. "[T]he administrator's interpretation of the plan, 'will not be disturbed if reasonable.'" Id. at 437 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114, 109 S.Ct. 948, 954 (1989).

24. This Court finds that Liberty Life's denial of Plaintiff's claim for benefits was not handled in an arbitrary and capricious manner.

## II. CONCLUSIONS OF LAW RELATING TO THE HANDLING OF THE CLAIM, BASED UPON THE MATERIALS CONTAINED IN THE CLAIM FILE

1. Liberty Life acted properly and reasonably in the handling of this file.

2. Mr. Howard identified Dr. Stephen Powers as his treating physician in the application for disability benefits filed by him. Dr. Powers opinion was that Mr. Howard suffered from pain relating to a recurrent herniated disc at the L4-5 level and L5 Radiculopathy.

3. Dr. Powers stated in his Attending Physician Statement of April 17, 2000, however, that, though Mr. Howard suffered from moderate limitation of functional capacity, he was capable of clerical\administrative activity.

4. Dr. Powers had prepared a number of reports prior to April 17, 2000. In those reports, he had indicated that Mr. Howard had shown improvement and that he would be released for work on a part-time basis on March 6, 2000. Dr. Powers had also stated that Mr. Howard would be released for work on a full-time on March 27, 2000.

5. On March 24, 2000, Mr. Howard visited Dr. Powers and advised him that he intended to apply for disability benefits. He asked if Dr. Powers would support a disability claim. Dr. Powers stated that he would support such a claim only for some limited disability.

6. In his application for disability benefits, Mr. Howard asserted that his disability had commenced on January 2, 2000.

7. The "Elimination Period" the period of time which must elapse before benefits were potentially payable under this Long-Term Disability Policy began to pay benefits was 180 days. Benefits, therefore, were not potentially due to Mr. Howard until July 1, 2000.

8. Liberty Life began a prompt investigation of this claim shortly after it was reported. As of July 1, 2000 it had received insufficient information to allow it to make a decision with regard to whether Mr. Howard was entitled to Long-Term disability benefits under the applicable policy.

9. On July 31, 2000, Liberty Life received a letter from Dr. Powers. This letter, dated July 24, 2000, stated that Dr. Powers was now of the opinion that Mr. Howard was totally disabled. The opinion of Dr. Powers, set forth in his report of July 24, 2000, was completely different from his prior reports in that the doctor previously stated that Mr. Howard was capable of some work activity and, in fact, he had stated that he intended to release Mr. Howard to full-time employment as of March 27, 2000.

10. The claims analyst who was handling the case up to this point was Felicia Boyd. During Ms. Boyd's handling of the filing, she had consulted with Debra Redfern, a Registered Nurse who was employed in Liberty Mutual's MDS Service.

11. The MDS Service is a group of registered nurses. This group of nurses is available for consultation upon request of the claims analyst. Following her receipt of this report of Dr. Powers dated July 24, 2000, Ms. Boyd consulted with Ms. Redfern. The discrepancy in the opinions of Dr. Powers was noted and it was determined that, as a result of this discrepancy, a pharmacy check would be obtained and a Functional Capacity Evaluation (FCE) would be obtained.

12. The pharmacy check was completed promptly.

13. Liberty Life attempted to set up the FCE promptly but it experienced difficulty in doing so because Dr. Powers was unavailable.

14.     An FCE is an objective test which is administered by physical therapists using exercise equipment and other means to evaluate an individual's abilities and limitations as they pertain to performance in a work environment.

15.     An FCE is typically administered by physical therapists.

16.     An FCE cannot be done without a physician's order.

17.     In this case, Dr. Powers was unavailable until August 25, 2000. There was a discussion as to whether his assistant could order an FCE. In any event, the authorization to perform the FCE was not received by Liberty Life until September 8, 2000 and the FCE was scheduled on the same day when the authorization for it was received.

18.     When the FCE was discussed with Mr. Howard, he stated that he had already undergone an FCE for the Social Security Administration and that he did not wish to undergo this test again. He therefore, agreed to provide copies of the report of the FCE already undergone by him.

19.     Despite Mr. Howard's agreement to provide copies of this FCE report, no copy of this report was ever provided and the FCE was rescheduled by Liberty Life to take place during November of 2000.

20.     The FCE proceeded on November 9, 2000. It was conducted by Healthsouth, a facility located at 450 Powers Avenue, Harrisburg, Pennsylvania 17109. Healthsouth is an organization which is independent from Liberty Life.

