



2 Oct

34
RB 7/9/02

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG M. HOWARD          :

                                :

     **Plaintiff,**         :

                                :     **Case No. 1:CV-01-0797**

     **v.**                 :     **(Judge Yvette Kane)**

                                :

**LIBERTY LIFE ASSURANCE**     :

**COMPANY OF BOSTON,**         :

**LIBERTY MUTUAL GROUP**      :

                                :

     **Defendant.**       :

                                :

**FILED**

HARRISBURG, PA

JUL 0 8 2002

MARY E. D'ANDREA, CLERK

Per _____ Deputy Clerk

## SUPPLEMENTAL PRETRIAL MEMORANDUM OF DEFENDANTS

### I.    INTRODUCTION:

Pursuant to the Court's Case Management Order of September 28, 2001, the parties filed their Pre

Trial Memoranda on June 19, 2002. In the Pre Trial Memorandum filed by Plaintiff, Plaintiff has leveled

certain charges against the Defendant. Plaintiff contends as follows:

> There has been an ongoing discovery dispute since the inception of the
> litigation. Defendant took the position in its Case Management Plan
> that no discovery was needed. Though the Court entered an Order
> relating to the scope of discovery, Defendant has by its belated
> objections and unresponsive answers impliedly maintained its position
> that discovery is not necessary. (Pre Trial Memorandum of Plaintiff
> Craig M. Howard, p.5)

Defendant submits that the aforementioned allegations have no substance whatsoever. The

record in this case demonstrates, that to the contrary, Defendant has cooperated in Discovery fully and

complied with the Orders entered by the Court in this case and with the Federal Rules of Civil Procedure.

## II.    ARGUMENT:

### A.    **INTERROGATORIES**

This action was filed in the Court of Common Pleas of Dauphin County, Pennsylvania. Because it arose under the Employee Retirement Income Security Act of 1974 (ERISA), it was removed to Federal Court.  Following removal, the parties agreed that Plaintiff could amend his Complaint to assert a cause of action under ERISA.

The parties filed a Joint Case Management Plan and the Scheduling Conference was held with the Court on June 29, 2001.  A copy of this document is enclosed herewith and marked Exhibit "A." Defendant had contended in the Case Management Plan that no discovery should be taken in the case because the Court's function in determining whether the Plan Administrator or its fiduciary acted in an arbitrary and capricious manner should be determined by the administrative record which was before the decision maker at the time of denial.  (Exhibit "A" item 6.20)  The Case Management Conference was held with the Court on June 29, 2001.   At this conference, one of the issues discussed was the scope of discovery.  Because there was disagreement relating to its scope, the Court directed the parties to file letter Briefs regarding this issue.   These Briefs were filed and, on October 2, 2001, the Court issued its Memorandum and Order recording this dispute.    A copy of that Memorandum and Order is enclosed herewith and marked Exhibit "B."  In its Opinion, the Court stated that: "In Pinto, the Third Circuit adopted the "sliding scale" approach to review under a heightened arbitrary and capricious standard where, as here, there  is such a conflict of interest.  In deciding where on that "sliding scale" a case falls, and therefore how deferentially to review the administrator's decision, the Court may "take evidence regarding the conflict of interest, and  ways in which the conflict may have influenced the decision." Therefore, Plaintiff is entitled to depose Defendants, officers, directors, employees, and others and discovery other evidence, relevant to "the sophistication of the parties, the information accessible to the parties, …the exact financial arrangement between the insurer and the company, [and]…the current status of the fiduciary." (internal

citations omitted) (Exhibit "B" pp. 1, 2)  The Court held therefore, that Plaintiff was entitled to depose Defendant's Officers, Directors, Employees and others and discover other evidence, relevant to the "sophistication of the parties," the information accessible to the parties, the exact financial arrangement between the insurer and the company and the current status of the fiduciary.  (Exhibit "B" p.2)  This Opinion established the law of the case relating to the scope of discovery.

By letter dated October 19, 2001, Plaintiff served a set of Interrogatories upon Defendant.  A copy of these Interrogatories and the Defendant's Interlineated answers to them is enclosed herewith and marked Exhibit "C."  As a review of the responses will indicate, Defendant answered nineteen (19) of twenty-five (25) Interrogatories,  and objected to five (5) questions which it considered to be outside of the Court's Ruling.  These questions related to underwriting criteria relating to the Plan (Question 17); annual premium for the years 1998, 1999 and 2000.  (Question 18); the number of similar plans Defendant had in effect for the years 1998, 1999 and 2000 (Question 19); the loss ratio for the years 1998, 1999 and 2000 and its effect on the annual premium.  (Question 21); the net profits or loss resulting from this contract and the reserve established on Plaintiff's claim. (Question 22 and 23),  Defendant considered these questions to be beyond the scope of the Court's Discovery Order in that they did not relate to the sophistication of the parties, the information accessible to the parties, the exact financial arrangement between the insurer and the company and the current status of the fiduciary.  Question 20 had asked for the exact financial arrangements between the Defendant and Penn State Geisinger Health System and the Defendant had answered that Interrogatory.

On January 3, 2002, at the request of counsel for Plaintiff, the Court held a Conference Call

provided on December 3, 2001.  Counsel for Defendant had discussed these Interrogatories with counsel

for Plaintiff and he understood that a brief extension to answer the Interrogatories had been granted.  In any

event, Plaintiff was not prejudiced even if the answers were not timely provided because the Defendant

agreed to a Motion to Amend the Order to allow a thirty-day extension of the discovery deadline.  A copy

of that Motion is enclosed herewith and marked Exhibit "G."  The Court granted this Motion and extended

discovery through February 25, 2002.

Though discovery in this case was concluded as of February 25, 2002, Plaintiff nonetheless

served a Second Set of Interrogatories on March 27, 2002.  Plaintiff did not seek leave of the Court before

serving these Interrogatories.  Plaintiff complains that these Interrogatories were not answered until May 3,

2002.  If these Interrogatories had been proper and if they were served by mail on March 27, 2002, the

answers would have been due under the Federal Rules of Civil Procedure within thirty-three (33) days, by

April 30, 2002.  Defendant chose to respond to the Interrogatories rather than to object to them as untimely.

Plaintiff fails to show how a three-delay in receiving these Interrogatories was in any manner prejudicial to

him.

It is submitted that the record in this case establishes that the Defendant fully complied with this

Court's Orders and the Federal Rules of Civil Procedure relating to Interrogatories and that the Plaintiff's

assertions relating to them have no basis.

**B.  DEPOSITIONS:**

Plaintiff charges that Defendant acted improperly with regard to the scheduling of depositions.

The record is to the contrary.

By letter of February 13, 2002, Plaintiff served a Notice of Deposition of four employees of Liberty

Life Assurance Company.  This notice was received by the Defendant on February 15, 2002.  Plaintiff

made no telephone call to determine the availability of these witnesses or defense counsel for the scheduled

date of February 22, 2002.  Defendant nonetheless attempted to determine the availability of these

witnesses for deposition by contacting the individual with whom he works at Liberty Life. He was advised on February 20, 2002 that but some of the witnesses resided in New Hampshire and one of them was in North Carolina. On February 22, 2002, Defense counsel wrote to counsel for Plaintiff regarding these depositions. A copy of this letter is attached hereto and marked Exhibit "H." In this letter, Defense counsel advised Plaintiff's counsel of the locations of these witnesses and stated that, if these depositions were to proceed, it would be necessary that they be taken in the jurisdictions where the witnesses reside. Counsel for the Defendant agreed to determine the availability of these witnesses during the next thirty (30) days.

The attorneys subsequently discussed the information Plaintiff sought from these witnesses and they agreed that most of this information could be provided by Stipulation. Counsel for Plaintiff agreed with obtaining this information by Stipulation by letters of March 13, 2002, March 27, 2002 and May 8, 2002. (Exhibits "I," "J," and "K") In fact, by letter of March 27, 2002, counsel for Plaintiff stated that, after the second set of Interrogatories were answered, he thought that "we can agree on Stipulation of Facts without the need of written Interrogatories or regular discovery depositions...) Exhibit "J"

Counsel for Plaintiff clearly did not intend to proceed with the depositions of these individuals and this is the only reason they did not proceed. The suggestion to the Court at this point that there was some improper conduct of the Defendant with regard to these depositions is unwarranted and is contradicted by counsel's own letters.

C. **CLAIMS MANUAL:**

In its initial Answers to Interrogatories, Defendant stated that it was in possession of a Claims Procedure Manual. It objected to the production of the manual as the information contained in it was confidential. It stated, however, that it would agree to produce a copy of this Manual if Plaintiff would agree to maintain its confidentiality and Plaintiff would agree to a Protective Order relating to it. (Exhibit "C", Answer to question 2) Though Plaintiff requested a copy of the Claims Manual and agreed to

maintain its confidentiality, he never agreed to sign a Protective Order relating to this Manual until his letter of May 8, 2002. In response to that letter, a Confidentiality Agreement was sent to him. This Agreement was returned on May 28, 2002 and the Manual was produced shortly after the signed Confidentiality Agreement was provided.

Counsel is correct in stating that Defendant did not produce its entire Claim Manual for review by Plaintiff. What it did produce was the Table of Contents relating to the Manual and it requested counsel for Plaintiff to select all materials which he wished to review. All of the materials requested by Plaintiff were provided with the exception of those materials which related to Short-Term Disability Claims. These sections were eliminated because no Short-Term Disability Claim is being made in this case. There was also a brief delay because counsel for Defendant initially sent an index to an incorrect manual. This was promptly corrected and all relevant sections of the Claim Manual requested by Plaintiff were sent to him by overnight mail on June 13, 2002. It is submitted that there was no basis for the claim that Defendant disregarded any Orders of this Court or the Federal Rules of Civil Procedure regarding the production of the Claim Manual.

### D.    **SOCIAL SECURITY OFFSET:**

At the attorney conference to prepare the Pre Trial Memoranda, there was a discussion relating to the Social Security offset. The topic was raised by counsel for Plaintiff who stated that he could not find the offset in the policy. After reviewing the policy, it was pointed out to counsel for Plaintiff that the offset appeared at pages 3 and 29 of the Policy Booklet. A copy of that booklet is attached hereto and marked Exhibit "I." That policy defines the applicable benefits based on a percentage of basic monthly earnings less the participant's Benefits Other Income as outlined in section 4 at page 28 and 29 states that Benefits from Other Income, include the amount of disability and/or Retirement Benefits under the United States Social Security Act. (Exhibit "L" p. 3, 28, 29) It was only after counsel for Plaintiff reviewed this provision that he contended that this provision had been waived because it had not been pleaded. Counsel

had been provided with a copy of this booklet, together with a complete copy of Defendant's Claims File on July 23, 2001. A copy of the letter transmitting these documents together with a copy of the United Parcel Service and Tracking Summary indicating delivery on July 23, 2001 are enclosed herewith and marked Exhibit "M." Counsel for Plaintiff was, therefore, in possession of this booklet for at least eleven months prior to the Pre Trial Conference. He certainly had an opportunity to review it and consider the provisions of the Policy.

Furthermore, in its Fourth Affirmative Defense raised in response to the Plaintiff's Amended Complaint, the Defendant asserted that "Plaintiff's claim does not fall within the scope of coverage of the Policy referred to in this Answer and it is barred by terms, conditions, definitions, exclusions and limitations set forth in that policy." A copy of this answer is attached hereto, made a part herein and marked Exhibit "M." This defense certainly incorporates all of the terms of the Policy into the Defendant's Answer. This was clearly no waiver of the Social Security offset.

Furthermore, the Social Security Offset is a part of the applicable Policy and this offset is required by the Policy to be used to determine the amounts of benefits allegedly owed

There is no basis for the Plaintiff's assertion that the Social Security offset does not apply. It is clearly does apply and it operates to reduce any benefits which are potentially recoverable from the Defendant.

## III.  CONCLUSION:

It is submitted that the record in this case demonstrates that the Defendant acted properly with regard to discovery in this case, that the Social Security offset is applicable and the Plaintiff is not entitled to recover attorney's fees.   Defendant Liberty Life Assurance Company of Boston respectfully requests

that the Court adopt the Proposed Findings of Fact and Conclusions of Law set forth with its Pre Trial

Memorandum and that it enter Judgment in its favor.

Respectfully submitted,

**KELLY, McLAUGHLIN, FOSTER,
BRACAGLIA, DALY, TRABUCCO & WHITE, LLP**

By: _____
        WILLIAM C. FOSTER, ESQUIRE
        Attorney for Defendant,
        Liberty Life Assurance Company of
        Boston and Liberty Mutual Group

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **CRAIG M. HOWARD** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 1:CV-01-0797** |
| **v.** | : | **(Judge Yvette Kane)** |
| | : | |
| **LIBERTY LIFE ASSURANCE** | : | |
| **COMPANY OF BOSTON,** | : | |
| **LIBERTY MUTUAL GROUP** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### CERTIFICATE OF SERVICE

I, William C. Foster, Esquire, hereby certify that a true and correct copy of Defendant's Supplemental Pre-Trial Memorandum was served on 3rd day of July, 2002 via UPS Overnight Mail upon the following individual:

John C. Dowling, Esquire
Rhoads & Sinon, LLP
1 South Market Square, 12th Floor
P.O. Box 1146
Harrisburg, PA 17108-1146

KELLY, MCLAUGHLIN, FOSTER, BRACAGLIA,
DALY, TRABUCCO & WHITE, LLP

By: _____
William C. Foster, Esquire
Attorney for Defendant,
Liberty Life Assurance Company of Boston.

Date: 7/3/02

with regard to these objections.  The positions of the parties were explained during this call and the Court stated that the parties should attempt to resolve the matter by agreement but that, if it could not be resolved, letter Briefs were to submitted within ten (10) days regarding the issues raised.[1]

The issues could not be resolved and letter Briefs were again submitted to the Court.  On March 6, 2002, the Court entered its second Memorandum and Order relating to discovery issues in this case.  A copy of that Memorandum and Order is attached hereto and marked Exhibit "D."  In this Opinion the Court held that two of the Plaintiff's inquiries were proper but that the Defendant could properly decline to respond to the remaining inquires of the Plaintiff.  The Court stated that Plaintiff may inquire into the "bases" on which the premium was calculated and "[the]" reserve established on Plaintiff's claim. (Exhibit "D" p. 2)  The Court stated that the Defendant may properly decline to respond to Plaintiff's request for information regarding "the negotiations leading up to the contract between Liberty Life and Penn State Geisinger," "[t]he number of similar plans," and "[t]he loss ratio for the years immediately preceeding and the year of the instant claim, as well as profits and losses resulting."  (Exhibit "D" p.2)

By letter of March 21, 2002, Defendant provided supplemental information relating to the bases of premium charged and the reserve established on the Plaintiff's claim.  A copy of Defendant's letter providing that information is attached hereto and marked Exhibit "E."  A further supplemental answer was provided by letter of April 22, 2002 is attached hereto and marked Exhibit "F."

Plaintiff's initial set of Interrogatories were, therefore, properly and fully answered.  When discovery disputes arose, they were brought to the attention of the Court and many of the objections raised by the Defendant were upheld.  Two of these objections were overruled and prompt answers to these Interrogatories were provided.  There is no basis for the claim that any unresponsive answers were filed.

Plaintiff claims that the Answers to these Interrogatories were late in that they were

---

[1] An additional objection was made regarding the request for a copy of Defendant's Claims Manual because of the proprietary nature of the Manual.  Defendant agreed to produce it if Plaintiff would agree to maintain its confidentiality and sign a Confidentiality Agreement in relating to it.

A

**Attorney for Plaintiff:**
John C. Dowling, Esquire
Rhoads & Sinon, LLP
1 South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146

**Attorney for Defendant:**
William C. Foster, Esquire
Kelly, McLaughlin & Foster, LLP
Suite 350, 620 West Germantown Pike,
Plymouth Meeting, Pa. 19462 –1056

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CRAIG M. HOWARD** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 1:CV-01-0797** |
| **v.** | : | **(Judge Yvette Kane)** |
| | : | |
| **LIBERTY LIFE ASSURANCE** | : | |
| **COMPANY OF BOSTON,** | : | |
| **LIBERTY MUTUAL GROUP** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## JOINT CASE MANAGEMENT PLAN

## I. PRINCIPAL ISSUES

     1.10    Separately for each party, please give a statement summarizing this case:

By Plaintiff:

By Defendant:

     Liberty Life Assurance Company of Boston ("Liberty Life") issued a Policy of insurance ("Policy") to Geisinger Health System "Geisinger"). This Policy was part of a Plan established by Geisinger pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"). It provided disability benefits to employees of Geisinger who met the requirements of the Policy. This Policy granted to Liberty Life the right to construe the Policy and to make determinations

regarding eligibility for benefits under it.  The Policy also provided that these determinations by Liberty Life are final.

Mr. Howard is a former employee of Milton S. Hershey Medical Center.  He made a claim for Long-Term Disability benefits. This claim was investigated and considered by Liberty Life and a determination was made that Mr. Howard was not eligible for benefits under this Policy.  An appeal was taken from this determination and the decision denying the claim was upheld.  This decision was a reasonable and proper one. It was not arbitrary or capricious and was made in accordance with the terms of the Policy and in accordance with ERISA requirements. This decision is final and any review of it is limited to a determination of whether it was arbitrary and capricious.

Plaintiff's claims for breach of contract and Bad Faith are barred and preempted by ERISA.

1.11    (Agreed as stated)


1.20    The principal factual issues that the parties agree upon are:

"And that the definition of disability is as set forth in the Policy" [replacing

Plaintiff's Complaint].

1.30    The legal issues which may require resolution in this matter are as follows:

1.    Whether the Plaintiff's common law claims are barred and preempted by ERISA?
2.    Whether the claim determinations made by Liberty Life were in accordance with the requirements of the Policy and ERISA?
3.    Whether review of the claim determinations made by Liberty Life is limited to a determination of whether that decision was arbitrary and capricious?
4.    Whether the record to be considered in reviewing the determinations made by Liberty Life is limited to those materials which were available to it at the time when its claim determinations were made?
5.    Whether Plaintiff seeks to impose obligations upon Liberty Life which exceed the requirements of  the Policy and ERISA?
6.    Whether Plaintiff has demonstrated any basis for any alleged heightened standard of review of the determinations made regarding Plaintiff's claim?

1.40    (Agreed as stated).

1.50

1.51.   None.

1.60    (Agreed as stated).

1.70

defendants intend to join:      None

1.80

defendants intend to add:      None

2.0     (Agreed as stated)

3.0     (Agreed as stated)

4.151   Disclosed by Defendant:

| Name | Title/Position |
|------|----------------|
| Edward P. Crouch, M.D. | Medical Director, Disability Products |
| Chuck Johnson | Appeal Review Consultant |
| Mark McDonald | Physical Therapist/Site Coordinator |
| Shawn R. Lesh | WorkStatrt Coordinator |
| Richard Edkins | Claims Manager |
| Felicia Boyd | Disability Case Manager |
| Debra Redfern | Nurse |

Defendant Liberty Life reserves the right to supplement this response.

4.251   Categories of documents disclosed by Defendant:

4.252   All documents which were available to the claim decision makers at the time of final denial.

4.253   Policy issued to Geisinger.

4.254   Claims File, excluding privileged information

4.351

    4.352   Liberty Life will produce to counsel for Plaintiff all documents which were available to the claim decision makers at the time of final denial, the Policy issued to Geisinger and the Claims File, excluding privileged information.

    4.402   Defendant Liberty Life contends that Plaintiff is not entitled to any damages.

5.0    Motion to Limit Discovery        Defendant      Within 30 days

6.10    By defendant:  None to date.

6.20    Defendant contends that no discovery should be taken in this case as the Court's function in determining whether a Plan Administrator or its fiduciary acted in an arbitrary and capricious manner, is limited to the Administrative Record which was before the decision-maker at the time of denial. Abnathya v. Hoffman La-Roche, Inc., 2 F.3d 40, 48 n.8 (3rd Cir. 1995); Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3rd Cir. 2000).

6.30    (Agreed as stated)

6.40    See 6.10, supra

6.50    See 6.10, supra.  If the Court denies Defendant's Motion to Limit Discovery, Liberty Life submits that the limitations prescribed by the Local Rules for the Middle District apply.

6.60    November 1, 2001

6.70    Defendant recommends:

        from plaintiff by:    2 weeks after close of discovery
        from defendant by:    2 weeks after plaintiff's report

6.80    (Agreed as stated)

7.0    (Agreed as stated)

8.0    William C. Foster, Esquire
        **KELLY, McLAUGHLIN & FOSTER, LLP**
        Suite 350, 620 West Germantown Pike,
        Plymouth Meeting, Pa. 19462 –1056
        Attorney for Defendant, Liberty Life Assurance Company of Boston

9.1    X    240 Days from the filing of the action in this court.

9.2     defendant:      February 2002

9.30    defendant:      January 2002

9.4     (Agreed as stated)

9.5     (Agreed as stated)

9.6     December 2001

10.0    (Agreed as stated)

11.0    Identification of Lead Counsel

Identify by name, address and telephone number lead counsel for each party:

> William C. Foster, Esquire
> **KELLY, McLAUGHLIN & FOSTER**
> Suite 350, 620 West Germantown Pike,
> Plymouth Meeting, Pa. 19462 –1056
>
> Attorneys for Defendant, Liberty Life Assurance Company of Boston

B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**CRAIG M. HOWARD** :
    **Plaintiff,** :
     :
    **v.** :    **CIVIL ACTION NO. 1:CV-01-797**
     :    **(Judge Kane)**
**LIBERTY LIFE ASSURANCE** :
**COMPANY OF BOSTON,** :
**LIBERTY MUTUAL GROUP** :
    **Defendant.** :

**FILED**
**HARRISBURG, PA**

OCT 0 2 2001

MARY E. D'ANDREA, CLERK
PER_____
         DEPUTY CLERK

**MEMORANDUM AND ORDER**

    Now before the Court is a dispute between the parties concerning the scope of discovery relevant to review of Defendant's decision to deny Plaintiff benefits under an ERISA-covered plan. Plaintiff seeks to depose Defendant's officers, directors, employees, and unidentified individuals to discover the nature and extent of a potential conflict of interest in Defendant's position as administrator and funder of the ERISA benefits at issue in this case. After consideration of the parties' letter briefs and its own research, the Court issues the following opinion:

    Pursuant to the US Supreme Court in Firestone Tire & Rubber Co. v. Bruch, a "heightened" standard is appropriate when reviewing benefit denials of insurance companies that pay ERISA benefits out of their own funds. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). See also, Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000). In Pinto, the Third Circuit adopted the "sliding scale" approach to review under a heightened arbitrary and capricious standard where, as here, there is such a conflict of interest. In deciding where on that "sliding scale" a case falls, and therefore how deferentially to review the

administrator's decision, the Court may "take evidence regarding the conflict of interest, and ways in which the conflict may have influenced the decision." Id., 214 F.3d at 395.  Therefore, Plaintiff is entitled to depose Defendant's officers, directors, employees, and others, and discover other evidence, relevant to "the sophistication of the parties, the information accessible to the parties, . . . the exact financial arrangement between the insurer and the company, [and] . . . the current status of the fiduciary." Id., 214 F.3d at 392.  **IT IS SO ORDERED**.

Yvette Kane
United States District Judge


Dated: October 2, 2001.