21.     Healthsouth issued its report on November 9, 2000. The report was signed by Mark McDonald, a Physical Therapist.

22.     The report of Healthsouth indicates that Mr. Howard was best suited for a sedentary and/or light work category for an eight hour day. The report described the testing which had been undergone by Mr. Howard and it noted certain inconsistencies in the testing. It was the opinion of Healthsouth that the test results represented Mr. Howard's minimum capabilities and not his maximum capabilities.

23. The report of Healthsouth contradicted the opinion of Dr. Powers set forth in his letter of July 24, 2000 which had stated that Mr. Howard was incapable of working. Accordingly, a copy of the report of Healthsouth was sent to Dr. Powers for his comments.

24. The Heathsouth was sent to Dr. Powers during November of 2000 with a request that he review it and provide any comments which he wished to make to it. There was no response to this request.

25. Mr. Howard engaged counsel during December of 2000. His attorney advised Liberty Life of his representation and provided documentation for its review. All reports provided, however, were already in the possession of Liberty Life.

26. Liberty Life advised counsel for Plaintiff by letter of January 3, 2001, that it had sent the Functional Capacity Evaluation report to Dr. Powers during November of 2000 but that a copy of it had not yet received a response from Dr. Powers.

27. Liberty Life made further efforts to obtain the comments of Dr. Powers regarding the FCE Report. It contacted Dr. Powers office on January 17, 2001 and spoke to his nurse regarding this matter. She said that the report had not been received. Liberty Life therefore sent another copy of this report to Dr. Powers office. That report was faxed to Dr. Powers on January 17, 2001. Dr. Powers still did not respond to this report. Calls were made to him by a claims analyst and two calls were made by Liberty Life's medical director, who was a licensed physician. The purpose of these calls was to set up a meeting to discuss the case.

28. Liberty Life made every possible effort to speak with Dr. Powers to obtain his comments upon the FCE. These efforts were unavailing as Dr. Powers did not respond to these communications.

29. The information which was available to Liberty Life does not support Mr. Howard's claim.

30. The evidence in the file, based upon objective testing, is that Mr. Howard is capable of working in a light to sedentary occupation.

31. At the time when he alleges he became disabled, Mr. Howard was working in an occupation which is classified as light to sedentary. Since he is capable of performing work in that occupation, he does not meet the definition of disability which is set forth in the policy issued by Liberty Life to Geisinger Health Services.

32. The decision of Liberty Life denying this claim is reasonable and it is fully supported by the evidence which was available to Liberty Life.

33. The Court will accord a high degree of deference to the decision of Liberty Life as there is no evidence to suggest that any potential conflict of interest had any effect whatsoever upon the decisions made in this case.

35. When viewed under the standard required by the <u>Pinto</u> case, discretion is to be given to a carrier such as Liberty Life in making decisions of this type. Liberty Life acted well within its discretion in this case and the Court finds that its decision should be affirmed.

### III.    CONCLUSIONS OF LAW RELATING TO DAMAGES

1) Defendant contends that Plaintiff does meet the definition of disability set forth in the applicable policy and that he is not entitled to benefits under that policy.

2) Alternatively, if the Court finds that Mr. Howard is entitled to benefits, Liberty Life is entitled to an offset from those benefits in the amount of $1,024.00 per month.

2) Plaintiff alleges that his monthly salary was $2,266.33. The maximum benefit which would be applicable, assuming that salary to be accurate, is $1,510.96.

3) If the Court finds that Mr. Howard is entitled to the maximum gross benefit under this policy of $1,510.96, that benefit should be offset by the applicable amount of social security and the remaining benefit would therefore be in the amount of $486.96 per month. If the Court finds that Mr. Howard is

Case 1:01-cv-00797-YK    Document 29    Filed 06/19/2002    Page 20 of 20

entitled to damages, the Court should award benefits only up to February 28, 2001 the date when this claim was denied.

4) If the Court finds that Mr. Howard is entitled to benefits, it may not award future benefits but it should remand the case to the administrator for further handling in accordance with the terms of the applicable policy.

Respectfully submitted,

KELLY, MCLAUGHLIN, FOSTER,
BRACAGLIA, DALY, TRABUCCO & WHITE,
LLP

By: _____*David R. [signature] for William C. Foster*_____
William C. Foster, Esq.
Attorneys for Defendant
Liberty Life Assurance Company of Boston