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG M. HOWARD
      Plaintiff

v.                  :      CASE NO: 1:CV-01-797

LIBERTY LIFE ASSURANCE    :      JUDGE KANE
COMPANY OF BOSTON,
LIBERTY MUTUAL GROUP,    :
           Defendant      JURY TRIAL DEMANDED

## DEFENDANT'S ANSWERS TO PLAINTIFF'S INTERROGATORIES DIRECTED TO DEFENDANT FIRST SET

TO:    Liberty Life Assurance Company of Boston
       *c/o* William C. Foster, Esquire
       Kelly, McLaughlin & Foster, LLP
       1617 J.F.K. Boulevard, Suite 1690
       Philadelphia, PA 19103

PLEASE TAKE NOTICE that you are required to answer separately, fully, in writing and under oath by a duly authorized agent or representative, these interrogatories pursuant to Rule 33 Federal Rules of Civil Procedure within thirty (30) days of the date of service. Pursuant to Rule 26(e), these interrogatories are deemed to be continuing Interrogatories. If between the time of filing your answers and the time of trial of this matter, you, or anyone acting on your behalf, learn of any further information not contained in your answers, or **if** you learn that any information set forth in your answers is or has become inaccurate or incorrect, you shall promptly file and serve supplemental answers.

# DEFINITIONS

The following definitions are applicable to these interrogatories:

"Document" means any written, handwritten, printed, typed, or other graphic matter of any kind or nature, however produced, reproduced or copied, including photographs, microfilms, phonographs, video and audio tapes, punch cards, magnetic tapes, discs, data cells, drums, and other data compilations, e-mail, and all other electronically stored data, however stored (including data files stored in/on office desktop computers/workstations, notebook/laptop computers, home computers, staff computers, palmtop devices or electronic organizers/secretaries, and network file servers/mini-computers; backup tapes including system-wide backups, disaster recovery backups, and personal or "ad hoc" backups; and other media sources including tape archives, replaced/removed drives, floppy diskettes, CD-ROMs, DDS, zip cartridges, and other portable media), photographs, microfilms, video and audio tapes, and any other data compilations from which information can be obtained.

"Identify" or "Identity" means when used in reference to -

(1)     A natural person, his or her:

      (a)     full name; and

      (b)     present or last known residence and employment address (including street name and number, city or town, and state or county);

(2)     A document:

      (a)     its description (e.g., letter, memorandum, report, etc.), title, and date;

      (b)     its subject matter;

      (c)     its author's identity;

      (d)     its addressee's identity;

      (e)     its present location; and

      (f)     its custodian's identity;

(3)     An oral communication:

      (a)     its date;

  (b)  the place where it occurred;

  (c)  its substance;

  (d)  the identity of the person who made the communication;

  (e)  the identity of each person to whom such communication was made; and

  (1)  the identity of each person who was present when such communication was made;

 (4)  A corporate entity:

  (a)  its full corporate name;

  (b)  its date and place of incorporation, if known; and

  (c)  its present address and telephone number;

 *(5)*  any other context: a description with sufficient particularity that the thing may thereafter be specified and recognized, including relevant dates and places, and the identification of relevant people, entities, and documents.

  "Incident" and/or "accident" means the occurrence that forms the basis of a cause of action or claim for relief set forth in the complaint or similar pleading.

  "Person" means a natural person, partnership, association, corporation, or government agency.

  "Plaintiff" means Craig M. Howard

  "Defendant means "Liberty Life Assurance Company of Boston" "Liberty Mutual Group".

  "Plan Administrator" means any and all employees or agents of Defendant who exercised any fact-finding or discretionary duties in relation to plaintiffs application for disability benefits.

  "Employer" means Penn State Geisinger Health System

  "Trustees" means all agents or employees of Defendant with discretionary power over any funds held by Defendant.

  Unless otherwise specifically indicated, all of the terms herein are to be given

their common, ordinary meanings.

For the purposes of these interrogatories, unless otherwise indicated, the singular includes the plural, and vice versa, and the masculine gender includes the feminine, and vice-versa.

## INSTRUCTIONS

The following instructions are applicable to these interrogatories:

(1)    Duty to answer.  The interrogatories are to be answered in writing, verified, and served upon the undersigned within 30 days of their service on you. Objections must be signed by the attorney making them; In your answers, you must furnish such information as is available to you, your employees, representatives, agents, and attorneys. Your answers must be supplemented and amended as required by the Pennsylvania Rules of Civil Procedure.

(2)    Claim of privilege.  With respect to any claim of privilege or immunity from discovery, you must identify the privilege or immunity asserted and provide sufficient information to substantiate the claim.

(3)    Option to produce documents.  In lieu of identifying documents in response to these interrogatories, you may provide copies of such documents with appropriate references to the corresponding interrogatories.

## GENERAL OBJECTIONS

Liberty Life objects to Plaintiff's Definitions and Instructions to the extent that they request assume the truth of the matters asserted therein, request information which exceed the requirements or are beyond the scope of discovery pursuant to the Federal Rules of Civil Procedure.  Without waiving these objections, Answering Defendant answers Plaintiff's Interrogatories as follows:

## INTERROGATORIES

1.    Please state the name, position, and business address of the person answering these interrogatories.

## ANSWER

Paula McGee

Counsel for Liberty Life also had involvement in the preparation of the responses to these Interrogatories.

2.      Does Defendant have any written procedure or protocol governing the handling of

disability claims?

**ANSWER**

Liberty Life is in possession of a claims procedure Manual. It objects to the request that it produce that Manual as the information contained in it is confidential. It will agree to produce a copy of this Manual if Plaintiff will agree to maintain its confidentiality and Plaintiff will agree to a Protective Order relating to it.

3.      Whether any interview of Plaintiffs employer was conducted and if so, the areas of inquiry and with whom the interview was held?

**ANSWER**

All communications between representatives of Liberty Life and representatives of The Milton S. Hershey Medical Center are described in the documents which have been provided to counsel for Plaintiff.

4.      Please state the name and position of the individual, if any, who was given the primary responsibility of evaluating Craig Howard's application for disability.

**ANSWER**

The meaning of the term "primary responsibility" as used in this Interrogatory is not clear. All individuals who participated in the consideration of this application are identified in the documents which have been provided to counsel for Plaintiff.

5.      Please state the names and positions of all individual employees or agents of Defendant who reviewed the application or recommended any action upon the application.

**ANSWER**

All such individuals are identified in the documents which have been provided to counsel for Plaintiff.

6.    Please identify each and every medical report considered in the process of evaluating the application. Please state for each such report:

   (a)    the date of the report;
   (b)    the name, position or title, and address of the person who provided the report;
   (c)    the diagnosis stated in the report;
   (d)    the prognosis stated in the report.

**ANSWER**

   (a)-(d)    Copies of all medical reports considered in evaluating this application are included among the documents which have been provided to counsel for Plaintiff.


7.    Please identify each and every report other than a medical report (for example, without limitations, the reports of rehabilitation services or any similar service) considered in the process of evaluating the application. Please state for each such report:

   (a)    the date of the report;
   (b)    the name and address of the person or service who provided each report;
   (c)    if not provided in answer to (b), above, the name and title of the individual who actually signed the report;
   (d)    the conclusion stated in each report.

**ANSWER**

   (a)-(d)    Copies of all such reports are included among the documents which have been provided to counsel for Plaintiff.

8.    Please identify any other reports or opinions, received or discovered in any manner that the Defendant relied upon in evaluation of Craig M. Howard's claim. If there are any such reports or opinions, please provide as to each:

   (a)    the date of the report or opinion;
   (b)    the name and address of the person or service who provided the report or opinion;
   (c)    if not provided in answer to (b), above, the name and title of the individual who actually signed the report or opinion;
   (d)    if the report or opinion was not received in writing, the manner in which it was received;
   (e)    the conclusion stated in each report.

**ANSWER:**

        (a)-(d)   Copies of all such reports or other documents considered are included among the documents which have been provided to counsel for Plaintiff.

    9.      Please state any facts, other than those stated in answer to the preceding interrogatories, that in any way contributed to the determination that Craig M. Howard was not eligible to receive permanent and total disability benefits.

**ANSWER:**

        Objected to as improper and argumentative.   The basis for the determination in this case is set forth in the documents which have been provided to counsel for Plaintiff.

    10.     Please state the date on which Craig M. Howard was notified by the Defendant that his application had been denied.

**ANSWER**

        This information is set forth in the documents which have been provided to counsel for Plaintiff.

    11.     Please state the reason(s) why the application was denied and identify each and every document that was used as a basis for that decision. Please provide specific reference to the pertinent Plan provisions on which the denial was based.

**ANSWER**

        This information is set forth in the documents which have been provided to counsel for Plaintiff.

    12.     If Defendant contends that Craig M. Howard is capable of performing an occupation for substantial remuneration, please identify with particularity said occupation(s) and the basis upon which you contend he can perform said occupation(s).

**ANSWER**

        This information is set forth in the documents which have been provided to counsel for Plaintiff.

13.   Please set forth in detail in what manner Plaintiff has not fully complied with the terms of the policy to receive benefits as averred in ¶ 11 of Defendant's Answer to Plaintiffs Amended Complaint.

**ANSWER:**

Plaintiff is not entitled to disability benefits under the Policy as he does not meet the definition of disability set forth in the Policy.

14.   Please set forth in detail what provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERJSA") bar, control and limit the Plaintiffs claim as set forth in Defendant's First Affirmative Defense.

**ANSWER:**

The Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA") bars any claim which Plaintiff may be asserting under state law.

15.   Please set forth in detail the substantial evidence alleged in the Third Affirmative Defense that Defendant's actions were not arbitrary, capricious or an abuse of discretion.

**ANSWER**

This information is set forth in the documents which have been provided to counsel for Plaintiff.

16.   Please set in detail what written notice of denial was supplied to the Plaintiff, giving the date and the source.

**ANSWER:**

This information is set forth in the documents which have been provided to counsel for Plaintiff.

17.   Please set forth in detail the underwriting criteria and what information was utilized in underwriting the insurance contract with Penn State Geisinger, Plan No. GF3-810-252761-01.

**ANSWER**

Objected to in that this Interrogatory seeks information that is not admissible or reasonably calculated to lead to the discovery of admissible evidence.

18.    Please identify the annual premium for the years 1998, each such year: 1999 and 2000 and for each such year:

    (a)    Explain the premium was calculated;
    (b)    What was the number of employees covered under the Plan;
    (c)    Was the premium a fixed rate or was the policy experience rated;
    (d)    Did the employer terminate the policy as a result of the Defendant's refusal to pay the Howard claim?

**ANSWER:**

    (a) – (d)  Objected to in that this Interrogatory seeks information that is not admissible or reasonably calculated to lead to the discovery of admissible evidence.

19.    Please set forth the number of similar Plans Defendant had in effect for the years 1998, 1999 and 2000, including the names of the respective employers.

**ANSWER:**

    Objected to in that this Interrogatory seeks information that is not admissible or reasonably calculated to lead to the discovery of admissible evidence.

20.    Detail the exact financial arrangements between Defendant and Penn State Geisinger Health System.

**ANSWER:**

    Premiums are paid on the basis of covered payroll for those employees eligible for coverage under the disability benefit plan. Premiums are remitted to Liberty Life on a monthly basis and are determined by the number of eligible employees multiplied by the premium rate.

21.    What was the loss ratio for the years 1998, 1999 and 2000 and what effect did this have on the annual premium?

**ANSWER**

    Objected to in that this Interrogatory seeks information that is not admissible or reasonably calculated to lead to the discovery of admissible evidence.

22.    Please set forth the net profits and the loss resulting from Defendant's contact with Penn State Geisinger Health System during the years 1998, 1999 and 2000.

**ANSWER**

Objected to in that this Interrogatory seeks information that is not admissible or reasonably calculated to lead to the discovery of admissible evidence.

23.    What reserve was established on Plaintiffs claim, on what date, and in what amount?

**ANSWER:**

Objected to in that this Interrogatory seeks information that is not admissible or reasonably calculated to lead to the discovery of admissible evidence.

24.    List the names, addresses and titles of Defendant's officers, directors, and employees who participated in anyway in soliciting, underwriting and supervising Defendant's contract with Penn State Geisinger Health System.

**ANSWER:**

The main underwriter on this file was Maureen Riley, Manager - Group Underwriting in Liberty Life's Dover, New Hampshire office.  The sales representatives were Jim Sullivan, now an Executive Group Disability Sales Consultant in Liberty Life's Weston, Massachusetts office and Mark Merritt, now an Executve Group disabiilty Sales Consultant in Liberty Life's Indianapolis, Indiana office.

25. For the years 1998, 1999 and 2000, give the number of disability claims made by Penn State Geisinger Health System employees against Defendant. Please state:

(a) What number of claims was accepted;
(b) What number of claims was rejected.

**ANSWER**

(a)-(b)  Objected to in that this Interrogatory seeks information that is not admissible or reasonably  calculated to lead to the discovery of admissible evidence.

KELLY, McLAUGHLIN & FOSTER

By: _____
William C. Foster, Esquire
Identification No. 03511
Steven L. Chung, Esquire
Identification No. 78834
Attorneys for Defendant
Liberty Life Assurance Company
of Boston

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

CRAIG M. HOWARD
                    Plaintiff

v.                                    :          CASE NO: 1:CV-01-797

LIBERTY LIFE ASSURANCE        :          JUDGE KANE
COMPANY OF BOSTON,
LIBERTY MUTUAL GROUP,         :
                    Defendant            JURY TRIAL DEMANDED


**CERTIFICATE OF SERVICE**


I, William C. Foster, Esquire, hereby certify that a true and correct copy of the

foregoing Answers to Plaintiffs Interrogatories Directed to Defendant - First Set was served this

17th day of December, 2001, via Facsimile and United States Mail, First Class, postage pre-paid,

upon the following individual:


John C. Dowling, Esquire
**Rhoads & Sinon LLP**
One South Market Square, 12th Floor
P. O. Box 1146
Harrisburg, PA  17108-1146


Kelly, McLaughlin & Foster, LLP


By:_____
William C. Foster, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG M. HOWARD          :
     Plaintiff,           :
               :
    v.              :          CIVIL ACTION NO. 1:CV-01-797
               :          (Judge Kane)
LIBERTY LIFE ASSURANCE    :
COMPANY OF BOSTON,        :                              **FILED**
LIBERTY MUTUAL GROUP      :                              **HARRISBURG**
     Defendant.           :
                                 MAR - 6 2002

                                    MARY E. D'ANDREA, CLERK
        **MEMORANDUM AND ORDER**      Per_____
                                          DEPUTY CLERK

     Now before the Court is a dispute between the parties concerning the scope of discovery

relevant to review of Defendant's decision to deny Plaintiff benefits under an ERISA-covered

plan.  This is not the parties' first discovery dispute.  In July, 2001, the parties disputed the extent

of discovery allowable into the relationship between insurer and administrator.  This Court

issued its ruling in a Memorandum and Order of October 2, 2001.  In that Order, the Court ruled

that Plaintiff is entitled to depose Defendant's officers, directors, employees, and others, and

discover other evidence, relevant to "the sophistication of the parties, the information accessible

to the parties, . . . the exact financial arrangement between the insurer and the company, [and] . . .

the current status of the fiduciary."  October 2, 2001 Order at 1 (quoting Pinto v. Reliance

Standard Life Ins. Co., 214 F.3d 377, 395 (3d Cir. 2000)).

     Following that Order, Plaintiff issued Interrogatories to Defendant, which now objects to

some of them as being not reasonably calculated to lead to the discovery of admissible evidence.

A telephone conference was held with the parties on January 3, 2002, and, with the Court's

permission, the parties submitted letter briefs.  Neither party captioned their brief as either a

motion to compel or motion for protective order.  However, the nature of the dispute and

positions of the parties have been made clear by the parties' letter briefs.  This Order follows.

Defendant resists disclosure of the materials requested by Plaintiff on the grounds that they exceed the scope of discovery authorized in this case, and do not relate to "the sophistication of the parties, the information accessible to the parties, . . . the exact financial arrangement between the insurer and the company, [and] . . . the current status of the fiduciary." As noted in the cases cited by the parties, where a conflict of interest is alleged a relevant inquiry is whether an insured's profits are affected by a claims decisions.  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000); Ayers v. Maple Press Co. and Affiliated Co., 168 F.Supp 2d 349 (M.D. Pa., 2001).  Two of Plaintiff's inquiries relate to this relationship and they are proper.  Plaintiff may inquire into the "bases on which the premium was calculated" and "[t]he reserve established on Plaintiff's claim."  (Plaintiff's Letter Brief, p. 3, ¶2 and ¶5) Plaintiff's remaining inquiries exceed the scope of this Court's Order permitting discovery and Plaintiff has failed to demonstrate that the information sought is reasonably calculated to lead to disclosure of relevant information.  Accordingly, Defendant may properly decline to respond to Plaintiff's request for information regarding "the negotiations leading up to the contract between Liberty Life and Penn State Geisinger," "[t]he number of similar plans," and "[t]he loss ratio for the years immediately preceeding and the year of the instant claim, as well as the profits and losses resulting."  (Plaintiff's Letter Brief, p. 3, ¶1, ¶3 and ¶4).

**IT IS SO ORDERED.**

Yvette Kane
United States District Judge

Dated: March 6, 2002

2

# KELLY, MCLAUGHLIN, FOSTER,

## BRACAGLIA, DALY, TRABUCCO & WHITE, LLP

ATTORNEYS AT LAW

1617 JFK BOULEVARD

SUITE 1690

PHILADELPHIA, PA 19103-1815

620 W. GERMANTOWN PIKE
SUITE 350
PLYMOUTH MEETING, PA 19462-1056
TELEPHONE (610) 941-7900
FAX: (610) 941-8133

TELEPHONE (215) 790-7900

FAX (215) 985-0675

900 HADDON AVENUE
SUITE 332
COLLINGSWOOD, NJ 08108-1903
TELEPHONE: (856) 869-3100
FAX: (856) 854-4233

WILLIAM C. FOSTER
ADMITTED IN PA & NJ

WFOSTER@LINKKMF.COM
215-790-7930

OUR FILE: LIBH17307

March 21, 2002

**VIA FACSIMILE**

John C. Dowling, Esquire
Rhoads & Simon, LLP
1 South Market Square
P.O. Box 1146
Harrisburg, PA  17108-1146

**Re:  Craig M. Howard v. Liberty Life Assurance Company of Boston**

Dear Mr. Dowling:

In response to the Court's Order, we hereby supplement our answers to Plaintiffs Interrogatories:

1.      We are providing the following additional information in addition to our original answer to Interrogatory number (23): The full reserve on this claim is $90,973.  The actuarial protocol is to hold a reserve at 50% of the full reserve value for a litigation claim, and the Company is therefore currently holding at 50% of the above figure.

2.      There is no specific Interrogatory which discusses the bases of premiums charged. Interrogatory number (20) asked us to detail the exact financial arrangement between Liberty Life and the Geisinger Health System.  We responded that premiums are paid on the basis of covered payroll for those employees eligible for coverage under the Disability Benefit Plan.  We also explained that premiums are remitted to Liberty Life on a monthly basis and are determined by the number of eligible employees multiplied by the premium rate. We hereby supplement that answer by providing the following information:  The Geisinger LTD plan is experience -rated.

John C. Dowling, Esquire
March 21, 2002
Page 2


We are obtaining further information regarding the amount of premiums paid and retrospective adjustments, if any. We will provide that information to you as soon as we receive it.


Very truly yours,

**Kelly, McLaughlin, Foster,**
**Bracaglia, Daly, Trabucco & White, LLP**


William C. Foster


WCF/ss
Enclosure

## KELLY, MCLAUGHLIN, FOSTER,

## BRACAGLIA, DALY, TRABUCCO & WHITE, LLP

ATTORNEYS AT LAW
1617 JFK BOULEVARD
SUITE 1690
PHILADELPHIA, PA 19103-1815

———

TELEPHONE (215) 790-7900
FAX (215) 985-0675

620 W. GERMANTOWN PIKE
SUITE 350
PLYMOUTH MEETING, PA 19462-1056
TELEPHONE (610) 941-7900
FAX: (610) 941-8133

900 HADDON AVENUE
SUITE 332
COLLINGSWOOD, NJ 08108-1903
TELEPHONE: (856) 869-3100
FAX: (856) 854-4233

WILLIAM C. FOSTER
ADMITTED IN PA & NJ

WFOSTER@LINKKMF.COM
215-790-7930

OUR FILE: LIBH17307

April 22, 2002

John C. Dowling, Esquire
Rhoads & Simon, LLP
1 South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146

Re:   **Craig M. Howard v. Liberty Life Assurance Company of Boston**

Dear John:

By letter of March 21, 2002, we supplemented our Answers to Plaintiff's Interrogatories in this matter. By that letter we also advised you that we would provide further information regarding the amount of premiums paid. That information is as follows:

The following premiums were paid for the designated years.

**1998 - $279,834.00**

**1999 - $685,387.00**

**2000 - $561,015.00**

There were no retrospective adjustments to these premiums.

Very truly yours,

**Kelly, McLaughlin, Foster,
Bracaglia, Daly, Trabucco & White, LLP**

William C. Foster

WCF/ss



# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG M. HOWARD                          :
        Plaintiff                          :
                        :
         v.                          : CASE NO: 1:CV-01-797
                        :
LIBERTY LIFE ASSURANCE                   : JUDGE KANE
COMPANY OF BOSTON,                       :
LIBERTY MUTUAL GROUP,                    :
        Defendant                         : JURY TRIAL DEMANDED
. . . . . . . . . . . . . . . . . . . . . . . . . . . . :

## ORDER

     AND NOW, this _____ day of _____, 200__, it is

hereby ORDERED that the Unopposed Motion to Amend Scheduling Order is

hereby GRANTED. It is further ORDERED that all fact discovery shall be

completed by February 25, 2002 and all dispositive motions along with supporting

briefs shall be filed by April 15, 2002.


                       BY THE COURT:


                       _____
                       HONORABLE YVETTE KANE

**FILED**
**HARRISBURG**

DEC 2 1 2001

MARY E. D'ANDREA, CLERK
Per _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRAIG M. HOWARD | : |
| Plaintiff | : |
| | : |
| v. | : CASE NO: 1:CV-01-797 |
| | : |
| LIBERTY LIFE ASSURANCE | : JUDGE KANE |
| COMPANY OF BOSTON, | : |
| LIBERTY MUTUAL GROUP, | : |
| Defendant | : JURY TRIAL DEMANDED |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

## UNOPPOSED MOTION TO AMEND SCHEDULING ORDER

Plaintiff, Craig M. Howard, ("Plaintiff") and Defendant, Liberty Life Assurance Company of Boston, Liberty Mutual Group, ("Defendant"), hereby request this Court to amend its Scheduling Order, dated September 28, 2001, to extend fact discovery until February 25, 2002 and to extend the time for filing dispositive motions until April 15, 2002. In support of such Motion, Plaintiff states as follows:

413160.1

Case 1:01-cv-00797-YK    Document 34    Filed 07/08/2002    Page 37 of 119

WHEREFORE, Plaintiff and Defendant respectfully request this Court grant the within Motion to Amend Scheduling Order.

Respectfully submitted,

RHOADS & SINON LLP

By: _____
John C. Dowling
Attorney I.D. No. 07058
One South Market Square
P. O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731

Attorneys for
Plaintiff

- 4 -

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG M. HOWARD                  :
      Plaintiff           :
                    :
                    :
       v.                        : CASE NO: 1:CV-01-797
                    :
LIBERTY LIFE ASSURANCE          : JUDGE KANE
COMPANY OF BOSTON,              :
LIBERTY MUTUAL GROUP,           :
      Defendant           : JURY TRIAL DEMANDED
.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. : .

## CERTIFICATE OF CONCURRENCE

      Pursuant to Local Rule 601.1, the undersigned hereby certifies that he spoke with William C. Foster, Esquire, counsel for Defendant on or about December 21, 2001 and was advised that the Defendant concurred in the foregoing Unopposed Motion to Amend Scheduling Order.

                             RHOADS & SINON LLP

                    BY: _____
                             John C. Dowling
                             Attorney I.D. No. 07058
                             One South Market Square
                             P. O. Box 1146
                             Harrisburg, PA 17108-1146
                             (717) 233-5731
                             Attorneys for Plaintiff

413181.1

# KELLY, McLAUGHLIN, FOSTER

## BRACAGLIA, DALY, TRABUCCO & WHITE, LLP

ATTORNEYS AT LAW

1617 JFK BOULEVARD

SUITE 1690

PHILADELPHIA, PENNSYLVANIA 19103-1815

———————

TELEPHONE (215) 790-7900

FAX (215) 985-0675

SUITE 350
620 W. GERMANTOWN PIKE
PLYMOUTH MEETING, PA 19462-1056
TELEPHONE (610) 941-7900
FAX: (610) 941-8133

SUITE 332
900 HADDON AVENUE
COLLINGSWOOD, NJ 08108-1903
TELEPHONE: (856) 869-3100
FAX: (856) 854-4233

OUR FILE: LIBH17307

WILLIAM C. FOSTER
(215) 790-7930
E-MAIL:
WFOSTER@LINKKMF.COM

ADMITTED IN PA, NJ

February 22, 2002

**VIA FACSIMILE**

John C. Dowling, Esquire
Rhoads & Sinon, LLP
1 South Market Square
P.O. Box 1146
Harrisburg, PA  17108-1146

   Re: **Craig M. Howard v. Liberty Life Assurance Company of Boston**

Dear Mr. Dowling:

   We are in receipt of your letter of February 13, 2002.  This letter was received by us on Friday, February 15, 2002.

   In this letter, you had requested the depositions of four individuals.  Would you please advise us of the nature of the testimony you are seeking from these individuals.  We are asking that you do this to be certain that you are seeking information which falls within the scope of the Court's Discovery Order.

   We also wish to advise you that none of these individuals are located in Pennsylvania. Some of them are in New Hampshire and one of them is in North Carolina.  If these depositions proceed, it will be necessary that they be taken in the jurisdictions where the witnesses reside.

John C. Dowling, Esquire
February 22, 2002
Page 2


We are determining the availability of these witnesses during the next thirty days.

 Would you please contact us at your earliest convenience to allow us to discuss the matters set forth in this letter.


    Very truly yours,

    **Kelly, McLaughlin, Foster**
    **Bracaglia, Daly, Trabucco & White, LLP**


    William C. Foster

WCF/mrf

# RHOADS & SINON LLP

ROBERT H. LONG, JR.[2]
SHERILL T. MOYER
JAN P. PADEN
RICHARD B. WOOD
LAWRENCE B. ABRAMS III[2]
J. BRUCE WALTER
JOHN P. MANBECK
FRANK J. LEBER
PAUL A. LUNDEEN
JACK F. HURLEY, JR.
DAVID B. DOWLING
DAVID F. O'LEARY
DAVID O. TWADDELL
CHARLES J. FERRY
STANLEY A. SMITH
JENS H. DAMGAARD[2]
DRAKE D. NICHOLAS
THOMAS A. FRENCH
DEAN H. DUSINBERRE
DONNA M.J. CLARK
CHARLES E. GUTSHALL
PAUL F. WESSELL
SHAWN D. LOCHINGER

JAMES H. CAWLEY
DEAN F. PIERMATTEI
KENNETH L. JOEL[1]
DEBRA M. KRIETE
TODD J. SHILL
DAVID M. BARASCH
LORI J. McELROY
THOMAS J. NEHILLA
KEVIN M. GOLD
CARL D. LUNDBLAD
JAMES E. ELLISON
RICHARD E. ARTELL
ROBERT J. TRIBECK
TIMOTHY J. NIEMAN
PAUL J. BRUDER, JR.[4]
JOANNE BOOK CHRISTINE
AMY J. MENDELSOHN[2]
MICHAEL W. WINFIELD[3]
KATHRYN G. SOPHY[1]
STEPHANIE E. DIVITTORE
KATHLEEN D. BRUDER[4,5]
CHRISTYLEE L. PECK
JOHN M. COLES

1 ALSO ADMITTED TO THE DISTRICT OF COLUMBIA BAR
2 ALSO ADMITTED TO THE FLORIDA BAR
3 ALSO ADMITTED TO THE MARYLAND BAR
4 ALSO ADMITTED TO THE NEW JERSEY BAR
5 ALSO ADMITTED TO THE NEW YORK BAR

ATTORNEYS AT LAW
TWELFTH FLOOR
ONE SOUTH MARKET SQUARE
P.O. BOX 1146
HARRISBURG, PA 17108-1146

TELEPHONE (717) 233-5731

FAX (717) 231-6637

WEBSITE: www.rhoads-sinon.com

OF COUNSEL
HENRY W. RHOADS
JOHN C. DOWLING

RETIRED
FRANK A. SINON

PAUL H. RHOADS
1907-1984
JOHN M. MUSSELMAN
1919-1980
CLYLE R. HENDERSHOT
1922-1980

DIRECT DIAL NO.
(717) 237-6700

FILE NO.
7583/01

March 13, 2002

Re:    **Craig M. Howard v. Liberty Life Assurance Company of Boston**

William C. Foster, Esquire
Kelly, McLaughlin & Foster, LLP
1617 J.F.K. Boulevard, Suite 1690
Philadelphia, PA 19103

Dear Mr. Foster:

In accordance with Judge Kane's Memorandum and Order of March 6, 2002, I assume you will be shortly supplying answers to interrogatories, nos. 18 and 23. You previously indicated you would supply the claims procedure manual requested in interrogatory no. 2, and I previously told you I would treat it as confidential and return it to you when litigation is concluded.

As to the depositions requested in my letter of February 13, 2002, the matters to be inquired into would be in accordance with Judge Kane's Order of October 2, *i.e.* "the sophistication of the parties, the information accessible to the parties,…the exact financial arrangement between the insurer and the company, [and]…the current status of the fiduciary", as well as her Order of March 6, stating the Plaintiff's area of inquiry into the "bases on which the premium was calculated", and "[t]he reserve established on Plaintiff's claim".

While I do not now the exact address of these parties, I assume they are Defendant's employees and/or officers. The action is within the Middle District of Pennsylvania, and I would expect that their depositions would be taken in the area of the Court's jurisdiction. To convenience you, I am willing to have the depositions taken in your office in Philadelphia.

It may be that much of the information sought can be obtained by Stipulation of Facts or Admissions. If you are interested in this alternative, please let me know and perhaps we can try to work something out.

422966.1

YORK:
TELEPHONE (717) 843-1718, FAX (717) 232-1459

AFFILIATED OFFICE:
STE. 203, 1700 S. DIXIE HWY, BOCA RATON, FL 33432
TELEPHONE (561) 395-5595, FAX (561) 395-5997

LANCASTER:
TELEPHONE (717) 397-4431, FAX (717) 232-1459

# RHOADS & SINON LLP

March 13, 2002
Page 2

Please let me hear from you promptly.

Very truly yours,

RHOADS & SINON LLP

By: _John C. Dowling_

John C. Dowling

JCD/clz

# RHOADS & SINON LLP

ROBERT H. LONG, JR.[2]
SHERILL T. MOYER
JAN P. PADEN
RICHARD B. WOOD
LAWRENCE B. ABRAMS III[2]
J. BRUCE WALTER
JOHN P. MANBECK
FRANK J. LEBER
PAUL A. LUNDEEN
JACK F. HURLEY, JR.
DAVID B. DOWLING
DAVID F. O'LEARY
DAVID O. TWADDELL
CHARLES J. FERRY
STANLEY A. SMITH
JENS H. DAMGAARD[2]
DRAKE D. NICHOLAS
THOMAS A. FRENCH
DEAN H. DUSINBERRE
DONNA M.J. CLARK
CHARLES E. GUTSHALL
PAUL F. WESSELL
SHAWN D. LOCHINGER

JAMES H. CAWLEY
DEAN F. PIERMATTEI
KENNETH L. JOEL[1]
DEBRA M. KRIETE
TODD J. SHILL
DAVID M. BARASCH
LORI J. McELROY
THOMAS J. NEHILLA
KEVIN M. GOLD
CARL D. LUNDBLAD
JAMES E. ELLISON
RICHARD E. ARTELL
ROBERT J. TRIBECK
TIMOTHY J. NIEMAN
PAUL J. BRUDER, JR.[4]
JOANNE BOOK CHRISTINE
AMY J. MENDELSOHN[2]
MICHAEL W. WINFIELD[3]
KATHRYN G. SOPHY[1]
STEPHANIE E. DIVITTORE
KATHLEEN D. BRUDER[4,5]
CHRISTYLEE L. PECK
JOHN M. COLES

1 ALSO ADMITTED TO THE DISTRICT OF COLUMBIA BAR
2 ALSO ADMITTED TO THE FLORIDA BAR
3 ALSO ADMITTED TO THE MARYLAND BAR
4 ALSO ADMITTED TO THE NEW JERSEY BAR
5 ALSO ADMITTED TO THE NEW YORK BAR

ATTORNEYS AT LAW
TWELFTH FLOOR
ONE SOUTH MARKET SQUARE
P.O. BOX 1146
HARRISBURG, PA 17108-1146

TELEPHONE (717) 233-5731

FAX (717) 231-6637

WEBSITE: www.rhoads-sinon.com

March 27, 2002

OF COUNSEL
HENRY W. RHOADS
JOHN C. DOWLING

RETIRED
FRANK A. SINON

PAUL H. RHOADS
1907-1980
JOHN M. MUSSELMAN
1919-1980
CLYLE R. HENDERSHOT
1922-1980

DIRECT DIAL NO.
(717) 237-6700

FILE NO.
7583/01

---

Re:    **Craig M. Howard v. Liberty Life Assurance Company of Boston**

William C. Foster, Esquire
Kelly, McLaughlin & Foster, LLP
1617 J.F.K. Boulevard, Suite 1690
Philadelphia, PA 19103

Dear Mr. Foster:

I am enclosing Second Set of Interrogatories which I believe are fully sanctioned by Judge Kane's discovery Orders. The pivotal procedural issue is, of course, the effect of denying Plaintiff's claim on the profit earned by Liberty Life in connection with its policy with The Geisinger Health System. I believe these Interrogatories will produce that answer.

Once this procedure hurdle is overcome, I think we can agree on a Stipulation of Facts without the need of written Interrogatories or regular discovery depositions. In that connection please advise me the addresses of the four persons whom we indicated we wish to depose in our letter of February 13, 2002, namely Maureen Riley, Chuck Johnson, Felicia Boyd and Dr. Edward P. Crouch.

I note from your letter of March 21, 2002, that you will furnish further information regarding the amount of premium paid and the retrospective adjustment.

424859.1

YORK:
TELEPHONE (717) 843-1718, FAX (717) 232-1459

AFFILIATED OFFICE:
STE. 203, 1700 S. DIXIE HWY., BOCA RATON, FL 33432
TELEPHONE (561) 395-5595, FAX (561) 395-9497

LANCASTER:
TELEPHONE (717) 397-4431, FAX (717) 232-1459

# Rhoads & Sinon LLP

March 27, 2002
Page 2


    I also assume you will shortly be forwarding us your claims procedure manual, which we will treat in confidence as noted in previous correspondence. We look forward to receiving this additional information as soon as possible.

                    Very truly yours,

                    RHOADS & SINON LLP

                    By:                John C. Dowling

JCD/clz

Enclosure

# RHOADS & SINON LLP

ROBERT H. LONG, JR.[2]
SHERILL T. MOYER
JAN P. PADEN
RICHARD B. WOOD
LAWRENCE B. ABRAMS III[2]
J. BRUCE WALTER
JOHN P. MANBECK
FRANK J. LEBER
PAUL A. LUNDEEN
JACK F. HURLEY, JR.
DAVID B. DOWLING
DAVID F. O'LEARY
DAVID O. TWADDELL
CHARLES J. FERRY
STANLEY A. SMITH
JENS H. DAMGAARD[2]
DRAKE D. NICHOLAS
THOMAS A. FRENCH
DEAN H. DUSINBERRE
DONNA M.J. CLARK
CHARLES E. GUTSHALL
PAUL F. WESSELL
SHAWN D. LOCHINGER

JAMES H. CAWLEY
DEAN F. PIERMATTEI
KENNETH L. JOEL[1]
DEBRA M. KRIETE
TODD J. SHILL
DAVID M. BARASCH
LORI J. McELROY
THOMAS J. NEHILLA
KEVIN M. GOLD
CARL D. LUNDBLAD
JAMES E. ELLISON
RICHARD E. ARTELL
ROBERT J. TRIBECK
TIMOTHY J. NIEMAN
PAUL J. BRUDER, JR.[4]
JOANNE BOOK CHRISTINE
AMY J. MENDELSOHN[1]
MICHAEL W. WINFIELD[3]
KATHRYN G. SOPHY[1]
STEPHANIE E. DIVITTORE
KATHLEEN D. BRUDER[4,5]
CHRISTYLEE L. PECK
JOHN M. COLES

1 ALSO ADMITTED TO THE DISTRICT OF COLUMBIA BAR
2 ALSO ADMITTED TO THE FLORIDA BAR
3 ALSO ADMITTED TO THE MARYLAND BAR
4 ALSO ADMITTED TO THE NEW JERSEY BAR
5 ALSO ADMITTED TO THE NEW YORK BAR

ATTORNEYS AT LAW
TWELFTH FLOOR
ONE SOUTH MARKET SQUARE
P.O. BOX 1146
HARRISBURG, PA 17108-1146

TELEPHONE (717) 233-5731

FAX (717) 231-6637

WEBSITE: www.rhoads-sinon.com

OF COUNSEL
HENRY W. RHOADS
JOHN C. DOWLING

RETIRED
FRANK A. SINON

PAUL H. RHOADS
1907-1984
JOHN M. MUSSELMAN
1919-1980
CLYLE R. HENDERSHOT
1922-1980

DIRECT DIAL NO.
(717) 237-6700

FILE NO.
7583/01

May 8, 2002

Re:    Craig M. Howard v. Liberty Life Assurance Company of Boston

William C. Foster, Esquire
Kelly, McLaughlin & Foster, LLP
1617 J.F.K. Boulevard, Suite 1690
Philadelphia, PA 19103

Dear Mr. Foster:

In response to your letter of May 3, 2002:

1.    You have not fully responded to Interrogatory No. 1 (Second Set).  Please give me the address and position of Ms. McGee.

2.    I do not understand your objection to Interrogatory No. 2, as this goes directly to the sophistication of the parties, an inquiry authorized by Judge Kane's Orders of October 2, 2001 and March 6, 2002.

3.    I do not understand what is not clear about Interrogatory No. 3.  Please explain. Perhaps the deposition of Ms. McGee will assist in this response.

4.    What is the rate guarantee mentioned in your response to Interrogatory No. 4? Again depositions will probably assist in answering this.

5.    I know of no requirement which requires that we advise the nature of the testimony requested at depositions.  The inquiries will, of course, be in accordance with Judge Kane's Orders, or, I am sure, objections will be made.

6.    As regards the claim manual, you agreed to produce the manual, not what you consider the "relevant portions".  We agreed in our letters of February 13, 2002; March 13, 2002; and March 27, 2002 to respect its confidentiality.  If you have a form for this, please send it along with the manual, and we will, of course, execute it.

429746.1

YORK:
TELEPHONE (717) 843-1718, FAX (717) 232-1459

AFFILIATED OFFICE
STE. 203, 1700 S. DIXIE HWY, BOCA RATON, FL 33432
TELEPHONE (561) 395-5595, FAX (561) 395-9497

LANCASTER:
TELEPHONE (717) 397-4431, FAX (717) 232-1459

## RHOADS & SINON LLP

May 8, 2002
Page 2

7.   As to the procedure for arriving at a Stipulation of Facts, we could send to each other proposed drafts or as seems more feasible, prepare a draft in conference. I am willing to come to your Philadelphia office to carry this out.

Very truly yours,

RHOADS & SINON LLP

By:

John C. Dowling

JCD/clz

# G R O U P

## *B e n e f i t s*

# P L A N

### Geisinger Health System
### Your Group Long Term Disability Plan



LIBERTY
MUTUAL.



## CERTIFICATE OF COVERAGE

Liberty Life Assurance Company of Boston (hereinafter referred to as "we", "our" and "us") welcomes you employer as a client.

**Sponsor:** Geisinger Health System

**Plan Number:** GF3-810-252761-01

**Effective Date:** August 1, 1998

When this plan refers to "you" or "your" it means the Employee insured under this plan. This is your Disability Income certificate of coverage as long as you are eligible for insurance and remain insured.

A few words about this certificate of coverage...

It is written in plain English. A few terms and provisions are written as required by insurance law. A few terms and provisions, please **PLEASE READ IT CAREFULLY.** If you have any questions about any terms and provisions, please contact the Insurance Administrator at your work location or write to us. We will assist you in any way we can to help you understand your benefits.

Also, if the terms of your certificate of coverage and the policy differ, the policy will govern. Your coverage may be terminated or modified in whole or in part under the terms and provisions of the policy.

_[signature]_

**Executive Vice President**

DOC3

-1-

## TABLE OF CONTENTS

SECTION 1 .......... SCHEDULE OF BENEFITS

SECTION 2 .......... TERMS YOU SHOULD KNOW

SECTION 3 .......... ELIGIBILITY AND
EFFECTIVE DATES

SECTION 4 .......... DISABILITY INCOME
BENEFITS

SECTION 5 .......... EXCLUSIONS

SECTION 6 .......... TERMINATION PROVISIONS

SECTION 7 .......... GENERAL PROVISIONS

DOC3-TOC-0001

- 2 -

---

## SECTION 1 - SCHEDULE OF BENEFITS

**ELIGIBLE CLASSES FOR INSURANCE BENEFITS:**
(Employees working a minimum of 30 regularly scheduled hours per
week who are defined as eligible)

**Who Is Eligible For Long Term Disability Benefits?:**

All Active Full-Time Employees, except Administrative Staff
Employees and Regular, Full-Time Technical-Service Employees
represented by the Teamsters, who are in Active Employment are
eligible for a 24 Month Own Occupation Benefit.

**ELIGIBILITY WAITING PERIOD:**

| | | |
|---|---|---|
| 1. | Present Employees: | None |
| 2. | New Employees: | None |

**EMPLOYEE CONTRIBUTIONS REQUIRED:**

Plan 1 and 2:    Employees may elect to contribute to the cost of the
plan

Plan 3:    Employees and the Sponsor share in the cost of the
plan

**LONG TERM DISABILITY COVERAGE**

**Your Elimination Period:**    180 days

**Your Amount Of Insurance Benefits:**

Plan 1:    50% (Benefit Percentage) of Basic Monthly Earnings not to
exceed a Maximum Monthly Benefit of $15,000.

Plan 2:    60% (Benefit Percentage) of Basic Monthly Earnings not to
exceed a Maximum Monthly Benefit of $15,000.

Plan 3:    66 2/3% (Benefit Percentage) of Basic Monthly Earnings
not to exceed a Maximum Monthly Benefit of $15,000.

Less your Benefits from Other Income as outlined in Section 4

DOC3-SCH-0001

- 3 -

## SECTION 1 - SCHEDULE OF BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

**Your Minimum Monthly Benefit:**

The Minimum Monthly Benefit is $100 or 10% of your gross Monthly Benefit, whichever is greater.

**Your Maximum Benefit Period:**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | To age 65 (but not less than 5 years) |
| 60 | 60 Months |
| 61 | 48 Months |
| 62 | 42 Months |
| 63 | 36 Months |
| 64 | 30 Months |
| 65 | 24 Months |
| 66 | 21 Months |
| 67 | 18 Months |
| 68 | 15 Months |
| 69 and over | 12 Months |

## SECTION 2 - TERMS YOU SHOULD KNOW

In this section we define some basic terms needed to understand this plan.

**"Active Employment"** means you must be actively at work for the Sponsor:

1. on a full-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

   a. at the Sponsor's usual place of business; or
   b. at a location to which the Sponsor's business requires you to travel.

You will be considered actively at work if you are actually at work on the day immediately preceding:

1. a weekend (except where one or both of these days are scheduled days of work);

2. holidays (except when such holiday is a scheduled work day);

3. paid vacations;

4. any non-scheduled work day;

5. an excused leave of absence (except medical leave for your own disabling condition and lay-off); and

6. an emergency leave of absence (except emergency medical leave for your own disabling condition).

**"Administrative Office"** means Liberty Life Assurance Company of Boston, 100 Liberty Way, Dover, New Hampshire 03820.

**"Annual Enrollment Period"** or **"Enrollment Period"** means the period before each policy anniversary so designated by the Sponsor and us during which you may enroll for coverage under this plan.

**"Application"** is the document completed by you when applying for coverage, it is attached to and is made a part of the policy.

## SECTION 2 - TERMS YOU SHOULD KNOW
### (Continued)

"Appropriate Available Treatment" means care or services which are (a) accessible within your geographical region; (b) covered expenses under your health plan or other form of funding, insured or uninsured; and, (c) provided by a Physician whose specialty is especially suitable for the management of an Injury or Sickness (as determined by the American Medical Association, or other nationally recognized medical boards).

"Basic Monthly Earnings" or "Pre-Disability Earnings" means the greater of (a) your current monthly rate of earnings from your Sponsor in effect immediately prior to the date Disability or Partial Disability begins; or (b) your prior calendar year earnings plus incentive compensation from your Sponsor averaged over the lesser of (a) the 12 month period prior to the date Disability begins; or (b) the period of employment. However, such earnings will not include bonuses, commissions, overtime pay and extra compensation other than incentive compensation.

"Consumer Price Index" means the CPI-W, a government publication for wage earners and clerical workers provided monthly by the U.S. Department of Labor, or its successor approved by the Insurance Commissioner or in the event of no successor a similar index of comparable purpose chosen by us and approved by the Insurance Commissioner.

"Determined Functional Capacity" means periodic evaluation(s) of your ability to function on the job in order to determine if you are fully functioning up to your current physical or mental capacity.

"Disability" or "Disabled" means:

i.   if you are eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability you are unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness; and

## SECTION 2 - TERMS YOU SHOULD KNOW
### (Continued)

"Disability" or "Disabled" (Continued)

ii.   After 24 months of benefits have been paid, you are unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

"Disability Benefits," when used with the term Retirement Plan, means money which:

1.   is payable under a Retirement Plan due to Disability as defined in that plan; and

2.   does not reduce the amount of money which would have been paid as Retirement Benefits at the normal retirement age under the plan if your Disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this plan.)

"Eligibility Date" means the date you become eligible for insurance under this plan. Eligible Classes are shown in the Schedule of Benefits.

"Eligibility Waiting Period" as shown in the Schedule of Benefits means the continuous length of time you must serve in an eligible class to reach your Eligibility Date.

"Elimination Period" means a period of consecutive days of Disability for which no benefit is payable. Your Elimination Period is shown in the Schedule of Benefits and begins on the first day of your Disability.

If you return to work for any 30 or less days during the Elimination Period and cannot continue, we will count only those days you are Disabled to satisfy the Elimination Period.

"Employee" means you or any other person in Active Employment with the Sponsor.

DOC3-DEF-0003 (Cont.)

## SECTION 2 - TERMS YOU SHOULD KNOW
### (Continued)

"Evidence of Insurability" means a statement or proof of your medical history upon which acceptance for insurance will be determined by us.

"Family Status Change" means any one of the following events that may occur:

1. your marriage or divorce;
2. the birth of a child to you
3. the adoption of a child by you;
4. the death of your spouse or child;
5. the commencement or termination of employment of your spouse;
6. the change from part-time employment to full-time employment by you or your spouse;
7. the change from full-time employment to part-time employment by you or your spouse;
8. the taking of unpaid leave of absence by you or your spouse.

"Gross Monthly Benefit" means your Monthly Benefit before any reduction for your Benefits from Other Income and earnings.

"Indexed Pre-Disability Earnings" means your Basic Monthly Earnings in effect just prior to the date your Disability or Partial Disability began adjusted on the first anniversary of benefit payments and each anniversary thereafter.

"Initial Enrollment Period" means one of the following periods during which you may first enroll for coverage under this policy:

1. If you are eligible for insurance on the policy effective date, a period before the policy effective date set by the Sponsor and us.

2. if you become eligible for insurance after the policy effective date, the period which ends 31 days after your eligibility date.

- 8 -

DOC3-DEF-0005

## SECTION 2 - TERMS YOU SHOULD KNOW
### (Continued)

"Injury" means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this policy (a) any Disability which begins more than 60 days after an Injury will be considered a Sickness; and (b) any Injury which occurs before you are covered under this policy, but which accounts for a medical condition that arises while you are covered under this policy will be treated as a Sickness.

"Material and Substantial Duties" means responsibilities that are normally required to perform your Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

"Medically Necessary" means that a service or supply is: (a) required for the treatment or management of an Injury or Sickness; (b) commonly and customarily recognized by Physicians as appropriate in the treatment or management of the Injury or Sickness (as determined by the American Medical Association, or other nationally recognized medical boards); (c) other than educational or experimental; and (d) not primarily for the comfort or convenience of the Physician or you.

"Non-Verifiable Symptoms" means your subjective complaints to a Physician which cannot be verified using tests, procedures or clinical examinations typically accepted in the practice of medicine. Such symptoms include, but are not limited to, dizziness, fatigue, headaches, loss of energy, numbness, pain, ringing in the ear, and stiffness.

"Own Occupation" means your occupation that you were performing when your Disability began. For the purpose of determining Disability under this policy, we will consider your occupation as it is normally performed in the national economy. Work Tasks performed for a specific employer or at a specific location will not be used to determine Disability.

"Part-time" with respect to Partial Disability, means your ability to perform the Material and Substantial Duties of your Own Occupation or any other occupation and earn between 20% and 80% of your Pre-Disability Earnings.

- 9 -

## SECTION 2 - TERMS YOU SHOULD KNOW
(Continued)

"**Physician**" or "**Attending Physician**" or "**Doctor**" means a person who (1) is licensed to practice medicine, to prescribe and administer drugs, and to treat patients and perform surgery; or (2) is a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the state where the policy is delivered, and practicing within the terms of his license.

It does not include you or your spouse, daughter, son, father, mother, sister or brother.

"**Pre-Disability Earnings**" - See definition of Basic Monthly Earnings.

"**Proof**" means the evidence in support of a claim for benefits and includes, but is not limited to: (a) a claim form completed and signed (or otherwise formally submitted) by you when claiming benefits; (b) an Attending Physician's statement completed and signed (or otherwise formally submitted) by your Attending Physician; and (c) provision by your Attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence that may be required by us in support of your claim for benefits.

"**Regular Attendance**" means your personal visits to your Attending Physician which are medically necessary according to generally accepted medical standards to effectively manage and treat your Disability or Partial Disability. The care and treatment must (1) be provided under the direction of a Physician whose specialty or experience is the most appropriate for your condition and (2) conform with generally accepted medical standards.

"**Retirement Benefit**", when used with the term Retirement Plan, means money which:

1.  is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

## SECTION 2 - TERMS YOU SHOULD KNOW
(Continued)

"**Retirement Benefit**" (Continued)

2.  does not represent contributions made by you (payments which represent your contributions are deemed to be received over your expected remaining life regardless of when such payments are actually received); and

3.  is payable upon:

    a.  early or normal retirement; or
    b.  Disability, if the payment does reduce the amount of money which would have been paid under the plan at the normal retirement age.

"**Retirement Plan**" means a plan which provides Retirement Benefits to you and which is not funded wholly by your contributions. The term shall not include: a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, stock ownership plan, 401k plan, TSA 403(b) plan or a non-qualified plan of deferred compensation.

"**Schedule of Benefits**" means the section of this plan which shows, among other things, the Eligible Classes, the Eligibility Waiting Period, your Elimination Period, your Amount of Insurance, the Minimum Benefit, and your Maximum Benefit Period.

"**Sickness**" means illness, disease, pregnancy or complications of pregnancy.

"**Sponsor**" means the entity to whom the policy is issued.

"**Sponsor's Retirement Plan**" is deemed to include any Retirement Plan:

1.  which is part of any Federal, State, Municipal or Association retirement system; or

2.  for which you are eligible as a result of employment with the Sponsor.

## SECTION 2 - TERMS YOU SHOULD KNOW
### (Continued)

"Monthly Benefit" means the amount payable by us to you if you are Disabled or Partially Disabled. Benefits for Long Term Disability coverage are determined on a monthly basis.

DOC3-DEF-0005 (Cont.)

- 12 -

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES

### Who Is Eligible For Coverage?

You are Eligible for Coverage if you are in Active Employment and in an Eligible Class for Insurance Benefits shown in the Schedule of Benefits.

### Your Eligibility Date For Insurance Benefits

If you are in an eligible class you will qualify for insurance on the later of:

1. this plan's Effective Date; or
2. the day after you complete the Eligibility Waiting Period shown in the Schedule of Benefits.

### Enrollment

You may enroll in or change coverage only during an Initial or Annual Enrollment Period or because of a Family Status Change as follows:

1. **Initial Enrollment Period**

   During the Initial Enrollment Period you may enroll in any one coverage or coverage option shown in the Schedule of Benefits. If you do not choose any coverage or coverage option, you will automatically be enrolled in Plan 2. If your Initial Enrollment Period takes place during or after the Annual Enrollment Period, but before the policy anniversary, your coverage option will apply for (a) the rest of the policy year in which you first become eligible; and (b) the next policy year.

2. **Annual Enrollment Period**

   During each Annual Enrollment Period, you may make any one of the following changes in coverage for the next policy year:

   a. a decrease in coverage;
   b. an increase in coverage by one or more levels subject to evidence of insurability; or

DOC3-ELG-0006.02

- 13 -

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

Enrollment (Continued)

2. **Annual Enrollment Period (Continued)**

   c. keep your coverage at the same level.

   If you fail to enroll for a change in your coverage option during any Annual Enrollment Period, you will continue to be insured for the same coverage option during the next policy year and no change in that coverage can be made during the next policy year, unless you experience a Family Status Change.

3. **Family Status Change**

   When you experience a Family Status Change, you may enroll for coverage within 31 days of the date of the Family Status Change. When you experience a Family Status Change, you may:

   a. decrease your coverage;

   b. increase your coverage by one or more levels subject to evidence of insurability; or

   c. keep your coverage at the same level.

   You must apply for the change in coverage within 31 days of the date of the Family Status Change. Such changes in coverage must be on account of or consistent with the reason that the change in coverage was permitted. A change in coverage is consistent with a Family Status Change only if it is necessary or appropriate as the result of the Family Status Change.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

Your Effective Date Of Insurance

1. Your insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if your written Application for insurance is:

   a. made with us through your Sponsor; and

   b. on a form satisfactory to us.

2. For Coverage Applied For During Initial Enrollment Periods:

   You will become insured for non-contributory insurance on your eligibility date. You will become insured for any other contributory coverage on the later of these dates:

   a. your eligibility date if you enroll before that date; or

   b. the date you enroll if you do it on or before the 31st day after your date of eligibility.

   If you do not enroll for any contributory coverage on or before the 31st day after your eligibility date you will automatically be enrolled in Plan 2

3. For Contributory Coverage Applied For During Annual Enrollment Periods, you will be insured for the selected contributory coverage on the later of these dates:

   a. on the first day of the next policy anniversary; or

   b. on the date Liberty gives its approval if you must submit Evidence of Insurability, at your expense, due to:

      i. an increase in your coverage option; or
      ii. you terminated your insurance while continuing to be eligible.

DOC3-ELG-0008 (Cont.)

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES (Continued)

**Your Effective Date of Insurance (Continued)**

4. **For Coverage Applied For Due To A Family Status Change**

   You will become insured for the selected coverage on the later of the following dates, provided you enroll or apply for the change in coverage before the 31st day following the Family Status Change:

   a. the date of the Family Status Change; or
   b. the date you enroll or apply for the change in coverage; or
   c. the date Liberty gives its approval if you must submit Evidence of Insurability, at your expense, due to:

      i.   an increase in your coverage option; or
      ii.  you terminated your insurance while continuing to be eligible.

5. **Delayed Effective Date for Insurance** - The Effective Date of any initial, increased or additional insurance for you will be delayed if you are not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will start on the date you return to Active Employment.

- 16 -

DOC3-ELG-0009

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES (Continued)

**Family Medical Leave**

Your coverage may be continued under this plan, subject to the required premium payment, during any period that you are not in Active employment because of a Family Medical Leave. Coverage will be provided at the same benefit levels in effect on the day immediately prior to the day your leave begins. Any change in the plan's benefit levels that may occur while you are on Family Medical Leave will apply.

**What Happens If You Are Retired?**

If you are a former Employee and are re-hired by the Sponsor within 12 months of your termination date, all past periods of Active Employment with the Sponsor will be used in determining your Eligibility Date. If you are re-hired by the Sponsor more than 12 months after your termination date, you will be considered a new Employee when determining your Eligibility Date.

- 17 -

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**What Happens If There Is A Transfer Of Insurance Carriers?**

In order to prevent loss of coverage for you because of a transfer of insurance carriers, this plan will provide coverage for you as follows:

**What Happens If You Are Not In Active Employment Due To Injury Or Sickness?**

This plan will cover you, subject to premium payments, if you were:

1. insured by the prior carrier at the time of transfer; and

2. not In Active Employment due to Injury or Sickness on the Effective Date of the plan.

The benefit payable will be in accordance with the provisions of this plan, less any benefit for which the prior carrier is liable. However, in no event will the benefit payable be greater than that which would have been paid under the prior carrier's benefit schedule.

**What Happens If You Are Disabled Due To A Pre-Existing Condition?**

If there is a Pre-Existing Condition Exclusion, a benefit may be payable for a Disability due to a Pre-Existing Condition if you:

1. were insured by the prior carrier at the time of transfer; and

2. were in Active Employment and insured under this plan on its Effective Date.

The benefit will be determined as follows:

1. We will apply this plan's pre-existing condition exclusion. If you qualify for a benefit, you will be paid according to this plan's benefit schedule.

DOC3-ELG-0004

- 18 -

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**What Happens If You Are Disabled Due To A Pre-Existing Condition? (Continued)**

The benefit will be determined as follows: (Continued)

2. If you cannot satisfy this plan's pre-existing condition exclusion, the prior carrier's pre-existing condition exclusion will be applied.

a. If you satisfy the prior carrier's pre-existing condition exclusion, giving consideration towards continuous time insured under both policies, you will be paid according to this plan's benefit schedule. However, in no event will the benefit payable be greater than that which would have been paid under the prior carrier's benefit schedule.

b. If you cannot satisfy the pre-existing condition exclusion of this plan or that of the prior carrier, no benefit will be paid.

DOC3-ELG-0004 (Cont.)

- 19 -

## SECTION 4 - DISABILITY INCOME BENEFITS

### LONG TERM DISABILITY COVERAGE

**Disability Benefit**

**When Is Your Disability Benefit Payable?**

When we receive proof that you are Disabled due to Injury or Sickness and require the regular attendance of a Physician, we will pay you a Monthly Benefit after the end of your Elimination Period. The benefit will be paid for the period of your Disability if you give to us proof of continued:

1. Disability; and
2. regular attendance of a Physician.

The proof must be given upon our request and at your expense. For the purpose of determining Disability, the Injury must occur and your Disability must begin while you are insured for this coverage. In addition, a loss of a license for any reason does not, in itself, constitute Disability.

Your Monthly Benefit will not:

1. exceed your Amount of Insurance; nor
2. be paid for longer than your Maximum Benefit Period.

Your Amount of Insurance and your Maximum Benefit Period are shown in the Schedule of Benefits.

DOC3-LTD-0001.03

- 20 -

## SECTION 4 - DISABILITY INCOME BENEFITS

### LONG TERM DISABILITY COVERAGE (Continued)

**Disability Benefit** (Continued)

**How Is Your Amount Of Disability Monthly Benefit Figured?**

To figure your amount of Monthly Benefit:

1. Multiply your Basic Monthly Earnings by the Benefit Percentage shown in the Schedule of Benefits.

2. Take the lesser of:

a. the amount figured in step (1) above; or
b. the Maximum Monthly Benefit shown in the Schedule of Benefits; and then

3. Deduct your Benefits from Other Income, (shown in the Benefits from Other Income provision of this coverage), from this amount.

The Disability Benefit payable will never be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. The Minimum Monthly Benefit will not be paid if the total of the Minimum Monthly Benefit and benefits you receive under Workers' Compensation and/or wage loss replacement benefits under the Pennsylvania Motor Vehicle Responsibility Law equals or exceeds 100% of your Pre-Disability Earnings.

DOC3-LTD-0001.03 (Cont.)

- 21 -

SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Quick Recovery Program (Plus)

**When Are Benefits Payable Under Our Quick Recovery Program (Plus)?**

When proof is received that you are Partially Disabled and have experienced a loss of earnings because of an Injury or Sickness, you may be eligible to receive a Loss of Earnings Monthly Benefit under our Quick Recovery Program (Plus).

To be eligible to receive such benefits, you may be employed in your own occupation or another occupation and:

1. must satisfy the Elimination Period; and

2. must be earning 20% or more of your Pre-Disability Earnings.

If you are earning less than 20% of your Pre-Disability Earnings, the Disability Benefit will be paid, and all other benefit provisions and terms applicable to Disability will apply as stated in this coverage.

For the purposes of this provision, you may satisfy your Elimination Period if you are Disabled or Partially Disabled, or a combination of Disabled or Partially Disabled, during such time.

A Monthly Benefit will be paid for the period of Partial Disability if proof is given to us upon request and at your expense of continued:

1. Partial Disability; and

2. regular attendance of a Physician.

SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Quick Recovery Program (Plus) (Continued)

For the purpose of determining Partial Disability, the Injury must occur and your Partial Disability must begin while you are insured for this coverage. In addition, a loss of a license for any reason does not, in itself, constitute Partial Disability.

"Partial Disability" or "Partially Disabled" means as a result of the Injury or Sickness, you are:

1. able to perform one or more, but not all, of the material and substantial duties of your own or any other occupation on an Active Employment or a part-time basis; or

2. able to perform all of the material and substantial duties of your own or any other occupation on a part-time basis.

The Amount of Loss of Earnings Monthly Benefit payable under our Quick Recovery Program (Plus) is described on the following page.

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

### LONG TERM DISABILITY INCOME COVERAGE (Continued)

**How Is Your Amount Of Loss Of Earnings Monthly Benefit Figured?**

If you are eligible for benefits under the Quick Recovery Program (Plus), during the first 12 months, we will pay a Work Incentive Benefit.

The Work Incentive Benefit will be an amount equal to your Pre-Disability Earnings multiplied by the Benefit Percentage shown in the Schedule of Benefits, without any reductions from earnings.

The Work Incentive Benefit will only be reduced, if the Monthly Benefit payable plus any earnings you receive exceed 100% of your Pre-Disability Earnings. If the combined total is more, the Monthly Benefit will be reduced by the excess amount so that the Monthly Benefit plus your earnings does not exceed 100% of your Pre-Disability Earnings.

Thereafter, to figure your Amount of Monthly Benefit the formula (A divided by B) X C will be used:

A = Your Pre-Disability Earnings minus your Basic Monthly Earnings received while you are Partially Disabled.

B = Your Pre-Disability Earnings.

C = Your Monthly Benefit as figured in the Disability provision of this coverage, (but, not including adjustments under the Cost of Living Adjustment Benefit, if included).

DOC3-LTD-0010.03

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

### LONG TERM DISABILITY INCOME COVERAGE (Continued)

On the first anniversary of benefit payments and each anniversary thereafter, for the purpose of calculating the benefit, the term "Pre-Disability Earnings" is:

1. replaced by "Indexed Pre-Disability Earnings"; and

2. increased annually by 7%, or the current annual percentage increase in the Consumer Price Index, whichever is less.

The Monthly Benefit payable will never be less than the Minimum Monthly Benefit shown in the Schedule of Benefits.

The Minimum Monthly Benefit will not be paid if the total of the Minimum Monthly Benefit and benefits the Covered Person receives under Workers' Compensation and /or wage loss replacement benefits under the Pennsylvania Motor Vehicle Responsibility Law equal or exceeds 100% of the Covered Person's Pre-Disability Earnings.

DOC3-LTD-0010.03 (Cont.)

SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

LONG TERM DISABILITY COVERAGE (Continued)

Mental Illness and Alcohol or Drug Abuse Limitation

The Benefit for Disability due to Mental Illness and Alcohol or Drug Abuse will not exceed 24 months of Monthly Benefit payments unless you meet one of these situations.

1.  You are in a Hospital or Institution for Mental Illness and Alcohol or Drug Abuse at the end of the 24 month period. The Monthly Benefit will be paid during the confinement.

    If you are still Disabled when you are discharged, the Monthly Benefit will be paid for a recovery period up to 90 days.

    If you become reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

2.  You are not confined in a Hospital or Institution for Mental Illness and Alcohol or Drug Abuse, but are fully participating in an Extended Treatment Plan for the condition that caused Disability. The Monthly Benefit will be payable to you for up to 36 months from the date of Disability.

    In no event will the Monthly Benefit be payable beyond the Maximum Benefit Period, shown in the Schedule of Benefits.

    "Extended Treatment Plan" means continued care that is consistent with the American Psychiatric Association's standard principles of treatment, and is in lieu of Hospital or Institutional confinement. It must be approved in writing by a Physician.

DOC3-LTD-0028.01

- 26 -

SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

LONG TERM DISABILITY COVERAGE (Continued)

Mental Illness and Alcohol or Drug Abuse Limitation (Continued)

"Hospital" or "Institution" means a facility licensed to provide care and Treatment for the condition causing the Covered Person's Disability.

"Mental Illness" means mental, nervous or emotional diseases or disorders whose diagnoses are outlined in the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition) by the American Psychiatric Association, and for which objective clinical evidence supporting the diagnosis is provided by the Physician. It does not include those diagnoses which are documented and recognized by the American Psychiatric Association to have an organic cause, specifically, diagnoses caused by the change in structure of an organ, which cannot be corrected through an appropriate treatment program or regime.

"Alcohol or Drug Abuse" means psychological or physiological disabilities or disorders resulting either directly or indirectly from alcohol or drug abuse, addiction or dependency.

DOC3-LTD-0028.01 (Cont)

- 27 -

# SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Benefits From Other Income

**What Are Your Benefits From Other Income?**

Your Benefits from Other Income means those benefits shown below:

1. The amount for which you are eligible under:

   a. Pennsylvania's Motor Vehicle Financial Responsibility Law;

   b. Workers' or Workmen's Compensation Law;

   c. occupational disease law;

   d. any compulsory benefit act or law; or

   e. any other act or law of like intent.

2. The amount of any disability benefits which you are eligible to receive under:

   a. any other group insurance plan of the Sponsor;

   b. any governmental retirement system as a result of your job with the Sponsor.

   c. any individual insurance plan. However, we will only offset with such plans if (i) your Monthly Benefit under this policy plus (ii) any benefits that you are eligible to receive under such individual insurance plan exceed 100% of your Pre-Disability Earnings. If the sum of (i) and (ii) exceeds 100% of your Pre-Disability Earnings, your Monthly Benefit under this policy will be reduced by such excess amount.

# SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Benefits From Other Income (Continued)

3. The amount of benefits you receive under the Sponsor's Retirement Plan as follows: (a) The amount of any Disability Benefits, or Retirement Benefits you voluntarily elect to receive as retirement payment under the Sponsor's Retirement Plan; and (b) the amount you are eligible to receive as retirement payments when you reach the later of age 62, or normal retirement age as defined in the Sponsor's plan.

4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, for which:

   a. you receive or are eligible for; and

   b. your spouse, child or children receive or are eligible for because of your Disability; or

   c. your spouse, child or children receive or are eligible for because of your eligibility for Retirement Benefits.

These Benefits from Other Income, except Retirement Benefits, must be payable as a result of the same Disability for which we pay a benefit.

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### What Happens If You Receive Any Cost Of Living Increases?

After the first deduction for each of your Benefits from Other Income, your Monthly Benefit will not be further reduced due to any cost of living increases payable under the Benefits from Other Income provision of this coverage. This provision does not apply to increases received from any form of employment.

### What Happens If You Receive A Lump Sum Payment?

If you receive Benefits from Other Income which are paid in a lump sum, they will be prorated on a monthly basis over the time period for which the sum is given or the Maximum Benefit Period, whichever is less.

### What Happens If Your Benefit Period Is Less Than A Month?

For any period which a Long Term Disability Benefit is payable that does not extend through a full month, the benefit will be paid on a prorated basis. The rate will be 1/30th per day for such period of Disability.

### How Can Your Benefit Period Be Extended?

Your Maximum Benefit Period is shown in the Schedule of Benefits. However, the benefit will be extended beyond the end of your Maximum Benefit Period if you attain the age specified in the benefit duration while Disabled and have not received 12 Monthly Benefit payments. In this event, the benefit period will be extended during the continuance of your Disability until 12 monthly payments have been paid.

DOC3-LTD-0014

---

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### When Will Your Long Term Disability Benefits Be Discontinued?

Your Monthly Benefit will cease on the earliest of:

1. the date you are no longer Disabled; or

2. the date you die; or

3. the end of your Maximum Benefit Period; or

4. the date your current earnings exceed 80% of your Indexed Pre-Disability Earnings; or

5. Because your current earnings may fluctuate, we may average your earnings over three (3) consecutive months rather than immediately terminating your benefit once 80% of your Indexed Pre-Disability Earnings have been reached.

6. the date you refuse Appropriate Available Treatment or advice which we determine to be Medically Necessary; or

7. the date we determine you are not personally visiting a Physician as frequently as is Medically Necessary, according to standard medical practice, to effectively manage and treat the condition(s) that caused Disability or Partial Disability; or

8. The date we determine you are not receiving Appropriate Available Treatment of your disabling condition(s) by a Physician whose specialty or experience is appropriate for the condition(s) that caused your Disability or Partial Disability; or

9. the date you refuse to undergo a medical evaluation, including a psychological or psychiatric referral evaluation as required by us; or

DOC3-LTD-0014/0027

## SECTION 4 - DISABILITY INCOME BENEFITS (Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**When Will Your Long Term Disability Benefits Be Discontinued? (Continued)**

9. the date you or your Physician do not provide us with required medical Proof which supports physical or mental impairment that is demonstrated by clinical and laboratory evidence; or

10. the date you fail to provide Proof regarding your eligibility for benefits, including information regarding eligibility for, or receipt of, other Income while you are Disabled or Partially Disabled; or

11. 6 months from the date your Disability or Partial Disability Benefits begin if your Disability or Partial Disability is primarily based on Non-Verifiable Symptoms; or

12. the date you refuse a job with the employer for which you are or could become reasonably fitted by training, education, experience, age and physical and mental capacity. Any job where worksite modifications were made to allow you to perform the material and substantial duties of the job is included in this requirement.

13. the date we determine you are not working at your Determined Functional Capacity; or

14. the date you fail to comply with a prescribed Appropriate Available Treatment plan.

## SECTION 4 - DISABILITY INCOME BENEFITS (Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**Successive Periods of Disability**

**What Happens If You Return To Work And Become Disabled Again?**

If you return to work and become Disabled again, you may qualify for Successive Periods of Disability. With respect to this coverage, "Successive Periods of Disability" means a Disability which is due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.

A Successive Period of Disability will be treated as part of your prior Disability if, after receiving Disability Benefits under this coverage, you:

1. return to your own occupation on an Active Employment basis for less than 6 continuous months; and

2. perform all the material and substantial duties of your own occupation.

To qualify for a Successive Periods of Disability Benefit, you must experience more than a 20% loss of your Pre-Disability Earnings.

Benefit payments will be subject to the terms of this coverage for your prior Disability.

If you return to your own occupation on an Active Employment basis for 6 continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. You must complete another Elimination Period.

If you become eligible for coverage under any other group Long Term Disability coverage, this Successive Period of Disability provision will cease to apply to you.

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Three Month Survivor Benefit

**What Happens To Your Benefit If You Die?**

We will pay a lump sum benefit to your Eligible Survivor when proof is received that you died:

1. after your Disability had continued for 180 or more consecutive days; and
2. while receiving a Monthly Benefit.

The lump sum benefit will be an amount equal to three times your Last Monthly Benefit.

If an overpayment is due Liberty at the time of your death, the benefit payable under this provision will be applied toward satisfying the overpayment.

"Eligible Survivor" means your spouse, if living, otherwise your children under age 25.

If payment becomes due to your children, payment will be made in equal shares to:

1. the children; or
2. the children's guardian on their behalf, or as the courts may otherwise direct; if the child is a minor or is physically or mentally incapable of giving a valid release for payment. This payment will be valid and effective against all claims by others representing or claiming to represent the children.

If there is no eligible survivor, no benefits are payable under this provision.

"Last Monthly Benefit" means the net Monthly Benefit paid to you immediately prior to your death without any reduction for earnings received from employment.

DOC3-LTD-0016.22

- 34 -

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Minimum Indemnity For Accidental Dismemberment And Loss Of Sight

**When Is Your Minimum Indemnity Benefit For Accidental Dismemberment And Loss Of Sight Payable?**

If Injury results in any of the losses listed in the Schedule below, the Disability Monthly Benefit will be paid to you for the number of monthly payments shown in this Schedule.

The loss must:

1. result from an Injury caused by an accident which occurred while you were insured for this benefit;
2. result from that Injury directly and independently of all other causes; and
3. occur within 100 days after the accident.

If you die before all of these payments have been made, the balance remaining at the time of your death will be paid to your estate.

### SCHEDULE

| For loss of | Minimum Number of Monthly Payments |
| --- | --- |
| Sight of Both Eyes | 46 |
| Both Hands | 46 |
| Both Feet | 46 |
| One Hand and One Foot | 46 |
| One Hand and Sight of One Eye | 46 |
| One Foot and Sight of One Eye | 46 |
| One Hand or One Foot | 46 |
| Sight of One Eye | 23 |
| Thumb and Index Finger of Either Hand | 15 |
| | 12 |

DOC3-LTD-0023

- 35 -

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

**LONG TERM DISABILITY COVERAGE (Continued)**

**Minimum Indemnity For Accidental Dismemberment And Loss Of Sight (Continued)**

The maximum number of monthly payments payable to you for all losses suffered in any one accident shall be limited to that one loss for which the greatest number of monthly payments is provided in the Schedule.

Loss of hands and feet means loss by severance at or above the wrist or ankle joint. Loss of sight means total and irrecoverable loss of sight. Loss of thumb and index finger means actual severance at or above the knuckles joining each to the hand. A benefit may be payable for a period in excess of the number of months indicated in the Schedule provided that you are Disabled.

DOC3-LTD-0023 (Cont.)

-36-

## SECTION 5 - EXCLUSIONS

**GENERAL EXCLUSIONS**

**What Disabilities Are Not Covered?**

This plan will not cover any Disability due to:

1. war, declared or undeclared or any act of war;

2. Intentionally self-inflicted injuries, while sane or insane;

3. active Participation in a Riot;

4. your committing of or the attempting to commit an indictable offense.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in defense of the person of the insured, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and firemen.

With respect to this provision, **Riot** shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together with a common intent, and damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

DOC3-EXC-0001.03

-37-

## SECTION 5 - EXCLUSIONS
(Continued)

### LONG TERM DISABILITY COVERAGE

**Pre-Existing Condition Exclusion**

**What Happens If Your Disability Results From A Pre-Existing Condition?**

This plan will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from a Pre-Existing Condition; and

2. which begins in the first 12 months after your Effective Date.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which you are diagnosed or received Treatment within three months prior to your Effective Date.

**"Treatment"** means consultation, care or services provided by a Physician including diagnostic measures and taking prescribed drugs and medicines.

## SECTION 6 - TERMINATION PROVISIONS

**When Will Your Insurance End?**

You will cease to be insured on the earliest of the following dates:

1. the date this plan terminates, but without prejudice to any claim originating prior to the time of termination;
2. the date you are no longer in an eligible class;
3. the date your class is no longer included for insurance;
4. the last day for which your required contribution has been made;
5. the date your employment terminates. Cessation of Active Employment will be deemed termination of employment, except the insurance will be continued for you if you were absent due to Disability during:
   a. your Elimination Period; and
   b. the period during which premium is being waived.
6. the date you cease active work due to a labor dispute, including any strike, work slowdown, or lockout.

We reserve the right to review and terminate all classes insured under this plan if any class(es) cease(s) to be covered.

**What Happens During Lay-off Or Leave Of Absence?**

The Sponsor may continue your coverage(s) by paying the required premiums, if you are:

1. temporarily laid off; or
2. given leave of absence.

Your coverage will not continue beyond the end of the plan month in which the lay-off or leave of absence begins. In continuing such coverage under this provision, the Sponsor agrees to treat all covered Employees equally.

**Note:** See "Section 3 - Eligibility and Effective Dates" for continuation of coverage due to a Family Medical Leave

## SECTION 6 - TERMINATION PROVISIONS
### (Continued)

**Long Term Disability Coverage - Conversion Privilege**

When your employment terminates with the Sponsor and you are no longer insured under this Policy, you may be eligible to convert and become insured under our group disability conversion policy with us without submitting Evidence of Insurability.

**How Will You Become Eligible For Group Disability Conversion?**

To be eligible to purchase group disability conversion insurance, you must:

1. have been insured under this plan for 12 consecutive months immediately prior to termination of your employment. The time insured under this plan as well as the one it replaced, if any, will be considered in determining your eligibility to convert to our group disability conversion policy; and

2. apply for the disability conversion coverage and submit the first quarterly premium to us within 31 days after termination of coverage under this plan due to termination of your employment.

**What Benefits Will Be Available Under The Group Disability Conversion Policy?**

If you are eligible 'to convert to our group disability conversion policy, we will determine the disability benefits and amount of disability coverage you will be eligible to receive in accordance with our established underwriting guidelines. The disability benefits and amount of disability coverage may not be the same as you were eligible to receive under this plan.

## SECTION 6 - TERMINATION PROVISIONS
### (Continued)

**Under What Circumstances May You Not Exercise the Conversion Privilege?**

You may not exercise this Conversion Privilege if:

1. your coverage under this plan ceases for any of the following reasons:

   a. this plan terminates;

   b. this plan is amended to exclude from coverage the class of employees to which you belong;

   c. you no longer belong to a class of employees eligible for coverage under this plan;

   d. you retire (when you receive payment from any employer's retirement plan as recognition of past services or have concluded your working career);

   e. you fail to pay any required premiums;

2. you are or become insured for long term disability coverage under another group plan within 31 days after termination of employment;

3. you are disabled under the terms of this plan;

4. you recover from a disability and do not return to work for the Sponsor;

5. you are not in active employment due to a mental or physical Sickness or Injury; or

6. you are on a Leave of Absence.

## SECTION 7 - GENERAL PROVISIONS

### How Will Statements Made In Your Application Affect Your Coverage?

In the absence of fraud, all statements made in any signed Application are considered representations and not warranties (absolute guarantees). No representation by:

1. the Sponsor in applying for this plan will make it void unless the representation is contained in the signed Application; or

2. you in applying for insurance under this plan will be used to reduce or deny a claim unless a copy of the Application for insurance, signed by you, is or has been given to you.

### Who Has The Authority For Interpretation Of This Plan?

We shall possess the authority, in our sole discretion, to construe the terms of this plan and to determine benefit eligibility hereunder. Our decisions regarding construction of the terms of this plan and benefit eligibility shall be conclusive and binding.

### What Happens If Your Age Is Misstated?

If your age has been misstated, an equitable adjustment will be made in the premium. If the amount of the benefit is dependent upon your age, the amount of the benefit will be the amount you would have been entitled to if your correct age were known.

### Who Will Pay Premiums During A Period For Which Benefits Are Payable?

Your Premium payments are waived during any period for which benefits are payable. If coverage is to be continued, premium payments may be resumed following a period during which they were waived.

A refund of premium will not be made for a period more than twelve months before the date we are advised of the error.

DOC3-GNP-0001

- 42 -

## SECTION 7 - GENERAL PROVISIONS
(Continued)

### When Can This Plan Be Contested?

The validity of this plan shall not be contested, except for non-payment of premiums, after it has been in force for three years from the date of issue. The validity of this plan shall not be contested on the basis of a statement made relating to insurability by you after such insurance has been in force for three years during your lifetime, and shall not be contested unless the statement is contained in a written instrument signed by you.

### What Happens When There Are Canadian Residents Covered?

If you are domiciled in Canada: (a) premium and benefit amounts will be deemed to be expressed in Canadian currency; (b) plan provisions concerning your rights are subject to applicable provincial statutes; and (c) with respect to benefits, an action under this plan may be brought in any court in the province where you are domiciled.

### How Will This Plan Affect Workers' Compensation?

This plan and the coverages provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

### When Must We Be Notified Of A Claim?

Written notice of your claim must be given to us within 30 days of the date of the loss on which your claim is based, if that is possible. If that is not possible, we must be notified as soon as it is reasonably possible to do so.

### When We Be Notified Of A Claim?

When we have the written notice of your claim, we will send you our claim forms. If the forms are not received within 15 days after written notice of your claim is sent, you can send us written proof of claim without waiting for the form.

DOC3-GNP-0001/0002

- 43 -

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

### When Must We Receive Proof Of Claim?

Proof of your claim must be given to us. This must be done no later than 90 days after the end of your Elimination Period.

Failure to furnish such proof within such time shall not invalidate nor reduce any claim if it was not reasonably possible to furnish such proof within such time. Such proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

Proof of your continued Disability or Partial Disability, when applicable, and regular attendance of a Physician must be given to us within 30 days of the request for the proof.

The proof must cover, when applicable:
   a.  the date your Disability or Partial Disability started;
   b.  the cause of your Disability or Partial Disability; and
   c.  the degree of your Disability or Partial Disability.

### When Must Payment Of Claim Be Made?

When we receive satisfactory proof of your claim, the benefit payable under this plan may be paid at least monthly, depending on the coverage for which your claim is made, during any period for which we are liable. Any balance remaining unpaid upon the termination of the period of liability will be paid immediately upon receipt of due written proof.

### Who Are Claims Paid To?

The benefit is payable to you. But, if a benefit is payable to your estate, or if you are a minor, or you are not competent, we have the right to pay up to $250 to any of your relatives or any other person whom we consider entitled thereto by reason of having incurred expense for your maintenance, medical attendance or burial. If we, in good faith, pay the benefit in such a manner, we will not have to pay such benefit again.

- 44 -

DOC3-GNP-0002/0003

---

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

### What Are Our Examination Rights?

We, at our own expense, will have the right and opportunity to have you, whose Injury or Sickness is the basis of a claim, examined by a Physician or vocational expert of our choice. This right may be used as often as reasonably required.

### What Are Our Rights Of Recovery?

If a benefit overpayment on any claim occurs, it will be required that reimbursement be made to us within 60 days of such overpayment, or we have the right to reduce future benefit payments until such reimbursement is received. We have the right to recover such overpayments from you or your estate.

### When Can Legal Proceedings Begin?

You or your authorized representative cannot start any legal action:

1.   until 60 days after proof of claim has been given; nor

2.   more than three years after the time proof of claim is required.

### How Will We Conform With State Statutes?

Any provision of this plan which, on its Effective Date, is in conflict with the statutes of the governing jurisdiction of this plan is hereby amended to conform to the minimum requirements of such statute.

### What Are Our Rights Of Subrogation?

When your Injury appears to be someone else's fault, benefits otherwise payable under this plan for loss of time as a result of that Injury will not be paid unless you or your legal representative agrees:

1.   to repay us for such benefits to the extent they are for losses for which compensation is paid to you by or on behalf of the person at fault;

- 45 -

DOC3-GNP-0003/0004.03

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

### What Are Our Rights Of Subrogation? (Continued)

2. to allow us a lien on such compensation and to hold such compensation in trust for us; and
3. to execute and give to us any instruments needed to secure the rights under 1 and 2, above.

Further, when we have paid benefits to or on your behalf, we will be subrogated to all rights of recovery that you have against the person at fault. These subrogation rights will extend only to recovery of the amount we have paid. You must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to us. This provision is not enforceable where prohibited by statute or regulation.

### Rehabilitation Incentive Benefit

We will pay an Increased Monthly Benefit while you are enrolled and fully participating in a Rehabilitation Program. We must first approve the Rehabilitation Program before you can be considered for this benefit. If we do not approve a Rehabilitation Program, the regular Disability Benefit will be payable provided you are Disabled under the terms of this plan.

To be eligible for a Rehabilitation Incentive Benefit, you must:

1. be Disabled and receiving benefits under this plan; and
2. be enrolled and fully participating in a Rehabilitation Program approved by us.

### Increased Monthly Benefit

If you are eligible for a Rehabilitation Incentive Benefit, the benefit percentage shown in the Schedule of Benefits to calculate your Amount of Insurance Benefits, will be increased to 80%. The increased benefit will begin on the 1st day of the month after we receive written proof of your enrollment and full participation in the Rehabilitation Program.

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

### Disability Benefits Limitation

If you, at any time, decline to enroll or fully participate in an approved Rehabilitation Program recommended by us, the benefit percentage shown in the Schedule of Benefits to calculate your Amount of Insurance Benefits will be reduced to 40% beginning on the 1st day of the month following receipt of your declination to enroll or fully participate in the approved Rehabilitation Program. If we recommend rehabilitation, benefits will be paid at the reduced amount from the date recommendation is made until we receive your written agreement to enroll and fully participate or not enroll in the Rehabilitation Program.

### Discontinuance Of The Rehabilitation Incentive Benefit

The Rehabilitation Incentive Benefit will terminate in accordance with the provisions entitled Discontinuance of Long Term Disability Benefits.

For the purpose of this provision, "Rehabilitation Program" means a comprehensive individually tailored, goal oriented program to return a Disabled Covered Person to gainful employment. The services offered may include, among other things: (a) physical therapy; (b) occupational therapy; (c) work hardening programs; (d) functional capacity evaluations; (e) psychological and vocational counseling; (f) rehabilitative employment; and (g) vocational rehabilitation to determine how your Disability may impact your employment options - including vocational evaluations, job placement services, resume preparation, job seeking skill training or retraining for a new occupation, evaluation of adaptive equipment to allow you to work, and working with the employer to assist you to return to gainful employment.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

### Estimated Benefits

We may estimate and include, in our computation of insurance benefits, the amount you are eligible to receive under any of the plans referred to in the Benefits from Other Income provision of this plan (except Retirement Benefits described in item 2).

With respect to benefits payable under the Social Security Act, you must make application with the Social Security Administration for benefit payments under that plan, when we determine that the Disability will extend beyond a 12 month period. If you do not make application for Social Security disability benefits when we require, we will begin to reduce your benefit by an estimated Social Security disability benefit amount. If the application is denied by the Social Security Administration, and we disagree with their decision, you are obligated to appeal the denial to the full extent afforded under the Social Security appeals process. If you do not appeal the denial, we will begin to reduce your benefit by an estimated Social Security disability benefit amount.

Benefit payments from any other source, referred to in the Benefits from Other Income provision of this plan, will reduce the benefits payable under this plan if we make a reasonable determination that you:

a. will be paid upon completion of the claim made under such plan; or

b. would have been paid if you pursued the claim under such plan within the required time.

In the event that we overestimate an amount you would have received from any plans referred to in the Benefits from Other Income provision of this plan we will reimburse you for such amount.

DOC3-GNP-0009

- 48 -

## NOTICE

If you become disabled within 12 months of your effective date of insurance, you will not be covered for long term disability coverage if your disability is caused or contributed to by, or results from a pre-existing condition.

A pre-existing condition is a condition resulting from an injury or sickness for which you are diagnosed or received treatment within three months prior to your effective date.

Treatment will include consultation, care or services provided by a physician including diagnostic measures and taking prescribed drugs.

DOP3-SNR-0001

- 49 -

## SUMMARY PLAN DESCRIPTION

### Geisinger Health System Welfare Plan

**Name of Plan:**

**Plan benefits are provided under the terms of the Group Disability Income Policy No. GF3-810-252761-01, hereinafter referred to as "the policy", issued by Liberty Life Assurance Company of Boston, hereinafter referred to as "Liberty", to the Employer as "Policyholder".**

**Participants Included:   See Schedule of Benefits**

**Name and Address of Employer:**

Geisinger Health System
2601 Market Place
Harrisburg, PA 19110-9360

**Who Pays For the Plan: Premiums are paid by the Sponsor.**

Plan 1 and 2 - Employees may elect to contribute to the cost of the plan

Plan 3 - Employees and the Sponsor share in the cost of the plan

**Plan Identification Number:**

a.   Employer IRS Identification No.:   23-2164794
b.   Plan No.:   LTD:   513

**Plan Year:   January 1st - December 31st**

**Plan Administrator, Name, Address and Telephone No:**

Geisinger System Services
100 N. Academy Avenue
Danville, PA 17822-1526
(717) 271-6640

Agent for Service of Legal Process on the Plan:   Same as above.

Type of Administration: Insurer Administration

- 50 -

## SUMMARY PLAN DESCRIPTION
### (Continued)

**Amendment of the Sponsor's Plan:**

The Sponsor's plan may be changed in whole or in part by the Sponsor's company. Such changes must be in writing and signed on or attached to the plan.

**Amendment of Liberty's Policy:**

The policy may be changed in whole or in part by mutual agreement of the Sponsor and Liberty. Only an Officer of Liberty can approve a change. The approval must be in writing and endorsed on or attached to the policy. No consent of any participant or any person referred to in the policy(ies) shall be required to amend, or change the policy(ies).

NOTE:   If you cease active employment, see your benefits administrator to determine what arrangements, if any, may be made to continue your coverage beyond the date you cease active employment.

**When May The Policy Terminate?**

1.   If the Sponsor fails to pay any premium within the grace period, the policy will automatically terminate at 12:00 midnight on the last day of the grace period. The "grace period" is the 4_ days following a premium due date during which premium payments may be paid.

2.   The Sponsor may terminate the policy by advance written notice delivered to Liberty at least 31 days prior to the termination date. But the policy will not terminate during any period for which premium has been paid.

- 51 -

# GROUP
# *Benefits*
# PLAN

### Geisinger Health System
### Your Group Long Term Disability Plan





## CERTIFICATE OF COVERAGE

Liberty Life Assurance Company of Boston (hereinafter referred to as "we", "our" and "us") welcomes your employer as a client.

**Sponsor:**    Geisinger Health System

**Plan Number:**    GF3-810-252761-01

**Effective Date:**    August 1, 1998

When this plan refers to "you" or "your" it means the Employee insured under this plan. This is your Disability Income certificate of coverage as long as you are eligible for insurance and remain insured.

A few words about this certificate of coverage...

It is written in plain English. A few terms and provisions are written as required by insurance law. **PLEASE READ IT CAREFULLY. If** you have any questions about any terms and provisions, please contact the Insurance Administrator at your work location or write to us. We will assist you in any way we can to help you understand your benefits.

Also, if the terms of your certificate of coverage and the policy differ, the policy will govern. Your coverage may be terminated or modified in whole or in part under the terms and provisions of the policy.

**Executive Vice President**

DOC3

-1-

## TABLE OF CONTENTS

SECTION 1.......... SCHEDULE OF BENEFITS

SECTION 2.......... TERMS YOU SHOULD KNOW

SECTION 3.......... ELIGIBILITY AND EFFECTIVE DATES

SECTION 4.......... DISABILITY INCOME BENEFITS

SECTION 5.......... EXCLUSIONS

SECTION 6.......... TERMINATION PROVISIONS

SECTION 7.......... GENERAL PROVISIONS

## SECTION 1 - SCHEDULE OF BENEFITS

**ELIGIBLE CLASSES FOR INSURANCE BENEFITS:**
(Employees working a minimum of 30 regularly scheduled hours per week who are defined as eligible)

**Who Is Eligible For Long Term Disability Benefits?:**

All Active Full-Time Employees, except Administrative Staff Employees and Regular, Full-Time Technical-Service Employees represented by the Teamsters, who are in Active Employment are eligible for a 24 Month Own Occupation Benefit.

**ELIGIBILITY WAITING PERIOD:**

1. Present Employees:    None
2. New Employees:    None

**EMPLOYEE CONTRIBUTIONS REQUIRED:**

Plan 1 and 2:    Employees may elect to contribute to the cost of the plan

Plan 3:    Employees and the Sponsor share in the cost of the plan

**LONG TERM DISABILITY COVERAGE**

**Your Elimination Period:**    180 days

**Your Amount Of Insurance Benefits:**

Plan 1:    50% (Benefit Percentage) of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $15,000.

Plan 2:    60% (Benefit Percentage) of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $15,000.

Plan 3:    66 2/3% (Benefit Percentage) of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $15,000.

Less your Benefits from Other Income as outlined in Section 4

## SECTION 1 - SCHEDULE OF BENEFITS
### (Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**Your Minimum Monthly Benefit:**

The Minimum Monthly Benefit is $100 or 10% of your gross Monthly Benefit, whichever is greater.

**Your Maximum Benefit Period:**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60............To age 65 (but not less than 5 years) |
| 60..............................................60 Months |
| 61..............................................48 Months |
| 62..............................................42 Months |
| 63..............................................36 Months |
| 64..............................................30 Months |
| 65..............................................24 Months |
| 66..............................................21 Months |
| 67..............................................18 Months |
| 68..............................................15 Months |
| 69 and over...............................12 Months |

## SECTION 2 - TERMS YOU SHOULD KNOW

In this section we define some basic terms needed to understand this plan.

**"Active Employment"** means you must be actively at work for the Sponsor:

1. on a full-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

   a. at the Sponsor's usual place of business; or

   b. at a location to which the Sponsor's business requires you to travel.

You will be considered actively at work if you are actually at work on the day immediately preceding:

1. a weekend (except where one or both of these days are scheduled days of work);

2. holidays (except when such holiday is a scheduled work day);

3. paid vacations;

4. any non-scheduled work day;

5. an excused leave of absence (except medical leave for your own disabling condition and lay-off); and

6. an emergency leave of absence (except emergency medical leave for your own disabling condition).

**"Administrative Office"** means Liberty Life Assurance Company of Boston, 100 Liberty Way, Dover, New Hampshire 03820.

**"Annual Enrollment Period"** or **"Enrollment Period"** means the period before each policy anniversary so designated by the Sponsor and us during which you may enroll for coverage under this plan.

**"Application"** is the document completed by you when applying for coverage, it is attached to and is made a part of the policy.

## SECTION 2 - TERMS YOU SHOULD KNOW
### (Continued)

"Appropriate Available Treatment" means care or services which are (a) accessible within your geographical region; (b) covered expenses under your health plan or other form of funding, insured or uninsured; and (c) provided by a Physician whose specialty is especially suitable for the management of an Injury or Sickness (as determined by the American Medical Association, or other nationally recognized medical boards).

"Basic Monthly Earnings" or "Pre-Disability Earnings" means the greater of (a) your current monthly rate of earnings from your Sponsor in effect immediately prior to the date Disability or Partial Disability begins; or (b) your prior calendar year earnings plus incentive compensation from your Sponsor averaged over the lesser of (a) the 12 month period prior to the date Disability begins; or (b) the period of employment. However, such earnings will not include **bonuses, commissions, overtime pay and extra compensation other than incentive compensation.**

"Consumer Price Index" means the CPI-W, a government publication for wage earners and clerical workers provided monthly by the U.S. Department of Labor, or its successor approved by the Insurance Commissioner or in the event of no successor a similar index of comparable purpose chosen by us and approved by the Insurance Commissioner.

"Determined Functional Capacity" means periodic evaluation(s) of your ability to function on the job in order to determine if you are fully functioning up to your current physical or mental capacity.

"Disability" or "Disabled" means:

i.   If you are eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability you are unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness; and

## SECTION 2 - TERMS YOU SHOULD KNOW
### (Continued)

"Disability" or "Disabled"(Continued)

ii.   After 24 months of benefits have been paid, you are unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

"Disability Benefits", when used with the term Retirement Plan, means money which:

1.   is payable under a Retirement Plan due to Disability as defined in that plan; and

2.   does not reduce the amount of money which would have been paid as Retirement Benefits at the normal retirement age under the plan if your Disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this plan.)

"Eligibility Date" means the date you become eligible for insurance under this plan. Eligible Classes are shown in the Schedule of Benefits.

"Eligibility Waiting Period" as shown in the Schedule of Benefits means the continuous length of time you must serve in an eligible class to reach your Eligibility Date.

"Elimination Period" means a period of consecutive days of Disability for which no benefit is payable. Your Elimination Period is shown in the Schedule of Benefits and begins on the first day of your Disability.

If you return to work for any 30 or less days during the Elimination Period and cannot continue, we will count only those days you are Disabled to satisfy the Elimination Period.

"Employee" means you or any other person in Active Employment with the Sponsor.

## SECTION 2 - TERMS YOU SHOULD KNOW
(Continued)

"Evidence of Insurability" means a statement or proof of your medical history upon which acceptance for insurance will be determined by us.

"Family Status Change" means any one of the following events that may occur:

1. your marriage or divorce;
2. the birth of a child to you;
3. the adoption of a child by you;
4. the death of your spouse or child;
5. the commencement or termination of employment of your spouse;
6. the change from part-time employment to full-time employment by you or your spouse;
7. the change from full-time employment to part-time employment by you or your spouse;
8. the taking of unpaid leave of absence by you or your spouse.

"Gross Monthly Benefit" means your Monthly Benefit before any reduction for your Benefits from Other Income and earnings.

"Indexed Pre-Disability Earnings" means your Basic Monthly Earnings in effect just prior to the date your Disability or Partial Disability began adjusted on the first anniversary of benefit payments and each anniversary thereafter.

"Initial Enrollment Period" means one of the following periods during which you may first enroll for coverage under this policy:

1. If you are eligible for insurance on the policy effective date, a period before the policy effective date set by the Sponsor and us.

2. if you become eligible for insurance after the policy effective date, the period which ends 31 days after your eligibility date.

DOC3-DEF-0003 (Cont.)

## SECTION 2 - TERMS YOU SHOULD KNOW
(Continued)

"Injury" means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this policy (a) any Disability which begins more than 60 days after an Injury will be considered a Sickness; and (b) any Injury which occurs before you are covered under this policy, but which accounts for a medical condition that arises while you are covered under this policy will be treated as a Sickness.

"Material and Substantial Duties" means responsibilities that are normally required to perform your Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

"Medically Necessary" means that a service or supply is: (a) required for the treatment or management of an Injury or Sickness; (b) commonly and customarily recognized by Physicians as appropriate in the treatment or management of the Injury or Sickness (as determined by the American Medical Association, or other nationally recognized medical boards); (c) other than educational or experimental; and (d) not primarily for the comfort or convenience of the Physician or you.

"Non-Verifiable Symptoms" means your subjective complaints to a Physician which cannot be verified using tests, procedures or clinical examinations typically accepted in the practice of medicine. Such symptoms include, but are not limited to, dizziness, fatigue, headaches, loss of energy, numbness, pain, ringing in the ear, and stiffness.

"Own Occupation" means your occupation that you were performing when your Disability began. For the purpose of determining Disability under this policy, we will consider your occupation as it is normally performed in the national economy. Work Tasks performed for a specific employer or at a specific location will not be used to determine Disability.

"Part-time" with respect to Partial Disability, means your ability to perform the Material and Substantial Duties of your Own Occupation or any other occupation and earn between 20% and 80% of your Pre-Disability Earnings.

DOC3-DEF-0005

## SECTION 2 - TERMS YOU SHOULD KNOW
(Continued)

"Physician" or "Attending Physician" or "Doctor" means a person who (1) is licensed to practice medicine, to prescribe and administer drugs, and to treat patients and perform surgery; or (2) is a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the state where the policy is delivered, and practicing within the terms of his license.

It does not include you or your spouse, daughter, son, father, mother, sister or brother.

"Pre-Disability Earnings"- See definition of Basic Monthly Earnings.

"Proof" means the evidence in support of a claim for benefits and includes, but is not limited to: (a) a claim form completed and signed (or otherwise formally submitted) by you when claiming benefits; (b) an Attending Physician's statement completed and signed (or otherwise formally submitted) by your Attending Physician; and (c) provision by your Attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence that may be required by us in support of your claim for benefits.

"Regular Attendance" means your personal visits to your Attending Physician which are medically necessary according to generally accepted medical standards to effectively manage and treat your Disability or Partial Disability. The care and treatment must (1) be provided under the direction of a Physician whose specialty or experience is the most appropriate for your condition and (2) conform with generally accepted medical standards.

"Retirement Benefit", when used with the term Retirement Plan, means money which:

1. is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

- 10 -

## SECTION 2 - TERMS YOU SHOULD KNOW
(Continued)

"Retirement Benefit"(Continued)

2. does not represent contributions made by you (payments which represent your contributions are deemed to be received over your expected remaining life regardless of when such payments are actually received); and

3. is payable upon:

   a. early or normal retirement; or

   b. Disability, if the payment does reduce the amount of money which would have been paid under the plan at the normal retirement age.

"Retirement Plan" means a plan which provides Retirement Benefits to you and which is not funded wholly by your contributions. The term shall not include: a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, stock ownership plan, 401k plan, TSA 403(b) plan or a non-qualified plan of deferred compensation.

"Schedule of Benefits" means the section of this plan which shows, among other things, the Eligible Classes, the Eligibility Waiting Period, your Elimination Period, your Amount of Insurance, the Minimum Benefit, and your Maximum Benefit Period.

"Sickness" means illness, disease, pregnancy or complications of pregnancy.

"Sponsor" means the entity to whom the policy is issued.

"Sponsor's Retirement Plan" is deemed to include any Retirement Plan:

1. which is part of any Federal, State, Municipal or Association retirement system; or

2. for which you are eligible as a result of employment with the Sponsor.

- 11 -

DOC3-DEF-0005 (Cont.)

## SECTION 2 - TERMS YOU SHOULD KNOW
### (Continued)

"Monthly Benefit" means the amount payable by us to you if you are Disabled or Partially Disabled. Benefits for Long Term Disability coverage are determined on a monthly basis.

---

DOC3-ELG-0006.02

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES

### Who Is Eligible For Coverage?

You are Eligible for Coverage if you are in Active Employment and in an Eligible Class for Insurance Benefits shown in the Schedule of Benefits.

### Your Eligibility Date For Insurance Benefits

If you are in an eligible class you will qualify for insurance on the later of:

1.  this plan's Effective Date; or
2.  the day after you complete the Eligibility Waiting Period shown in the Schedule of Benefits.

### Enrollment

You may enroll in or change coverage only during an Initial or Annual Enrollment Period or because of a Family Status Change as follows:

1.  **Initial Enrollment Period**

    During the Initial Enrollment Period you may enroll in any one coverage or coverage option shown in the Schedule of Benefits. If you do not choose any coverage or coverage option, you will automatically be enrolled in Plan 2. If your Initial Enrollment Period takes place during or after the Annual Enrollment Period, but before the policy anniversary, your coverage option will apply for (a) the rest of the policy year in which you first become eligible; and (b) the next policy year.

2.  **Annual Enrollment Period**

    During each Annual Enrollment Period, you may make any one of the following changes in coverage for the next policy year:

    a.  a decrease in coverage;
    b.  an increase in coverage by one or more levels, subject to evidence of insurability; or

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**Enrollment (Continued)**

**2. Annual Enrollment Period (Continued)**

c. keep your coverage at the same level.

If you fail to enroll for a change in your coverage option during any Annual Enrollment Period, you will continue to be insured for the same coverage option during the next policy year and no change in that coverage can be made during the next policy year, unless you experience a Family Status Change.

**3. Family Status Change**

When you experience a Family Status change, you may enroll for coverage within 31 days of the date of the Family Status Change. When you experience a Family Status Change, you may:

a. decrease your coverage;

b. increase your coverage by one or more levels subject to evidence of insurability; or

c. keep your coverage at the same level.

You must apply for the change in coverage within 31 days of the date of the Family Status Change. Such changes in coverage must be on account of or consistent with the reason that the change in coverage was permitted. A change in coverage is consistent with a Family Status Change only if it is necessary or appropriate as the result of the Family Status Change.

---

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**Your Effective Date Of Insurance**

1. Your insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if your written Application for insurance is:

a. made with us through your Sponsor; and

b. on a form satisfactory to us.

2. For Coverage Applied For During Initial Enrollment Periods:

You will become insured for non-contributory insurance on your eligibility date. You will become insured for any other contributory coverage on the later of these dates:

a. your eligibility date if you enroll before that date; or

b. the date you enroll if you do it on or before the 31st day after your date of eligibility.

If you do not enroll for any contributory coverage on or before the 31st day after your eligibility date you will automatically be enrolled in Plan 2

3. For Contributory Coverage Applied For During Annual Enrollment Periods, you will be insured for the selected contributory coverage on the later of these dates:

a. on the first day of the next policy anniversary; or

b. on the date Liberty gives its approval if you must submit Evidence of Insurability, at your expense, due to:

i. an increase in your coverage option; or

ii. you terminated your insurance while continuing to be eligible.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**Your Effective Date of Insurance (Continued)**

4. **For Coverage Applied For Due To A Family Status Change**

   You will become insured for the selected coverage on the later of the following dates, provided you enroll or apply for the change in coverage before the 31st day following the Family Status Change:

   a. the date of the Family Status Change; or
   b. the date you enroll or apply for the change in coverage; or
   c. the date Liberty gives its approval if you must submit Evidence of Insurability, at your expense, due to:
      i. an increase in your coverage option; or
      ii. you terminated your insurance while continuing to be eligible.

5. **Delayed Effective Date for Insurance** - The Effective Date of any initial, increased or additional insurance for you will be delayed if you are not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will start on the date you return to Active Employment.

-16-

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**Family Medical Leave**

Your coverage may be continued under this plan, subject to the required premium payment, during any period that you are not in Active employment because of a Family Medical Leave. Coverage will be provided at the same benefit levels in effect on the day immediately prior to the day your leave begins. Any change in the plan's benefit levels that may occur while you are on Family Medical Leave will apply.

**What Happens If You Are Retired?**

If you are a former Employee and are re-hired by the Sponsor within 12 months of your termination date, all past periods of Active Employment with the Sponsor will be used in determining your Eligibility Date. If you are re-hired by the Sponsor more than 12 months after your termination date, you will be considered a new Employee when determining your Eligibility Date.

-17-

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**What Happens If There Is A Transfer Of Insurance Carriers?**

In order to prevent loss of coverage for you because of a transfer of insurance carriers, this plan will provide coverage for you as follows:

**What Happens If You Are Not In Active Employment Due To Injury Or Sickness?**

This plan will cover you, subject to premium payments, if you were:

1. insured by the prior carrier at the time of transfer; and

2. not In Active Employment due to Injury or Sickness on the Effective Date of the plan.

The benefit payable will be in accordance with the provisions of this plan, less any benefit for which the prior carrier is liable. However, in no event will the benefit payable be greater than that which would have been paid under the prior carrier's benefit schedule.

**What Happens If You Are Disabled Due To A Pre-Existing Condition?**

If there is a Pre-Existing Condition Exclusion, a benefit may be payable for a Disability due to a Pre-Existing Condition if you:

1. were insured by the prior carrier at the time of transfer; and

2. were in Active Employment and insured under this plan on its Effective Date.

The benefit will be determined as follows:

1. We will apply this plan's pre-existing condition exclusion. If you qualify for a benefit, you will be paid according to this plan's benefit schedule.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**What Happens If You Are Disabled Due To A Pre-Existing Condition? (Continued)**

The benefit will be determined as follows: (Continued)

2. If you cannot satisfy this plan's pre-existing condition exclusion, the prior carrier's pre-existing condition exclusion will be applied.

   a. If you satisfy the prior carrier's pre-existing condition exclusion, giving consideration towards continuous time insured under both policies, you will be paid according to this plan's benefit schedule. However, in no event will the benefit payable be greater than that which would have been paid under the prior carrier's benefit schedule.

   b. If you cannot satisfy the pre-existing condition exclusion of this plan or that of the prior carrier, no benefit will be paid.

# SECTION 4 - DISABILITY INCOME BENEFITS

## LONG TERM DISABILITY COVERAGE

### Disability Benefit

### When Is Your Disability Benefit Payable?

When we receive proof that you are Disabled due to Injury or Sickness and require the regular attendance of a Physician, we will pay you a Monthly Benefit after the end of your Elimination Period. The benefit will be paid for the period of your Disability *if you give to us proof of continued:*

1. Disability; and

2. regular attendance of a Physician.

The proof must be given upon our request and at your expense. For the purpose of determining Disability, the Injury must occur and your Disability must begin while you are insured for this coverage. In addition, a loss of a license for any reason does not, in itself, constitute Disability.

Your Monthly Benefit will not:

1. exceed your Amount of Insurance; nor

2. be paid for longer than your Maximum Benefit Period.

Your Amount of Insurance and your Maximum Benefit Period are shown in the Schedule of Benefits.

---

# SECTION 4 - DISABILITY INCOME BENEFITS

## LONG TERM DISABILITY COVERAGE (Continued)

### Disability Benefit (Continued)

### How Is Your Disability Benefit Figured?

To figure your amount of Monthly Benefit:

1. Multiply your Basic Monthly Earnings by the Benefit Percentage shown in the Schedule of Benefits.

2. Take the lesser of:

   a. the amount figured in step (1) above; or

   b. the Maximum Monthly Benefit shown in the Schedule of Benefits; and then

3. Deduct your Benefits from Other Income, (shown in the Benefits from Other Income provision of this coverage), from this amount.

The Disability Benefit payable will never be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. The Minimum Monthly Benefit will not be paid if the total of the Minimum Monthly Benefit and benefits you receive under Workers' Compensation and/or wage loss replacement benefits under the Pennsylvania Motor Vehicle Responsibility Law equals or exceeds 100% of your Pre-Disability Earnings.

SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

LONG TERM DISABILITY COVERAGE (Continued)

Quick Recovery Program (Plus)

When Are Benefits Payable Under Our Quick Recovery Program (Plus)?

When proof is received that you are Partially Disabled and have experienced a loss of earnings because of an Injury or Sickness, you may be eligible to receive a Loss of Earnings Monthly Benefit under our Quick Recovery Program (Plus).

To be eligible to receive such benefits, you may be employed in your own occupation or another occupation and:

1. must satisfy the Elimination Period; and

2. must be earning 20% or more of your Pre-Disability Earnings.

If you are earning less than 20% of your Pre-Disability Earnings, the Disability Benefit will be paid, and all other benefit provisions and terms applicable to Disability will apply as stated in this coverage.

For the purposes of this provision, you may satisfy your Elimination Period if you are Disabled or Partially Disabled, or a combination of Disabled or Partially Disabled, during such time.

A Monthly Benefit will be paid for the period of Partial Disability if proof is given to us upon request and at your expense of continued:

1. Partial Disability; and

2. regular attendance of a Physician.

- 22 -

SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

LONG TERM DISABILITY COVERAGE (Continued)

Quick Recovery Program (Plus) (Continued)

For the purpose of determining Partial Disability, the Injury must occur and your Partial Disability must begin while you are insured for this coverage. In addition, a loss of a license for any reason does not, in itself, constitute Partial Disability.

"Partial Disability" or "Partially Disabled" means as a result of the Injury or Sickness, you are:

1. able to perform one or more, but not all, of the material and substantial duties of your own or any other occupation on an Active Employment or a part-time basis; or

2. able to perform all of the material and substantial duties of your own or any other occupation on a part-time basis.

The Amount of Loss of Earnings Monthly Benefit payable under our Quick Recovery Program (Plus) is described on the following page.

- 23 -

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**How Is Your Amount Of Loss Of Earnings Monthly Benefit Figured?**

If you are eligible for benefits under the Quick Recovery Program (Plus), during the first 12 months, we will pay a Work Incentive Benefit.

The Work Incentive Benefit will be an amount equal to your Pre-Disability Earnings multiplied by the Benefit Percentage shown in the Schedule of Benefits, without any reductions from earnings.

The Work Incentive Benefit will only be reduced, if the Monthly Benefit payable plus any earnings you receive exceed 100% of your Pre-Disability Earnings. If the combined total is more, the Monthly Benefit will be reduced by the excess amount so that the Monthly Benefit plus your earnings does not exceed 100% of your Pre-Disability Earnings.

Thereafter, to figure your Amount of Monthly Benefit the formula (A divided by B) X C will be used:

A = Your Pre-Disability Earnings minus your Basic Monthly Earnings received while you are Partially Disabled.

B = Your Pre-Disability Earnings.

C = Your Monthly Benefit as figured in the Disability provision of this coverage, (but, not including adjustments under the Cost of Living Adjustment Benefit, if included).

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

On the first anniversary of benefit payments and each anniversary thereafter, for the purpose of calculating the benefit, the term "Pre-Disability Earnings" is:

1. replaced by "Indexed Pre-Disability Earnings"; and

2. increased annually by 7%, or the current annual percentage increase in the Consumer Price Index, whichever is less.

The Monthly Benefit payable will never be less than the Minimum Monthly Benefit shown in the Schedule of Benefits.

The Minimum Monthly Benefit will not be paid if the total of the Minimum Monthly Benefit and benefits the Covered Person receives under Workers' Compensation and / or wage loss replacement benefits under the Pennsylvania Motor Vehicle Responsibility Law equal or exceeds 100% of the Covered Person's Pre-Disability Earnings.

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**Mental Illness and Alcohol or Drug Abuse Limitation**

The Benefit for Disability due to Mental Illness and Alcohol or Drug Abuse will not exceed 24 months of Monthly Benefit payments unless you meet one of these situations.

1. You are in a Hospital or Institution for Mental Illness and Alcohol or Drug Abuse at the end of the 24 month period. The Monthly Benefit will be paid during the confinement.

   If you are still Disabled when you are discharged, the Monthly Benefit will be paid for a recovery period up to 90 days.

   If you become reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

2. You are not confined in a Hospital or Institution for Mental Illness and Alcohol or Drug Abuse, but are fully participating in an Extended Treatment Plan for the condition that caused Disability. The Monthly Benefit will be payable to you for up to 36 months from the date of Disability.

   In no event will the Monthly Benefit be payable beyond the Maximum Benefit Period, shown in the Schedule of Benefits.

   **"Extended Treatment Plan"** means continued care that is consistent with the American Psychiatric Association's standard principles of treatment, and is in lieu of Hospital or Institutional confinement. It must be approved in writing by a Physician.

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**Mental Illness and Alcohol or Drug Abuse Limitation (Continued)**

**"Hospital"** or **"Institution"** means a facility licensed to provide care and Treatment for the condition causing the Covered Person's Disability.

**"Mental Illness"** means mental, nervous or emotional diseases or disorders whose diagnoses are outlined in the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition) by the American Psychiatric Association, and for which objective clinical evidence supporting the diagnosis is provided by the Physician. It does not include those diagnoses which are documented and recognized by the American Psychiatric Association to have an organic cause, specifically, diagnoses caused by the change in structure of an organ, which cannot be corrected through an appropriate treatment program or regime.

**"Alcohol or Drug Abuse"** means psychological or physiological disabilities or disorders resulting either directly or indirectly from alcohol or drug abuse, addiction or dependency.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**Benefits From Other Income**

**What Are Your Benefits From Other Income?**

Your Benefits from Other Income means those benefits shown below:

1. The amount for which you are eligible under:

   a. Pennsylvania's Motor Vehicle Financial Responsibility Law;

   b. Workers' or Workmen's Compensation Law;

   c. occupational disease law;

   d. any compulsory benefit act or law; or

   e. any other act or law of like intent.

2. The amount of any disability benefits which you are eligible to receive under:

   a. any other group insurance plan of the Sponsor;

   b. any governmental retirement system as a result of your job with the Sponsor;

   c. any individual insurance plan. However, we will only offset with such plans if (i) your Monthly Benefit under this policy plus (ii) any benefits that you are eligible to receive under such individual insurance plan exceed 100% of your Pre-Disability Earnings. If the sum of (i) and (ii) exceeds 100% of your Pre-Disability Earnings, your Monthly Benefit under this policy will be reduced by such excess amount.

DOC3-LTD-0029.07

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**Benefits From Other Income (Continued)**

3. The amount of benefits you receive under the Sponsor's Retirement Plan as follows: (a) The amount of any Disability Benefits, or Retirement Benefits you voluntarily elect to receive as retirement payment under the Sponsor's Retirement Plan; and (b) the amount you are eligible to receive as retirement payments when you reach the later of age 62, or normal retirement age as defined in the Sponsor's plan.

4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, for which:

   a. you receive or are eligible for; and

   b. your spouse, child or children receive or are eligible for because of your Disability; or

   c. your spouse, child or children receive or are eligible for because of your eligibility for Retirement Benefits.

These Benefits from Other Income, except Retirement Benefits, must be payable as a result of the same Disability for which we pay a benefit.

DOC3-LTD-0029.07 (Cont.)

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

**What Happens If You Receive Any Cost Of Living Increases?**

After the first deduction for each of your Benefits from Other Income, your Monthly Benefit will not be further reduced due to any cost of living increases payable under the Benefits from Other Income provision of this coverage. This provision does not apply to increases received from any form of employment.

**What Happens If You Receive A Lump Sum Payment?**

If you receive Benefits from Other Income which are paid in a lump sum, they will be prorated on a monthly basis over the time period for which the sum is given or the Maximum Benefit Period, whichever is less.

**What Happens If Your Benefit Period Is Less Than A Month?**

For any period which a Long Term Disability Benefit is payable that does not extend through a full month, the benefit will be paid on a prorated basis. The rate will be 1/30th per day for such period of Disability.

**How Can Your Benefit Period Be Extended?**

Your Maximum Benefit Period is shown in the Schedule of Benefits. However, the benefit will not be extended beyond the end of your Maximum Benefit Period if you attain the age specified in the benefit duration while Disabled and have not received 12 Monthly Benefit payments. In this event, the benefit period will be extended during the continuance of your Disability until 12 monthly payments have been paid.

---

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

**When Will Your Long Term Disability Benefits Be Discontinued?**

Your Monthly Benefit will cease on the earliest of:

1. the date you are no longer Disabled; or

2. the date you die; or

3. the end of your Maximum Benefit Period; or

4. the date your current earnings exceed 80% of your Indexed Pre-Disability Earnings; or

Because your current earnings may fluctuate, we may average your earnings over three (3) consecutive months rather than immediately terminating your benefit once 80% of your Indexed Pre-Disability Earnings have been reached.

5. the date you refuse Appropriate Available Treatment or advice which we determine to be Medically Necessary; or

6. the date we determine you are not personally visiting a Physician as frequently as is Medically Necessary, according to standard medical practice, to effectively manage and treat the condition(s) that caused Disability or Partial Disability; or

7. The date we determine you are not receiving Appropriate Available Treatment of your disabling condition(s) by a Physician whose specialty or experience is appropriate for the condition(s) that caused your Disability or Partial Disability; or

8. the date you refuse to undergo a medical evaluation, including a psychological or psychiatric referral evaluation as required by us; or

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### When Will Your Long Term Disability Benefits Be Discontinued?
(Continued)

9. the date you or your Physician do not provide us with required medical Proof which supports physical or mental impairment that is demonstrated by clinical and laboratory evidence; or

10. the date you fail to provide Proof regarding your eligibility for benefits, including information regarding eligibility for, or receipt of, other income while you are Disabled or Partially Disabled; or

11. 6 months from the date your Disability or Partial Disability Benefits begin if your Disability or Partial Disability is primarily based on Non-Verifiable Symptoms; or

12. the date you refuse a job with the employer for which you are or could become reasonably fitted by training, education, experience, age and physical and mental capacity. Any job where worksite modifications were made to allow you to perform the material and substantial duties of the job is included in this requirement.

13. the date we determine you are not working at your Determined Functional Capacity; or

14. the date you fail to comply with a prescribed Appropriate Available Treatment plan.

---

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Successive Periods of Disability

### What Happens If You Return To Work And Become Disabled Again?

If you return to work and become Disabled again, you may qualify for Successive Periods of Disability. With respect to this coverage, "Successive Periods of Disability" means a Disability which is due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.

A Successive Period of Disability will be treated as part of your prior Disability if, after receiving Disability benefits under this coverage, you:

1. return to your own occupation on an Active Employment basis for less than 6 continuous months; and

2. perform all the material and substantial duties of your own occupation.

To qualify for a Successive Periods of Disability Benefit, you must experience more than a 20% loss of your Pre-Disability Earnings.

Benefit payments will be subject to the terms of this coverage for your prior Disability.

If you return to your own occupation on an Active Employment basis for 6 continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. You must complete another Elimination Period.

If you become eligible for coverage under any other group Long Term Disability coverage, this Successive Period of Disability provision will cease to apply to you.

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Three Month Survivor Benefit

### What Happens To Your Benefit If You Die?

We will pay a lump sum benefit to your Eligible Survivor when proof is received that you died:

1.  after your Disability had continued for 180 or more consecutive days; and
2.  while receiving a Monthly Benefit.

The lump sum benefit will be an amount equal to three times your Last Monthly Benefit.

If an overpayment is due Liberty at the time of your death, the benefit payable under this provision will be applied toward satisfying the overpayment.

"Eligible Survivor" means your spouse, if living, otherwise your children under age 25.

If payment becomes due to your children, payment will be made in equal shares to:

1.  the children; or
2.  the children's guardian on their behalf, or as the courts may otherwise direct; if the child is a minor or is physically or mentally incapable of giving a valid release for payment. This payment will be valid and effective against all claims by others representing or claiming to represent the children.

If there is no eligible survivor, no benefits are payable under this provision.

"Last Monthly Benefit" means the net Monthly Benefit paid to you immediately prior to your death without any reduction for earnings received from employment.

DOC3-LTD-0016.22

## SECTION 4 - DISABILITY INCOME BENEFITS
### (Continued)

## LONG TERM DISABILITY COVERAGE (Continued)

### Minimum Indemnity For Accidental Dismemberment And Loss Of Sight

### When Is Your Minimum Indemnity Benefit For Accidental Dismemberment And Loss Of Sight Payable?

If Injury results in any of the losses listed in the Schedule below, the Disability Monthly Benefit will be paid to you for the number of monthly payments shown in this Schedule.

The loss must:

1.  result from an Injury caused by an accident which occurred while you were insured for this benefit;
2.  result from that Injury directly and independently of all other causes; and
3.  occur within 100 days after the accident.

If you die before all of these payments have been made, the balance remaining at the time of your death will be paid to your estate.

### SCHEDULE

| For loss of | Minimum Number of Monthly Payments |
|---|---|
| Sight of Both Eyes.............................................. | 46 |
| Both Hands..................................................... | 46 |
| Both Feet....................................................... | 46 |
| One Hand and One Foot....................................... | 46 |
| One Hand and Sight of One Eye.............................. | 46 |
| One Foot and Sight of One Eye............................... | 46 |
| One Hand or One Foot......................................... | 23 |
| Sight of One Eye.............................................. | 23 |
| Thumb and Index Finger of Either Hand....................... | 15 |
| | 12 |

DOC3-LTD-0023

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE (Continued)

**Minimum Indemnity For Accidental Dismemberment And Loss Of Sight (Continued)**

The maximum number of monthly payments payable to you for all losses suffered in any one accident shall be limited to that one loss for which the greatest number of monthly payments is provided in the Schedule.

Loss of hands and feet means loss by severance at or above the wrist or ankle joint. Loss of sight means total and irrecoverable loss of sight. Loss of thumb and index finger means actual severance at or above the knuckles joining each to the hand. A benefit may be payable for a period in excess of the number of months indicated in the Schedule provided that you are Disabled.

DOC3-LTD-0023 (Cont.)

- 36 -

---

## SECTION 5 - EXCLUSIONS

### GENERAL EXCLUSIONS

**What Disabilities Are Not Covered?**

This plan will not cover any Disability due to:

1. war, declared or undeclared or any act of war;

2. Intentionally self-inflicted injuries, while sane or insane;

3. active Participation in a Riot;

4. your committing of or the attempting to commit an indictable offense.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in defense of the person of the insured, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and firemen.

With respect to this provision, Riot shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together with a common intent, and damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

DOC3-EXC-0001.03

- 37 -

## SECTION 5 - EXCLUSIONS
### (Continued)

## LONG TERM DISABILITY COVERAGE

### Pre-Existing Condition Exclusion

**What Happens If Your Disability Results From A Pre-Existing Condition?**

This plan will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from a Pre-Existing Condition; and

2. which begins in the first 12 months after your Effective Date.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which you are diagnosed or received Treatment within three months prior to your Effective Date.

**"Treatment"** means consultation, care or services provided by a Physician including diagnostic measures and taking prescribed drugs and medicines.

---

## SECTION 6 - TERMINATION PROVISIONS

**When Will Your Insurance End?**

You will cease to be insured on the earliest of the following dates:

1. the date this plan terminates, but without prejudice to any claim originating prior to the time of termination;

2. the date you are no longer in an eligible class;

3. the date your class is no longer included for insurance;

4. the last day for which your required contribution has been made;

5. the date your employment terminates. Cessation of Active Employment will be deemed termination of employment, except the insurance will be continued for you if you were absent due to Disability during:

   a. your Elimination Period; and

   b. the period during which premium is being waived.

6. the date you cease active work due to a labor dispute, including any strike, work slowdown, or lockout.

We reserve the right to review and terminate all classes insured under this plan if any class(es) cease(s) to be covered.

**What Happens During Lay-off Or Leave Of Absence?**

The Sponsor may continue your coverage(s) by paying the required premiums, if you are:

1. temporarily laid off; or

2. given leave of absence.

Your coverage will not continue beyond the end of the plan month in which the lay-off or leave of absence begins.   In continuing such coverage under this provision, the Sponsor agrees to treat all covered Employees equally.

**Note:** See "Section 3 - Eligibility and Effective Dates" for continuation of coverage due to a Family Medical Leave

# SECTION 6 - TERMINATION PROVISIONS
## (Continued)

### Long Term Disability Coverage - Conversion Privilege

When your employment terminates with the Sponsor and you are no longer insured under this Policy, you may be eligible to convert and become insured under our group disability conversion policy with us without submitting Evidence of Insurability.

### How Will You Become Eligible For Group Disability Conversion?

To be eligible to purchase group disability conversion insurance, you must:

1. have been insured under this plan for 12 consecutive months immediately prior to termination of your employment. The time insured under this plan as well as the one it replaced, if any, will be considered in determining your eligibility to convert to our group disability conversion policy; and

2. apply for the disability conversion coverage and submit the first quarterly premium to us within 31 days after termination of coverage under this plan due to termination of your employment.

### What Benefits Will Be Available Under The Group Disability Conversion Policy?

If you are eligible to convert to our group disability conversion policy, we will determine the disability benefits and amount of disability coverage you will be eligible to receive in accordance with our established underwriting guidelines. The disability benefits and amount of disability coverage may not be the same as you were eligible to receive under this plan.

# SECTION 6 - TERMINATION PROVISIONS
## (Continued)

### Under What Circumstances May You Not Exercise the Conversion Privilege?

You may not exercise this Conversion Privilege if:

1. your coverage under this plan ceases for any of the following reasons:

    a. this plan terminates;
    b. this plan is amended to exclude from coverage the class of employees to which you belong;
    c. you no longer belong to a class of employees eligible for coverage under this plan;
    d. you retire (when you receive payment from any employer's retirement plan as recognition of past services or have concluded your working career);
    e. you fail to pay any required premiums;

2. you are or become insured for long term disability coverage under another group plan within 31 days after termination of employment;

3. you are disabled under the terms of this plan;

4. you recover from a disability and do not return to work for the Sponsor;

5. you are not in active employment due to a mental or physical Sickness or Injury; or

6. you are on a Leave of Absence.

## SECTION 7 - GENERAL PROVISIONS

### How Will Statements Made In Your Application Affect Your Coverage?

In the absence of fraud, all statements made in any signed Application are considered representations and not warranties (absolute guarantees). No representation by:

1. the Sponsor in applying for this plan will make it void unless the representation is contained in the signed Application; or

2. you in applying for insurance under this plan will be used to reduce or deny a claim unless a copy of the Application for insurance, signed by you, is or has been given to you.

### Who Has The Authority For Interpretation Of This Plan?

We shall possess the authority, in our sole discretion, to construe the terms of this plan and to determine benefit eligibility hereunder. Our decisions regarding construction of the terms of this plan and benefit eligibility shall be conclusive and binding.

### What Happens If Your Age Is Misstated?

If your age has been misstated, an equitable adjustment will be made in the premium. If the amount of the benefit is dependent upon your age, the amount of the benefit will be the amount you would have been entitled to if your correct age were known.

A refund of premium will not be made for a period more than twelve months before the date we are advised of the error.

### Who Will Pay Premiums During A Period For Which Benefits Are Payable?

Your Premium payments are waived during any period for which benefits are payable. If coverage is to be continued, premium payments may be resumed following a period during which they were waived.

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

### When Can This Plan Be Contested?

The validity of this plan shall not be contested, except for non-payment of premiums, after it has been in force for three years from the date of issue. The validity of this plan shall not be contested on the basis of a statement made relating to insurability by you after such insurance has been in force for three years during your lifetime, and shall not be contested unless the statement is contained in a written instrument signed by you.

### What Happens When There Are Canadian Residents Covered?

If you are domiciled in Canada: (a) premium and benefit amounts will be deemed to be expressed in Canadian currency; (b) plan provisions concerning your rights are subject to applicable provincial statutes; and (c) with respect to benefits, an action under this plan may be brought in any court in the province where you are domiciled.

### How Will This Plan Affect Workers' Compensation?

This plan and the coverages provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

### When Must We Be Notified Of A Claim?

Written notice of your claim must be given to us within 30 days of the date of the loss on which your claim is based, if that is possible. If that is not possible, we must be notified as soon as it is reasonably possible to do so.

When we have the written notice of your claim, we will send you our claim forms. If the forms are not received within 15 days after written notice of your claim is sent, you can send us written proof of claim without waiting for the form.

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

### When Must We Receive Proof Of Claim?

Proof of your claim must be given to us. This must be done no later than 90 days after the end of your Elimination Period.

Failure to furnish such proof within such time shall not invalidate nor reduce any claim if it was not reasonably possible to furnish such proof within such time. Such proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

Proof of your continued Disability or Partial Disability, when applicable, and regular attendance of a Physician must be given to us within 30 days of the request for the proof.

The proof must cover, when applicable:

   a.  the date your Disability or Partial Disability started;
   b.  the cause of your Disability or Partial Disability; and
   c.  the degree of your Disability or Partial Disability.

### When Must Payment Of Claim Be Made?

When we receive satisfactory proof of your claim, the benefit payable under this plan may be paid at least monthly, depending on the coverage for which your claim is made, during any period for which we are liable. Any balance remaining unpaid upon the termination of the period of liability will be paid immediately upon receipt of due written proof.

### Who Are Claims Paid To?

The benefit is payable to you. But, if a benefit is payable to your estate, or if you are a minor, or you are not competent, we have the right to pay up to $250 to any of your relatives or any other person whom we consider entitled thereto by reason of having incurred expense for your maintenance, medical attendance or burial. If we, in good faith, pay the benefit in such a manner, we will not have to pay such benefit again.

-44-

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

### What Are Our Examination Rights?

We, at our own expense, will have the right and opportunity to have you, whose Injury or Sickness is the basis of a claim, examined by a Physician or vocational expert of our choice. This right may be used as often as reasonably required.

### What Are Our Rights Of Recovery?

If a benefit overpayment on any claim occurs, it will be required that reimbursement be made to us within 60 days of such overpayment, or we have the right to reduce future benefit payments until such reimbursement is received. We have the right to recover such overpayments from you or your estate.

### When Can Legal Proceedings Begin?

You or your authorized representative cannot start any legal action:

  1.  until 60 days after proof of claim has been given; nor

  2.  more than three years after proof of claim is required.

### How Will We Conform With State Statutes?

Any provision of this plan which, on its Effective Date, is in conflict with the statutes of the governing jurisdiction of this plan is hereby amended to conform to the minimum requirements of such statute.

### What Are Our Rights Of Subrogation?

When your Injury appears to be someone else's fault, benefits otherwise payable under this plan for loss of time as a result of that Injury will not be paid unless you or your legal representative agrees:

  1.  to repay us for such benefits to the extent they are for losses for which compensation is paid to you by or on behalf of the person at fault;

- 45 -

## What Are Our Rights Of Subrogation? (Continued)

2. to allow us a lien on such compensation and to hold such compensation in trust for us; and
3. to execute and give to us any instruments needed to secure the rights under 1. and 2. above.

Further, when we have paid benefits to or on your behalf, we will be subrogated to all rights of recovery that you have against the person at fault. These subrogation rights will extend only to recovery of the amount we have paid. You must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to us. This provision is not enforceable where prohibited by statute or regulation.

## Rehabilitation Incentive Benefit

We will pay an Increased Monthly Benefit while you are enrolled and fully participating in a Rehabilitation Program. We must first approve the Rehabilitation Program before you can be considered for this benefit. If we do not approve a Rehabilitation Program, the regular Disability Benefit will be payable provided you are Disabled under the terms of this plan.

To be eligible for a Rehabilitation Incentive Benefit, you must:

1. be Disabled and receiving benefits under this plan; and
2. be enrolled and fully participating in a Rehabilitation Program approved by us.

## Increased Monthly Benefit

If you are eligible for a Rehabilitation Incentive Benefit, the benefit percentage shown in the Schedule of Benefits to calculate your Amount of Insurance Benefits, will be increased to 80%. The increased benefit will begin on the 1st day of the month after we receive written proof of your enrollment and full participation in the Rehabilitation Program.

## Disability Benefits Limitation

If you, at any time, decline to enroll or fully participate in an approved Rehabilitation Program recommended by us, the benefit percentage shown in the Schedule of Benefits to calculate your Amount of Insurance Benefits will be reduced to 40%, beginning on the 1st day of the month following receipt of your declination to enroll or fully participate in the approved Rehabilitation Program. If we recommend rehabilitation, benefits will be paid at the reduced amount from the date recommendation is made until we receive your written agreement to enroll and fully participate or not enroll in the Rehabilitation Program.

## Discontinuance Of The Rehabilitation Incentive Benefit

The Rehabilitation Incentive Benefit will terminate in accordance with the provisions entitled Discontinuance of Long Term Disability Benefits.

For the purpose of this provision, "Rehabilitation Program" means a comprehensive individually tailored, goal oriented program to return a Disabled Covered Person to gainful employment. The services offered may include, among other things: (a) physical therapy; (b) occupational therapy; (c) work hardening programs; (d) functional capacity evaluations; (e) psychological and vocational counseling; (f) rehabilitative employment; and (g) vocational rehabilitation to determine how your Disability may impact your employment options - including vocational evaluations, job placement services, resume preparation, job seeking skill training or retraining for a new occupation, evaluation of adaptive equipment to allow you to work, and working with the employer to assist you to return to gainful employment.

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

### Estimated Benefits

We may estimate and include, in our computation of insurance benefits, the amount you are eligible to receive under any of the plans referred to in the Benefits from Other Income provision of this plan (except, Retirement Benefits described in item 2).

With respect to benefits payable under the Social Security Act, you must make application with the Social Security Administration for benefit payments under that plan, when we determine that the Disability will extend beyond a 12 month period. If you do not make application for Social Security disability benefits when we require, we will begin to reduce your benefit by an estimated Social Security disability benefit amount. If the application is denied by the Social Security Administration, and we disagree with their decision, you are obligated to appeal the denial to the full extent afforded under the Social Security appeals process. If you do not appeal the denial, we will begin to reduce your benefit by an estimated Social Security disability benefit amount.

Benefit payments from any other source , referred to in the Benefits from Other Income provision of this plan, will reduce the benefits payable under this plan if we make a reasonable determination that you:

a. will be paid upon completion of the claim made under such plan; or

b. would have been paid if you pursued the claim under such plan within the required time.

In the event that we overestimate an amount you would have received from any plans referred to in the Benefits from Other Income provision of this plan we will reimburse you for such amount.

DOC3-GNP-0009

- 48 -

## NOTICE

If you become disabled within 12 months of your effective date of insurance, you will not be covered for long term disability coverage if your disability is caused or contributed to by, or results from a pre-existing condition.

A pre-existing condition is a condition resulting from an injury or sickness for which you are diagnosed or received treatment within three months prior to your effective date.

Treatment will include consultation, care or services provided by a physician including diagnostic measures and taking prescribed drugs.

DOP3-SNR-0001

- 49 -

## SUMMARY PLAN DESCRIPTION

Name of Plan:    Geisinger Health System Welfare Plan

Plan benefits are provided under the terms of the Group Disability Income Policy No. GF3-810-252761-01, hereinafter referred to as "the policy", issued by Liberty Life Assurance Company of Boston, hereinafter referred to as "Liberty", to the Employer as "Policyholder".

Participants Included:    See Schedule of Benefits

Name and Address of Employer:

> Geisinger Health System
> 2601 Market Place
> Harrisburg, PA 19110-9360
> Commerce Court - Suite 300

Who Pays For the Plan: Premiums are paid by the Sponsor.

Plan 1 and 2 - Employees may elect to contribute to the cost of the plan

Plan 3 - Employees and the Sponsor share in the cost of the plan

Plan Identification Number:

   a.   Employer IRS Identification No.: 23-2164794
   b.   Plan No.:   LTD:   513

Plan Year:   January 1st - December 31st

Plan Administrator, Name, Address and Telephone No:

> Geisinger System Services
> 100 N. Academy Avenue
> Danville, PA 17822-1526
> (717) 271-6640

Agent for Service of Legal Process on the Plan:   Same as above.

Type of Administration: Insurer Administration

## SUMMARY PLAN DESCRIPTION
### (Continued)

Amendment of the Sponsor's Plan:

The Sponsor's plan may be changed in whole or in part by the Sponsor's company. Such changes must be in writing and endorsed on or attached to the plan.

Amendment of Liberty's Policy:

The policy may be changed in whole or in part by mutual agreement of the Sponsor and Liberty. Only an Officer of Liberty can approve a change. The approval must be in writing and endorsed on or attached to the policy. No consent of any participant or any other person referred to in the policy(ies) shall be required to modify, amend, or change the policy(ies).

NOTE:   If you cease active employment, see your benefits administrator to determine what arrangements, if any, may be made to continue your coverage beyond the date you cease active employment.

When May The Policy Terminate?

1. If the Sponsor fails to pay any premium within the grace period, the policy will automatically terminate at 12:00 midnight of the last day of the grace period. The "grace period" is the 45 days following a premium due date during which premium payment may be paid.

2. The Sponsor may terminate the policy by advance written notice delivered to Liberty at least 31 days prior to the termination date. But the policy will not terminate during any period for which premium has been paid.

## SUMMARY PLAN DESCRIPTION
(Continued)

**When May The Policy Terminate? (Continued)**

3. Liberty may terminate the policy on any premium due date by giving written notice to the Sponsor at least 31 days in advance if:

   a. The number of employees insured is less than 10;

   b. Less than 100% of the employees eligible for any noncontributory insurance are insured for it;

   c. The Sponsor fails:

      i. To furnish promptly any information which Liberty may reasonably require; or

      ii. To perform any other obligations pertaining to the policy.

4. Termination may take effect on any earlier date when both the Sponsor and Liberty agree.

No consent of any participant or any other person referred to in the policy(ies) shall be required to terminate the policy(ies).

**What Are Your Rights In The Event Of Policy Termination?**

Termination of the policy under any conditions will not prejudice any payable claim which occurs while the policy is in force.

- 52 -

## SUMMARY PLAN DESCRIPTION
(Continued)

**What Are Your Rights Under ERISA?**

1. As a participant in this plan, you are entitled to certain rights and protection under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

   a. Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all Plan documents including insurance contracts, collective bargaining agreements (if applicable) and copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

   b. Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for the copies.

   c. Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

2. In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.

3. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

4. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

- 53 -

## SUMMARY PLAN DESCRIPTION
### (Continued)

### What Do You Do To Appeal?

You, the claimant, or your authorized representative may appeal a denied claim within 60 days after you receive Liberty's notice of denial. You have the right to:

1.  Submit a request for review, in writing, to Liberty;

2.  Review pertinent documents; and

3.  Submit issues and comments in writing to Liberty.

Liberty will make a full and fair review of the claim and may require additional documents as it deems necessary or desirable in making such a review. A final decision on the review shall be made not later than 60 days following receipt of the written request for review. If special circumstances require an extension of time for processing, you will be notified of the reasons for the extension, and a decision shall be made not later than 120 days following receipt of the request for review. The final decision on review shall be furnished in writing and shall include the reasons for the decision with reference, again, to those policy provisions upon which the final decision is based.



**LIBERTY MUTUAL.**

Liberty Life Assurance Company
of Boston

5/99

M

# RHOADS & SINON LLP

ROBERT H. LONG, JR.*
SHERILL T. MOYER
JAN P. PADEN
RICHARD B. WOOD
LAWRENCE B. ABRAMS III*
J. BRUCE WALTER
JOHN P. MANBECK
FRANK J. LEBER
PAUL A. LUNDEEN
JACK F. HURLEY, JR.
DAVID B. DOWLING
DAVID F. O'LEARY
DAVID O. TWADDELL
CHARLES J. FERRY
STANLEY A. SMITH
JENS H. DAMGAARD*
DRAKE D. NICHOLAS
THOMAS A. FRENCH
DEAN H. DUSINBERRE
DONNA M.J. CLARK
CHARLES E. GUTSHALL
PAUL F. WESSELL

SHAWN D. LOCHINGER
JAMES H. CAWLEY
DEAN F. PIERMATTEI
KENNETH L. JOEL
DEBRA M. KRIETE
TODD J. SHILL
LORI J. McELROY
THOMAS J. NEHILLA
KEVIN M. GOLD
CARL D. LUNDBLAD
JAMES E. ELLISON
RICHARD E. ARTELL
ROBERT J. TRIBECK
TIMOTHY J. NIEMAN
PAUL J. BRUDER, JR.
JOANNE BOOK CHRISTINE
SUSAN E. SCHWAB
AMY J. MENDELSOHN*
MICHAEL W. WINFIELD**
KATHRYN G. SOPHY
STEPHANIE E. DIVITTORE
KIMBERLY L. SNELL-ZARCONE
KATHLEEN D. BRUDER

*ALSO ADMITTED TO THE FLORIDA BAR
**ALSO ADMITTED TO THE MARYLAND BAR

ATTORNEYS AT LAW
TWELFTH FLOOR
ONE SOUTH MARKET SQUARE
P.O. BOX 1146
HARRISBURG, PA 17108-1146

TELEPHONE (717) 233-5731

FAX (717) 231-6637

WEBSITE: www.rhoads-sinon.com

July 3, 2001

OF COUNSEL
FRANK A. SINON
HENRY W. RHOADS
JOHN C. DOWLING
R. STEPHEN SHIBLA

PAUL H. RHOADS·
1907-1984
JOHN M. MUSSELMAN
1919-1980
CLYLE R. HENDERSHOT
1922-1980

DIRECT DIAL NO.
(717) 237-6700

FILE NO.
7583/01

Re:     Craig M. Howard v. Liberty Life Assurance Company of Boston

William C. Foster, Esquire
Kelly, McLaughlin & Foster, LLP
1617 J.F.K. Boulevard, Suite 1690
Philadelphia, PA 19103

Dear Mr. Foster:

I received Judge Kane's Order regarding a letter brief concerning the scope of discovery.

I note in the Joint Case Management Plan under item 4.352 that "Liberty Life will produce to counsel for Plaintiff all documents which are available t the claim's decision maker at the time of final denial, the policy issued to Geisinger and the claim file, excluding privileged information".

It would greatly facilitate and make more relevant our scope of discovery if we could have these documents before preparing our discovery requests.

Your cooperation and courtesy would be appreciated.

Very truly yours,

RHOADS & SINON LLP

By: John C. Dowling

JCD/clz

⌐⌐ - 5 2001

393264.1

YORK:
TELEPHONE (717) 843-1718, FAX (717) 232-1459

AFFILIATED OFFICE:
STE. 203, 1700 S. DIXIE HWY, BOCA RATON, FL 33432
TELEPHONE (561) 395-5595, FAX (561) 395-9497

LANCASTER:
TELEPHONE (717) 397-4431, FAX (717) 232-1459

# KELLY, McLAUGHLIN & FOSTER, LLP

ATTORNEYS AT LAW
1617 JFK BOULEVARD
SUITE 1690
PHILADELPHIA, PENNSYLVANIA 19103-1815

———————

TELEPHONE (215) 790-7900
FAX (215) 985-0675

SUITE 350
620 W. GERMANTOWN PIKE
PLYMOUTH MEETING, PA 19462-1056
TELEPHONE (610) 941-7900
FAX: (610) 941-8133

WILLIAM C. FOSTER
(215) 790-7930
E-MAIL:
WFOSTER@LINKKMF.COM

ADMITTED IN PA, NJ

SUITE 332
900 HADDON AVENUE
COLLINGSWOOD, NJ 08108-1903
TELEPHONE: (856) 869-3100
FAX: (856) 854-4233

OUR FILE: LIBH17307

July 20, 2001

John C. Dowling, Esquire
Rhoads & Sinon, LLP
1 South Market Square, 12th Floor
P.O. Box 1146
Harrisburg, PA  17108-1146

**Via Overnight Mail**

**Re:** **Craig M. Howard v. Liberty Life Assurance Company of Boston**

Dear Mr. Dowling:

Enclosed herewith is a copy of Liberty Life's claim file relating to the above-referenced matter.  We are also enclosing a copy of the Group Benefits Plan.

Very truly yours,

**KELLY, McLAUGHLIN & FOSTER, LLP**

William C. Foster

WCF/cfm
Enclosures

UPS Next Day Air
UPS Worldwide Express

S h i p p i n g   D o c u m e n t

See instructions on back. Call 1-800-PICK-UPS (800-742-5877) for additional information.

**TRACKING NUMBER** | 1Z F10 72V 22 1002 258 8

**1 SHIPMENT FROM**

UPS ACCOUNT NO.

SHIPPER'S UPS ACCOUNT NO.  **F 1 0 7 2 V**

REFERENCE NUMBER  *LIBH17307*

NAME  *Bill Foster*  TELEPHONE  **610-941-7970**

COMPANY
**KELLY MCLAUGHLIN & FOSTER**

STREET ADDRESS
**620 W GERMANTOWN PIKE 350**

CITY AND STATE  **PLYMOUTH MEETING    PA**  ZIP CODE  **19462-1068**

**2 EXTREMELY URGENT DELIVERY TO**

NAME  *John C. Dowling, Esq*  TELEPHONE

COMPANY  *Rhoads & Sinon*

STREET ADDRESS  *1 South Market Square 12th Fl.*  DEPT./FLR.

CITY AND STATE (INCLUDE COUNTRY IF INTERNATIONAL)  *Harrisburg PA*  ZIP CODE  *17108*

**SHIPPER'S COPY**

WEIGHT    ENTER "LTR" IF LETTER    WEIGHT If applicable

CHARGES

**4 TYPE OF SERVICE**

[X] NEXT DAY AIR    [ ] EXPRESS (INTL)    $

FOR WORLDWIDE EXPRESS SHIPMENTS
Mark an "X" in this box if shipment only contains documents of no commercial value.    [ ] DOCUMENTS ONLY

**5**    [ ] SATURDAY PICKUP    [ ] SATURDAY DELIVERY    $

OPTIONAL SERVICES    [ ] INSURED VALUE    $
Contents are automatically protected up to $100. For insured value over $100, see instructions.    AMOUNT

[ ] C.O.D.    $
If C.O.D., enter amount to be collected and attach completed UPS C.O.D. tag to package.    AMOUNT

**6 ADDITIONAL HANDLING CHARGE**    [ ] An Additional Handling Charge applies for certain items. See instructions.    $

**TOTAL CHARGES**    $

**7 METHOD OF PAYMENT**    [ ] BILL SHIPPER    [ ] BILL RECEIVER    [ ] BILL THIRD PARTY    [ ] CREDIT CARD    American Express    [ ] CHECK
Next Day Air Only    Diner's Club    MasterCard    Visa
RECORD ACCOUNT No. IN SECTION 8

**8 RECEIVERS / THIRD PARTYS UPS ACCT. NO. OR MAJOR CREDIT CARD NO.**    EXPIRATION DATE

THIRD PARTY'S COMPANY NAME

STREET ADDRESS

CITY AND STATE    ZIP CODE

The shipper authorizes UPS to act as forwarding agent for export control and customs purposes. The shipper certifies that these commodities, technology or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited.

**9 SHIPPER'S SIGNATURE**  X    DATE OF SHIPMENT

0101911202609 6/00 W



# Tracking Summary

To see a detailed report for each package, please select the Detail button.

| TRACKING NUMBER | STATUS | | |
|---|---|---|---|
| 1.   1Z F10 72V 22 1002 258 8 | **Delivered** | Delivered on: | Jul 23, 2001 9:59 A.M. |
| | | Delivered to: | HARRISBURG, PA, US |
| | | Signed by: | WEINTROB |
| | | Service Type: | NEXT DAY AIR |



Tracking results provided by UPS: Jul 3, 2002  4:15 P.M. Eastern Time (USA)

**NOTICE:** UPS authorizes you to use UPS tracking systems solely to track shipments tendered by or for you to UPS for delivery and for no other purpose. Any other use of UPS tracking systems and information is strictly prohibited.

⇧ Top of Page

Home | Track | Ship | Rates | Transit Time | Pickup | Drop-off | Supplies
Service Guide | E-Business | Customer Service | About UPS | Site Guide | MY UPS.COM

Copyright © 1994-2002 United Parcel Service of America, Inc. All Rights Reserved. NASCAR® is a registered trademark of the National Association for Stock Car Auto Racing, Inc.
Trademark and Tariff Information

N

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **CRAIG M. HOWARD** | : | |
| **Plaintiff,** | : | |
|  | : | **Case No.  1:CV-01-0797** |
| **v.** | : | |
|  | : | **Judge Kane** |
| **LIBERTY LIFE ASSURANCE** | : | |
| **COMPANY OF BOSTON,** | : | |
| **LIBERTY MUTUAL GROUP** | : | |
|  | : | |
| **Defendant.** | : | |
|  | : | |

## ANSWER TO AMENDED COMPLAINT
## WITH AFFIRMATIVE DEFENSES

The Answer with affirmative defenses of Defendant Liberty Life Assurance Company of Boston ("Liberty Life") to the Amended Complaint of Craig M. Howard respectfully represents as follows:

1.     Admitted that Plaintiff is an adult individual who resides at the  stated address. The remaining allegations of  this Paragraph are denied. Based upon documents that have been provided by Plaintiff to Liberty Life , Plaintiff is 44 years of age at the present time.

2.     Admitted.

3.     It is admitted that Liberty Life conducts business in Dauphin County, Pennsylvania and it is admitted that Liberty Life sells Group Long Term Disability insurance in the Commonwealth of Pennsylvania. The remaining allegations of Paragraph 3 are conclusions of law to which  no responsive pleading is required.

4.     Admitted.

5.     Denied as stated. It is admitted that a Plan identified as " Geisinger Health System

remaining allegations set forth in this Paragraph are denied.

9.    Denied. It is admitted that Plaintiff has made a claim for disability benefits and it is admitted that the benefits schedule provides for certain benefits for disabled persons. It is denied that Plaintiff is entitled to disability benefits under the Policy because he does not meet the definition of disability set forth in the Policy. The remaining allegations set forth in this Paragraph are denied.

10.    Admitted in part; denied in part. It is admitted that Plaintiff has made a claim for disability benefits upon Liberty Life. It is denied that Plaintiff is totally and permanently disabled and it is denied that he is entitled to benefits under the terms of the Policy. The remaining allegations of this Paragraph are denied.

11.    Admitted in part; denied in part. It is admitted that Plaintiff has made a claim for disability benefits upon Liberty Life. It is denied that Plaintiff has fully complied with the terms of the Policy to receive benefits, and it is denied that Plaintiff is totally and permanently disabled. The remaining allegations of this Paragraph are denied.

12.    Admitted in part; denied in part. It is admitted that Plaintiff has made a claim for disability benefits upon Liberty Life. It is denied that benefits are due and are to be due to Plaintiff in the future. The remaining allegations of this Paragraph are denied.

13.    It is admitted that Chuck Johnson, an Appeal Review Consultant employed by Liberty Life, wrote a letter dated February 28, 2001 and it is admitted that this letter, inter alia, made the statements set forth in this Paragraph. The remaining allegations contained in this Paragraph are denied as the correspondence dated February 28, 2001 is a document which speaks for itself. By way of further response, additional information was also set forth in this letter. A copy

3

of this letter is attached hereto and marked Exhibit "A".

14(a)-(f).    Denied.  The allegations contained in Paragraphs 14(a) through (f), inclusive, are conclusions of law which are denied.  By way of further response, it is denied that Defendant Liberty Life acted in an arbitrary, illegal, capricious, unreasonable, reckless, not in good faith, or breached its fiduciary duty at any time or in any manner.  It is averred, to the contrary, that Liberty Life properly handled Plaintiff's claim at all times. Further,  Plaintiff is not entitled to disability benefits under the Policy because he does not meet the definition of disability set forth in the Policy.

15.    Denied as stated.  It is admitted that Liberty Life pays Long Term Disability benefits to claimants who qualify for such benefits under certain policies of insurance and it is admitted that these payments are made from funds derived from premium payments made to Liberty Life by its policyholders.

16.    It is admitted that Liberty Life determines eligibility for benefits under the  Policy of Insurance referred to at paragraph 5 of this Complaint.

17.    Denied as stated.  It is admitted that Liberty Life determines eligibility for benefits and pays Long Term Disability benefits to claimants who qualify for such benefits under certain policies of insurance and it is admitted that these payments are made from funds derived from premium payments made to Liberty Life by its policyholders .

18.    Denied.  The allegations contained in this Paragraph are conclusions of law which are denied. By way of further response, it is denied that that the decisions made by Liberty Life in this case resulted from any alleged conflict of interest or bias. It is also denied that Liberty Life acted in an arbitrary or capricious manner in the handling of this claim.

19.    Denied.  The allegations contained in this Paragraph are conclusions of law which

4

are denied. By way of further response, it is denied that Plaintiff is entitled to benefits under the terms of the Policy, and it is denied that Liberty Life acted with bias or prejudice toward Plaintiff.

WHEREFORE, Defendant Liberty Life Assurance Company of Boston respectfully requests that this Honorable Court dismiss Plaintiff's Complaint with prejudice.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, controlled and limited the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA")

## SECOND AFFIRMATIVE DEFENSE

At all times material hereto, Liberty Life acted reasonably and in good faith.

## THIRD AFFIRMATIVE DEFENSE

Liberty Life's actions were supported by substantial evidence. These actions were not arbitrary, capricious or an abuse of discretion.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claim does not fall within the scope of coverage of the Policy referred to in this Answer and it is barred by the terms, conditions, definitions, exclusions and limitations set forth in that Policy.

## FIFTH AFFIRMATIVE DEFENSE

Liberty Life provided adequate written notice of the denial to Plaintiff.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a cause of action or claim upon which relief can be granted.

5

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claim is precluded by the determination of Liberty Life that Mr. Howard is not entitled to benefits. This denial was appealed by the claimant pursuant to the provisions of the Plan of Geisinger Health System, which Plan was established pursuant to the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA"), and, February 28, 2001, Liberty Life upheld the denial. This determination is final and, as a result of it, Plaintiff is not entitled to proceed with this claim.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff asserts state law claims, all such claims are barred and preempted by the provisions of the Employee Retirement Income Security Act 29 U.S.C. §1001 et seq. ("ERISA")

## NINTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff's complaint seeks to assert claims for breach of contract, breach of the obligation of good faith and fair dealing and claims of bad faith denial of benefits, all such claims are barred and preempted by the provisions of the Employee Retirement Income Security Act 29 U.S.C. §1001 et seq.("ERISA")

WHEREFORE, Defendant Liberty Life Assurance Company of Boston respectfully requests that the Court enter an Order dismissing the Complaint of Plaintiff, with prejudice, and entering judgment in its favor.

KELLY, McLAUGHLIN & FOSTER

By: _____

William C. Foster, Esquire
Identification No. 03511
Attorneys for Defendant
Liberty Life Assurance Company
of Boston

7

EXHIBIT A



Liberty Mutual Group

Group Disability Claims
PO Box 1525
Dover, NH 03821
(603) 749-2600

February 28, 2001

Rhoads & Sinon, LLP
Attorneys at Law
Attn: John Dowling
One South Market Square
PO Box 1146
Harrisburg PA 17108-1146

RE:    Long Term Disability Benefits
       Penn State Geisinger
       Claimant:    Mr. Craig Howard
       Claim #: 641498

Dear Attorney Dowling:

We have completed our review of your request for reconsideration of Mr. Craig Howard's Long Term Disability claim and have determined we are unable to alter our original decision to deny his benefits.

As stated in our letter of July 25, 2000, the Penn State Geisinger Long Term Disability policy, under which he is covered, states:

> "Disability" or "Disabled" means:
>
> i.    During the Elimination Period and the next 24 months of Disability you are unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness; and
>
> ii.    After 24 months of benefits have been paid, you are unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

The basis for Mr. Howard's denial was outlined in our letter of July 25, 2000, which is enclosed for your review.

February 28, 2001
Craig Howard
Page 3.

We received your letter dated December 19, 2000, on Mr. Howard's behalf, and the additional documentation. However, this information was already contained in Mr. Howard's file. On January 16, 2001, Mr. Howard informed us that Dr. Powers' office never received the copy of the FCE. We faxed another copy of the evaluation to Dr. Powers' office, attention Jamie, on January 17, 2001, asking for Dr. Powers' comment. We sent you a letter updating you on the status of Mr. Howard's appeal and asked for any additional medical records you wished to be part of Mr. Howard's appeal be submitted by January 31, 2001. To date, we have not received any additional medical documentation or a response from Dr. Powers.

In our attempt to provide a full and fair review, we referred Mr. Howard's file to our Medical Director, Dr. Edward Crouch. On February 7, 2001, Dr. Crouch called Dr. Powers' office in order to schedule a time convenient for Dr. Powers to discuss Mr. Howard's condition. Dr. Crouch was informed to call back on Monday, February 12, 2001. Dr. Crouch called back on February 12, 2001, and left a message asking Dr. Powers to return his call. To date, there has been no response from Dr. Powers' office to discuss the patient or to schedule a time to discuss the patient.

Mr. Howard's occupation, as a Staff Assistant, is considered sedentary and no heavy lifting is involved. He has the ability to modify positions or activities based upon physical need. Thus, it has been determined that Mr. Howard has the physical functional capacity to perform the material and substantial duties of his occupation. Therefore, he does not meet the definition of disability under the terms of Penn State Geisinger's disability policy and no benefits are payable.

Under ERISA guidelines, Mr. Howard was entitled to appeal the determination made by Liberty Life Assurance Company of Boston, and submit any additional information wished to be considered as part of the appeal. Liberty Life Assurance Company of Boston conducted a full and fair review of the appeal and accompanying materials and notified you and Mr. Howard of the results of that review. At this time, Mr. Howard's administrative rights to review have been exhausted and no further reviews will be conducted by Liberty Life Assurance Company of Boston.

*February 28, 2001*
*Craig Howard*
*Page 2.*

We received Mr. Howard's appeal letter and a medical narrative from Dr. Powers on July 31, 2000. As outlined in our letter of October 6, 2000, we were in the process of obtaining authorization from Dr. Powers to proceed with a Functional Capacities Evaluation. This was completed and the exam was scheduled for September 22, 2000. At that time, Mr. Howard informed us that he would be unable to attend that exam and that he recently had an exam performed by the Social Security Administration. Mr. Howard agreed to obtain a copy of the evaluation and submit it to us for review.

On October 25, 2000, we received a copy of Mr. Howard's Social Security award letter, a letter from Ms. Mary Bednar at Hershey Medical Center, and the first page of the evaluation performed on May 11, 2000, by Dr. Stuart A. Hartman, D.O. for the Social Security Administration. On November 3, 2000, we received the remainder of the exam from Dr. Hartman.

Based on the results of this examination, it was determined we would schedule an additional FCE, with a physical therapist. The Functional Capacities Evaluation was performed on November 9, 2000. After performing a battery of tests, the results of the evaluation concluded:

> *The results of this evaluation indicate that Craig M. Howard is best suited for a sedentary and/or light work category for an 8 hour day (US Dept. of Labor). His maximum occasional lifts were 31 and 21 pounds. His sitting tolerance was demonstrated on an occasional basis and required frequent positional changes. He tolerated standing and walking on a frequent basis.*

> *It is the opinion of this evaluation team that these results represent Mr. Howard's minimal capabilities and not his maximal capabilities.*

The results of this examination were forwarded to Dr. Powers, Mr. Howard's treating physician, for comment and additional medical documentation if he disagreed with the findings. On December 20, 2000, we received a fax from Dr. Powers' office stating that pre-payment of $250.00 was needed in order to provide any comment.

*February 28, 2001*
*Craig Howard*
*Page 4.*

Determinations made by Liberty Life Assurance Company of Boston are based on the provisions outlined in the Penn State Geisinger policy. These provisions are not contingent on decisions made by the Social Security Administration.

We have rendered our final determination of this claim and will now close our file.

Sincerely,

Chuck Johnson
Appeal Review Consultant

cc:    Craig Howard
       25 S Lingle Ave
       Palmyra PA  17078

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CRAIG M. HOWARD** | : | |
| **Plaintiff,** | : | |
| | : | **Case No.  1:CV-01-0797** |
| **v.** | : | |
| | : | |
| **LIBERTY LIFE ASSURANCE** | : | **JURY TRIAL DEMANDED** |
| **COMPANY OF BOSTON,** | : | |
| **LIBERTY MUTUAL GROUP** | : | |
| **Defendant.** | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, William C. Foster, Esquire, hereby certify that a true and correct copy of Defendant

Liberty Life Assurance Company of Boston's Answer to Plaintiff's Amended Complaint with

Affirmative Defenses was served this 1st day of August, 2001, via UPS Overnight Mail, postage

pre-paid, upon the following individual:

John C. Dowling, Esquire
Rhoads & Sinon, LLP
1 South Market Square
P.O. Box 1146
Harrisburg, PA  17108-1146


                                        KELLY, McLAUGHLIN & FOSTER

                                        By: _____
                                        **WILLIAM C. FOSTER, ESQUIRE**
                                        Attorney for Defendant
                                        Liberty Life Assurance Company of Boston

Dated: _8/1/01_

8