2 C †

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

ORIGINAL

37
7/18/02

**FILED**
HARRISBURG, PA

JUL 1 7 2002

MARY E. D'ANDREA, CLER
Per _____
Deputy Clerk

| | |
|---|---|
| CRAIG M. HOWARD | : |
| Plaintiff | : |
| | : |
| | : |
| v. | : CASE NO: 1:CV-01-797 |
| | : |
| LIBERTY LIFE ASSURANCE | : JUDGE KANE |
| COMPANY OF BOSTON, | : |
| LIBERTY MUTUAL GROUP, | : |
| Defendant | : JURY TRIAL DEMANDED |

. . . . . . . . . . . . . . . . . . . . . . . . . . . :

## EXHIBITS FOR PLAINTIFF'S TRIAL BRIEF

Respectfully submitted,

Date: July 17, 2002

John C. Dowling
RHOADS & SINON LLP
One South Market Square, 12th Floor
Harrisburg, PA  17108
(717) 233-5731

ATTORNEYS FOR PLAINTIFF

Service: **LEXSEE®**
Citation: **2000 U.S. App. LEXIS 11983**

*214 F.3d 377, \*; 2000 U.S. App. LEXIS 11983, \*\*;*
*24 E.B.C. 1897*

MARIA H. PINTO, Appellant v. RELIANCE STANDARD LIFE INSURANCE COMPANY

NO. 99-5028

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

214 F.3d 377; 2000 U.S. App. LEXIS 11983; 24 E.B.C. 1897

September 22, 1999, Argued
May 31, 2000, Filed

**SUBSEQUENT HISTORY: [\*\*1]**

As Corrected June 2, 2000. As Amended July 19, 2000.

**PRIOR HISTORY:** On Appeal From the United States District Court For the District of New Jersey. (D.C. Civ. No. 96-cv-03508). District Judge: Honorable Anne E. Thompson.

**DISPOSITION:** Reversed and remanded.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee appealed from an order of the United States District Court For the District of New Jersey, which granted summary judgment in favor of defendant insurer on claims concerning defendant's denial of plaintiff's request for benefits under the Employee Retirement Income Security Act.

**OVERVIEW:** At issue was the standard courts should use when reviewing a denial of a request for benefits under an Employee Retirement Income Security Act (ERISA) plan by an insurance company, which, pursuant to a contract with an employing company, both determine benefit eligibility, and paid those benefits out of its own funds. Plaintiff employee appealed a district court's grant of summary judgment in favor of defendant insurer on her claims concerning insurer's denial of the employee's request for benefits under ERISA. The court found that a higher standard of review was required when reviewing benefits denials of insurance companies paying benefits out of their own funds. There was a genuine issue of material fact as to whether defendant acted arbitrarily and capriciously when it concluded that plaintiff was not totally disabled by her cardiac condition and therefore was not entitled to long-term disability benefits. The court reversed the district court's judgment.

**OUTCOME:** Summary judgment reversed and remanded because a genuine issue of material fact existed as to whether defendant insurer, who both determined eligibility and administered disability plan funds, acted arbitrarily and capriciously when it concluded that plaintiff was not totally disabled by her cardiac condition and therefore was not entitled to long-term disability benefits.

**CORE TERMS:** arbitrary and capricious, fiduciary, administrator, conflict of interest, beneficiary, deference, insurer, heightened, sliding scale, deferential, administer, sedentary, conflicted, totally disabled, standard of review, cardiac, bias, doctor, asthma, dual, de novo


review, self-dealing, pulmonary, discretionary, meritorious, claimant, paying, abuse of discretion, disability, shifting

## CORE CONCEPTS - ■ Hide Concepts

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Fiduciary Responsibilities

❧When an insurance company both funds and administers an Employee Retirement Security Income plan, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review.

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Fiduciary Responsibilities

❧The United States Court of Appeals for the Third Circuit applies a sliding scale method to determine the level of review in cases involving potentially conflicted Employee Retirement Security Income fiduciaries, intensifying the degree of scrutiny to match the degree of the conflict.

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies

❧Under 29 U.S.C.S. § 1132(a)(1)(b), a beneficiary is allowed to sue for benefits due to him under the terms of the plan.

📄 Civil Procedure : Appeals : Standards of Review : De Novo Review
📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Fiduciary Responsibilities

❧The interpretation of the Employee Retirement Income Security Act is governed by the common law of trusts, and appellate review of a conflicted benefits denial is de novo based on the fact that the plan gives the administrator no discretion to interpret the plan. Trust principles dictate that fiduciaries should be given no deference when making non-discretionary decisions. A deferential standard of review is appropriate when a trustee exercises discretionary powers, but that if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Fiduciary Responsibilities

❧An insurance company acts under a strong conflict of interest when both administering and paying out benefits under an Employee Retirement Income Security Act plan.

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Fiduciary Responsibilities

❧There is an inherent conflict between the roles assumed by an insurance company that administers claims under a policy it issued. Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business.

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Fiduciary Responsibilities

❧A conflict flows inherently from the nature of the relationship when an employer contracts with an insurance company to provide and determine Employee Retirement

Income Security Act benefits.

Pensions & Benefits Law : Employee Retirement Income Security Act (ERISA) : Procedures
The Employee Retirement Security Income Act generally requires that assets of a
benefits plan be held in trust by one or more trustees. 29 U.S.C.S. § 1103(a).
However, this requirement is excepted for insurance companies; the requirements that
the assets be held in a trust does not apply to assets of a plan which consist of
insurance contracts or policies issued by an insurance company qualified to do business
in a state. 29 U.S.C.S. § 1103(b)(1).

Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Fiduciary
Responsibilities
In the determination of the question whether the trustee in the exercise of a power is
acting from an improper motive the fact that the trustee has an interest conflicting
with that of the beneficiary is to be considered.

Pensions & Benefits Law : Employee Retirement Income Security Act (ERISA) : Civil Claims
& Remedies
The best way to consider potentially relevant factors, such as a structural conflict of
interest, in evaluating an inherent conflict between the roles assumed by a company
both administering and paying out benefits under an Employee Retirement Income
Security Act plan, is to use them to heighten the degree of scrutiny, without actually
shifting the burden away from the plaintiff.


**COUNSEL:** SAMUEL J. HALPERN, ESQUIRE (ARGUED), West Orange, NJ, for Appellant.

STEVEN P. DEL MAURO, ESQUIRE, ROBERT P. LESKO, ESQUIRE (ARGUED), Del Mauro,
DiGiaimo & Knepper, Morristown, NJ, for Appellee.

**JUDGES:** Before: BECKER, Chief Judge, and GARTH, Circuit Judge and POLLAK, District
Judge. *


* Honorable Louis H. Pollak, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

**OPINIONBY:** BECKER

**OPINION: CORRECTED  [*378]  OPINION OF THE COURT**

BECKER, *Chief Judge.*

This appeal concerns the standard courts should use when reviewing a denial of a request for
benefits under an ERISA plan by an insurance company which, pursuant to a contract with an
employing company, both determines eligibility for benefits, and pays those benefits out of
its own funds. This question, and variations thereof, have bedeviled the federal courts since
considered dicta in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 103 L. Ed. 2d 80, 109
S. Ct. 948 (1989),  [**2]  gave opaque direction about how courts should review
discretionary benefits denials by potentially conflicted ERISA fiduciaries. In *Firestone,* the
Court instructed that the "arbitrary and capricious" standard was appropriate but that a
conflict of interest should be considered as a "factor" in applying this standard.

Courts of appeals have taken different approaches to integrating these seemingly

Case 1:01-cv-00797-YK    Document 87    Filed 07/17/2002    Page 5 of 101

incongruous directions when reviewing decisions of insurance companies that both fund a plan and are also ERISA plan administrators. Following the lead of five other such courts, we hold that, ☂when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review. In reaching this conclusion, we are cognizant of the previous cases in which we have been highly deferential to decisions of an employer who funds and administers a benefit plan, a practice grounded in the belief that the structural incentives to deny meritorious claims are generally outweighed by the opposing incentives to grant them -- such as the "incentives to avoid the loss of morale and higher wage demands that could [**3] result from denials of benefits." *Nazay v. Miller*, 949 F.2d 1323, 1335 (3d Cir. 1991). However, we conclude that these incentives (assuming their existence) do not apply with the same force to an insurance company that pays benefits out of its own coffers. The relationship with the welfare of the beneficiaries is more attenuated, and there are problems of imperfect information. In the insurance company-as-funder-and-administrator context, the fund from which monies are paid is the same fund from which the insurance company reaps its profits. This is in contrast [*379] to the actuarially determined benefit funds typically maintained by employers (especially in the pension area) that usually cannot be recouped by the employer or directly redound to its benefit. Our rule is also informed by the understanding that "smoking gun" direct evidence of purposeful bias is rare in these cases so that, without more searching review, benefits decisions will be virtually immunized.

The courts of appeals that have forged the trail in this area have presented different formulations of the heightened standard. Some courts, led by the Eleventh Circuit, have established a standard approaching [**4] de novo review, shifting the burden to the defendant company to explain its decisions. ☂However, we side with the majority of courts of appeals, which apply a sliding scale method, intensifying the degree of scrutiny to match the degree of the conflict.

In this case, applying a heightened degree of scrutiny because of the financial conflict, we conclude that there is a genuine issue of material fact as to whether the defendant, Reliance Standard Life Insurance Company, acted arbitrarily and capriciously when it concluded that the plaintiff, Maria Pinto, an employee of Reliance Standard's client Rhone-Poulenc Corporation, was not totally disabled by her cardiac condition and therefore did not deserve long-term disability benefits. Our heightened review allows us to take notice of discrete factors suggesting that a conflict may have influenced the administrator's decision. First, Reliance Standard's reversal of its initial decision to grant benefits was itself questionable. Second, its final report credited the evidence favorable to denial while inadequately explaining why it rejected the contrary evidence--the same evidence on the basis of which it had initially determined to award [**5] benefits. Third, while Reliance Standard relies on the fact that two physicians found Pinto not to be totally disabled while two others disagreed, one of the doctors on whom Reliance Standard relied was not a cardiologist but a pulmonologist, and he found Pinto's condition satisfactory only from his (pulmonary) vantage point, whereas the disability dispute is over a condition that is cardiological in nature.

In light of the evidence in the record, we conclude that a factfinder could find that Reliance Standard's actions were arbitrary and capricious. Therefore, we will reverse the grant of summary judgment and remand to the District Court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

Pinto was an accounting clerk for Rhone-Poulenc from 1986 to 1991. In July 1991, she stopped working because of a heart condition, which was diagnosed as mitral stenosis and cardiac asthma. After receiving short-term benefits from Rhone-Poulenc, she applied, in June 1992, for long-term disability (LTD) benefits from Reliance Standard, which had contracted to administer and pay LTD benefits under Rhone-Poulenc's ERISA plan. The policy provides

benefits for **[\*\*6]** individuals who submit "satisfactory proof" of "Total Disability" to Reliance Standard. In pertinent part, an employee is "Totally Disabled" when, "after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation." It is undisputed that Reliance Standard had discretion to interpret the plan.

When Pinto applied for LTD benefits, Dr. Alan Bahler, her treating physician since 1977, sent Reliance Standard a diagnosis of her condition, which was confirmed by a cardiac catheterization. He reported that she had mitral stenosis secondary to rheumatic heart disease, which brings on shortness of breath, and orthopnea (the inability to breathe well without sitting erect) with borderline congestive heart failure. Bahler further attested that Pinto had developed symptoms of mitral valvular dysfunction, including symptoms of cardiac asthma and early congestive heart failure, worsening exercise tolerance, and palpitations. He concluded that "her present condition precludes her from actively working even at a clerical level . . . **[\*380]** her only viable option at the present time is continued medical therapy, sedentary life style, and avoidance of high **[\*\*7]** stress situations that could precipitate her cardiac asthma." In December 1992 and April and August 1993, Bahler recertified Pinto's total disability. In the 1993 certification, Bahler indicated that Pinto could not stand for long, could not lift ten pound objects, could not be exposed to stress, and should remain sedentary.

In October 1992, Reliance Standard sent Pinto a letter granting her application for long term benefits. It advised her that periodic medical certification would be required, and requested that she promptly apply for social security disability benefits. In December 1992, Pinto certified, in connection with a disability review by Reliance Standard, that she had not in any capacity, and that she remained under treatment. She noted that she had been hospitalized for two days in November of that year, when she had been treated for bronchial asthma and acute bronchitis. In April 1993, Pinto recertified that she was disabled and represented that she had recently been treated by two physicians.

Pinto also applied for Social Security Disability benefits. In May 1993, the Social Security Administration (SSA) denied Pinto's application, finding her not disabled. **[\*\*8]** She forwarded a copy of the determination letter to Reliance Standard. Reliance Standard strongly encouraged Pinto to appeal the adverse decision, which she did. In September 1993, SSA denied Pinto's appeal, concluding that her asthma attacks could be controlled by medication, that her rheumatic heart disease was stable, and that her shortness of breath did not preclude work. One month later, Reliance Standard requested that Dr. Bahler relay to it the specific limitations that prevented Pinto from being an accounting clerk. Dr. Bahler responded by referring to his previous reports.

In November 1993, Reliance Standard terminated Pinto's benefits. Its denial letter cited the SSA denial, and the language tracked that of the denial. n1 It also asserted: "Your physician has stated that you can perform the duties of a sedentary occupation within your present physical limitations and restrictions." Reliance Standard appeared to read Dr. Bahler's assertion that Pinto needed to maintain a sedentary *lifestyle* as a statement that she could perform sedentary *work,* and the described limitations to define absolutely the limits of her potential (i.e., it apparently read his statement that **[\*\*9]** she could not lift ten pound items to imply that she could regularly lift less weighty items).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 The SSA denial stated:

        * You have asthma. However, these attacks can be controlled with prescribed medication.

* You have experienced heart problems. However, following a recovery period, you are able to work.

* The evidence shows no other condition which significantly limits your ability to work.

The Reliance Standard revocation letter stated:

1) if you have asthma it can be controlled by medication,

2) your heart condition is stable,

3) your shortness of breath according to the Social Security Administration Denial, the tests show you are still able to work.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Pinto requested a review of this decision. Dr. Bahler wrote Reliance Standard in January 1994, explaining Pinto's medical history and affirming his determination that Pinto's "only viable option at the present time is continued medical therapy, sedentary life style, and avoidance of high stress situations that **[**10]** could precipitate her cardiac asthma. . . . Pinto is totally and permanently disabled at this time and therefore is unfit to perform any task or job in the labor market." Then, in February 1994, the SSA reversed its earlier denial and awarded her benefits. It determined that she had a severe cardiac condition and that she was too disabled to perform any job for which she had the requisite skills.

In the early summer of 1994, Reliance Standard retained Dr. Martin I. Rosenthal, **[*381]** an internist, who examined Pinto and reviewed Dr. Bahler's echocardiogram and cardiac catheterization studies. He recommended pulmonary testing and, after some initial ambivalence, concluded that Pinto was not totally disabled. In November (following Rosenthal's suggestion), Dr. Robert A. Capone, a pulmonologist, examined Pinto, and initially declined to decide whether she had a disabling reactive airways disease because he thought therapeutic intervention might make a difference. However, when pressed by Reliance Standard in December (no therapeutic interaction had occurred between November and December) he indicated that he did not think that any respiratory condition prohibited her from working, and, while **[**11]** noting the inadequacy of the available data, concluded that he did "not believe that there is a strong likelihood of reactive airways disease."

After Dr. Rosenthal's examination but before Dr. Capone's, a Reliance Standard staff worker, in an internal document, recommended reestablishing Pinto's benefits pending the pulmonary testing. However, Reliance Standard decided to do the opposite, holding the resumption of benefits until the pulmonary testing. It is noteworthy that the same staff worker had similarly recommended a resumption of benefits in April because she thought Reliance Standard had misunderstood Dr. Bahler's assertion that Pinto must be sedentary to mean sedentary work instead of sedentary lifestyle. In February 1995, Reliance Standard rejected Pinto's appeal of its earlier benefits reversal. It wrote her that "Dr. Bahler, Dr. Rosenthal, and Dr. Capone have all indicated you retain the physical functional capacity to engage in sedentary work. The subsequent correlation of this activity level with the material duties of your occupation substantiated that you are capable of performing the material duties of your regular occupation."

In January 1996, Pinto was examined **[**12]** by Dr. Rowland D. Goodman, II, a heart and chest specialist who shares offices with Dr. Bahler. Dr. Goodman reviewed her medical records, examined her, and concluded that she suffered from rheumatic heart disease with

mitral stenosis and that she was totally disabled. Goodman's report was unavailable to Reliance Standard when making the initial decision, but was used when making the decision in question here (after the remand discussed *infra*).

In July 1996, Pinto filed the present ERISA suit in the District Court under ☎ 29 U.S.C. § 1132(a)(1)(b), which allows for a beneficiary to sue for "benefits due to him under the terms of the plan." In January 1997, Reliance Standard moved for summary judgment on the grounds that the decision was discretionary, and not arbitrary and capricious. The District Court agreed and granted the motion. Pinto appealed. In an unpublished opinion (hence non-precedential under our Internal Operating Procedures § 5.3), we vacated the judgment and remanded, *see Pinto v. Reliance Std. Life Ins. Co., 156 F.3d 1225* (Table) (3d Cir. May 28, 1998) (No. 97-5297), concluding that Reliance Standard had apparently misinterpreted **[**13]** Dr. Bahler's diagnosis when it stated that "all" of the physicians who had examined her determined that Pinto had the "functional capacity to engage in sedentary work." Given the disconnect between this interpretation of Dr. Bahler's diagnosis and his own repeated conclusion that Pinto was unfit for any work, we stated that

> we cannot confidently rule that Reliance's decision was not arbitrary and capricious. We are unsure whether Reliance properly reviewed Dr. Bahler's reports or whether it misinterpreted his conclusions. Moreover, we do not know whether it would have made the same decision based solely on Dr. Rosenthal and Dr. Capone's evaluations. Therefore, these are matters that will require reconsideration by Reliance.

We also briefly discussed the problem of the standard of review for situations where an insurer administers benefits out of its own funds:

> We are not convinced that such a dual role presents the type of conflict of interest **[*382]** that would warrant discarding the arbitrary and capricious standard, but in any event under *Firestone* such a conflict would merely be a factor in the court's determination whether there has been an abuse of discretion. **[**14]** . . . We . . . review Reliance's determination under an arbitrary and capricious standard, taking into account the circumstances.

Reliance Standard dutifully reconsidered, and affirmed its earlier denial. In August, an Assistant Manager of Quality Review, Richard D. Walsh, issued a letter explaining the rejection. The letter opined that, although Dr. Bahler had stated that Pinto should not work, the limitations that he put on her activity would not preclude her from working. Walsh cited the United States Department of Labor's *The Revised Handbook for Analyzing Jobs* as evidence that the job of accounting clerk is "sedentary." He also cited the conclusions of Drs. Rosenthal and Capone. As regards Dr. Goodman's examination, Walsh stated that he had "provided no new findings, restrictions, or limitations to substantiate his conclusions," and commented on the fact that he shares a mailing address with Dr. Bahler, implicitly suggesting that Goodman's conclusions might be biased by his association with Dr. Bahler. Walsh did not mention Pinto's successful appeal of the Social Security denial. Although there is no record evidence that Reliance Standard knew of Social Security's reversal, **[**15]** it must have known of it at least after the case was remanded as it is mentioned in the previous panel's opinion.

On remand, the District Court again granted summary judgment for Reliance Standard. Although it purported to apply the arbitrary and capricious standard "shaped by the circumstances of the inherent conflict of interest," it proceeded to explain that "an

administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pinto v. Reliance Std. Life Ins. Co.,* No 96-3508 (D.N.J. Dec. 12, 1998). The court concluded that there was not an issue of material fact as to whether Reliance Standard had acted arbitrarily and capriciously. Of the rejection of Dr. Bahler's conclusions in favor of those of its own doctors, the court stated that "such a determination based on independent medical evaluations is not arbitrary and capricious, even when Reliance Standard's dual role as both insurer and decisionmaker is taken into account." *Id.* This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and our standard of review is plenary.

## II. Reviewing Conflicted [**16] Decisions

### A. *Firestone*

Our analysis of the issue in this case must begin with *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989). Prior to *Firestone,* courts had adopted different approaches to the conflict of interest problem under ERISA, many choosing to vary the degree of deference they gave ERISA benefits administrators operating under a conflict of interest. *See Brown v. Blue Cross & Blue Shield of Ala.,* 898 F.2d 1556, 1560 (11th Cir. 1990) (collecting cases). However, as one court of appeals has stated, "the Supreme Court [in *Firestone*] . . . swept the standard of review board clear." *De Nobel v. Vitro Corp.,* 885 F.2d 1180, 1185 (4th Cir. 1989).

*Firestone* began when a group of plaintiffs sued their employer, who was also the ERISA plan administrator, for wrongfully terminating welfare and pension benefits. A panel of this court considered the relevant principles of trust law, with special attention to the rationales for the general deference given to impartial trustees, concluding that those reasons carry little or no force when trustees are in a position to [**17] profit from denying trust benefits. *See Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 145 (3d Cir. 1987). We also considered the incentives and actual relationship of the parties, and the fact that the benefit plan was contracted for and its terms subject to negotiation. *Id.* We concluded [*383] that trust and contract principles both dictated that our review of the conflicted benefits denial should be de novo, giving no deference to either the administrator's or participants' interpretations. We essentially applied "the principles governing construction of contracts between parties bargaining at arms length." *Id.*

The Supreme Court affirmed the specific holding in that case--that the administrator's decision should be reviewed de novo, giving no deference to either party--but used a significantly different rationale. ⊞The Court began by stating that interpretation of ERISA should be governed by the common law of trusts, and then grounded the de novo review on the fact that the plan gave the administrator no discretion to interpret the plan. *See Firestone,* 489 U.S. at 111. The Court observed that trust principles dictated that fiduciaries should [**18] be given no deference when making non-discretionary decisions, *see* 489 U.S. at 111; *see also infra* note 2. It then turned to a brief discussion pertinent to this case, noting that "a deferential standard of review [is] appropriate when a trustee exercises discretionary powers," n2 but that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, *that conflict must be weighed* as a *factor in determining whether there is an abuse of discretion.*" *Id.* at 115 (quoting *Restatement (Second) of Trusts* § 187, cmt. d (1959)) (emphasis added). Since *Firestone,* courts have struggled to give effect to this delphic statement, and to determine both what constitutes a conflict of interest and how a conflict should affect the scrutiny of an administrator's decision to deny benefits. The next two Sections discuss these problems as applied to an independent insurer who is empowered with discretion to determine who deserves benefits under a plan which it funds.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 In an article entitled *The Supreme Court Flunks Trusts,* 1990 S. CT. REV. 207, Professor John H. Langbein argues that the Supreme Court's correlation of arbitrary and capricious review with discretionary decisions and de novo review with nondiscretionary decisions has no foundation in the common law of trusts. *See id.* at 219. He submits that in our opinion in Bruch we were "following trust-law tradition in scrutinizing fiduciary conduct more closely when conflict of interest is suspected." *Id.* at 217. Langbein correctly predicted that companies would quickly redraft their plans to confer unambiguous grants of discretion so as to garner deferential review, *see id.* at 221, and also predicted that the problems of how courts should deal with conflicted fiduciaries would resurface, *see id.* at 222.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - **[\*\*19]**

## B. What Constitutes A Conflict?

Employers typically structure the relationship of ERISA plan administration, interpretation, and funding in one of three ways. First, the employer may fund a plan and pay an independent third party to interpret the plan and make plan benefits determinations. Second, the employer may establish a plan, ensure its liquidity, and create an internal benefits committee vested with the discretion to interpret the plan's terms and administer benefits. Third, the employer may pay an independent insurance company to fund, interpret, and administer a plan. While we have previously held that the first two arrangements do not, in themselves, typically constitute the kind of conflict of interest mentioned in *Firestone, see infra* Section F, today we address the third arrangement for the first time, concluding that it generally presents a conflict and thus invites a heightened standard of review. n3 Our sister circuits that have examined this issue have fallen into two basic camps. Most hold that the nature of the relationship **[\*384]** between the funds, the decision, and the beneficiary invites self-dealing and therefore requires closer scrutiny, but others allow **[\*\*20]** heightened review only if there is independent evidence that the conflict infected a particular benefits denial.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 There may be, of course, variations on each of these arrangements. For example, an employer may pay out of a fund fixed by actuarial tables, which the employer only pays into, but cannot withdraw from, or one from which the employer may withdraw unused assets. An insurance company that administers funds might charge the employing company a fixed fee, or the fee could be closely dependent on the benefits payouts. Any such difference might affect a district court's assessment of the incentives of an administrator/insurer and therefore affect the nature of its review.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

## C. Courts of Appeals Holding that the Independent Insurance Company Administrator is Operating under an Inherent Conflict

⌂The Eleventh Circuit was the first to conclude that an insurance company acts under a "strong conflict of interest" when both administering and paying out benefits under an ERISA plan. *Brown v. Blue Cross & Blue Shield of Ala.,* 898 F.2d 1556, 1561 (11th Cir. 1990). **[\*\*21]** ⌂It held that there is

    an inherent conflict between the roles assumed by an insurance company that administers claims under a policy it issued. . . . Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business.

*Id.* at 1561 (internal quotations omitted). The *Brown* court noted that a structural conflict of interest may unconsciously encourage even a principled fiduciary to make decisions that are not solely in the interest of the beneficiary. *See id.* at 1565. Under this view, although the arrangement is not illegal or inappropriate under ERISA, it warrants heightened scrutiny. "Judicial hesitation to inquire into the fiduciary's motives will leave the beneficiaries unprotected unless the existence of a substantial conflicting interest shifts the burden to the fiduciary to demonstrate that its decision is not infected with self-interest." *Id.*

In *Doe v. Group Hospitalization & Med. Servs.,* 3 F.3d 80 (4th Cir. 1993), the Fourth Circuit, like the Eleventh, concluded that a "conflict **[**22]** flows inherently from the nature of the relationship" when an employer contracts with an insurance company to provide and determine ERISA benefits.

> *Id.* at 86.
> Undoubtedly, [Blue Cross's] profit from the insurance contract depends on whether the claims allowed exceed the assumed risks. To the extent that Blue Cross has discretion to avoid paying claims, it thereby promotes the potential for its own profit. . . . Even the most careful and sensitive fiduciary in those circumstances may unconsciously favor its profit interest over the interests of the plan, leaving beneficiaries less protected than when the trustee acts without self-interest and solely for the benefit of the plan.

*Id.* at 86-87. *See also Bedrick v. Travelers Ins. Co.,* 93 F.3d 149, 154 (4th Cir. 1996) (citing *Doe).* The Fifth Circuit, in a recent en banc discussion, also affirmed a commitment to heightened scrutiny of decisions by an insurer who administers benefits from its own funds. In *Vega v. Nat'l Life Ins. Serv., Inc.,* 188 F.3d 287 (5th Cir. 1999), the plan administrator insurance company was a subsidiary of the plan insurer (the **[**23]** court treated the interests as aligned), and while the court recognized that if the company denied meritorious claims, its "reputation may suffer as a result and others may be less willing to enter into contracts where the company has discretion to decide claims," *id.* at 295 n.8, it concluded that these incentives did not outweigh the strong incentive to self-deal, *see id.* at 295-98. The Tenth and Eighth Circuits have also concluded that when an insurance company acts as the administrator for benefits coming from its own funds, the conflict warrants a more searching review. *See Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263 (8th Cir. 1997); *Pitman v. Blue Cross & Blue Shield of Okla.,* 24 F.3d 118, 120-22 (10th Cir. 1994) (citing *Doe).*

**D. Courts of Appeals Holding that the Independent Insurance Company Structural Relationship Does not Give Rise to a Conflict That Should Affect Standard of Review**

The Seventh Circuit requires a specific demonstration that bias affected a decision **[*385]** before modifying the arbitrary and capricious standard when reviewing the decisions of an insurance company in this posture. **[**24]** *See Mers v. Marriott Internat'l Group Accidental Death and Dismemberment Plan,* 144 F.3d 1014 (7th Cir. 1998). In *Mers,* the benefit plan was insured by the American International Group (AIG), an independent insurer, that also was charged with interpreting the plan. The *Mers* court considered, and rejected, Mers's argument that less deference should be given to AIG's decision because it was operating under a conflict of interest. "We presume," it held, "that a fiduciary is acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict." *Id.* at 1020. Relying on what it styled as law and economics principles, the court concluded that the requested payout in that case was slight compared to the company's bottom line, and that it is in a company's best long-term interest to award meritorious claims so that employees and employers will think and speak well of it, and seek business with it.

*Id.* at 1021. Neutrality, opined the panel, begets business success, while self-dealing hurts it. *Id.* Therefore, a claimant bears the burden of providing specific evidence of a "significant **[**25]** conflict" (without suggesting what that would entail), or specific evidence of bias. *Id.* at 1020.

The Second Circuit, like the Seventh, requires evidence that a conflict actually infected the decision before it uses anything but the most deferential review of a fiduciary's determination. *See Whitney v. Empire Blue Cross & Blue Shield,* 106 F.3d 475 (2d Cir. *Sullivan v. LTV Aerospace & Defense Co.,* 82 F.3d 1251, 1255-56 (2d Cir. 1996); *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 440-44 (2d Cir. 1995). It reasons not from effect but language, concluding that *Firestone* simply does not require anything but arbitrary and capricious review unless the plaintiff demonstrates how a conflict biased a fiduciary's decision. *See Pagan,* 52 F.3d at 440-44. However, it is noteworthy that a recent panel of the Second Circuit, in an opinion by Judge Oakes joined by Judges Newman and Winter, has expressed dissatisfaction with *Pagan* and *Whitney.* While recognizing that it was bound by precedent, it stated that "we have numerous concerns regarding *Pagan,* which we believe reduces *Firestone's* ruling **[**26]** as to the impact of a conflict of interest." *DeFelice v. American Int'l Life Assur. Co. of New York,* 112 F.3d 61, 66 n.3 (2d Cir. 1997).

### E. Courts of Appeals In Which the Law Is Unclear

The Ninth and Sixth Circuits appear to be unsettled on this issue. The Ninth Circuit sometimes requires something more than the fact that an insurance company administers benefits out of its own funds to trigger heightened review. In *Atwood v. Newmont Gold,* 45 F.3d 1317, 1322-23 (9th Cir. 1995), the court explained that the traditional abuse of discretion standard applies even in conflicted situations unless there is specific evidence that the conflict infected the process. In *Snow v. Standard Ins. Co.,* 87 F.3d 327, 331 (9th Cir. 1996), the court followed *Atwood* when an insurance company both funded and administered an ERISA plan, declining to apply heightened review because there was no evidence that the "formal conflict led to a true conflict." 87 F.3d at 331. *See also Lang v. Long-term Disability Plan of Sponsor Applied Remote Tech.,* 125 F.3d 794 (9th Cir. 1997) (only applying heightened review because there **[**27]** were independent indications that the conflict biased the decisionmaking). On the other hand, in *Tremain v. Bell Indus., Inc.,* 196 F.3d 970, 976 (9th Cir. 1999), the court stated that "less deferential" arbitrary and capricious review was in order when the plan administrator was also the insurer. *Cf. Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 n.2 (9th Cir. 1999) ("Because we conclude that Kearney is entitled to de novo review, which gives no deference at all to Standard's decision, we do not reach the question whether he would be entitled to less deferential review were he entitled only to review for abuse of discretion.").

**[*386]** The Sixth Circuit's precedent is also unclear. In *Miller v. Metropolitan Life Ins.,* 925 F.2d 979, 984-85 (6th Cir. 1991), the court took the insurance company's conflict of interest into account in the court's review of the insurance company's decision as an administrator, therefore applying a heightened arbitrary and capricious standard. On the other hand, in *Yeager v. Reliance Standard,* 88 F.3d 376, 381-82 (6th Cir. 1996), the court did not consider the conflicted role of the insurance **[**28]** company when applying the arbitrary and capricious standard.

### F. The Law of this Circuit

We have not previously addressed the precise issue involved in this case. There is, however, some cognate discussion of the standard of review in cases where an employer both funded and administered a plan. In the first such case, *Nazay v. Miller,* 949 F.2d 1323 (3d Cir. 1991), we applied the unmodified arbitrary and capricious standard in reviewing a denial of benefits. While implicitly recognizing that there might be a risk of opportunism, we concluded that this alone did not constitute evidence of a conflict of interest, in part because the

employer "had incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits." *Id.* at 1335. We also commented on the fact that the denial was individual, instead of class-based, implying that when more money was at stake--i.e., when a large class of beneficiaries requested and was denied benefits--the potential conflict might invite closer scrutiny. *See id.*

In the same year, we decided *Kotrosits v. GATX Corp. Non-contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1173 (3d Cir. 1992), **[**29]** in which a benefits committee within a company administered the company's funded plan. We concluded that the unmodified arbitrary and capricious review was appropriate in the absence of specific, tangible evidence that the structural relationship had tainted the review process. Though we held that a plaintiff urging that we disregard the grant of discretion in a plan "has the burden of showing some reason to believe the exercise of discretion has been tainted," we stated that this burden could be met "where such a party shows the kind of conflict of interest that could realistically be expected to bias the decision makers." *Id.* at 1173. If such a conflict were present, we suggested, *"[Firestone] counsels in favor of withholding deference." Id.* n4 By way of explaining why we presumed that the fiduciary was not influenced by self-interest in *Kotrosits,* we compared the assets of the plan (which were substantial) to the potential costs of paying out to the beneficiaries (which were also substantial, but less so), and concluded that it was unlikely that the company would have to replenish the plan. *See Id.* "The record shows no direct impact on the Plan **[**30]** sponsor and only a possibility of future indirect consequences to it." *Id.*

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n4 The Fifth Circuit has taken this as evidence that we follow the Eleventh Circuit. *See Vega,* 188 F.3d at 297.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

In *Abnathya v. Hoffman-LaRoche, Inc.,* 2 F.3d 40 (3d Cir. 1993), we recognized that "some degree of conflict inevitably exists where an employer acts as the administrator of its own employee benefits plan," but held that the conflict in that case was insufficiently compelling to "require special attention or a more stringent standard of review under *[Firestone]." Id.* at 45 n.5. We noted that the company's contributions to the fund were fixed such that it "incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits." *Id. See also Mitchell v. Eastman Kodak,* 113 F.3d 433, 437 n.4 (3d Cir. 1997) (following the reasoning and language of *Abnathya*).

While *Heasley v. Belden & Blake Corp.,* 2 F.3d 1249 (3d Cir. 1993) **[**31]** is not directly on point, it demonstrates an openness to using **[*387]** heightened scrutiny when a party administers benefits out of its own funds. In *Heasley,* we reviewed de novo whether an ERISA plan term "experimental procedure" applied to a liver transplant. We recognized that the apparent ambiguity of this term might be cured if the plan provided for a party to interpret it, but noted that under such a scheme, the interpretation should be allocated to an independent party, given the threat of self-dealing. *See id.* at 1260-61 n.12. This, we said, followed the "general and sensible rule that courts scrutinize more closely decisions by plan administrators acting under a conflict of interest." *Id.*

The final opinion that bears mention is our earlier unpublished (and therefore non-precedential) opinion in this very case, *Pinto v. Reliance Std. Life Ins. Co.,* 156 F.3d 1225 (Table) (3d Cir. May 28, 1998) (No. 97-5297). In that opinion we stated as follows:

> We are not convinced that such a dual role presents the type of conflict of interest that would warrant discarding the arbitrary and capricious standard, but in any event under *Firestone* such **[**32]** a conflict would merely be a factor in

the court's determination whether there has been an abuse of discretion.

An issue similar to that before us here was considered by our sister circuits in _Brown v. Blue Cross and Blue Shield of Alabama, Inc.,_ 898 F.2d 1556 (11th Cir. 1990), and _Miller v. Metropolitan Life Insurance Corp.,_ 925 F.2d 979 (6th Cir. 1991). The _Miller_ court, following _Brown,_ held that in such a circumstance although the insurance company's "fiduciary role lies in perpetual conflict with its profit making role as a business, and the conflict of interest is substantial . . . the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest." _Miller,_ 925 F.2d at 984. We too will apply this standard and review Reliance's determination under an arbitrary and capricious standard, taking into account the circumstances.

Under the arbitrary and capricious standard, an administrator's decision will only be overturned if it is "without reason, unsupported by substantial evidence or erroneous as a matter **[**33]** of law. . . . the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." It is important to recognize that ERISA does not make the judges the decisionmakers. It merely assures that the appropriate procedure is followed.

The opinion is somewhat delphic. But the citations to _Miller, see supra_ Section II.E, _infra_ Section IV, (and also to _Brown, see supra_ Section II.C, _infra_ Section IV), both of which consider an insurer making decisions out of its own funds to be operating under an inherent conflict (in contrast to citations of cases of a contrary stripe), suggest that a heightened degree of scrutiny is required in this situation, an approach essentially the same as that we adopt in this opinion, but which we refine and clarify. _See_ Part IV, adopting the "sliding scale" approach endorsed by a majority of our sister circuits. n5

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n5 The purpose of the remand was to permit Reliance Standard to revisit its denial of benefits, because the panel thought that Reliance Standard had misunderstood Dr. Bahler's assessment of Pinto's capabilities. Therefore, the prior panel did not need to precisely assess the structural relationship, nor determine a method for shaping our arbitrary and capricious review when there is a conflict. Both issues are now squarely before us.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[**34]**

### III. Is Heightened Review Required When an Insurance Company Both Funds and Administers Benefits?

Informed by our canvass of the jurisprudence, we are persuaded that heightened scrutiny is required when an insurance company is both plan administrator and funder. We find especially persuasive the analysis of the Fourth, Fifth, Eighth, Tenth and Eleventh Circuits, and their conclusion that potential self-dealing warrants **[*388]** that fiduciary insurer's decisions be closely inspected. We do not denigrate the Seventh Circuit's suggestion that if a carrier denied clearly meritorious claims on a regular basis and became notoriously unfriendly to claimants, unions and employees might protest and demand that their employer switch to a different insurance plan. Nor do we think that most insurance companies are unmoved by the importance of building a strong reputation and competing successfully for the business of administering plans. An insurance company "can hardly sell policies if it is too severe in administering them." _Doe v. Travelers Ins. Co.,_ 167 F.3d 53, 57 (1st Cir. 1999). However, ERISA litigation generally arises only in close cases, and there would seem to be **[**35]** insufficient incentive for the carrier to treat borderline cases (unlikely to become causes celebres) with the level of attentiveness and solicitude that Congress imagined when it

created ERISA "fiduciaries." Rather, insurance carriers have an active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers, an economic consideration overlooked by the Seventh Circuit.

To amplify, while in a perfect world, employees might pressure their companies to switch from self-dealing insurers, there are likely to be problems of imperfect information and information flow. Employees typically do not have access to information about claim-denying by insurance companies, and the relationship between employees and insurance companies is quite attenuated; so long as obviously meritorious claims are well-handled, it is unlikely that an insurance company's business will suffer because of its client's employees' dissatisfaction. Additionally, many claims for benefits are made after individuals have left active employment and are seeking pension or disability benefits. Details about the handling of those claims, [**36] whether responsible or irresponsible, are unlikely to seep into the collective knowledge of the still active employees. If Pinto's claim is denied, few at Rhone-Poulenc will learn of it, and Reliance Standard will have little motive to heed the economic advice of the Seventh Circuit that "it is a poor business decision to resist paying meritorious claims for benefits." Mers, 144 F.3d at 1020.

We also observe that the typical employer-funded pension plan is set up to be actuarially grounded, with the company making fixed contributions to the pension fund, and a provision requiring that the money paid into the fund may be used only for maintaining the fund and paying out pensions. As we explained in Abnathya and Mitchell, the employer in such a circumstance "incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits." Abnathya, 2 F.3d at 45 n.5; Mitchell, 113 F.3d at 437 n.4. In contrast, although there is nothing in the record indicating the precise nature of Reliance Standard's internal structure, the typical insurance company is structured [**37] such that its profits are directly affected by the claims it pays out and those it denies. n6

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 We do not, of course, pretend to establish an absolute, per se rule, recognizing that different relationships between the parties could effect a different result. Cf. Metropolitan Life Ins. Co. v. Potter, 992 F. Supp. 717 (D.N.J. 1998) ("[A] conflict may arguably be ameliorated where, as here, the plan is experience-rated because the premiums charged to the employer are adjusted annually based on claims paid the previous year and thus the fiduciary's incentive to deny claims to increase profits is lessened, if not eliminated.").

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

We recognize that the preceding section involves implicit assumptions about economic behavior, but such assumptions have become necessary in the post-Firestone era as we, and other courts, must somehow determine when a conflict warrants close scrutiny. Inasmuch as we are making such assumptions, however, they seem less exceptional than those of the Seventh Circuit, [**38] which, we believe, has an overly optimistic view of the flow of information and the sophistication of employees. Furthermore, while all circuits that have considered [*389] these questions appear to agree that some level of conflict may be unavoidable and not every conflict will heighten the level of scrutiny, the Seventh and Circuits alone require evidence of actual self dealing, and hold that the nature of the relationship itself can never, or almost never, affect the standard of review. Needless to say, Firestone contains no such requirement, and its use of the word "conflict" instead of "direct evidence of bias" counsels against the most stern reading. As we opined in Kotrosits, the Firestone court appears, by recognizing the import of a conflict, to have "implicitly adopted the position . . . that, where the claimant demonstrates that it would be inequitable to defer to the plan administrator, stricter scrutiny of his decision is in order." 970 F.2d at 1172.

Finally, this is not a scenario where a "smoking gun" is likely to surface, and direct evidence of a conflict is rarely likely to appear in any plan administrator's decision. Our reading, we believe, [**39] infuses at least some meaning into the *Firestone* regime.

Finally, the unique role of insurance companies within ERISA supports our position. ☒ERISA generally requires that assets of a benefits plan be "held in trust by one or more trustees." 29 U.S.C. § 1103(a). However, this requirement is excepted for insurance companies; the requirements that the assets be held in a trust *does not apply* "to assets of a plan which consist of insurance contracts or policies issued by an insurance company qualified to do business in a State." 29 U.S.C. § 1103(b)(1). Therefore, "inasmuch as 'the basis for the deferential standard for review in the first place was the trust nature of most ERISA plans,' the most important reason for deferential review is lacking." *Brown v. Blue Cross and Blue Shield of Ala.,* 898 F.2d 1556, 1561 (11th Cir. 1990) (quoting *Moon v. American Home Assurance Co.,* 888 F.2d 86, 89 (11th Cir. 1989)).

Our own case law in the general area, set forth in Section II.F, supports our conclusion. These opinions are self-consciously laden with negative pregnants, suggesting that structural bias [**40] could heighten the review. For example, we noted that the defendants in those cases did *not* "incur" a "direct expense as a result of the allowance of benefits," or "benefit directly from the denial or discontinuation of benefits," *Abnathya,* 2 F.3d at 45 n.5; *Mitchell,* 113 F.3d at 437 n.4, implying that a company that did profit directly would be subject to a more stringent standard. Likewise, the most deferential review was appropriate when the employer had "incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits," *Nazay,* 949 F.2d at 1335, and there was only a "possibility of future indirect consequences to it," *Kotrosits,* 970 F.2d at 1173. By negative implication, a heightened standard of review would appear to be appropriate when a plan funder like an insurance company "incurs a direct expense," the consequences to it are direct and contemporary, and, while it has incentives to maintain good business relationships, it lacks the incentive to "avoid the loss of morale and higher wage demands that result from a denial of benefits." We are also supported by the fact [**41] that the great bulk of district courts in this Circuit have interpreted this precedent as mandating heightened scrutiny when the insurance company is the insurer and makes determinations. n7

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 *See* *Nolen v. Paul Revere Life Ins. Co.,* 32 F. Supp. 2d 211, 216 (E.D. Pa. 1998) (the dual role requires a heightened standard): *Morris v. Paul Revere Ins. Group,* 986 F. Supp. 872, 881-82 (D.N.J. 1997) (same); *Rizzo v. Paul Revere Ins. Group,* 925 F. Supp. 302, 309 (D.N.J. 1996) (same), *aff'd,* 111 F.3d 127 (3d Cir. 1997); *Nave v. Fortis Bens. Ins. Co.,* No. 98-3960, 1999 U.S. Dist. LEXIS 13382 (E.D.Pa. Aug. 25, 1999) ("Fortis's dual role as the Plan's claims administrator and as the insurance company which insures the benefits provided under the Plan certainly creates a genuine or substantial conflict of interest."); *Landau v. Reliance Std. Life Ins. Co.,* No. 98-903, 1999 U.S. Dist. LEXIS 3673 (E.D. Pa. Jan. 13, 1999) (following *Brown); Sciarra v. Reliance Standard Life Ins. Co.,* No. 97-1363, 1998 U.S. Dist. LEXIS 13786 (E.D. Pa. Aug. 26, 1998) ("[Defendant's] dual role as administrator and insurer of its own plan creates a conflict between its providing benefits to claimants and its own financial status."); *Perri v. Reliance Standard Life Ins. Co.,* No. 97-1369, 1997 U.S. Dist. LEXIS 12741 (E.D. Pa. Aug. 19, 1997) ("Reliance Standard's dual role as administrator and insurer of its own plan creates a conflict between its providing benefits to claimants and its own financial status."); *cf. Marques v. Reliance Std. Life Ins. Co.,* 1999 U.S. Dist. LEXIS 17406 (E.D. Pa. Nov. 1, 1999) ("This Court finds it hard to believe that there is not a conflict of interest when the defendant makes benefit decisions and pays for benefits out of its own assets.").

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - [**42]  [*390]

For all the foregoing reasons, we believe that a higher standard of review is required when reviewing benefits denials of insurance companies paying ERISA benefits out of their own funds.

## IV. What Standard of Review?

The question remains, then, *what* should be the higher standard of review? This secondary question is distinct from the first: even those courts that find that there is no conflict in the insurance company context have struggled with how to incorporate a conflict--when they find one--into the framework of arbitrary and capricious review mandated by *Firestone.* In *Kotrosits v. GATX Corp. Non-contributory Pension Plan for Salaried Employees, 970 F.2d 1165, 1173 (3d Cir. 1992)* we stated that had a conflict existed, *Firestone* "counsels in favor of withholding deference." This suggests de novo review. On the other hand, in *Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 n.5 (3d Cir. 1993)* we suggested that the circumstances might require "special attention or a more stringent standard of review under *Firestone."* Again, we turn to the other circuits, where we find three methods of dealing with a conflict: burden shifting,  **[**43]** de novo review, and the sliding scale.

We begin with *Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556 (11th Cir. 1990),* in which the Eleventh Circuit turned to the common law of trusts to determine the appropriate method for reviewing the conflicted discretionary decisions of an insurance company. *See 898 F.2d at 1564.* It concluded that while an uninterested fiduciary should receive a great deal of deference, common law trust cases dictated that the highly conflicted one should not; even potentially conflicted decisions were closely scrutinized, in part to protect the particular beneficiaries in a given case, and in part "to discourage arrangements where a conflict arises." *Id. at 1565.* The court determined that a beneficiary need only show a substantial structural conflict of interest in order to shift the burden to the fiduciary to demonstrate that the conflict did not infect a benefits denial. *See id. at 1566.* It announced the following rule:

> When a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts **[**44]** to the fiduciary to prove that its interpretation of plan provision committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

*Id.* at 1566-67.

To be sure, as a preliminary matter, the court must first determine that the fiduciary's decision was "'wrong' from the perspective of de novo review." *Id.* at 1567 n. 12. But once shifted, the task of justifying the interpretation is by no means insurmountable. If the fiduciary can demonstrate a routine practice or give other plausible justifications--such as the interests of other beneficiaries--deference may be granted. "Even a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion **[*391]** among choices which reasonably may be considered to be in the interests of the participants and beneficiaries." *Brown,* 898 F.2d at 1568. **[**45]** The kind of justification that is given as an example is an assertion, supported by evidence, that an insurance company's "interpretation of its policy is calculated to maximize the benefits available to plan participants and beneficiaries at a cost that the plan sponsor can afford (or will pay)." *Id.* The legitimacy of such an assertion should be ascertained by looking to, among other things, the consistency of the practice, the reasonableness of the "reading" (in that case, interpreting a

term), and the internal consistency of the plan with the proffered reading. *See id.*

The essence of the Eleventh Circuit's approach is that the fiduciary should be accorded deference, but only when deciding between options which are all in the best interest of the beneficiary or beneficiaries. Insurance companies, unlike the typical trustees, may be viewed with some skepticism because of the primacy of their profit-making function. Therefore, given the structural conflict, the administrator of an insurance company funding an ERISA plan has the burden of proving that beneficiary interests motivated a decision which would be "wrong" under de novo review. *See id.* A version of the *Brown* **[**46]** approach has been followed by several panels of the Ninth Circuit. *See, e.g., Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1322 (9th Cir. 1995) (given material probative evidence of a conflict, the burden is shifted to the denying company to give a legitimate justification for a denial).

The Second Circuit, while stringent in requiring particular evidence that a conflict infected the decisionmaking process, uses de novo review once it credits such evidence. *See Sullivan v. LTV Aerospace & Defense Co.,* 82 F.3d 1251, 1255-56 (2d Cir. 1996). Unlike the Eleventh Circuit, the test outlined in *Sullivan* does not include burden shifting. "If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan de novo." *Id.*

Other courts have rejected the shifting burden and either/or models, and instead use a sliding scale approach, according different degrees of deference depending on the apparent seriousness of the conflict. According to the Fourth Circuit, "the fiduciary decision will be entitled to some deference, **[**47]** but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 87 (4th Cir. 1993). Despite this divergence from the Eleventh Circuit's burden shifting, we read the *Doe* court as engaging in a highly demanding exercise when it applies this sliding scale, "review[ing] the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries." *Id.*

The Fourth Circuit's sliding scale approach has been adopted by several other courts. *See Vega v. National Life Ins. Service, Inc.,* 188 F.3d 287, 296 (5th Cir. 1999) (en banc) (using the sliding scale approach); *Chambers v. Family Health Plan Corp.,* 100 F.3d 818 (10th Cir. 1996) ("The arbitrary and capricious standard is sufficiently flexible to allow a reviewing court to adjust for the circumstances alleged, such as trustee bias in favor of a third-party or self-dealing by the trustee."); *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir. 1991) **[**48]** (the arbitrary and capricious standard is "shaped" by the circumstances when there is a conflict of interest). Despite a feint in the direction of adopting the *Brown* approach, *see Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263, 1265 (8th Cir. 1997) (holding that the "perpetual conflict" which exists when an insurer administers benefits from its own plan warrants a de novo standard of review), the Eighth Circuit has settled on the sliding scale. *See Woo v. Deluxe Corp.,* 144 F.3d 1157, 1161 (8th Cir. **[**392]** 1998) (explicitly adopting sliding scale). The First Circuit uses something like the sliding scale, testing a decision by measuring its "reasonableness" in the context it was made, which necessarily includes an awareness of the effects of the decision on the parties. *Doe v. Travelers Ins. Co.,* 167 F.3d 53, 57 (1st Cir. 1999). Reasonableness, notes that court, "has substantial bite itself." *Id.*

We adopt the approach of the sliding scale cases. That approach allows each case to be examined on its facts. The court may take into account the sophistication of the parties, the information accessible to the parties, and the exact financial **[**49]** arrangement between the insurer and the company. For example, a court can consider whether the insurance contract is fixed for a term of years or changes annually, and whether the fee paid by the company is modified if there are especially large outlays of capital by the insurer.

Were we to apply extremely deferential arbitrary and capricious review, we would likely affirm the judgment **[**53]** of the district court, because there is some credible evidence which an administrator could have relied upon to conclude that Maria Pinto was not totally disabled. Two doctors, one of whom is a specialist in cardiology, stated that they did not believe that she was totally disabled. Therefore, Reliance Standard's decision was not "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya, 2 F.3d at 45* (quoting *Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500* (W.D.Pa. 1989)). On the other hand, were we to apply de novo review, we would probably conclude that Reliance Standard made the incorrect determination, because Pinto presented credible evidence from her long-time treating cardiologist that she was totally disabled for cardiological reasons, evidence which was affirmed by another cardiologist, and only one other cardiologist, who had much less opportunity to perform tests and examine her than her own doctor, concluded that she was not. According deference to neither side, Pinto's case seems stronger.

However, applying a heightened arbitrary and capricious review, we are deferential, but not absolutely deferential. **[**54]** Like the Fifth Circuit, "the greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard." *Vega, 188 F.3d at 297.* Therefore, we look not only at the result--whether it is supported by reason--but at the process by which the result was achieved. In so doing, we note several problems. First, Reliance Standard reversed its own initial determination that Pinto was totally disabled without receiving any additional medical information. The only thing that changed between Reliance Standard's initial acceptance and its subsequent denial was that Pinto notified Reliance Standard that her SSA application had been rejected (a determination that the SSA subsequently abandoned). The SSA's rejection of Pinto appears to have triggered Reliance Standard's investigation into Pinto's disability, suggesting that Reliance Standard places significant trust in the SSA process, yet the SSA's subsequent reversal had no such effect. Inconsistent treatment of the same facts was viewed with suspicion by the *Brown* court. *See 898 F.2d at 1569* ("That [the insurance company] would reach opposing conclusions on the basis **[**55]** of the same evidence seriously challenges the assumptions upon which deference is accorded to [its] interpretation of the plan.").

Second, looking at the final decision, we see a selectivity that appears self-serving in the administrator's use of Dr. Bahler's expertise. Reliance Standard used some of Dr. Bahler's specific limitations to explain its rejection, but it did not accept (or satisfactorily explain its rejection of) his conclusion that she was totally disabled. **[*394]** The Fifth Circuit addressed a similar circumstance, where the administrator credited one part of the advice of a treating doctor, but not his other advice. That court held that this was unacceptable in the context. *See Salley v. E.I. DuPont de Nemours & Co., 966 F.2d 1011, 1015 (5th Cir. 1992).* This inconsistent treatment of the same authority *in two separate instances* (the SSA, Dr. Bahler) raises the likelihood of self-dealing. Applying the sliding scale to this case, our review is ratcheted upward by these suspicious events.

Finally, when a staff worker reviewing the files recommended that Pinto be reestablished pending further testing, her suggestion was rejected, and Reliance Standard decided **[**56]** to do the opposite: suspend the resumption of benefits. Although this in itself does not prove bias, it lends further support to the view that whenever it was at a crossroads, Reliance Standard chose the decision disfavorable to Pinto. The default position was that benefits were not granted.

Taking all of these procedural anomalies into account, we find ourselves on the far end of the arbitrary and capricious "range," and we examine the facts before the administrator with a high degree of skepticism. n8

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n8 Our focus on process should not be read to require an additional duty to conduct a good faith, reasonable investigation. That is, we are not holding that Reliance Standard had a duty to gather more information, merely that the decision might have been arbitrary and capricious given the information available. *Compare Vega*, 188 F.3d at 288 (rejecting claim that administrator had an affirmative duty to conduct good faith and reasonable investigation).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Reliance Standard relies heavily on the **[**57]** "two-to-two" argument, arguing that because there are two doctors on either side of the Pinto disability debate, a decision to credit either side cannot be arbitrary and capricious. However, neither of the doctors retained by Reliance Standard had the same contact with Pinto that Dr. Bahler did. Dr. Rosenthal read Dr. Bahler's reports, examined Pinto, and talked with her, but this examination, however professional, does not compare with the eighteen years of interaction between Dr. Bahler and Pinto. The essence of Dr. Balder's conclusion was that Pinto's condition was "labile"; that is, her condition *could* severely worsen under stress or activity ("high stress situations . . . could precipitate her cardiac asthma."). Although she *might* be able to persist in an occupation for some time, and she had basic motor skills, the risk of work was too great. Reliance Standard gave no explanation for its rejection of this aspect of Dr. Bahler's assessment.

Moreover, while Reliance Standard relies on Dr. Capone, Dr. Capone is a pulmonologist; he could only, and did only, assess whether she had pulmonary problems. The pulmonary examination was at Dr. Rosenthal's suggestion, but neither **[**58]** Pinto nor Dr. Bahler have suggested that the source of her disability was pulmonary. That Dr. Capone concluded that she was not disabled by respiratory disease should not discredit Dr. Bahler. Moreover, Dr. Capone originally suggested that in order to decide whether Pinto was disabled, she would first need to undergo therapy to see if it made a difference. She never underwent therapy, but despite his initial reluctance--and after being pressed--he concluded that she was not totally disabled. If Reliance Standard was as accommodating with Dr. Bahler's conclusions as it was with Dr. Capone's, it would likely have granted Pinto benefits.

For these reasons, a factfinder could conclude that Reliance Standard's decision to credit its doctors over Drs. Bahler and Goodman was the result of self dealing instead of the result of a trustee carefully exercising its fiduciary duties to grant Pinto the benefits due her under the insurance plan. Summary judgment was therefore inappropriate, for there is a genuine issue of material fact as to whether Reliance Standard acted arbitrarily and capriciously. The judgment of the District **[**395]** Court will be reversed, and the case remanded for further proceedings **[**59]** consistent with this opinion. There is sufficient evidence at this stage to merit a penetrating review of the decision under the heightened standard. The decision was close enough that such a review may result in a determination that it was arbitrary and capricious. On remand, the District Court may take evidence regarding the conflict of interest, and ways in which the conflict may have influenced the decision, and then determine whether, considering the conflict, the decision was "arbitrary and capricious" in the sense described in Section IV.

Service: **LEXSEE®**
Citation: **2000 U.S. App. LEXIS 11983**
View: Full
Date/Time: Friday, June 22, 2001 - 4:43 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2001 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

B

LEXSEE 122 f.supp.2d. 566

**MARY FRIESS, Plaintiff, v. RELIANCE STANDARD LIFE INS. CO., et al., Defendants.**

**CIVIL ACTION NO. 99-5010**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*122 F. Supp. 2d 566; 2000 U.S. Dist. LEXIS 17118*

**November 29, 2000, Filed**

**DISPOSITION:**
 [**1] Defendant's Motion for Summary Judgment DENIED without prejudice.

**COUNSEL:**
For MARY P. FRIESS, PLAINTIFF: ARLENE GLENN SIMOLIKE, ARLENE GLENN SIMOLIKE AND ASSOCIATES, PHILADELPHIA, PA USA. RACHEL BENNER DeANGELO, ARLENE GLENN SIMOLIKE AND ASSOCIATES, P.C., PHILADELPHIA, PA USA.

For RELIANCE STANDARD LIFE INSURANCE COMPANY, DEFENDANT: JOSHUA BACHRACH, RAWLE AND HENDERSON, PHILA, PA USA.

**JUDGES:**
ANITA B. BRODY, J.

**OPINIONBY:**
ANITA B. BRODY

**OPINION:**

[*568]

**EXPLANATION AND ORDER**

 Before me is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion will be denied without prejudice.

 Plaintiff Mary Friess brought this action against the defendant, Reliance Standard Life Insurance Company ("Reliance") following Reliance's denial of her claim for long-term disability ("LTD") benefits. Because the insurance policy at issue is an employee benefit plan, this action is governed by the Employee Retirement Income

Security Act of 1974 ("ERISA"), *29 U.S.C. § § 1001* et seq. Removal was proper as ERISA provides that a civil action may be brought in federal court by a plan participant "to recover benefits due to him under the terms of the plan. . [**2] . ." *29 U.S.C. § 1132*(a)(1)(B). ERISA preempts all state claims that "relate to any employee benefit plan." *29 U.S.C. § 1144*(a).

**Factual Background n1**

 n1 As appropriate at summary judgment, the following facts, where controverted, are construed in the manner most favorable to the plaintiff as non-moving party.

 Woodward and Lothrop established and maintained a benefit plan offering LTD benefits to its employees. As an employee of Woodward and Lothrop, n2 Friess participated in the plan. Her coverage under the plan became effective in 1989. n3

 n2 Friess was a merchandise associate at John Wanamaker's, a division of Woodward and Lothrop, at the time of her allegedly disabling injury.

 n3 The parties do not dispute the fact that Friess had coverage under the LTD Policy. In 1989, through her employer, Friess applied for LTD insurance with Reliance. She opted for the coverage that provided benefits equivalent to 60% of her salary should she become disabled. Answer to Defendant's Motion for Summary

122 F. Supp. 2d 566, *; 2000 U.S. Dist. LEXIS 17118, **

Page 2

Judgment, Exhibit A. Friess allegedly paid the premiums, through a payroll deduction, from 1989 until the date of her accident in May 1994.

[**3]

Woodward and Lothrop's plan was insured under a group LTD policy ("the Policy") issued and administered by Reliance. The Policy states that Reliance will pay a monthly benefit if an insured:

[*569]

(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us.

Defendant's Motion for Summary Judgment, Exhibit B, p. 7.0. According to the Policy, an employee is "Totally Disabled" when "during the Eliminator Period and thereafter an Insured cannot perform the material duties of any occupation. ... Any occupation is one that the Insured's education, training or experience will reasonably allow." Id. at 2.1. An insured who is "Partially Disabled"--capable of performing the material duties of any occupation on a part-time basis or some of the material duties on a full-time basis--will be considered Totally Disabled, the definition continues, except during the "Elimination Period." The "Elimination Period" is defined as a period of 90 consecutive days of Total Disability for which no benefit is payable, [**4] and begins on the first day of Total Disability. Id. at 1.0-2.0.

On January 19, 1996, Friess submitted a claim for LTD benefits under the Policy. Friess maintained that she had become totally disabled on May 25, 1994, when she fell from a platform at work and broke her left ankle. In her motion, plaintiff indicates that she had expected the injury to heal, allowing her to return to work. However, her doctors eventually determined that the ankle injury was permanent, as her severe pain and difficulty walking and standing did not subside. Following the determination that the injury was permanent, Friess filed her claim with Reliance in January of 1996. n4

n4 Since the accident, Friess has made successful claims for worker's compensation and Social Security disability benefits. Friess has been receiving worker's compensation benefits since May 25, 1994, the day of the fall at work. Reliance was aware of the worker's compensation claim, but maintains that Friess did not give

Reliance a copy of the file made by the worker's compensation insurance carrier. On April 14, 1999, the Social Security Administration ("SSA") awarded Friess disability benefits.

[**5]

After receiving Friess's claim in January of 1996, Reliance opened a file on Friess and began obtaining medical records from her treating physicians. At Reliance's request, Friess provided the necessary medical releases and authorizations, and also provided Reliance with contact information concerning the doctors she had seen after the ankle injury. Based on the information provided by Friess, Reliance undertook to contact those doctors to obtain necessary records and evaluations.

The compiled medical records document problems with Friess's left ankle and foot dating from November 28, 1994, when William Markmann, M.D. began treating Friess for those problems. n5 However, Friess maintains that her medical treatment began immediately following her fall on May 25, 1994. On the day of the fall, she was taken to the emergency room at Nazareth Hospital and treated for an ankle injury. On the next day, May 26, 1994, Friess saw Dr. Thomas Peff for treatment. Dr. Peff treated Friess over the next several months. During that time, Dr. Peff put a cast on the ankle and had Friess perform physical therapy.

n5 The medical records indicate that Friess saw Dr. Markmann in early 1989 for problems with her left ankle. As Reliance does not claim that its denial of benefits was predicated on a finding of preexisting condition, however, that evidence is not relevant.

[**6]

In November of 1994, Dr. Markmann's practice assumed care for Friess. The record of his November 28, 1994 evaluation n6 indicates that Friess described her earlier treatment under Dr. Peff to Dr. Markmann. Friess also provided Dr. Markmann with x-rays she brought with her from Dr. Peff's office. Friess complained to Dr. Markmann of persistent pain in her left ankle and foot that made [*570] walking and standing difficult. Dr. Markmann ordered an MRI n7 scan of her ankle and foot and also an EMG n8 of her back and left leg. On December 20, 1994, Markmann prescribed Percodan in response to Friess's request for pain relief.

n6 Defendant's Motion for Summary Judgment, Exhibit D.

Case 1:01-cv-00797-YK   Document 37   Filed 07/17/2002   Page 24 of 101

● ● Page 4

122 F. Supp. 2d 566, *; 2000 U.S. Dist. LEXIS 17118, **

Friess was taken immediately following the accident at work, nor from Dr. Peff, who first treated Friess for her injury.

The parties dispute the reasons for the absence of Dr. Peff's records from the administrative record. Friess contends that Dr. Peff did not respond because Reliance made an error in its request for records. Reliance sent a written request to Dr. Peff dated October 23, 1996. n14 In that request, Reliance asked Dr. Peff to provide copies of all medical treatment records "for the period from May 1, 1995 to present." Friess broke her ankle in May of 1994. She [**11] was no longer in Dr. Peff's care by May of 1995. Because Reliance did not request records from the relevant time period, Friess maintains, Dr. Peff did not respond and Reliance lacked information critical to it decision.

>    n14  Answer to Defendant's Motion for Summary Judgment, Exhibit B.

Reliance points out that the Policy places the burden of producing medical records on Friess, providing that benefits will be paid "if an Insured ... submits satisfactory proof of Total Disability to us." In its reply brief, Reliance included a letter sent to Friess on October 25, 1996 informing her that the medical information necessary to continue processing her claim had not been received. n15 The letter stated that Reliance had requested information from Dr. Peff and Dr. Grossinger, and would not continue to process the application until a response was received. The letter also stated: "if you have additional medical information not previously supplied, please forward a copy for our review." Despite the October 23, 1996 request [**12] to Dr. Peff and the October 25, 1996 notice to Friess, Reliance never received records from Dr. Peff. Reliance made its December 13, 1996 decision to deny benefits based on an administrative record that contained no medical documentation made prior to November 28, 1994, although the ankle injury occurred in May of 1994.

>    n15 Defendant's Reply Brief in Support of its Motion for Summary Judgment, Exhibit A.

Friess claims that she attempted to appeal the December 1996 decision, and was again denied. On October 1, 1999, Friess filed suit in the Philadelphia County Court of Common Pleas. Reliance properly removed the action to federal court.

## Summary Judgment Standard

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court should determine whether there [**13] are factual issues that merit a trial. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Summary judgment is appropriate if no factual issues exist and the only issues before the court are legal. See *Sempier v. Johnson and Higgins, 45 F.3d 724, 727 (3d Cir. 1995).*

At summary judgment, the nonmoving party receives the benefit of all reasonable inferences. See *Sempier, 45 F.3d at 727.* The motion should be granted if the record taken as a whole "could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348.*
 [*572]

## Standard of Review for Denial of Benefits under ERISA

The ERISA statute itself does not dictate a standard of review. However, the Supreme Court addressed the issue in *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989),* and determined that:

a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo [**14] standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. ... Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.

*Id. at 115* (citation omitted). Under Firestone, when a plan grants its administrator discretionary authority, courts should limit review of the administrator's decision to abuse of discretion. Firestone also instructs that a discretionary administrator's conflict of interest should influence the amount of deference a court shows in its review of the decision under the abuse of discretion standard.

The Third Circuit has subsequently held that when the language of a plan gives the administrator discretionary authority, courts must apply the arbitrary

Case 1:01-cv-00797-YK    Document 37    Filed 07/17/2002    Page 25 of 101

122 F. Supp. 2d 566, *; 2000 U.S. Dist. LEXIS 17118, **

Page 5

and capricious standard of review. n16 See *Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 44-45 (3d Cir. 1993).* Under that highly deferential standard of review, a court must defer to the administrator's [**15] decision unless the decision "is not clearly supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Id. at 41.* The discretion required to trigger the arbitrary and capricious standard of review can be express or implied from the plan's terms. See *Luby v. Teamsters Health Welfare and Pension Trust Funds, 944 F.2d 1176, 1180 (3d Cir. 1991).*

> n16 The "arbitrary and capricious" standard is essentially the same as the "abuse of discretion" standard. See *Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45, n.4 (3d Cir. 1993).* See also *Nazay v. Miller, 949 F.2d 1323, 1336 (3d Cir. 1991); Daniels v. Anchor Hocking Corp., 758 F. Supp. 326, 328-330 (W.D. Pa. 1991).*

The Courts of Appeals have gone in somewhat different directions in their efforts to interpret Firestone's instruction that a conflict of interest should be a "factor" in determining the level of deference [**16] shown to a discretionary administrator. The Third Circuit recently held that when an insurance company both insures and administers benefits, it is generally acting under a conflict of interest that warrants a heightened form of the arbitrary and capricious review standard. See *Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377, 378 (3d Cir. 2000).* While recognizing that particular circumstances could ameliorate the inherent conflict, the Third Circuit in Pinto recognized that the typical insurance company is structured so that the payment of claims directly affect its profits. Given that self interest, "there would seem to be insufficient incentive for the carrier to treat borderline cases ... with the level of attentiveness and solicitude that Congress imagined when it created ERISA 'fiduciaries.'" *Id. at 388.* The Third Circuit concluded that a heightened standard is appropriate when reviewing benefit denials of insurance companies that pay ERISA benefits out of their own funds. See *Id. at 390.*

In Pinto, the Third Circuit adopted the "sliding scale" approach to review under a "heightened" arbitrary and capricious [**17] standard. To best reconcile Firestone's dual commands, the Third Circuit concluded, the arbitrary and capricious standard cannot be abandoned even in the presence of a conflict that threatens to seriously bias the administrator's decision. Rather, the intensity of review should increase in proportion to the intensity of the conflict. See *Pinto, 214 F.3d at 393.* The Third [*573] Circuit instructed district courts to "consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review." Id.

While the Court in Pinto subjected self-interested administrators to a more searching standard of arbitrary and capricious review, it refused to impose new evidentiary burdens on them. In Pinto, the Third Circuit made it clear that the conflicted administrator is not required to make a good faith, reasonable investigation of a claim. See *Pinto, 214 F.3d at 394, n.8.* The Third Circuit did not suggest that the administrator has a duty to gather more information. See Id. Imposing such duties would effectively shift the burden of proof to the administrator. A rule that permitted such a result would be at odds with [**18] the Supreme Court's instructions to defer to the determinations of administrators vested with discretionary authority.

Rather, the proper inquiry is whether the record adequately supports the administrator's decision. n17 In Pinto, the Third Circuit instructed lower courts to consider not only the reasonableness of the result, but also the process by which the result was achieved. See *Pinto, 214 F.3d at 393.* Courts should scrutinize the problems in the decisionmaking process used by the self-interested administrator. "Suspicious events" raise the likelihood of self-dealing, and move review toward the stricter extreme of the arbitrary and capricious range. See *Id. at 394.*

> n17 Policy considerations reinforce the wisdom of focusing the inquiry on the sufficiency of the record. Such an approach eliminates the need for the district court to engage in fact-finding, an exercise that would discourage the parties from assembling evidence at the administrator's level, where evidence is most easily and most efficiently assembled. See *Vega v. National Life Insurance Services, 188 F.3d 287, 298 (5th Cir. 1999).*

[**19]

To arrive at the proper standard of review, the district court must make a finding on the extent to which conflicts of interest warrant increased scrutiny. Pinto held that the district court, while forbidden from expanding the administrative record on the historic facts that informed the administrator's decision, may take evidence regarding the conflict of interest and ways in which the conflict may have influenced that decision. n18 See *Pinto, 214 F.3d at 395.* The Third Circuit described the type of evidence the court may consider

Case 1:01-cv-00737-YK    Document 37    Filed 07/17/2002    Page 26 of 101

122 F. Supp. 2d 566, *; 2000 U.S. Dist. LEXIS 17118, **

Page 6

when evaluating the seriousness of the conflict: the sophistication of the parties, the information accessible to the parties, the exact financial relationship between the insurer and the employer company, the current status of the fiduciary, and the stability of the employer company. n19 *Id. at 392.* Such evidence equips the district court to review the contested decision under an "arbitrary and capricious" standard heightened according to the potency of the conflict.

n18 The district court also may find sufficient evidence in the record to conclude that review under the heightened standard is required. *Pinto, 214 F.3d at 395.* [**20]

n19 Defendant's Motion for Summary Judgment indicates that Friess's former employer, Woodward and Lothrop, ceased operations in 1996. Some courts assume that an employer's reputational interest in fairly settling the claims of its employees may mitigate potential conflicts, as the employer would come under pressure to discontinue a plan that was highly unpopular with its employees. Here, Woodward and Lothrop cannot be counted on to police Reliance's temptation to self deal.

**Application**

If the Policy grants discretionary authority to Reliance, its decision to deny Friess benefits must be reviewed under the arbitrary and capricious standard. The Policy does not contain an express grant of discretionary authority to the administrator, Reliance; rather, it provides that Reliance will pay benefits if the insured submits "satisfactory proof" of total disability. The grant of discretion in the policy does not need to be explicit to trigger [*574] the arbitrary and capricious review standard. The Third Circuit has recognized that discretionary authority may be implied in a plan's terms even if not granted [**21] expressly. See *Luby, 944 F.2d at 1180.*

The Third Circuit in Pinto found discretionary authority conveyed in the exact "satisfactory proof" language used in the Policy. Considering a provision requiring submission of satisfactory proof of total disability, the Third Circuit concluded: "It is undisputed that Reliance Standard had discretion to interpret the plan." *Pinto, 214 F.3d at 379.* n20 The identical language in the Policy before this court, therefore, invests Reliance with discretion over benefit determinations.

n20 Courts in this district and in other circuits have concluded that this exact "satisfactory proof" language confers discretion on the administrator. See, e.g., *Marques v. Reliance Standard Life Insurance Co., 1999 U.S. Dist. LEXIS 17406, No. CIV.A. 99-2033, 1999 WL 1017475,* at *2 (E.D. Pa. Nov. 1, 1999) (Relying on Luby to infer discretion from the "satisfactory proof" language); *Landau v. Reliance Standard Life Insurance Co., 1999 U.S. Dist. LEXIS 279, No. CIV.A. 98-903, 1999 WL 46585* at *4-5 (E.D. Pa. Jan. 13, 1999); *Sciarra v. Reliance Standard Life Insurance Co., 1998 U.S. Dist. LEXIS 13786, No. CIV.A. 97-1363, 1998 WL 564481* at *7-8 (E.D. Pa. Aug. 26, 1998) (Finding that the phrase "satisfactory proof" confers discretionary authority on Reliance to determine eligibility for LTD benefits). See also *Yeager v. Reliance Standard Life Insurance Co., 88 F.3d 376, 381 (6th Cir. 1991); Wilcox v. Reliance Standard Life Insurance Co., 1999 U.S. App. LEXIS 5027, No. 98-1036, 1999 WL 170411* at *2 (4th Cir. Mar. 23, 1999) (unpublished opinion) ("Only the most tortured reading of the language in Reliance's 'Insuring Clause' could lead to a conclusion that the plan in this case is not vested with the discretionary authority to determine eligibility for benefits.").

[**22]

While Reliance has discretion, if its judgment is compromised by conflicts of interest, the highly deferential standard of arbitrary and capricious review must be adapted. Conflicts must be factored into the deference shown to the administrator's determination. In this case, Woodward and Lothrop paid Reliance to fund, interpret, and administer its LTD plan. In Pinto, the Third Circuit concluded that such an arrangement "generally presents a conflict and thus invites a heightened standard of review." *Pinto, 214 F.3d at 383.* Simply by the terms of its arrangement with Woodward and Lothrop, Reliance has a potential conflict of interest.

In determining the influence of the potential conflict on the decision to deny Friess LTD benefits, I must consider the process by which Reliance reached that decision. Pinto does not impose on Reliance a duty to conduct a good faith, reasonable investigation; however, it does invite the conclusion that Reliance based on inadequate information might have been arbitrary and capricious. Procedural anomalies indicating a biased review process help the court determine how much to lessen its deference to the administrator's decision. [**23]



122 F. Supp. 2d 566, *; 2000 U.S. Dist. LEXIS 17118, **

Page 7

Overall, it seems that Reliance may have conducted an unreasonably lax investigation into Friess' claim. For example, the record indicates that its effort to reach Dr. Peff, the first doctor to treat Friess, amounted to a single letter containing a major error. While Reliance made it clear to Friess that she was responsible for submitting additional medical information not already supplied, it may have been reasonable to think that Reliance had undertaken to contact Dr. Peff on its own. As Dr. Peff did not respond to the erroneous letter, Reliance may have lacked adequate medical information on the crucial period of time immediately following Friess's May 1994 injury.

In addition, Reliance did not undertake an independent medical review of Friess' condition. While Reliance is not required to order an independent examination, the failure to examine may indicate an inattentive process. Also, Reliance did not credit the Social Security Administration's finding that Friess was disabled. n21 The Court [*575] in Pinto actually observed that Reliance, also a party to the Pinto case, "places significant trust in the SSA process." *Pinto, 214 F.3d at 393*. Finally, Reliance [**24] may have used selectively the statement made by Dr. Beight, Friess' attending physician. Reliance concludes that Dr. Beight has certified Friess for sedentary work, yet fails to credit both his inability to say when she might possibly return to work, and his conclusion that Friess probably has reached maximum recovery. Procedural anomalies such as these, Pinto suggests, could push a court to the "far end of the arbitrary and capricious 'range,'" causing the court to examine the administrative record with great skepticism. *Pinto, 214 F.3d at 393*.

n21 Reliance argues in its Motion for Summary Judgment that the SSA determination was not a part of the administrative record on which it made its December 1996 decision to deny benefits. Friess learned of the favorable decision from the SSA in April 1999, months before she filed suit against Reliance. Had she presented it to Reliance at that time as evidence of disability, Reliance could have used the SSA findings to reconsider its decision.

**[**25] Conclusion**

Summary judgment must be denied if a reasonable factfinder could conclude that Reliance's decision was the result of self-dealing instead of the result of a trustee carefully exercising its fiduciary duty to Mary Friess. See *Pinto, 214 F.3d at 394*. Here, there appear to be genuine issues of material fact as to whether Reliance may have acted arbitrarily and capriciously under the Pinto standard in making its determination on the basis of an inadequate record.

On the basis of the evidence already submitted by parties, it might be possible to conclude that Reliance's conflict of interest is sufficiently potent to warrant a penetrating review of the decision to deny Friess benefits. However, I defer my conclusion to allow the parties to gather evidence on the conflict of interest and the ways in which the conflict ought to shape the heightened arbitrary and capricious standard of review described in *Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000)*.

Defendant's Motion for Summary Judgment is therefore denied without prejudice. An appropriate order follows.

**AND NOW**, this 29th Day of November, [**26] 2000, it is **ORDERED** that Defendant's Motion for Summary Judgment (Docket Entry No. 9) is **DENIED** without prejudice.

It is **FURTHER ORDERED** that the parties are authorized to take discovery until January 19, 2001 regarding the potential conflict of interest according to *Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000)*. The parties shall file dispositive motions no later than February 2, 2001. The parties shall file responses to dispositive motions no later than February 16, 2001.

**ANITA B. BRODY, J.**

Case 1:01-cv-00797-YK    Document 57    Filed 07/17/2002    Page 28 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7940                    Page 1 of 19

Service:  **LEXSEE®**
Citation:  **2001 U.S. Dist. LEXIS 7940**

*2001 U.S. Dist. LEXIS 7940, \**

ALAN R. DAVIES, Plaintiff VS. THE PAUL REVERE LIFE INSURANCE COMPANY, a Provident Company, Defendant

3:CV-99-0370

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2001 U.S. Dist. LEXIS 7940

June 13, 2001, Decided
June 13, 2001, Filed

**DISPOSITION:  [\*1]**  PRLIC's motion for summary judgment denied and plaintiff's motion for summary judgment treated as motion for partial summary judgment granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff sued defendant insurer after the insurer determined that plaintiff was not entitled to benefits under a long-term disability insurance policy governed by the Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq. The parties filed cross-motions for summary judgment.

**OVERVIEW:** Plaintiff claimed that the insurer had abused its discretion in determining that he was not eligible for long-term disability benefits. The court applied a heightened arbitrary and capricious review standard given that the insurer determined eligibility for benefits and funded the payment of those benefits. The administrative record compiled before the plan administrator did not contain sufficient evidence on which a reasonable mind could have based a rational decision that plaintiff remained able to perform the important duties of his occupation as a commodities trader notwithstanding repeated episodes of uncontrolled blood pressure while at work. Rather, the credible medical testimony in the record compelled the opposite conclusion, that plaintiff's uncontrolled hypertension precluded him from engaging in the stressful activities of the job. Thus, plaintiff was entitled to an award of benefits, at least through the date of a physician's report.

**OUTCOME:** Plaintiff's motion for summary judgment was treated as a motion for partial summary judgment and was granted. Defendant's motion for summary judgment was denied.

**CORE TERMS:** hypertension, blood pressure, arbitrary and capricious, medication, occupation, commodities, summary judgment, disability, disability benefits, uncontrolled, eligibility, duty, administrator, interview, insurer, conflict of interest, heightened, labile, consultant, claimant, impairment, severe, administrative record, doctor, performing, diagnosis, trader, summary judgment motion, deferential, searching

### CORE CONCEPTS - ■ Hide Concepts

Civil Procedure : Summary Judgment : Summary Judgment Standard
Cross-motions for summary judgment do not constitute a concession by the parties that summary adjudication of dispositive issues is appropriate. Accordingly, a district

court confronted with cross-motions for summary judgment must still ascertain whether there is any genuine dispute as to a material fact. A contest concerning facts that could affect the outcome of the litigation under governing substantive law, i.e., the material facts, precludes entry of summary judgment. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable fact finder could return a verdict for the non-moving party.

Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies

A denial of benefits challenged under 29 U.S.C.S. § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. When the language of a plan governed by the Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., accords the administrator discretionary authority to determine eligibility for benefits, judicial review of a decision to deny benefits is limited to ascertaining whether the denial is arbitrary and capricious. The arbitrary and capricious standard is essentially the same as the abuse of discretion standard. Under this highly deferential standard, an administrator's decision will not be disturbed if reasonable.

Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies

Where a plan administrator with discretionary authority to decide eligibility for benefits under the Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., is burdened by a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion. According to the United States Court of Appeals for the Third Circuit, there is a mandate for a more searching scrutiny of discretionary decisions in situations where the impartiality of the administrator is called into question, either because the structure of the plan itself inherently creates a conflict of interest or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case.

Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies

When an insurance company both insures and administers benefits, it is generally acting under a conflict of interest that warrants a heightened form of the arbitrary and capricious review standard. While recognizing that particular circumstances could ameliorate the inherent conflict, the United States Court of Appeals for the Third Circuit recognizes that the typical insurance company is structured so that the payment of claims directly affects its profits. Given that self interest, there would seem to be insufficient incentive for the carrier to treat borderline cases with the level of attentiveness and solicitude that Congress imagined when it created fiduciaries under the Employee Retirement Income Security Act (ERISA), 29 U.S.C.S. § 1001 et seq. A heightened standard is appropriate when reviewing benefit denials of insurance companies that pay ERISA benefits out of their own funds.

Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies

In the context of reviewing a benefit denial by an insurance company that pays Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., benefits out of its own funds, the United States Court of Appeals for the Third Circuit adopts the sliding scale approach to review under a heightened arbitrary and capricious standard. To best reconcile the dual commands of judicial precedent, the arbitrary and capricious standard cannot be abandoned even in the presence of a conflict that threatens to

Case 1:01-cv-00737-YK    Document 37    Filed 07/17/2002    Page 30 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7940                    Page 3 of 19

seriously bias the plan administrator's decision. Rather, the intensity of review should increase in proportion to the intensity of the conflict.

📋 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
❦Factors pertinent to the intensity of scrutiny applied when reviewing benefit denials by insurance companies that pay Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., benefits out of their own funds include the sophistication of the parties, the information accessible to the parties, the exact financial arrangement between the insurer and the company, and the current status of the fiduciary. Such evidence equips the district court to review the contested decision under an arbitrary and capricious standard heightened according to the potency of the conflict.

📋 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
❦In the context of reviewing a benefit denial by an insurance company that pays Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., benefits out of its own funds, the United States Court of Appeals for the Third Circuit indicates that a more searching scrutiny of discretionary decisions is warranted where the structure of the plan itself inherently creates a conflict of interest. When an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review. Lower courts have required application of a heightened arbitrary and capricious review where the entity deciding eligibility for benefits also pays the benefits.

📋 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
❦In the context of reviewing a benefit denial by an insurance company that pays Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., benefits out of its own funds, the United States Court of Appeals for the Third Circuit instructs that review under a heightened arbitrary and capricious standard is deferential, but not absolutely deferential, and the greater the evidence of conflict on the part of the administrator, the less deferential the abuse of discretion standard. The reviewing court is to look not only at the result, whether it is supported by reason, but at the process by which the result was achieved. In this regard, although there is no duty to conduct a good faith, reasonable investigation, judicial precedent does invite the conclusion that a decision based upon inadequate information might have been arbitrary and capricious.

📋 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
❦While an insurer is not required to order an independent examination under the Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., the failure to examine may indicate an inattentive process.

📋 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
❦Pursuant to the Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., courts will overturn adverse benefits decisions based upon such selective reading of medical records by a captive consultant.

**COUNSEL:** For ALAN R. DAVIES, plaintiff: Lucille Marsh, J. Frederick Rohrbeck, Kreder, Brooks, Hailstone & Ludwig, Scranton, PA.



Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7940                    Page 4 of 19

For THE PAUL REVERE LIFE INSURANCE COMPANY, defendant: Elizabeth A. Venditta, Andrew F. Susko, White & Williams, LLP, Philadelphia, PA.

**JUDGES:** Thomas I. Vanaskie, Chief Judge, Middle District of Pennsylvania.

**OPINIONBY:** Thomas I. Vanaskie

**OPINION: MEMORANDUM**

The principal issue presented in the above-captioned matter on cross-motions for summary judgment is whether The Paul Revere Life Insurance Company ("PRLIC") abused its discretion in determining that plaintiff Alan R. Davies was not entitled to benefits under a long term disability insurance policy governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, et seq. Because a combination of factors -- including, in particular, the inherent conflict of interest in PRLIC not only administering the ERISA-governed disability plan, but also funding plan benefits -- warrants more stringent scrutiny on the "sliding scale" of abuse of discretion review established in Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000), and PRLIC's denial of benefits does not survive close examination of its processes and rationale, PRLIC's summary judgment motion will be denied. **[*2]** Furthermore, because the record demonstrates that Mr. Davies' uncontrolled hypertension rendered him "unable to perform the important duties of his own occupation on a Full-time or part-time basis," -- the test for eligibility for benefits under the plan -- Davies' summary judgment motion will be granted.

## I. BACKGROUND

On May 1, 1997, Davies applied to PRLIC for benefits under a group long term disability insurance policy issued by PRLIC to Davies' employer, Sterling Commodities Corp. The policy issued and administered by PRLIC provides for payment of benefits in the event a covered employee:

>    1. is unable to perform the important duties of his own occupation on a Full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy; and
>
>    2. does not work at all; and
>
>    3. is under Doctor's Care.

Appendix to Defendant's Summary Judgment Motion at PRL000394. n1

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n1 The administrative record on Davies' claim for benefits was filed as an Appendix to the Defendant's Summary Judgment Motion. Hereinafter, the administrative record will be cited as "App. at PRL #."

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*3]**

There is no dispute that Davies satisfied the second and third requirements for disability benefits -- he did not work at all and he was under a doctor's care. The focus of PRLIC's decision was on his ability to perform the important duties of his own occupation on a full or part-time basis.

The record reveals that Davies sustained damage to an aortic valve as a result of rheumatic fever in 1961, when he was 11 years old. (App. at PRL00006.) Davies claims that since suffering from rheumatic fever he has had blood pressure problems, with very high systolic and very low diastolic readings. (Id.) In January of 1986, at age 35, Davies underwent a surgical replacement of his aortic valve with a porcine valve. At that time, Davies had been working in the commodities trading business for approximately 12 years. (Id.) Davies temporarily left the commodities business following the 1986 surgery, returning in January 1990 because "I had been feeling very well, and my blood pressure was normal after that first surgery, for the first time in my adult life." (Id.) In June of 1994, the porcine valve was replaced with a St. Jude's valve. Davies returned to work as a commodities trader **[*4]** in September of 1994. (Id.) In his application for disability benefits, Davies reported:

> After my second surgery, my blood pressure did not return to the normal levels it had been after the first surgery. I have had high readings at virtually every checkup since, although the valve itself is functioning normally. I have been on various medications since the second surgery to control my blood pressure, starting with Vasotec and Lanoxin. I have experienced a variety of symptoms at work, including light-headedness, dizziness, headache, tingling in the fingers, pain in the left arm, tightness and pain in the chest and back, and stabbing pain in the lower back. Also, flashing lights in my eyes, leading to headaches.
>
> These symptoms have become increasingly frequent and severe over the last year. I became concerned with how I was feeling on the trading floor and began to have my blood pressure checked by the registered nurse on duty at the trading floor. The first time I had it checked I was shocked that it was so high, around 200/105. The nurse was concerned, asked me if I was on medication, and recommended immediately calling my doctor. This was repeated about once a week **[*5]** for the next few weeks, with no appreciable change, and I saw my doctor in late February 1997. We tried various medications, but my pressure at work remained very high. My doctor told me to take a medical leave on March 28, and I have not returned to work since. My blood pressure seems to be under better control away from work, although it is still not as normal as I would like. Unfortunately, I believed that if I were to return to work, my pressure would immediately go back up to dangerously high levels.

(App. at PRL000006-7.) Confirming Davies' account of high blood pressure while at work were reports of the "floor nurse," which were as follows:

| Date | Reading |
| --- | --- |
| March 5, 1997 | 174/100 |
| March 12, 1997 | 186/106 |
| March 13, 1997 | 176/100 |
| March 19, 1997 | 180/106 |
| March 25, 1997 | 186/104 |
| March 26, 1997 | 176/100 |

(App. PRL000073.)

Accompanying the application for disability benefits was an April 22, 1997 letter from Davies' attending physician, Don W. Henderson, M.D., F.A.C.P. Dr. Henderson indicated that, while anti-hypertensive medication proved effective outside the work environment, Davies' blood

pressure was essentially uncontrolled when he was working  **[*6]**  as a commodities broker. Dr. Henderson concluded:

> [Davies] prognosis is guarded. His blood pressures do clearly go out of control at work. I mentioned to him that he should strongly consider discontinuing his present employment.

(App. at PRL000015.)

By letter dated August 1, 1997, PRLIC informed Davies' counsel that the application for long term disability benefits was denied. The denial letter suggested that consideration of Davies' claim had been impaired as a result of the refusal of Davies' counsel to allow a field claim representative to interview Dr. Henderson. As to the medical records that were obtained, PRLIC explained:

> We have reviewed the medical records from Dr. Henderson and Dr. Bernardi. Volatile or lobile [sic] hypertension should be controlled with appropriate medication. Dr. Bernardi, Mr. Davies' cardiologist, did not need to see him for six months following his February 20, 1997 visit. The office notes during that visit state that Mr. Davies was experiencing no chest pain, no shortness of breath, no syncope. He has had no growth limiting symptoms. Dr. Henderson states that Mr. Davies has significant improvement when he is taking his medications.  **[*7]**
>
> * * *
>
> Based on the medical documentation that we have obtained, we find no evidence of a continued impairment that would have rendered Mr. Davies totally disabled from performing the important duties of his occupation as a floor trader.

(App. at PRL000038-39.)

The denial letter followed review of the file by Dr. Marvin Goldstein, an in-house medical consultant employed by PRLIC. n2 Dr. Goldstein was requested to answer the following questions:

> Based on the records does it appear that [Davies] would be totally precluded from performing the important duties of his occupation since 3-27-97? Do we need additional information?

(App. at PRL000036.) Dr. Goldstein's handwritten reply, dated June 30, 1997, n3 consists entirely of the following:

> (1) No. Despite the claimant's # 10 statement n4 and the 4/22/97 Henderson letter to [Attorney] Howell, the 3/27/97 office note makes no mention of work status; "Volatile or labile hypertension" is not considered a true "hypertension" and should be able to be controlled via appropriate medication; I do not believe Henderson sent us "all" med records 1/96 to present; and, thirdly, Bernardi's 2/20/97 note  **[*8]**  (and he is the cardiologist) does not proscribe work, was to

see the claimant in "six months," while noting that the client had an "anxiety/panic attack syndrome." I believe the latter is probably at the basis for this claim.

(2) I doubt any others [medical records] exist, unless Henderson's 2/7/97-1/96 notes would reveal more than we know now.

(App. at PRL000036-37.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 Dr. Goldstein's qualifications and field of specialization do not appear in the record. Dr. Goldstein has been described as PRLIC's "in-house physician," Mizzell v. Paul Revere Life Ins. Co., 118 F. Supp. 2d 1016, 1019 (C.D. Cal. 2000), PRLIC's "Associate Medical Director," Rosenthal v. Long-Term Disability Plan of Epstein, Becker & Green, P.C., 1999 U.S. Dist. LEXIS 21443, No. CV-98-4246, 1999 WL 1567863, *5 (C.D. Cal. Dec. 21, 1999), and as "a Full-time employee of [PRLIC] who is board certified in internal medicine with a sub-specialty in cardiovascular disease." Grady v. Paul Revere Life Ins. Co., 10 F. Supp. 2d 100, 114 (D. R.I. 1998). Dr. Goldstein has been called upon by PRLIC to opine with respect to a variety of alleged disabling conditions. See, e.g., Cini v. Paul Revere Life Ins. Co., 50 F. Supp. 2d 419, 420-21 (E.D. Pa. 1999) (spondylolisthesis and fibromyalgia); Rosenthal, supra (labile hypertension); Grosz-Salomon v. Paul Revere Life Ins. Co., No. CV-98-7020, 1999 WL 33244979 (C.D. Cal. Feb. 4, 1999) (herniated lumbar disks); Nolen v. Paul Revere Life Ins. Co., 32 F. Supp. 2d 211 (E.D. Pa. 1998) (prostate cancer with resulting urinary incontinence); Grady, supra (back and knee problems); Kozar v. Paul Revere Life Ins. Co., 1996 U.S. Dist. LEXIS 18106, No. 96-CV-70280 (E.D. Mich. Oct. 23, 1996) (coronary artery disease and adult onset diabetes); Wolfe v. Paul Revere Life Ins. Co., 1998 U.S. Dist. LEXIS 12516, No. 1:98- CV-3 (W.D. N.C. June 23, 1998) (wrist and elbow problems). **[*9]**

n3 It should be noted that Dr. Goldstein's reply precedes the efforts of the PRLIC field claim representative to interview Dr. Henderson.

n4 "# 10 statement" refers to the section of the disability application in which Davies described his disabling condition.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Unmentioned in Dr. Goldstein's handwritten note and in the denial letter is the fact that Dr. Bernardi's office note of February 20, 1997 indicated that Davies' complaints included "periods of uncontrolled hypertension," and the fact that Dr. Bernstein's diagnosis included "uncontrolled hypertension." (App. at PRL000029.) Nor did Dr. Goldstein acknowledge the fact that Davies' blood pressure was extremely high in the work setting despite taking prescribed anti-hypertensive medication. It should also be noted that the denial letter did not refer to the fact that PRLIC's decision was based upon a review of medical records conducted by an in-house medical consultant.

On October 24, 1997, Davies, through his attorney, exercised his right to appeal the adverse benefits determination. (App. at PRL000079.) In his appeal letter, Davies reiterated **[*10]** that his blood pressure was dangerously high while at work even though he was taking prescribed medication. The appeal letter also noted that Dr. Bernardi was concerned with the functioning of the mechanical aortic valve, and did not treat Davies for his uncontrolled hypertension. Accompanying the appeal letter were records from the trading floor nurse, documenting very elevated blood pressure readings on a number of days during March, 1997. (Id.) Mr. Davies supplemented his appeal with an August 18, 1997 letter report of Dr. Bernardi, who stated that his opinion concerning Mr. Davies' condition was limited to aortic



valvular disease, and did not concern the effects of Mr. Davies' hypertension. Dr. Bernardi expressly disclaimed any "specific opinion regarding Mr. Davies' ability to cope with stress at work." (App. at PRL000083.) Also supplementing Davies' appeal were records from Samir B. Pancholy, M.D., a cardiologist who examined Davies on October 28, 1997. (App. at PRL000077-78 and 87-88.) Dr. Pancholy advised Davies "to avoid any forms of severe physical and mental stress in view of findings of severe systolic as well as diastolic hypertension at rest." (App. at PRL000078.)  **[*11]** n5

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 At the time of Dr. Pancholy's examination of Davies, Davies' blood pressure was 190/100 mm/Hg. (App. at PRL000088.)

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Following receipt of additional medical records, Dr. Goldstein undertook another review of the file to answer the following questions:

> Do the records support an impairment which would preclude the [claimant] from performing the important duties of his own [occupation] on either a [part-time] or [full-time] basis 3/27/97-present?
>
> What is the current impairment?
>
> Any [additional] info needed/recommendations?

(App. at PRL000167.) Dr. Goldstein's hand-written responses to the inquiries were as follows:

> (1) No.
>
> (2) Minimal.
>
> (3) I doubt any exists, but a follow-up on Pancholy's assessment might be of interest.

(App. at PRL000168.) Dr. Goldstein added the following observation:

> It is unfortunate that the claimant, attorney and [attending physician] acted so prematurely -- an ambulatory B.P. survey might have answered all this!  **[*12]**

Id. Dr. Goldstein's reply to the claims representative's inquires were also preceded by the following observations:

> (1) This episode of alleged impairment began with the 2/7/97 visit, the first visit to the [attending physician] in 2 year, i.e., 2/23/95. By 3/27/97 (3rd visit) the [attending physician] was [in] "discussions with Howell" (attorney), and this date became DD [date of disability].



(2) Pancholy (10/28/97) notes 'no obvious signs of end organ failure.' Bernardi's 8/18/97 disclaimer on the question of hypertension is of interest in terms of what he (a board-certified cardiologist) does not choose to talk about.

(3) 5 B.P. recordings at work (3/5-3/26/97) do not constitute a definitive assessment, i.e. what times of day, what Rx at the time, etc.

(App. at PRL000167-68; emphasis in original.)

By letter dated January 22, 1998, PRLIC denied Mr. Davies' appeal. (App. at PRL000169-172). Without disclosing the fact of Dr. Goldstein's review, the January 22, 1998 denial letter reflected his reasoning. In this regard, PRLIC stated that "it is our opinion that the elevated readings taken at work on the six occasions between **[*13]** March 5, 1997 to March 26, 1997 do not constitute a definitive assessment of an uncontrolled hypertension." (App. at PRL000171.) Also in this regard, the PRLIC letter of January 22, 1998 referred to the absence of a "certification" from Dr. Bernardi pertaining to the effects of Mr. Davies' blood pressure on his ability to work as a commodities trader. PRLIC explained:

We do not feel that the blood pressure readings taken at work are in and of themselves documentation that Mr. Davies is suffering an impairment while at work to preclude him from performing his occupational duties, and the medical records provided do not, in our opinion, reflect an impairment outside of the work place which would also support a Total Disability. (App. at PRL000172.)

Although the January 22, 1998 letter rejecting Davies' appeal would ordinarily have concluded the administrative processes, PRLIC agreed to consider the claim again on an "exceptional" basis. n6 PRLIC undertook to consider Davies' claim after receiving an August 18, 1998 letter report of Frank A. Milani, M.D. (App. at PRL 000174.) Dr. Milani indicated that his review included records of the Raphael Heart Group, n7 a disability **[*14]** form of U.S. Life Company, a disability form of CNA, and Dr. Henderson's office notes. Dr. Milani recorded blood pressure readings of 210/110 in the right arm and 202/108 in the left arm. Dr. Milani's diagnosis included hypertension and hypertensive cardiovascular disease, with an observation that "left ventricular hypertrophy and strain may be a function of both pre-existing severe aortic stenosis and now present severe labile, presumably essential hypertension." Dr. Milani's report responded to some specific questions as follows:

1. Do you concur with the recorded diagnosis and current treatment? If not, please discuss. YES, it is obvious that his hypertension is not completely controlled and he understands that this may require significant attention.

2. Does the medical information support Mr. Davies total disability from his occupation or any occupation? I believe Mr. Davies is disabled and ought not to continue in his occupation as a Commodities Trader. He, however, can perform activities on a consistent basis below that level of commitment.

(App. at PRL000176.)

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n6 Apparently, PRLIC will "exceptionally" re-open an administrative record and consider a claim based upon receipt of material information. See, e.g., Cini v. Paul Revere Life Ins. Co.,



Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7940                    Page 10 of 19

50 F. Supp. 2d 419, 423 (E.D.Pa. 1999).  **[*15]**

n7 Dr. Pancholy was a member of the Raphael Heart Group. See App. at PRL000078.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Dr. Milani's report was forwarded to Dr. Goldstein, who was requested to answer the following question:

> Does the exam of [Dr. Milani] provide evidence of limitations and restrictions which would preclude the insured from performing the duties of his own occupation?

(App. at PRL000185.) Dr. Goldstein answered this inquiry in the negative, maintaining that Mr. Davies' hypertension was treatable and Dr. Milani's opinion was suspect because of the absence of a documented "specific drug therapy trial." (App. at PRL000186.) Dr. Goldstein concluded that, "I would not deny this man needs (better?) care for his hypertension, but I do deny it automatically and permanently equates to impairment for his [occupation]." (Id.) By letter dated December 17, 1998, PRLIC denied Davies' application for disability benefits, again mimicking Dr. Goldstein's analysis.

This litigation was commenced on March 9, 1999. Davies seeks relief under 29 U.S.C. § 1132 (a)(1)(B), which, in pertinent **[*16]** part, provides:

> A civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

As noted above, both parties have moved separately for summary judgment. Oral argument on the motions was conducted on February 21, 2001. This matter is ripe for disposition.

## II. DISCUSSION

### A. Summary Judgement Standards

Cross-motions for summary judgment do not constitute a concession by the parties that summary adjudication of dispositive issues is appropriate. See Transportes Ferreos De Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001). Accordingly, a district court confronted with cross-motions for summary judgment must still ascertain whether there is any genuine dispute as to a material fact. A contest concerning facts that could affect the outcome of the litigation under governing substantive law, i.e., the material facts, precludes entry of summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995). **[*17]** "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable [fact finder] could return a verdict for the non-moving party." Id.

In this case, the parties are in agreement as to the terms of the ERISA-governed disability plan and the contents of the administrative record on which PRLIC based its denial of benefits. There is also no dispute that PRLIC was both the insurer and the claims

Case 1:01-cv-00797-TFH   Document 37   Filed 07/17/2002   Page 38 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7940                    Page 11 of 19



administrator of the Group Long Term Disability Income Insurance Policy pursuant to which benefits were to be paid under the ERISA-governed plan. Moreover, PRLIC submitted uncontradicted evidence that the insurance policy in question "was issued and renewed as an experience-rated policy in that the experience on the policy [was] used to determine premium rate . . . ." (Declaration of Anthony Perreault (Dkt. Entry 34) at P 3.) The policy, however, also included a "Rate Guarantee Rider." (App. at PRL000243). Finally, there is no dispute that Mr. Davies' former employer, Sterling Commodities Corp., canceled coverage with PRLIC before PRLIC **[*18]** made its final adverse benefits decision in December of 1998. Based upon the absence of a genuine dispute as to these facts that are material to the outcome of this case, disposition of this matter on summary judgment motions appears to be appropriate.

## B. Scope of Judicial Review of Benefits Decision

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989), the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When the language of a plan governed by ERISA accords the administrator discretionary authority to determine eligibility for benefits, judicial review of a decision to deny benefits is limited to ascertaining whether the denial is arbitrary and capricious. Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 44-45 (3d Cir. 1993). "The 'arbitrary and capricious' standard is essentially the same as the 'abuse of discretion' standard." Friess v. Reliance Standard Life Ins. Co., 122 F. Supp. 2d 566, 572 (E.D.Pa. 2000). **[*19]** Under this highly deferential standard, an administrator's decision "will not be disturbed if reasonable." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997). Where, however, an administrator with discretionary authority to decide eligibility for benefits is burdened by a conflict of interest, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone Tire & Rubber Co., 489 U.S. at 115. In Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000), the court "interpreted Firestone Tire to mandate a more searching scrutiny of . . . discretionary decisions in situations where the impartiality of the administrator is called into question, either because the structure of the plan itself inherently creates a conflict of interest or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case." Goldstein v. Johnson & Johnson, F.3d , 2001 U.S. App. LEXIS 10834, No. 00-5149, slip op. at 3 (3d Cir. May 25, 2001)(emphasis added).

In this case, there is no dispute that PRLIC had discretionary authority to determine eligibility **[*20]** for disability benefits. n8 There is also no dispute that PRLIC operated under the conflict of interest inherent whenever a claims administrator not only determines eligibility benefits, but also funds the payment of those benefits. As explained by Judge Brody in

> Friess, 122 F. Supp. 2d at 572:
> When an insurance company both insures and administers benefits, it is generally acting under a conflict of interest that warrants a heightened form of the arbitrary and capricious review standard. While recognizing that particular circumstances could ameliorate the inherent conflict, the Third Circuit in Pinto recognized that the typical insurance company is structured so that the payment of claims directly affects its profits. Given that self interest, 'there would seem to be insufficient incentive for the carrier to treat borderline cases . . . with the level of attentiveness and solicitude that Congress imagined when it created ERISA fiduciaries.' The Third Circuit concluded that a heightened standard is appropriate when reviewing benefit denials of insurance companies that pay ERISA benefits out of their own funds.
>
> In Pinto, the Third Circuit adopted **[*21]** the 'sliding scale' approach to review

under a 'heightened' arbitrary and capricious standard. To best reconcile Firestone's dual commands, the Third Circuit concluded, the arbitrary and capricious standard cannot be abandoned even in the presence of a conflict that threatens to seriously bias the Administrator's decision. Rather, the intensity of review should increase in proportion to the intensity of the conflict.

Factors pertinent to the intensity of scrutiny include "the sophistication of the parties, the information accessible to the parties, . . . the exact financial arrangement between the insurer and the company, [and] . . . the current status of the fiduciary." Pinto, 214 F.3d at 392. "Such evidence equips the district court to review the contested decision under an 'arbitrary and capricious' standard heightened according to the potency of the conflict." Friess, 122 F. Supp. 2d at 573.

- - - - - - - - - - - - - - - - - Footnotes- - - - - - - - - - - - - - - - - -

n8 The plan at issue in this case specifically provides:

> The Paul Revere Life Insurance Company is the Claims Administrator for benefits contained in the group policies it has issued to your employer. As such, it has the full, final, conclusive and binding authority to construe and interpret any of its group insurance policies that provide benefits under your employer's welfare benefit plan as may be necessary to make any and all decisions and determinations under such policies. A decision of the claims Administrator shall not be overturned unless it is arbitrary and capricious or unless there is no rational basis for the decision.

(App. at PRL00070.)

- - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - **[*22]**

In this case, there is no evidence that Mr. Davies was a sophisticated applicant for disability benefits. That is, there is no evidence that he was on equal footing with PRLIC in terms of understanding the process by which his claim was to be reviewed and the information that should have been compiled to support his claim. For example, there is no indication that he was aware that the absence of an ambulatory blood pressure record while he was working would be viewed as critical by the PRLIC decision-maker. It is also clear that he was not informed that PRLIC was relying on an in-house medical advisor to consider his claim. In this regard, PRLIC's first two denial letters did not disclose the review undertaken by Dr. Goldstein. There were no discussions between Dr. Goldstein and any of the three physicians who opined that Mr. Davies should not work as a commodities trader. Thus, the first two factors -- sophistication of the parties and accessibility to information -- militate in favor of heightened review.

The fact that PRLIC both determined eligibility for benefits and paid benefits also weighs in favor of intensified scrutiny of the adverse benefits decision. In Goldstein, supra **[*23]** , the Third Circuit indicated that "a more searching scrutiny of . . . discretionary decisions" is warranted where, as here, "the structure of the plan itself inherently creates a conflict of interest. . . ." In Pinto, the Third Circuit held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." 214 F.3d at 378. Lower courts have interpreted Pinto to require application of "a heightened arbitrary and capricious review" where, as here, the entity deciding eligibility for benefits also pays the benefits. See Cimino

v. Reliance Standard Life Ins. Co., 2001 U.S. Dist. LEXIS 2643, No. Civ. A. 00-2088, 2001
253791, *3 (E.D. Pa. March 12, 2001); Wilkerson v. Reliance Standard Life Ins. Co., 2001
U.S. Dist. LEXIS 5366, No. Civ. A. 99-4799, 2001 WL 484126, *1 (E.D. Pa. March 6, 2001);
Friess, 122 F. Supp. 2d at 574.

Subsequent to oral argument in this matter, PRLIC supplemented the record by presenting
affidavit asserting that the policy in question "was issued and renewed as an experience-
rated policy in that the experience on the **[*24]** policy is used to determine premium rate,
and was in full force and effect from the beginning of Mr. Davies' claim in May, 1997 through
October 31, 1998." (Declaration of Anthony Perreault (Dkt. Entry 34) at P 3.) Such a funding
structure may arguably ameliorate the conflict of interest inherent in the structure of the plan
at issue in this case. See Pinto, 214 F.3d at 388 n.6. Offsetting any ameliorating effect of the
premium-setting mechanism, however, is the existence of a "Rate Guarantee Rider." During
the duration of the rider, premium rates could be changed only upon amendment of the
group policy "to change eligibility provisions or benefits or to add or drop insurance on any
affiliated or subsidiary employer," or when "the total number of insured Employees changed
by more than 25 percent from the number of Employees insured on the effective date of
[the] Rider." (App. at PRL000419.) There is no evidence that any of these events occurred.
Although the record is unclear as to whether the Rate Guarantee rider was in effect while Mr.
Davies' claim for disability benefits was under consideration, n9 what is clear from the record
is that Sterling Commodities Corp. **[*25]** had cancelled coverage with PRLIC before it made
its final decision on Mr. Davies' claim. Thus, the manner in which premiums were to be
calculated would not have enabled PRLIC to recoup the substantial outlay of funds to pay Mr.
Davies' benefits. n10 Accordingly, both the financial arrangement between PRLIC and
Sterling Commodities, as well as the fact that the relationship had terminated at the time the
final decision on Mr. Davies' claim was made, support more searching scrutiny than the
highly deferential arbitrary and capricious standard otherwise implies. n11

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 The Duration and Rate Guarantee Rider established the term for both the group policy and
the Rate Guarantee Rider as the period February 1, 1995 through January 31, 1997. (Id.)
The Duration and Rate Guarantee Rider provided that before the policy expiration date, the
question of renewal would be addressed and "mutual acceptance of renewal conditions will
result in [PRLIC] issuing an updated Duration and Rate Guarantee Rider." (Id.) Although it is
clear that the policy was renewed beyond January 31, 1997, the record does not include the
"updated Duration and Rate Guarantee Rider." **[*26]**

n10 Under the terms of the policy, Mr. Davies may have been entitled to benefits of $ 10,000
per month for a substantial period of time.

n11 After the oral argument was conducted in this matter, PRLIC submitted the Declaration
of Lorraine Scola, a "Senior Group Claim Examiner" for PRLIC who made the final decision on
Mr. Davies' claim in December of 1998. Ms. Scola asserted that she did not know of the
cancellation of the group policy when she made her decision. (Declaration of Lorraine Scola
(Dkt. Entry 35) at P 7.) She also asserted, however, that she did not know that the policy at
issue was an experience-rated one. Thus, the fact that she was unaware of the termination of
the policy does not affect the conclusion that heightened scrutiny is warranted because it
may be inferred from her Declaration that she understood that benefits payable as a result of
her determination would be funded by PRLIC, adversely affecting the company's profits and
reflecting the inherent conflict of interest that warrants more searching scrutiny of the
discretionary decision at issue in this case.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

## C. Review **[*27]** of PRLIC's Decision Under a Heightened Arbitrary and Capricious

**Standard**

☼Pinto instructs that review under a heightened arbitrary and capricious standard is "deferential, but not absolutely deferential," and "'the greater the evidence of conflict on the part of the administrator, the less deferential [the] abuse of discretion standard.'" 214 F.3d at 393. The reviewing court is to "look not only at the result -- whether it is supported by reason -- but at the process by which the result was achieved." Id. In this regard, although Pinto "does not impose . . . a duty to conduct a good faith, reasonable investigation . . ., it does invite the conclusion that a decision based upon inadequate information might have been arbitrary and capricious." Friess, 122 F. Supp. 2d at 574.

In this case, the pertinent process is that utilized by PRLIC from the time it received Mr. Davies' application until the final denial of his claim in December of 1998. The pertinent record consists of all the evidence before the decision maker at the time of the final denial of benefits. See Mitchell 113 F.3d at 440; Ernest v. Plan Administrator of the Textron Insured Benefits Plan, 124 F. Supp. 2d 884, 893 (M.D. Pa. 2000).  **[*28]**

The process employed by PRLIC consisted of some unsuccessful attempts to interview Mr. Davies and Dr. Henderson and a cursory examination of medical records by a PRLIC in-house medical advisor. Although Mr. Davies (or, more correctly, his lawyer) must shoulder some responsibility for the initial inability of PRLIC to conduct interviews, the record indicates that PRLIC's efforts to conduct certain interviews before its first decision in this case were minimal, and that PRLIC made no effort to interview pertinent persons after receipt of Mr. Davies' appeal of the original decision. n12 Significantly, Mr. Davies' appeal identified the nurse on the commodities exchange floor who took the elevated blood pressure readings in March of 1997, but PRLIC did not contact her. Mr. Davies' appeal also identified another physician who had opined that he should not return to work as a commodities trader, Dr. Pancholy. It is undisputed that PRLIC made no effort to talk to Dr. Pancholy. It is also undisputed that PRLIC did not interview Mr. Davies' employer to determine whether he was having difficulties in performing his work as a floor trader as a result of high blood pressure. Nor did PRLIC seek  **[*29]**  to interview Dr. Milani, even though the content of his letter report clearly indicated that he was retained by another insurance company to evaluate Mr. Davies' ability to work as a commodities floor trader and opined that Mr. Davies could not do so. (See App. at PRL000174-176.) PRLIC did not ask Mr. Davies to undergo an examination by an independent medical expert, although a field representative suggested that such an examination be considered. (App. at PRL000066.) ☼"While [an insurer] is not required to order an independent examination, the failure to examine may indicate an inattentive process." Friess, 122 F. Supp. 2d at 574.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n12 The record indicates that a field representative for PRLIC attempted to speak with Dr. Henderson on July 7 and 8, 1997. (App. at PRL000065.) The field representative's report indicates that he was advised by Mr. Davies' lawyer that there was no need "to speak to either the insured or the attending physician at the present time . . . ." (Id.) There is nothing in the record to suggest that any other attempts to interview Dr. Henderson or Mr. Davies were made by PRLIC.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  **[*30]**

PRLIC relied almost exclusively upon the opinion of a non-examining physician. Such handling of a claim raises doubts about the reasonableness of the denial of benefits. See Cohen v. Standard Ins. Co., 2001 U.S. Dist. LEXIS 6604, No. Civ. A. 00-5971, 2001 WL 527812, *4 (E.D. Pa. May 17, 2001). Certainly, Dr. Goldstein's review of a cold record cannot compare with the years of interaction between Dr. Henderson and Mr. Davies. See Pinto, 214 F.3d at 394. Moreover, Dr. Goldstein's cursory handwritten reports reflect a one-sided,

Case 1:01-cv-00797-TFH    Document 57    Filed 07/17/2002    Page 42 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7940                    Page 15 of 19



adversarial consideration of the record, as opposed to an impartial evaluation. His assertion that "'volatile or labile hypertension' is not considered a true 'hypertension' and should be able to be controlled via appropriate medication," (App. at PRL000036; emphasis in original), is not supported by reference to any underlying medical treatise or other authoritative source. The record showed blood pressure readings plainly supporting a diagnosis of hypertension. n13 The record also supports the conclusion that, despite medication, Mr. Davies' condition was exacerbated while in the stressful activity of trading on the floor of a commodities exchange. **[*31]** There is thus no basis in the record for disputing the diagnosis of labile hypertension.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n13 Hypertension refers to "persistently high arterial blood pressure." Richard Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary at 355 (1987). Persons having systolic blood pressure of more than 140 mm Hg and/or diastolic blood pressure of more than 90 mm Hg, or who are taking anti-hypertensive medication, are generally regarded as having hypertension. The Merck Manual, § 16, Ch. 199, at http://www.merck.com/pubs/mmanual/section 16/chapter 199/199a.htm The record reflects consistent readings above these thresholds, even while Mr. Davis was away from work and on anti-hypertensive medication. (App. at PRL000079.)

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

Dr. Goldstein refers only to those parts of Dr. Bernardi's February 20, 1997 report that were adverse to Mr. Davies' position (i.e., Dr. Bernstein did not proscribe work and was not going to see Mr. Davies for six months), while ignoring Dr. Bernstein's report that Mr. Davies complained of "periods **[*32]** of uncontrolled hypertension," as well as disregarding Dr. Bernardi's diagnosis of "uncontrolled hypertension." (App. at PRL000029.) Dr. Goldstein's surmise that the "anxiety/panic attack syndrome" mentioned by Dr. Bernardi "is probably at the basis for this claim" further suggests an adversarial consideration of the record, as opposed to an impartial evaluation. n14

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n14 There is medical literature that suggests that panic attacks may be related to hypertension. See, e.g., S.J. C. Davies, et al., "Association of Panic Disorder and Panic Attacks With Hypertension," 107 Am. J. of Med. 310 (1999).

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

Dr. Goldstein's second handwritten report, dated January 6, 1998, reads more like a legal argument than a medical opinion. Once again, he makes selective reference to the evidence of record (the absence of obvious signs of end organ failure mentioned by Dr. Pancholy and the limited number of blood pressure readings while Mr. Davies was at work (App. at PRL000167-168)), without discussing the medical significance of **[*33]** the evidence of record.

Perhaps most disconcerting is Dr. Goldstein's treatment of Dr. Milani's report. (App. at PRL000185-186.) Dr. Goldstein's handwritten note of December 15, 1998 seems to focus on the fact that Dr. Milani did not conduct his examination until August 12, 1998. Dr. Goldstein underlined the word "now" in Dr. Milani's statement of "now present severe essential hypertension." He criticizes as introducing "unnecessary confusion" Dr. Milani's use of the terms "labile" and "essential" to describe Mr. Davies' hypertension, without ever explaining why such descriptive terms were inappropriate. n15 While Dr. Goldstein complains of the absence of a documented drug therapy trial to treat Mr. Davies' hypertension, he completely ignores the evidence of record that shows the various medications taken by Mr.

Davies without success in controlling his hypertension while at work. Dr. Milani, by way of contrast, makes explicit reference to the medications being taken by Mr. Davies, who nonetheless presented with a blood pressure reading of 210/110 in the right arm and 202/108 in the left arm when examined by Dr. Milani. Dr. Goldstein provides no information concerning **[*34]** the significance of these elevated blood pressure readings. Nor does he refer to Dr. Milani's finding of left ventricular hypertrophy and strain. n16 Dr. Milani suggested a possible connection between Mr. Davies left ventricular hypertrophy and his hypertension. Dr. Goldstein does not offer any remark as to the significance of this finding. Finally, Dr. Goldstein fails to make any reference to the significance of the fact that Dr. Milani was obviously conducting an examination of Mr. Davies for purpose of expressing an opinion as to his ability to work as a commodities trader in connection with a claim for benefits under a disability policy. (See App. at PRL000174.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 "Essential" hypertension refers to high blood pressure with no known cause. Richard Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary at 355 (1987). Labile refers to unstable or fluctuating. Id. at 401.

n16 Hypertrophy refers to an "enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." Richard Sloane, The Sloane-Dorland Annotated Medical Legal Dictionary at 356 (1987).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*35]**

Courts have overturned adverse benefits decisions based upon such selective reading of medical records by a captive consultant. For example, in Rosenthal v. Long-Term Disability Plan of Epstein, Becker & Green, P.C., 1999 U.S. Dist. LEXIS 21443, No. CIV-98-4246, 1999 WL 1567863 (C.D. Cal. Dec. 21, 1999), the plaintiff, a trial attorney, sought benefits under a long-term disability policy issued and administered by PRLIC. The basis for plaintiff's claim was similar to the basis for the claim advanced here -- moderate to severe essential hypertension with labile blood pressure. As in this case, there was left ventricular hypertrophy. Two treating physicians, one a cardiologist, advised the plaintiff to quit working as a trial attorney. Id. at *3. As in this case, the plaintiff's medical records were reviewed by Dr. Goldstein, who opined that the plaintiff's hypertension should be treatable. Although PRLIC began paying benefits to the plaintiff (unlike this case), they did so with the express reservation that additional information was required. Unlike this case, PRLIC arranged for an independent medical examination of the plaintiff. The court found, however, that the independence of the medical **[*36]** examination was compromised by questions asked of the examining physician, which assumed a normal 8 hour work day, as opposed to the much longer work hours reported by the plaintiff as part of the requirements of a trial attorney. Ultimately, PRLIC denied benefits. The court reversed the denial of benefits. In language particularly apropos here, it stated:

> The record . . . reveals that Paul Revere's employees Nelson and Goldstein put themselves in an adversarial posture toward claimant from the outset, although their attitude was not revealed . . . until much later. Goldstein reviewed the medical records that established a ten-year history of uncontrollable high blood pressure and responded in a conclusory fashion to the serious issues raised therein. For example, in response to Dr. Grifka's detailed report regarding Rosenthal's condition, Dr. Goldstein mentioned it by taking a few words out of context and labeling the advice [to quit work as a trial attorney] 'presumptive and prophylactic.' His comments appear superficial and designed only to give Nelson ammunition to deny the claim.

Case 1:01-cv-00797-YK   Document 37   Filed 07/17/2002   Page 44 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7940                    Page 17 of 19

Id. at *13.

Another instructive ruling is Judge Newcomer's recent decision **[*37]** in Cohen, supra. Plaintiff in Cohen was a labor lawyer who claimed disability because of serious coronary artery disease, with an exacerbation of symptoms during work. Benefits were denied on the basis of opinions of two consulting physicians, who, like Dr. Goldstein, simply reviewed the evidence of record. Employing the heightened arbitrary and capricious standard established in Pinto, Judge Newcomer found in the record a selective appraisal of the evidence that appeared to be self-serving. Id. at *5. He further found that the rejection of plaintiff's claim in the face of evidence that work stress increased the risk of heart complication was arbitrary and capricious.

In the matter sub judice, PRLIC's "reliance on Dr. Goldstein's limited medical review when presented with contrary evidence from [plaintiff's] treating doctor indicates that it 'offered an explanation that runs counter to the evidence before it.'" Postma v. Paul Revere Life Ins. Co. 1998 U.S. Dist. LEXIS 14458, No. 95- C-6575, 1998 WL 641335, *8 (N.D. III. Sept. 10, 1998). The documentation shows Dr. Goldstein operating "in a mode more properly described as adversarial rather than evaluative." **[*38]** Rosenthal, 1999 WL 1567862, at *14. He responded in a very conclusory manner to the records presented to him. Particularly illuminating is his reaction to the report of Dr. Milani, an independent medical expert who expressed an opinion that Mr. Davies was "disabled and ought not to continue in his occupation as a Commodities Trader." (App. at PRL000176). Under these circumstances, it was unreasonable for PRLIC to rely upon the opinion of Dr. Goldstein. See Pierce v. American Waterworks Co., 683 F. Supp. 996, 1000 (W.D. Pa. 1988) (denial of long term disability benefits based upon the report of a non-examining consulting physician was arbitrary and capricious). Simply stated, Dr. Goldstein's perfunctory observations in the face of substantial countervailing evidence afford an inadequate foundation upon which to base a reasonable decision that Mr. Davies was ineligible for benefits. This conclusion is buttressed by the fact that PRLIC's decision is entitled to only limited deference in view of the conflict of interest under which it operated and the other factors suggesting a more searching inquiry is warranted. That PRLIC conducted a cursory investigation **[*39]** in this matter, coupled with the fact that it relied exclusively on its captive consultant, who, in turn, acted as an advocate for denial of benefits as opposed to an independent expert, compel the conclusion that the denial of benefits cannot withstand the more searching scrutiny required in this case. n17

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n17 PRLIC asserts that it "was free to rely on the opinions of the physicians it consulted and reject the conclusions of plaintiff and his physician(s)." (Brief in Support of PRLIC's Summary Judgment Motion (Dkt. Entry 20) at 36.) This assertion rests on the unsound premise that PRLIC's decision is entitled to absolute deference. Moreover, the case law upon which PRLIC relies for the proposition that its decision must be sustained because it relied on Dr. is plainly distinguishable. For example, in Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228 Cir. 1997), the insurer had referred the claim file to an Independent Board Certified Physician's Roundtable. The insurer provided the Roundtable's report to the claimant's health care providers to seek their comments. When the insurer received additional information, it again submitted the information to the Roundtable, which included new members who reviewed the material and came to the same conclusion. The court found that the reports of the Roundtable "constitute a substantial basis on which an objectively reasonable decisionmaker could determine that Ellis was not disabled . . . ." Id. at 234. The facts of Ellis stand in stark contrast to those presented here: there was nothing independent about Dr. Goldstein's review; his observations were not disclosed to Mr. Davies' physicians; and PRLIC did not consult a different expert when presented with new information. In Sweatman v. Commercial Union Ins. Co., 39 F.3d 594 (5th Cir. 1994), another case upon which PRLIC relies, the insurer contracted with an association that provided independent medical

Case 1:01-cv-00797-TK   Document 37   Filed 07/17/2002   Page 43 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7940                              Page 18 of 19

consultants. Moreover, the insurer retained an investigator to interview the claimant and investigate the claim. Two independent physicians came to the same conclusion. Similarly, in Donato v. Metropolitan Life Ins. Co. 19 F.3d 375 (7th Cir. 1994), the insurer retained Underwriting Medical Actuarial Consultants, which used a physician who was board-certified in the appropriate field to render an opinion as to disability. When the claimants submitted additional information, the insurer forwarded it to the independent medical consulting agency for a second opinion. Clearly, these cases do not stand for the proposition advanced by PRLIC here. Both the independence of the consultant and the quality of the consultant's review are the pertinent factors in determining whether reliance upon the consultant is reasonable. In this case, the absence of independence and perfunctory review conducted by Dr. Goldstein militate against reliance on his opinion.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*40]**

In light of the rejection of Dr. Goldstein's opinions, the only competent evidence of record in this case points to a finding of disability. Drs. Henderson, Pancholy and Milani, each operating independently, concluded that Mr. Davies' uncontrolled hypertension precluded him from engaging in the stressful activities of a commodities floor trader. There is no basis in the record on which reasonable minds could rely to reach a contrary conclusion. Under these circumstances, Mr. Davies is entitled to an award of benefits, at least through the date of Dr. Milani's report, August 18, 1998. n18 See Cohen, supra, at *6 (after finding that denial of disability benefits was arbitrary and capricious, the court concluded that remand was inappropriate as the record before the ERISA plan administrator established plaintiff's eligibility for disability benefits); Grady, 10 F. Supp. 2d at 115 (record before trial court establish not only that the denial of benefits was arbitrary and capricious, but also that plaintiff was entitled to benefits); Kozar v. Paul Revere Life Ins. Co., 1996 U.S. Dist. LEXIS 18106, No. 96- CV-70280, (E.D. Mich. Oct. 23, 1996)(same). **[*41]**

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n18 The parties did not address the question of the relief to be granted in this case. Moreover, Mr. Davies did not submit in support of his summary judgment motion updated medical information. This is not surprising given the position of PRLIC that judicial review is limited to the administrative record. Absent information concerning his present condition, however, the extend of the relief to which he may be entitled cannot be determined. Under these circumstances, plaintiff's motion will be treated as one for partial summary judgment, with a decree entered that the denial of benefits was arbitrary and capricious and that plaintiff established disability at least through August 18, 1998. A conference will be conducted for the purpose of determining whether additional proceedings are required in this case. If additional proceedings are not required, the conference will also concern the form that the judgment entered in this matter should take.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

### III. CONCLUSION

The administrative record compiled before **[*42]** the plan administrator in this case does not contain sufficient evidence on which a reasonable mind could base a rational decision that Mr. Davies remained able to perform the important duties of his occupation as a commodities trader notwithstanding repeated episodes of uncontrolled blood pressure while at work. Indeed, the evidence of record compels the opposite conclusion. Accordingly, PRLIC's motion for summary judgment will be denied, and plaintiff's motion for summary judgment, treated as a motion for partial summary judgment, will be granted. An appropriate Order follows.

Thomas I. Vanaskie, Chief Judge

Middle District of Pennsylvania

**ORDER**

**NOW, THIS 13th DAY OF JUNE, 2001,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. The motion for summary judgment filed on behalf of defendant Paul Revere Life Insurance company (Dkt. Entry 19) is **DENIED.**

2. Plaintiff's motion for summary judgment, treated as a motion for partial summary judgment (Dkt. Entry 22), is **GRANTED.** It is hereby decreed that the decision to deny long term disability insurance benefits was arbitrary and capricious, and that plaintiff is entitled **[*43]** to benefits under the applicable insurance policy, at least through August 18, 1998.

3. A conference will be conducted in Chambers on **Tuesday, July 17, 2001 at 9:30 a.m.** in Room 401 of the William J. Nealon Federal Building & United States Courthouse for the purpose of determining what, if any, additional proceedings are required to bring this case to a final judgment.

Thomas I. Vahaskie, Chief, Judge

Middle District of Pennsylvania

FILED: 6/13/01

Service: **LEXSEE®**
Citation: **2001 U.S. Dist. LEXIS 7940**
View: Full
Date/Time: Tuesday, July 10, 2001 - 3:51 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2001 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 1:01-cv-00767-YK   Document 37   Filed 07/17/2002   Page 17 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 1 of 26

Service: **LEXSEE®**
Citation: **2001 U.S. Dist. LEXIS 8141**

*2001 U.S. Dist. LEXIS 8141, \**

STEPHEN P. LASSER, Plaintiff, v. RELIANCE STANDARD LIFE INSURANCE COMPANY, Defendant.

Civil Action No. 99-4131

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

2001 U.S. Dist. LEXIS 8141

June 13, 2001, Decided

**DISPOSITION:  [\*1]** Judgment entered in favor of plaintiff Dr. Stephen P. Lasser ("Dr. Lasser") on his complaint against defendant Reliance Standard Life Insurance Company.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff insured brought an action against defendant insurer alleging wrongful denial of Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., disability benefits.

**OVERVIEW:** Plaintiff insured filed a claim for disability benefits with defendant insurer under his Employee Retirement Income Security Act (ERISA), 29 U.S.C.S. § 1001 et seq., plan. The insurer denied the insured's claim after determining that the insured was not disabled because he failed to prove the elements of coverage under his ERISA plan. The insured sued the insurer, claiming wrongful denial of disability benefits. The insurer argued that the insured failed his burden to prove that he was disabled, what the material duties of his regular occupation were, and that he was unable to perform them. The court ruled for the insured, holding that the insurer wrongfully denied disability benefits the insured was entitled to under his ERISA plan. The court concluded that the medical evidence presented by the insured supported his disability claim, and that the insured met his burden of showing that he was unable to perform his duties as an orthopedic surgeon due to his disability.

**OUTCOME:** Judgment was entered in favor of plaintiff insured.

**CORE TERMS:** duty, occupation, stress, disability, emergency, orthopedic surgeon, claimant, occupational, on-call, disabled, doctor, regular, arbitrary and capricious, administrator, tspt, vocational, cardiologist, insured, heart attack, orthopedic, surgeon, patient, full-time, insurer, cardiac, heightened, surgery, standard of review, profession, disability benefits

### CORE CONCEPTS - ■ Hide Concepts

Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
When it comes to determining whether the denial of Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., benefits was or was not arbitrary and capricious, the inquiry must be limited to that evidence before the claims administrator.

Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil

Case 1:01-cv-00387-YK   Document 37   Filed 07/17/2002   Page 48 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 2 of 26

Claims & Remedies
✜Where an insurer of an Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., plan is also acting as a claims administrator a structural conflict of interest exists between the company's duty to administer claims fairly and its obligation to pay those claims from its own coffers.

▤ Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
✜Under the arbitrary and capricious standard, the district court may overturn a decision of an Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law. A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision. Thus, the scope of review is narrow and the court is not free to substitute its own judgment for that of the administrator in determining eligibility for plan benefits.

▤ Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
▤ Administrative Law : Judicial Review : Standards of Review : Arbitrary & Capricious Review

✜When an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review. The consideration of the individual case is used to determine exactly how heightened the form of arbitrary and capricious review must be. The lower courts must consider factors suggesting self-interest on the part of the claims administrator. These factors will guide the courts' selection of the appropriate point along the sliding scale of more and more intrusive scrutiny of administrators' decision.

▤ Administrative Law : Judicial Review : Standards of Review : Arbitrary & Capricious Review

✜Heightened arbitrary and capricious review is required in all cases where an inherent conflict is present. In the absence of extrinsic evidence of conflict or bias, an administrator in a structural conflict situation is entitled to a moderate degree of deference.

▤ Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
✜A higher standard of review is required when reviewing benefits denials of insurance companies paying Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 et seq., benefits out of their own funds.

▢ Insurance Law : Disability Insurance
✜An occupational disability policy, which insures against loss of income due to the inability of insureds to engage in their regular or usual occupations, is to be distinguished from a general disability policy, which provides benefits only to insureds who cannot engage in any occupation for which they are reasonably suited.

▤ Public Health & Welfare Law : Social Security, Medicare & Medicaid : Disability Benefits
✜In the context of analyzing a claim of cardiac disability for Social Security insurance benefits, it is reversible error to focus on physical capacity to the exclusion of emotional stress associated with work.

▤ Insurance Law : Disability Insurance : Total Disability
✜It is a basic tenet of insurance law that an insured is disabled when the activity in

question would aggravate a serious condition affecting the insured's health. The insured is considered to be disabled where it is impossible for him to work without hazarding his health or risking his life. In fact, this proposition is sufficiently well-settled that in many jurisdictions it travels under the name of the common care and prudence rule.

Insurance Law : Disability Insurance : Insurability
Where medical prudence requires a cessation of work activity, the insured is disabled. This is true even though the insured may be capable of physical activity. Clearly the risk of a heart attack may be a disabling factor even though the claimant can sit, stand, or ambulate.

Insurance Law : Disability Insurance : Insurability
Where a disability consists of a danger of future negative health events, post-diagnosis employment does not necessarily negate the finding of disability. In the context of a disability where the claimant hazards his well-being by returning to work against his doctors' recommendations, return to work should not affect the benefits determination. This is particularly true where a claimant is forced to work by economic considerations.

Administrative Law : Judicial Review : Standards of Review : Arbitrary & Capricious Review

Under the arbitrary and capricious standard, the decision-maker may choose to credit some evidence over other evidence.

Insurance Law : Disability Insurance : Insurability
Regular occupation, on its face, refers to that occupation in which the claimant is usually engaged, as opposed to a part-time or occasional professional activity. Regular occupation in a disability policy means a job of the same general character as the insured's previous job, requiring similar skills and training and involving comparable duties. The regular occupation concept does not limit the insurer to considering only the precise activities of the insured's previous job. It does, however, require some consideration of the nature of the institution at which the claimant was employed.

Insurance Law : Disability Insurance : Insurability
The materiality of a given occupational duty depends upon the importance of that duty to the claimant's professional endeavors, measured as a combination of the amount of time the activity consumes and its qualitative importance to the professional mission. A duty is material when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the regular occupation. The concept of a regular occupation is not limited to mean only the insured's previous job. However, a claims administrator considering an occupational disability claim must make some allowance for the mode in which the claimant practiced her or his profession. To rely solely on broad job classifications without some consideration for the geographical or institutional context ascribes a fungibility to the occupations of insureds that is consistent with neither reality nor the regular occupation formulation of the policy.

Insurance Law : Disability Insurance : Insurability
The burden of proving disability insurance coverage rests upon the claimant, and there is no duty on the insurer's part to investigate the substantive details of a claim.

**COUNSEL:** LEWIS STEIN, ESQ., DAVID J. GRUBER, ESQ., NUSBAUM, STEIN, GOLDSTEIN & BRONSTEIN, Succasunna, NJ, for Plaintiff.

JOSHUA BACHRACH, ESQ., RAWLE & HENDERSON, Marlton, NJ, for Defendant.

**JUDGES:** ALFRED M. WOLIN, U.S.D.J.

**OPINIONBY:** ALFRED M. WOLIN

**OPINION:**

**WOLIN, District Judge**

This matter was opened before the Court upon the complaint of plaintiff Dr. Stephen P. Lasser against defendant Reliance Standard Life Insurance Company ("Reliance") claiming that plaintiff was wrongly denied disability benefits under an insurance policy maintained by his employer. Jurisdiction is established by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. This Court denied summary judgment and made certain other rulings governing the litigation of this matter in an Opinion and Order reported as Lasser v. Reliance Standard Life Ins. Co., 130 F. Supp. 2d 616 (D.N.J., Feb. 8, 2001)(the "February Opinion").

This matter was tried to the Court on April 10, 2001. At trial, the Court heard live **[*2]** testimony relevant to those issues delineated in the February Opinion and certain other issues as discussed below. In addition, the Court has considered the administrative record before the claims adjudicator who denied Dr. Lasser's claim for benefits on behalf of Reliance. This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52. For the reasons set forth below, the Court will reverse the denial of benefits by Reliance and enter judgment in favor of plaintiff.

**BACKGROUND**

The background of this matter was set forth at length in the Court's February Opinion, familiarity with which is assumed. Pursuant to its policy of insurance, Reliance acts as the insurer/underwriter and claims administrator of the ERISA-governed, employee benefit plan maintained during periods relevant to this matter by Townsquare Orthopedic Associates. Dr. Lasser was an orthopedic surgeon employed by Townsquare Orthopedic, a small, four-doctor practice.

Dr. Lasser has had a heart condition for many years. He has undergone bypass surgery and suffered a myocardial infarction, referred to in this Opinion by the more colloquial "heart attack. **[*3]** " The decision to deny Dr. Lasser's application for disability benefits was made by Richard Walsh, Esq., Reliance's Manager of Technical Services. The evidentiary record in this matter consists of written materials used by Mr. Walsh in making his decision and Mr. Walsh's testimony at trial.

As this Court explored at length in its February Opinion, this case presents two discrete fields of inquiry. First, under the Third Circuit's decision in **Pinto v. Reliance Ins. Co., 214 F.3d 377 (3d Cir. 2000),** this Court must decide whether the insurer's decision to deny benefits was tainted by a conflict of interest. Deciding this question is necessary to determine where on Pinto's "sliding scale" of arbitrary and capricious review this case belongs; the greater the evidence of conflict, the less this Court may defer to the insurer's determination. Second, once the correct standard of review has been determined, the Court must apply it to the claims administrator's decision and decide whether, on the record before him, the administrator was arbitrary or capricious in denying the benefits.

Because of the nature of this action, not all evidence may be considered on all issues. **[*4]** Any evidence properly before the Court may be considered to decide whether Reliance was

Case 1:01-cv-00737-YK    Document 57    Filed 07/17/2002    Page 51 of 101



influenced by a conflict of interest. 🔹When it comes to determining whether the denial of benefits was or was not arbitrary and capricious, however, the inquiry must be limited to that evidence before the claims administrator. See generally Lasser, 130 F. Supp. 2d at 627-30. The only witness to testify at trial of this matter was Mr. Walsh. Much of his testimony was relevant solely to the conflict-of-interest question and extrinsic to his denial of Dr. Lasser's benefits. Other testimony, however, concerned the extent of Walsh's knowledge when he made the benefits determination and the various internal rules and conventions under which he operated.

Walsh's understanding and these rules and conventions, while not part of the paper record, nonetheless form part of the matrix within which Walsh made the decision affecting Dr. Lasser. Their soundness, vel non, provides important insight into whether and how Walsh may have abused his discretion. Evidence of what Walsh considered and how he considered it is thus part of the "record" in the broader sense. Moreover, Walsh's testimony **[*5]** regarding the basis for the denial of benefits substantially mirrors the arguments of Reliance's counsel, as might be expected given that Walsh is himself an attorney. On this basis, the Court will consider certain of Walsh's trial testimony in relation to the underlying question of whether the denial of benefits was arbitrary and capricious. The Court has been careful, however, to treat only the actual evidentiary record before the claims administrator as dispositive of the ultimate question of whether denial of the benefits was an abuse of discretion under the policy.

## DISCUSSION

### 1. Determining the Standard of Review

As noted above and as explored extensively elsewhere, Pinto v. Reliance Insurance held that 🔹where an insurer of an ERISA plan is also acting as a claims administrator a structural conflict of interest n1 exists between the company's duty to administer claims fairly and its obligation to pay those claims from its own coffers. It is established in this case that the Townsquare Orthopedic Associates ERISA plan granted discretion to Reliance to administer benefits. The United States Supreme Court has held that when an ERISA plan grants such discretion to **[*6]** a fiduciary, a denial of benefits may be reviewed in the federal courts only for abuse of that discretion, or under the functionally equivalent arbitrary and capricious standard of review. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 This conflict has also been referred to by this Court and the Court of Appeals as the "inherent conflict" or "structural bias" problem. E.g., 214 F.3d at 389. Although "structural conflict" is perhaps the most descriptive, the Court will continue its prior practice of using these terms interchangeably.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

The Court recites the well-known law articulating this standard because it provides a base of reference for what follows. 🔹Under the arbitrary and capricious standard, "the district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) **[*7]** (quoting Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500 (W.D. Pa. 1989)); accord Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997). "A decision is supported by 'substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision.'" Courson v. Bert Bell NFL Player Retirement Plan, 214 F.3d 136, 142 (3d Cir. 2000); Daniels v. Anchor Hocking Corp., 758 F. Supp. 326, 331 (W.D. Pa. 1991). Thus, the scope of review is narrow and "'the court is not free to

Case 1:01-cv-00737-YK   Document 37   Filed 07/17/2002   Page 52 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 6 of 26



substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits.'" Id. (quoting Lucash v. Strick Corp., 602 F. Supp. 430, 434 (E.D. Pa. 1984), aff'd, 760 F.2d 259 (3d Cir. 1985)).

The Pinto Court held that ☙"when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." 214 F.3d 326 at 378. The Court of Appeals left to consideration of the individual case exactly how "heightened" the form of arbitrary **[*8]** and capricious review must be. The lower courts must consider factors suggesting self-interest on the part of the claims administrator. These factors will guide the courts' selection of the appropriate point along the "sliding scale" of more and more intrusive scrutiny of administrators' decision. Id. at 379.

The Court of Appeals acknowledged that it was giving birth to "some form of intermediate scrutiny that has no analogue in this field," **214 F.3d 377 at 392,** and questions remain regarding its application. One is whether a threshold increase in the level of scrutiny is required in all cases in which a claims administrator operates under an inherent conflict of interest, or whether Pinto's sliding scale might, in the appropriate case, slide all the way back to fully deferential arbitrary and capricious review. The Court does not refer to those cases in which an insurer's structural conflict problem is directly ameliorated by considerations such as an experience-rated premium relationship with its insured. See **214 F.3d at 388 n.6.** The question is, where does the "sliding scale" start in the archetypal case of an insurer/claims administrator **[*9]** for which every granted claim travels, dollar-for-dollar, to the company's bottom line.

☙The Eastern District of Pennsylvania has found that Pinto requires heightened arbitrary and capricious review in all cases where an inherent conflict is present. Cimino v. Reliance Standard Life Ins. Co., 2001 U.S. Dist. LEXIS 2643, 2001 WL 253791, *3 (E.D. Pa., March 12, 2001). References in post-Pinto Court of Appeals decisions support that view. Goldstein v. Johnson & Johnson, ___ F.3d ___, 2001 U.S. App. LEXIS 10834, 2001 WL 567719, *7 (3d Cir., May 25, 2001) (heightened arbitrary and capricious review properly applied where design of plan creates conflict of interest or where specific facts exist indicating bias); Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 n.7 (3d Cir. 2000)(in Pinto, "we decided that a heightened standard of review applies where the same entity both funds and administers an ERISA plan"). In Oslowski v. Life Ins. Co. of No. Am., ___ F. Supp. 2d ___, 2001 WL 401575 (W.D. Pa., April 12, 2001), the district court found that in the absence of extrinsic evidence of conflict **[*10]** or bias, an administrator in a structural conflict situation was entitled to a "moderate degree of deference."

Passages from Pinto itself may be read to suggest that some increase in scrutiny is mandated in all cases of inherent conflict. Indeed, the Court of Appeals stated bluntly, "we believe that ☙a higher standard of review is required when reviewing benefits denials of insurance companies paying ERISA benefits out of their own funds." **214 F.3d at 390;** see also **id. at 378** ("We hold that, when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review.") (emphasis added). The introduction of the sliding scale concept later in the Pinto opinion complicates the simplicity of these pronouncements. Moreover, this Court recognizes, as did the Pinto court, the esoteric nature of the entire sliding-scale approach. See **id. at 392-93.** These caveats notwithstanding, the Court believes that traditional, unmodified arbitrary and capricious review can no longer be appropriate in the paradigm case of an insurer **[*11]** with a true, structural conflict, even where other indicia of conflict or bias are absent.

This being said, it is also clear that the beginning point of Pinto's sliding scale of heightened arbitrary and capricious review lies but a modest distance from the original standard, and

Case 1:01-cv-00797-YK   Document 37   Filed 07/17/2002   Page 53 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 7 of 26

that, absent other evidence of bias, the Court should engage in no more than a modicum of additional scrutiny. In February, this Court wrote:

> Thus, at trial, the Court will consider all the evidence relevant to the degree of conflict and the resulting location on Pinto's range of heightened arbitrary and capricious review, and the Court will render a plenary determination of those issues at that time. At this stage of the proceeding, the level of intrusiveness with which the Court will review the denial of benefits is still an open question. The facts that emerge may confirm the Court's view as already expressed. These facts may, however, move the Court either further along the scale towards Pinto's "high degree of scepticism" or, assuming the problems already identified are satisfactorily explained, back towards a more deferential standard of review.

130 F. Supp. 2d at 626.  [*12]  The Court, it is true, did posit a standard of review it considered appropriate based on the facts then before it. The Court was careful, however, as the quoted passage shows, to make clear that this standard of review was a tentative one.

The foregoing discussion was necessary for the following reason. Based upon the trial testimony in this matter, the Court finds no evidence of overt bias exhibited by Walsh, the claims administrator. It will be seen below that the Court finds that the denial of benefits was erroneous, and, indeed, so wrong as to require reversal under any standard. It would be redundant to repeat each of these errors here only to discuss them again later in connection with the merits. Suffice it to say that Walsh's testimony has convinced the Court that the specific shortcomings identified in this Court's February Opinion were due to errors of analysis and not bias in favor of his employer. The instances raised by counsel leave Dr. Lasser's allegations of active self-dealing not proven.

As discussed, this leaves the Court at the mild end of the heightened arbitrary and capricious scale, subjecting the benefits decision to only that extra scrutiny required by the  [*13]  structural conflict arising from the insurer acting as its own claims administrator. For lack of a more precise formulation, the Court adopts that of the Western District of Pennsylvania and finds that a "moderate degree of deference" is the proper standard of review.

## 2. The Merits of the Decision

Each of the issues in play in this case is governed by the Reliance policy. It provides that:

> "Totally Disabled" and "Total Disability" mean, with respect to [Physicians and Administrators], that as a result of an injury or Sickness, [n2] during the Elimination Period and thereafter an insured cannot perform the material duties of his/her regular occupation;
> (1) "Partially Disabled" and "Partial Disability" mean that as a result of injury or Sickness an insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An insured who is Partially Disabled with be considered Totally Disabled, except during the Elimination Period;
> . . . .

This is an occupational disability policy, which insures against loss of income due to the inability of insureds to engage in their  [*14]  regular or usual occupations. It is to be distinguished from a general disability policy, which provides benefits only to insureds who

cannot engage in any occupation for which they are reasonably suited. <u>Smith v. Equitable Life Assur. Soc. of the United States, 67 F.3d 611, 616 (7th Cir. 1995).</u>

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 It has not been contested that Lasser's heart condition is the result of sickness, as defined in the policy, and the Court will consider this element of coverage established.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Within the question of the substantive merits of the administrator's decision again lie two, discrete areas of inquiry. First, the parties dispute what activities Dr. Lasser can or cannot do. Second, the parties dispute what activities constitute the "material duties of [Dr. Lasser's] regular occupation." Again, familiarity with many of the details of the record evidence on these points, discussed at some length in the February Opinion, is assumed.

**a. The Medical Evidence**

Reliance's error in connection with this **[*15]** first issue, what Dr. Lasser is medically capable of doing, falls into four, interrelated categories. The first concerns defendant's persistent reliance on a Dr. Burke, an independent cardiologist who examined Dr. Lasser for Reliance. The second involves the weight placed on the New York Heart Association Functional Class scale, which purports to measure a patient's cardiac health based on the patient's physical capacity. Third, and related to the previous two, is Reliance's treatment of the issue of occupational stress. The last is directed to Reliance's assessment of the connection between risk, in this case risk of a heart attack, and capacity to perform.

The failings of Dr. Burke's analysis of Dr. Lasser's condition were explored in the February Opinion. In summary, Dr. Burke's examination of Dr. Lasser involved a treadmill test and other examination techniques calculated to reveal what Dr. Lasser's physical capacity was at the moment of the examination. Dr. Burke gave it as his professional opinion that "this individual does not demonstrate any cardiovascular disability." Three other reviewing cardiologists and two treating cardiologists provided written opinions which appear **[*16]** in the record of this case. Every other doctor involved came to a substantially different conclusion from Dr. Burke. Regarding the utility of Dr. Burke's treadmill stress test, Dr. wrote that it "is absolutely not the standard of care" and "not known to be accepted as conventional to any clinical cardiologist." Dr. Lubow stated, "The fact that the test was not done in a manner accepted by all cardiologists raises a question about the qualifications of [Dr. Burke] who denied the patient's disability." RSL469. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 This citation is to the administrative record submitted as a trial exhibit and admitted into evidence. The page number and "RSL" prefix refers to the bates number sequence of the documents in the record.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Important omissions in Dr. Burke's opinion were identified by the other doctors. Most prominently, by focusing on transient physical capacity, Dr. Burke failed to appreciate the risk to Dr. Lasser posed by occupational stress. Indeed, there is no mention of this issue in Dr. Burke's report. **[*17]** By ignoring the question of occupational stress in relation to Dr. Lasser's cardiac health and what professional duties it is medically reasonable for him to perform, Dr. Burke is at odds with the formidable weight and, indeed, unanimity of the other cardiologists opining on this case.

In addition, key points were missing from Dr. Burke's analysis, leading other doctors to conclude that Dr. Burke had failed adequately to review the medical record before him. For instance, Dr. Aldrich pointed out that Dr. Burke failed to notice a lack of improvement between thallium stress tests taken in August of 1996 and April of 1997 because Dr. Burke's report did not mention the August 1996 test. RSL464. Dr. Burke stated that he reviewed records of a catheterization performed in October 1996, but Dr. Lubow points out that there was no catheterization on that date, but only one done in July 1996 which revealed important problems with Dr. Lasser's heart, problems not mentioned by Dr. Burke. Both Drs. Lowell and Lubow complained that Dr. Burke missed or ignored medical records indicating that Dr. Lasser's bypass graft had failed and that Dr. Lasser's heart had significant and deteriorating anatomical **[*18]** abnormalities. n4 RSL466, RSL469.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 Dr. Lowell wrote:

> No mention is made in Dr. Burke's letter of the presence of a failed bypass graft to the main vessel of Dr. Lasser's heart. This main vessel is now fed somewhat surreptitiously [sic] by another bypass graft which at 12 years of age is statistically likely to begin to fail in the not distant future. Additionally, this vessel is compromised by a 60% obstructive plaque. This critical anatomic point ought to have played a role in Dr. Burke's determination because of the likely role stress will play in Dr. Lasser's future health.

RSL466.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Dr. Burke, in a rebuttal letter solicited by Reliance, wrote: "It is not important what an individual's anatomical profile is as long as the risk factor prevention program is maximal and that function as far as can be determined . . . is entirely within normal limits." RSL115. Dr. Burke made this statement in support of his conclusion that the opinions of Drs. Lubow and Aldrich were not "germane" to "the essential **[*19]** question of what is this individual's functional capacity in terms of being able to work." Id.

Here is revealed the flaw in Dr. Burke's approach. Dr. Burke believes that if a patient can, at any given moment, perform at a certain level and if risk factors are minimized as much as possible, then other problems, such as a failed and deteriorating bypass, occupational stress, and other factors pointing to a risk of a catastrophic medical event in the future, are "not important" and indeed, not even "germane" to the question of disability. It is obvious even to the lay person that a person might minimize risk factors for a heart attack and yet still be so sick that engaging in certain activities presents a medically unacceptable danger of future injury or death. This holds true even though, on any given day, that person might engage in such activities with no noticeable ill effect.

As will be seen below, this error has infected Reliance's entire treatment of the case. Yet, even on its own terms, Dr. Burke's reasoning is circular. He qualifies his position of no disability with the proviso, "so long as risk factor prevention is maximal." But the risk factor prevention cited by all **[*20]** five of the other doctors includes reducing Dr. Lasser's occupational stress by eliminating emergency surgery and on-call duties. Dr. Fields opined that, with these restrictions, Dr. Lasser could work forty hours a week, but the other doctors called for both the substantive restrictions on his duties and less than full-time working hours. n5 Dr. Burke's claim that with "maximal" risk prevention Dr. Lasser is not disabled

Case 1:01-cv-00737-YK   Document 57   Filed 07/17/2002   Page 56 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 10 of 26



does not respond to the points his colleagues raised and, in fact, strains credulity.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n5 See RSL183 (Dr. Raska) (reduced schedule "absolutely necessary"); RSL464 (Dr. Aldrich) (any increase in work load beyond the reduced hours prior to the termination of benefits "would substantially increase his risk for future cardiac events"); RSL466 (Dr. Lowell) (cannot fulfill duties of "full time" orthopedic surgeon); RSL469 (Dr. Lubow) (citing change in schedule as part of medically indicated stress risk reduction).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The testimony of Walsh reveals the extent to which Reliance relied upon the New  **[*21]**  York Heart Association Functional Classification system. This system has four levels of functionality for measuring the capacity for exercise of patients with cardiac disease. Level-four patients are unable to exercise at all without physical discomfort. Level one designates "patients with cardiac disease but with no limitation of physical activity." RSL252. The system also contains a scale of grades A through E denominated "therapeutic classification." Grade-A patients need have no restrictions on physical activity; grade E must be at complete rest.

Dr. Burke rated Dr. Lasser as functional class one and therapeutic class A. Dr. Raska, perhaps the most vehemently critical of Dr. Burke's work, also rated Dr. Lasser as functional class one, but therapeutic class C ("ordinary physical activity should be moderately restricted and . . . more strenuous physical efforts should be discontinued"). RSL252. Dr. Fields, in response to Walsh's question, also rated Dr. Lasser as class one. RSL92. It is clear that Walsh considered the classification of fundamental importance. See Tspt. at 22, 29-30. Indeed, Walsh inquired of Dr. Fields whether stress could be discounted as a risk factor in patients  **[*22]**  classified as level one. RSL79.

Dr. Fields responded that stress could not be discounted, writing that "In essence, functional class and exercise performance can predict general prognosis but can not predict future cardiac events." RSL93. Dr. Fields went on to emphasize the need to apply such general guidelines of cardiac care to the individual case. Id. Regarding Dr. Lasser's partially successful and aging bypass, Dr. Fields stated "cardiovascular prudence restricts isometric activity, competitive sports, and other acute emotional or physiological stress events from which the patient cannot immediately withdraw." Id.

It is apparent from the text of the New York Heart Association classification form in the record that it does not address the issue of emotional and/or occupational stress. RSL252. The functional classifications are directed solely to the patient's physical exercise capacity. Even the therapeutic classes, which in any event were not mentioned by Walsh, address only whether limiting physical activity is necessary. Nothing in the New York Heart Association classifications provides explicit guidance regarding psychological stress, and Dr. Field's letter rejects  **[*23]**  the inquiry of Walsh seeking scientific evidence linking a class-one rating to a reduced role of stress as a heart attack risk factor.

As will already be clear, the medical evidence overwhelmingly supported the fact that occupational stress posed a serious risk of further deterioration of Dr. Lasser's heart condition and of another heart attack. Speaking generally, Dr. Fields wrote: "Both physical and emotional stress are identified triggers of acute myocardial infarction." RSL92. Dr. Aldrich said, "Stress is a well-documented risk factor not only for the development of coronary artery disease itself, but within that context to the precipitation of a myocardial infarction." RSL463. Likewise was Dr. Raska:

Stress regardless of exercise tolerance is a recognized independent risk factor for


recurrent coronary artery disease. . . . There are multiple studies in both humans animals and in the laboratory which demonstrate that stress causes flux in the level [of] catecholamines in the circulation which have been shown to be a precipitant of acute myocardial infarction and sudden death.

RSL83-84.

The doctors were no less emphatic in relating the general proposition to **[*24]** Dr. Lasser's case. Dr. Lubow wrote, "However, the biggest risk to [Dr. Lasser] is physical and emotional stress that cannot be controlled easily. . . . Such stress is accepted by all experts as a significant risk factor in coronary artery disease." Dr. Lowell: "I contend that a less stressful environment would contribute to his graft longevity and subsequently his life." RSL466. Dr. Aldrich states pointedly that, with increased occupational stress, "Dr. Lasser's risk of myocardial infarction with all of its attendant morbidity and mortality will rise significantly." RSL463. Finally, Dr. Lasser provided to Reliance the report of his treating psychiatrist documenting the fact that Dr. Lasser experienced stress stemming from his return to an increased practice following the denial of his disability benefits.

In the backdrop of the other doctors' opinions, it is notable that Dr. Burke's report does not address occupational stress at all. The letter dated April 13, 1999, from Reliance purporting to set forth the reasons for denying Dr. Lasser's administrative appeal also makes no mention of the question of stress nor of its implications for Dr. Lasser. Finally, Walsh's testimony shows **[*25]** what weight was afforded the evidence of the danger of stress. This passage is illustrative:

> THE COURT: [quoting from Dr. Lieb's report] "I firmly believe that return to the reduced work schedule recommended by his cardiologist to lessen job related stress would be in his best interest and reduce the risk of jeopardizing his health and life."
>
> What weight, if any, did you give to that statement of Dr. Lieb?
>
> WALSH: Again, I didn't give it a great deal of weight, to be quite honest with Honor. I hate to sound harsh but I would suggest that reducing stress would be in everybody's best interest.

Tspt. at 46.

Elsewhere, Walsh's answers to questions clearly intended to elicit what weight he placed on the issue of stress were simply evasive. See Tspt. at 80-84. It appears that Walsh was prepared to at least entertain the possibility of stress in connection with emergency and on-call duties, tspt. at 83, although Reliance has challenged even that finding. Plainly, Walsh did not consider occupational stress to be a significant factor in relation to number of hours worked excluding those specific activities. Tspt. at 81, 83. Elsewhere, he states again: "Everybody **[*26]** has stress in their life and I certainly understood that when I made the decision." Tspt. at 84.

Of course, everybody does not have Dr. Lasser's heart condition. Walsh's references to the stress in "everybody's" life or that "everybody" would benefit from reduced stress are superficial at best. Juxtaposition of these references with Walsh's other testimony, e.g., that "physical capacity played a great deal into my determination," tspt. at 81, other references throughout the transcript, and the witness's demeanor lead to a virtually inescapable



Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 12 of 26

inference. Dr. Lasser's supposed physical capacity drove Walsh's decision to deny benefits and substantially displaced consideration of the risk posed by occupational stress, which played a markedly less important role in the claims analysis. See also, e.g., tspt. at 75. Courts have found ☜in the context of analyzing a claim of cardiac disability for Social Security insurance benefits that it is reversible error to focus on physical capacity to the exclusion of emotional stress associated with work. Schlabach v. Secretary of Health, Educ. & Welfare, 469 F. Supp. 304, 315 (N.D. Ind. 1978). The relative lack of weight Walsh **[*27]** placed on occupational stress in assessing Dr. Lasser's disability claim cannot be squared with the medical evidence and is unreasonable on the facts of this case.

Finally, the Court cannot accept Walsh's analysis of risk of future harm in relation to present disability under the terms of the disability policy. ☜It is a basic tenet of insurance law that an insured is disabled when the activity in question would aggravate a serious condition affecting the insured's health. See Stark v. Weinberger, 497 F.2d 1092, 1098-99 (7th Cir. 1974); Oppenheimer v. Fomch, 495 F.2d 396, 398 (4th Cir. 1974); Stillwell v. Sullivan, 1992 U.S. Dist. LEXIS 20242, 1992 WL 401971, *6 (D. Kan., Dec. 30, 1992). As noted in the Applemans' treatise, "The insured is considered to be . . . disabled where it is impossible for him to work without hazarding his health or risking his life." 1C Appleman, Insurance Law & Practice § 651 at 241 (1981). In fact, this proposition is sufficiently well-settled that in many jurisdictions it travels under the name of the "common care and prudence rule." E.L. Kellett, Annotation, Continuation of Work as Affecting Finding of Total or Permanent Disability **[*28]** within Insurance Coverage, 24 A.L.R.3d 8, § 3(a) (1969); see, e.g., McGowan v. Orleans Furniture Inc., 586 So. 2d 163, 166 (Miss. 1991); John Hancock Mut. Life Ins. Co. v. Poss, 154 Ga. App. 272, 267 S.E.2d 877, 880 (Ga. App. 1980).

Insureds with heart conditions or who have experienced heart attacks provide an obvious context for the application of these principles. E.L. Kellett, Annotation, Heart or Vascular Condition as Constituting Total or Permanent Disability within Insurance Coverage, 21 A.L.R. 3d 1383, § 3 (1968). ☜Where medical prudence requires a cessation of work activity, the insured is disabled; insurers have failed to convince courts that risk of a heart attack in the future does not constitute a present disability. Pompe v. Continental Cas. Co., 119 F. Supp. 2d 1004, 1010 (W.D. Mo. 2000)("Such an approach would force patients with serious health risks to cripple themselves, or even risk death, in order to be considered disabled. . . . The law is not so harsh.") (citing Herring v. Canada Life Assur. Co., 207 F.3d 1026 (8th Cir. 2000)).

This is true even though the insured **[*29]** may be capable of physical activity. Honeysucker v. Bowen, 649 F. Supp. 1155, 1162 (N.D. Ill. 1986). Clearly the risk of a heart attack may be a disabling factor even though the claimant can sit, stand, or ambulate. Schlabach, 469 F. Supp. at 314; Avemco Life Ins. Co. v. Luebker, 240 Ark. 349, 399 S.W.2d 265 (Ark. 1966).

Paraphrasing rather than quoting at length, Walsh testified on direct examination that he was aware that some of the doctors had linked stress to an increased risk of heart attack. See Tspt. at 32. Walsh complained, however, that the doctors had not quantified the amount of increase. Tspt. at 32 ("Is it increased to 51% or is it increased to 5%? It wasn't clear."). In response to counsel's question, Walsh stated that if risk of a heart attack were "more likely than not," then the disability benefits would not have been denied. Tspt. at 32-33.

Counsel, in Reliance's submissions, has pursued this line of argument as further reflected in this exchange with Walsh at trial.

> Q: Now, does this policy anywhere in the definition of disability or anywhere in the policy at all, does it say anything about paying **[*30]** benefits for prospective disabilities?

Case 1:01-cv-00797-YK    Document 37    Filed 07/17/2002    Page 59 of 101

> A: No, it doesn't.
> Q: Potential disabilities?
> A: No, it doesn't.
> Q: Risk of relapse?
> A: No.

Tspt. at 44-45. But even Walsh had previously conceded that a greater than 50% chance of a heart attack would qualify as a disability. The fact is that Walsh's testimony leaves no room for doubt that he was imposing his own assessment of the necessary probability of a serious medical event before a risk in futuro would be considered a disability.

It was not required that the cardiologists state a numeric percent of probability of a heart attack for them to conclude that, in their professional opinion, certain occupational stress posed a medically unacceptable risk of a heart attack. Nor was Walsh entitled to substitute his own, more-likely-than-not probability threshold for the judgment of the doctors. Moreover, as the authorities cited above establish, a medically unacceptable risk of a future heart attack and possible death may constitute a present disability under the policy, notwithstanding the suggestion of Walsh's testimony and counsel's arguments that Dr. Lasser's condition constitutes only an uninsured risk of harm in the future. **[*31]**

On April 13, 1999, Walsh wrote to Dr. Lasser's counsel denying the appeal from Walsh's earlier termination of benefits. This stands as Reliance's final denial letter and written opinion of the claims administrator. RSL45-48. In fact, the portion directed to the medical issues is not long and the entire letter is couched as a rebuttal to the arguments posed by counsel rather than as a comprehensive exposition of Reliance's grounds for denying the claim.

The most substantive point in Walsh's letter is the following: "Whether or not Dr. Burke's assessment was accurate, the information provided by every other physician involved in this case support our conclusion that Dr. Lasser can work on a full-time (40 hour per week) basis provided he avoid being on call and performing emergency surgery." RSL47. As noted above (see supra footnote 5) and in this Court's prior Opinion, this statement is in error. Only Dr. Fields opined that Dr. Lasser could work a forty-hour week. In its post-trial submission, Reliance has slightly modified its position, claiming only that no doctor specifically disapproved a forty-hour work week. While the other doctors did not state a maximum number of hours **[*32]** Dr. Lasser can work, the proposition that he can work full-time cannot fairly be reconciled with the overwhelming majority of the medical opinion available in this case as set forth in the doctors' opinion letters.

Walsh goes on to state that "It should be noted that even these restrictions [i.e. no emergency or on-call duties] are questionable given the fact that Dr. Lasser has demonstrated the ability to perform these activities since the termination of his benefits." RSL47-48. Indeed, it is clear from Walsh's testimony that Dr. Lasser's return to on-call and emergency duties heavily influenced his decision to deny further benefits. See Tspt. at 24, 43, 44, 45-46, 83-84. Reliance persists in this view in its arguments before this Court. Defendant's Trial Brf. at 6 ("The fact that he was working proved that he was no longer disabled.").

Obviously, where a disability consists of a danger of future negative health events, post-diagnosis employment does not necessarily negate the finding of disability. Stark v. Weinberger, 497 F.2d 1092, 1100 (7th Cir. 1974). In the context of a disability where the claimant hazards his well-being by returning to work against **[*33]** his doctors' recommendations, return to work should not affect the benefits determination. 1C Apppleman, supra, § 651 at 242-45; Kellett, supra, 24 A.L.R.3d 8 § 3(a); see also Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1326 n.6 (11th Cir. 2001)("We doubt that Levinson's status as a full-time employee constitutes evidence that he was able to perform


the material duties of his occupation on a full-time basis."); <u>General Am. Life Ins. Co. v. Yarbrough, 360 F.2d 562, 566 (8th Cir. 1966)</u>; <u>Stillwell, 1992 WL 401971</u> at *6-*7; <u>Johnson v. State Farm Mut. Auto. Ins. Co., 342 So. 2d 664 (La. 1977)</u>. This is particularly true where a claimant is forced to work by economic considerations. See <u>Johnson, 342 So. 2d at 667</u>; 10 Lee R. Russ & Thomas F. Segalla, Crouch on Insurance 3d 147:13. n6

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 Cases such as <u>Kaufman v. Provident Life & Cas. Inc. Co., 828 F. Supp. 275 (D.N.J. 1992)</u>, aff'd, <u>993 F.2d 877 (3d Cir. 1993)</u>, holding that continuous and regular employment will preclude a finding of disability are distinguishable. There is no suggestion in Kaufman that the claimant's return to work posed a risk to his health nor that he did so contrary to the express advice of his doctors. Moreover, Kaufman's return to work was obviously more complete and continuous than Dr. Lasser's. Claimant Kaufman earned over $ 600,000 per year while asserting he was disabled and he only reduced his activities, the district court found, to increase his prospects of continuing to receive disability benefits. <u>828 F. Supp. at 286.</u>

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - **[*34]**

Dr. Lasser has testified by affidavit that he returned to on-call and emergency duties out of economic necessity caused by the termination of his benefits. No evidence has appeared to rebut this. The medical opinions in the record explained that the fact Dr. Lasser had not suffered a cardiac event following his return to work meant nothing in terms of the risk he was running nor the possibility that Dr. Lasser's condition would likely deteriorate as a result. Walsh's statement in his letter that Dr. Lasser's return to an increased schedule makes "questionable" the existence of Dr. Lasser's disability shows his misunderstanding of the nature of the disability involved. See also tspt. at 83-84 (Walsh testifying that Dr. Lasser "demonstrated the capacity to perform all of the other duties of his occupation and subsequently performed even those duties that you found too stressful").

Miscellaneous other testimony by Walsh leads the Court to question further whether he ever correctly understood the gist of Dr. Lasser's case that he was disabled. For example, Walsh testified that he gave Dr. Lieb's psychiatric report "very little weight," because it was the only psychiatric report offered, **[*35]** because Dr. Lieb's treatment was only for a three-month period, and because there was no claim that Dr. Lasser had been taking psychotropic medicines. Tspt. at 45-46. However, the point of Dr. Lieb's opinion was not to make a claim for a psychiatric disability. Dr. Lieb's opinion was offered to establish the link between Dr. Lasser's normal duties as a fully-engaged orthopedic surgeon and the emotional stress Dr. Lasser was experiencing.

The reasons Walsh gave for discounting Dr. Lieb seem completely to miss the thrust of his opinion, focusing instead on whether there is evidence of a severe or long-term psychiatric condition. Indeed, elsewhere Walsh testified that he had no knowledge of whether on-call and emergency surgery would be stressful to Dr. Lasser. If Walsh had correctly understood the import of Dr. Lieb's opinion, this void would have been filled.

In sum, the Court finds that Walsh's conclusion that Dr. Lasser was not disabled cannot be reconciled with the medical evidence before him. Walsh's continued reliance on Dr. Burke's opinion and on the New York Heart Association functional capacity scale is plainly error. Neither authority, as demonstrated, even considers the **[*36]** issue of emotional stress as a risk factor for a heart attack.

In the face of the strongly worded and unanimous opinions of the other cardiologists, Walsh was not free to disregard occupational stress, clearly the primary threat to Dr. Lasser's cardiac well-being. The connection between Dr. Lasser's occupation and that stress was



established by Dr. Lieb's opinion as supplemented by the treating and consulting cardiologists. For Walsh to discount this weight of medical opinion on the ground that "reducing stress would be in everybody's best interest," tspt. at 46, was an abuse of discretion.

To hold that the medical evidence supported a return to a forty-hour week is likewise clearly wrong. Disregarding Dr. Burke who saw no reason for any limitation at all, only Dr. Fields approved a forty-hour week, "restricting this to outpatient and consultative orthopedics." RSL93. Dr. Lasser's treating cardiologist and three other cardiologists made it clear that a forty-hour week was contrary to their advice. During the administrative review process, questions were raised regarding the impartiality of Drs. Raska and Lubow because they came from the same practice group. Although counsel for Reliance **[*37]** continues to raise this issue, Walsh's final decision letter considered and dismissed this concern and termed Dr. Raska's opinion "comprehensive" and "objective." RSL47.

Under the arbitrary and capricious standard, the decision-maker may choose to credit some evidence over other evidence. The decision-maker may not, however, adopt what is so clearly the minority view, dismissing this substantial weight of medical authority for a contrary position, without at least some rational explanation for doing so. Even less so under the heightened arbitrary and capricious review applicable in this case may Walsh ignore the views of Drs. Raska, Lubow, Aldrich and Lowell. Thus, no reason is given for dismissing, for example, Dr. Raska's opinion that a reduced schedule is "absolutely necessary to maintain this patient's health" or the numerous similar opinions in the record. Walsh's and Reliance's repeated assertions that all of the doctors favored a return to a forty-hour week are unreasonable and, indeed, inexplicable. Certainly these bare assertions do not justify crediting only Dr. Field's opinion.

**b. The Vocational Evidence**

Reliance's decision to deny Dr. Lasser's benefits is best **[*38]** seen as resting on two grounds in the alternative. First, Walsh found, unreasonably in the view of the Court, that Dr. Lasser's heart condition did not prevent him from working a full-time schedule or from performing on-call or emergency duties. In the alternative, assuming that Dr. Lasser was disabled from on-call and emergency duties, Walsh ruled that these activities were not "material duties of [Dr. Lasser's] regular occupation." It will be noticed that this alternative argument takes as an underlying premise that a forty-hour week is still possible for Dr. Lasser, a point the Court has rejected supra.

It is, however, common ground that if providing emergency and on-call services are material duties of Dr. Lasser's regular occupation, and if Dr. Lasser is disabled from these activities, then Dr. Lasser is entitled to benefits under the policy even if he is otherwise able to work full-time. This is due to the provision in the policy that a disability permitting the insured to perform only a portion of his material duties on a full-time basis constitutes a total disability for the purposes of the policy. It is also common ground that Dr. Lasser's regular occupation was as **[*39]** an orthopedic surgeon and that he performed emergency and on-call services before being diagnosed with his disability. Much of the energies of counsel were directed to disputing whether emergency and on-call services are a material duty for an orthopedic surgeon.

Walsh has made it clear that he brings no personal knowledge to the question of what the "regular occupation" of an orthopedic surgeon might involve, what might or might not be considered emergency or on-call services, or whether such services are a material duty of an orthopedic surgeon. See Tspt. at 34, 101. The transcript contains the following exchange.

THE COURT: . . . let's say the doctor goes to his office five days a week . . . and



your kid eight years old is playing on the playground, falls and breaks his arm, and you take him to the doctor at noon and the arm has to be x-rayed, set, cast put on. Is that an emergency?

THE WITNESS: I don't know if that's classified as an emergency or not.

THE COURT: Well, did you give any thought to it as to whether it's an emergency or not?

THE WITNESS: As I said, I thought about elective surgery in general. No I didn't think about that particular situation. **[*40]**

THE COURT: If that were to be considered an emergency, would that in any way influence your decision?

THE WITNESS: I don't believe it would.


Tspt. 28-29. Walsh testified that the information upon which he formed his opinion in this case was limited to the Department of Labor's Dictionary of Occupational Titles ("DOT") and the survey taken by an outside vocational consultant. Tspt. at 34.

The Court has already addressed the shortcomings in Reliance's analysis of the vocational issues. In its February Opinion, the Court found that the DOT is "far too blunt an instrument to be instructive as to the material duties of an orthopedic surgeon." 130 F. Supp. 2d at 624. The DOT describes the occupation of a surgeon as evaluating patients and performing operations. As noted, "Orthopedic Surgeon" is identified as an "Undefined Related Title," "specializing in correction or prevention of skeletal abnormalities utilizing surgical, medical, and physical methodologies." RSL261.

The DOT does not disclose whether or in what proportion an Orthopedic Surgeon deals with emergencies. Indeed, as Walsh's testimony quoted above suggests, there is no information as to what **[*41]** would even be considered an emergency. Walsh refers to the possibility of elective surgery, but the DOT is silent regarding when, if ever, elective surgery is performed by Orthopedic Surgeons. (Interestingly, the DOT does indicate that a surgeon's working conditions involve performance under stress.)

Presumably the DOT's "skeletal abnormalities" includes broken bones. In fact, common knowledge as supplemented by a generic dictionary suggests that such injuries are the bread and butter of a normal practice for an orthopedic surgeon. See American Heritage College Dictionary 965 (3d ed. 1993)(including treatment of "injuries and skeletal disorders" in definition of orthopedics). As demonstrated above, Walsh did not know and did not consider whether treating a routine fracture was properly classified as an emergency. By logical implication, therefore, Walsh did not know or consider whether treating such an injury was a material part of an orthopedic surgeon's job. This is entirely consistent with his reliance upon the DOT, which, of course, provides no information on this point.

Walsh testified that the DOT was a mainstay of the long-term disability insurance industry. Tspt. at 115. **[*42]** This Court is not the only tribunal to find this authority lacking. See, e.g., Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 253 (2d Cir. 1999); Pinto v. Massanari, 249 F.3d 840, 2001 WL 436061 (9th Cir. 2001)(DOT definition of hand packager was "generic" and did not adequately capture "varying abilities and job knowledge" required of persons with this job description) (internal quotation omitted); Paige v. Bowen, 695 F. Supp. 975, 980-81 (N.D. Ill. 1988); see also Wright v. Sullivan, 900 F.2d 675, 684 (3d Cir. 1990)(absence of job listing in DOT shows DOT not comprehensive, not that job does not exist). However, whether or not Walsh appreciated the shortcomings of the DOT's

occupational definition, he testified that he decided to commission a survey to determine whether emergency and on-call duties were material duties of an orthopedic surgeon. The Court has already expressed its opinion of the survey in general terms in its February Opinion. Further study of the record and the testimony of Walsh only confirms the Court's prior view that this survey was fatally flawed in its execution **[*43]** and in Reliance's interpretation of it. In sum, the survey added nothing to the information base upon which Walsh relied for his decision.

The core question of the survey was: is it "reasonable to expect that an Orthopedic Surgeon can practice in this field" when disabled from performing emergency or on-call duties. See 103 F. Supp. 2d at 624 (survey quoted in full). It is notable that the question does not ask whether emergency and on-call duties form a significant part of a typical orthopedic surgeon's practice. The question defines neither what is meant by "practice in this field" nor emergency or on-call duties. The vocational expert employed by Reliance opined that such a definition would be redundant to the intended recipients of the survey. RSL53. The omission is important, however, in light of the professed lack of knowledge on the part of the decision-maker, Walsh. This lack of knowledge and the lack of specifics in the survey question mean that Walsh was forced to rely upon the results of the survey as a kind of net opinion, without permitting him to weigh by any logical process the validity or relevance of the answers he received.

This fact makes it only **[*44]** the more unfortunate that the questions in the survey were ill-framed. What "reasonable" may mean in this context is unclear. The phrase "practice in this field" only muddies the waters further. A respondent could well have believed that the hypothetical disabled orthopedic surgeon could practice in some capacity in the field of orthopedics, but not necessarily as an orthopedic surgeon.

Indeed, one respondent took the trouble to point out this ambiguity, writing: "In your example, you are describing a physician who is not an orthopaedic surgeon, but might be considered an orthopaedist." RSL150. Other respondents may have construed "reasonable" to mean that it would be conceivable, or practicable, or even merely desirable that a disabled doctor could still practice "in this field" despite the stated restrictions. The central problem is that the question does not directly ask for the respondents' empirical observation of the real-world situation. Walsh's reliance on the survey, with its yes-or-no answers unadorned by any definition or explanation of exactly what duties the respondents are considering, was not well taken.

Reliance maintains that the follow-up questions remedy the lack **[*45]** of real-world connection for the central question posed. These ask the respondents to rank from "none to rare," to "occasional," or "frequent" the employment possibilities for the disabled orthopedic surgeon. Reliance believes that the frequency response "none to rare" should be considered to mean "rare" rather than none, by virtue of the positive response to the question is it "reasonable" that the disabled person could practice in the field. Finally, Reliance maintains that full-time employment as an orthopedic surgeon is implicit in the question.

The Court rejects each of these arguments. There is no reason that a respondent might not feel it would be "reasonable" for a restricted orthopedic surgeon to "practice in this field," (whatever that might mean) but that employment opportunities were in fact non-existent. Full-time employment is not implicit in the question. If, for example, the respondent believed that emergency surgery included setting a broken arm during office hours, then that respondent might well opine that a disabled doctor could practice "in the field" but that his opportunity to practice might be so reduced that full-time employment was impossible. The structure **[*46]** of the survey makes it impossible to rule out this possibility and Walsh, with his own professed lack of knowledge, is in no position to correct this shortcoming.

Finally, as noted previously, only fourteen responses were received from the one hundred

Case 1:01-cv-00737-YK   Document 57   Filed 07/17/2002   Page 64 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 18 of 26

addressees of the survey. Five stated that it was not reasonable for the restricted orthopedic surgeon to practice in the field, and thus furnished no further response. Three answered yes, but marked the "none to rare" response. Another respondent, providing further evidence of the ambiguity of the question, stated that practice in the field would be possible, but that the doctor would be limited to writing reports. As this Court has already found, this is not equivalent to practicing as an orthopedic surgeon. Thus, even of the small fraction of persons who took the trouble to respond to the survey at all, nine, or 64% could plausibly be understood to have meant that no employment opportunities for the restricted orthopedic surgeon existed at all. Stated otherwise, Reliance succeeded in securing only five responses out of the one hundred questionnaires sent indicating the employment opportunities for the hypothetical disabled orthopedic **[*47]** surgeon were better than "none to rare."

To maintain consistency with the February Opinion, the Court relies upon the survey responses submitted as Exhibit X to the Declaration of David J. Gruber submitted by plaintiff in opposition to the motion for summary judgment. For reasons not clear to the Court, the documents submitted at trial only contained nine responses. It may have been that Walsh only considered the nine responses while making his decision. If so, then reference to the larger number actually favors the validity of Reliance's survey.

If only the nine responses were before Walsh, then the Court finds that a fair reading of those responses would lead to either a five to four vote in favor of Reliance or an equal split in favor of Dr. Lasser, depending upon how one interprets a single ambiguous answer. See RSL151 (response number two). It should be noted, however, that from the more limited pool of nine responses only one ranked the job opportunities as better than "none to rare." In any event, for the reasons stated, the mere fact of a simple majority of responses cannot justify the reliance the insurer placed upon this survey.

In fact, there are a number of grounds **[*48]** upon which to question the reliability of the survey, even if one accepts Reliance's mode of analyzing the results. A letter from Reliance's vocational consultant states that the recipients of the questionnaire were selected from "various orthopedic surgeons affiliated with the AMA, American Academy of Orthopaedic Surgeons-1998 Board of Councilors Members, leading local medical schools, teaching hospitals, etc." RSL170. Did their selection, and the apparent emphasis on doctors in large institutions, influence the responses received? Why was the survey sent to only one hundred persons? Do fourteen (or nine) responses represent a statistically reliable sample of the profession; indeed, how many orthopedic surgeons are there in the United States? A document in the record titled "Overview of the American Academy of Orthopaedic Surgeons" claims the organization has 14,796 active fellows. RSL161. Yet, Walsh disavowed even a general impression of how many orthopedic surgeons practice in the United States. Tspt. at 40.

How should one interpret the small percentage of responses? Does the fact that a recipient responded mean that she or he was predisposed to agree with the premise of the survey's **[*49]** question and, if so, how then should one interpret the fact that 86 persons could not be bothered to reply? How can anyone know even whether the addressees of the survey questionnaire were the actual respondents, and not a member of the doctor's staff or even some unrelated party? An e-mail address is a notoriously unreliable identifier of the author of an e-mail.

None of these questions was addressed by Reliance or its outside vocational survey vendor. They are sufficiently obvious to the interested non-expert that they should have been raised by the insurer before relying upon this survey in a case of such importance. The Court finds that the survey was so obviously worthless as an authoritative measure of the material duties of an orthopedic surgeon that Walsh's reliance upon it must be deemed unreasonable.

However, Reliance's treatment of the small number of positive responses reveals a more

Case 1:01-cv-00797-YK    Document 37    Filed 07/17/2002    Page 65 of 101

fundamental error in its analysis of this case. All of the evidence, both medical and vocational, is relevant only to the extent it elucidates Dr. Lasser's situation in relation to the terms of the disability policy for which Reliance accepted premiums. The policy speaks of an inability to [*50] perform the "material duties" of one's "regular" occupation. Although courts have found that this language is not as helpful as it could be, see Scammacca v. Royal Maccabees Life Ins. Co., 2001 U.S. App. LEXIS 9347, 2001 WL 493427, *1 (9th Cir., May 9, 2001) (unpublished), the Court finds it sufficiently clear in this case to have guided the discretion of the claims administrator.

"Regular occupation," on its face, refers to that occupation in which the claimant is usually engaged, as opposed to a part-time or occasional professional activity. Although the Third Circuit has ruled in cases involving the same or similar policies, those cases did not present this precise issue and our Court of Appeals has not interpreted this specific language. The Second Circuit has held that "regular occupation" in a disability policy means a job of "'the same general character as the insured's previous job, requiring similar skills and training and involving comparable duties.'" Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 252 (2d Cir. 1999)(quoting Dawes v. First Unum Life Ins. Co., 851 F. Supp. 118, 122 (S.D.N.Y. 1994)). The "regular occupation" concept [*51] does not limit the insurer to considering only the precise activities of the insured's previous job. It does, however, require "some consideration of the nature of the institution at which the claimant was employed." 181 F.3d at 253.

Thus, in Kinstler, the claimant was a director of nurses in a small health care agency whose job required some physical activity. The Second Circuit held that it was proper to consider this activity as a material duty, even though a director of nursing in a larger hospital would have an entirely sedentary position. 181 F.2d at 253. Similarly, the Fourth Circuit, in O'Bryhim v. Reliance Standard Life Ins. Co., 1999 U.S. App. LEXIS 19232, 1999 WL 617891, *8 (4th Cir., Aug. 16, 1999)(unpublished), looked to the duties the claimant actually performed, and not to the duties of an abstract job category to determine the material duties of the claimant's "regular occupation."

This Court finds that the materiality of a given occupational duty depends upon the importance of that duty to the claimant's professional endeavors, measured as a combination of the amount of time the activity consumes and its qualitative importance to the mission. A [*52] duty is "material" when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the "regular occupation." The Court is careful not to limit the concept of a "regular occupation" to mean only the insured's previous job. However, the Court believes that a claims administrator considering an occupational disability claim must make some allowance for the mode in which the claimant practiced her or his profession. To rely solely on broad job classifications without some consideration for the geographical or institutional context ascribes a fungibility to the occupations of insureds that is consistent with neither reality nor the "regular occupation" formulation of the policy.

Reliance's treatment of the vocational evidence is in conflict with these basic policy fundamentals.

> THE COURT: What concerns, if any, did that cause you that only 14 out of a hundred responded and that there was submitted a lack of uniformity among the 14 that responded?

> WITNESS: True. It really didn't give me concerns, though, from my perspective. As I just said, we look to see if the job exists and is available. [*53] We don't necessarily look to see that it exists in plentiful numbers, and even with a limited number of responses, the number of them did say that it exists.



Tspt. at 40. The argument latent in defendant's counsel's direct question of Walsh further demonstrates the error in Reliance's approach.

> COUNSEL: Do you consider somebody totally disabled if you can't find them a job? In other words, is it your responsibility to find somebody a job?
>
> WITNESS: Not at all, no.

Tspt. at 39. Walsh makes it clear that neither the number of available positions nor their geographic location makes a difference to Reliance as long as the job is "available." Id. n7

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 The Court notes that this marks an abandonment of Reliance's previous position that a majority of the survey respondents favored its position. It is clear from Walsh's testimony that if any respondents had favored Reliance's position, the claim would have been denied.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

It is intuitively obvious that this viewpoint cannot be reconciled  [*54]  with the facts of this case and the language of the policy. Here the claimant practices a relatively common and familiar medical specialty in the northeastern United States. Reliance would tell disabled claimants that because a nationwide survey has discovered five members of their profession (assuming the respondents were in fact the addressees of the survey) who believe that a person with the claimant's disabilities could practice (whether in the rural South, the steppes of Nebraska or Hawaii matters not), n8 that such claimants can still function unimpaired in their established line of work. Reliance cannot seriously contend that this is the premise upon which their insureds purchase disability policies. Walsh believes that if at least one job with the claimant's professional title exists with the claimant's particular restrictions, the claimant can perform the "material duties" of the claimant's "regular profession." This is not a rational interpretation of the terms of the policy.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 The Court rejects the implication of Walsh's testimony that he discounted the survey respondent from Alaska, but weighed more heavily the response purporting to come from Newark's University of Medicine and Dentistry. Tspt. at 108-09. Reliance, having commissioned a survey intended to provide a statistically meaningful sampling of the orthopedic surgeon's profession nationwide, cannot change horses and advance the response of one respondent as representing the expert opinion of a local practitioner. Moreover, even acknowledging that the rules of evidence do not bind plan administrators, for Reliance to consider an unverified e-mail response to such a flawed survey as evidence of expert local opinion would be completely unreasonable. In any event, the Court will take Walsh at his word and conclude from his testimony that he considered neither the professional affiliation nor the geographic distribution of the responses and that his opinion would not have been altered if he had. Tspt. at 109.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*55]

The logical flaw inherent in the vocational survey is as follows. The only issue upon which a survey such as the one conducted in this case could possibly be relevant is to determine what the material duties of an orthopedic surgeon actually are. Orthopedic surgeons would have

useful knowledge on this point and could be surveyed regarding what duties they actually perform, what proportion of their time each such duty occupies, and what duties they consider central to their role in the medical profession as "orthopedic surgeons."

In addition, it would have been highly relevant if the survey had been directed to surveying orthopedic surgeons practicing in small-practice settings. It will be recalled that Dr. Lasser was one of four doctors at Townsquare Orthopedic. It is too obvious to be belabored that, in a small practice, on-call and emergency surgery may be more material to a doctor's occupation than for a practitioner at a large medical center.

On a more fundamental level, by posing a hypothetical question of whether it would be "reasonable" for an orthopedic surgeon with Dr. Lasser's restrictions to practice, and asking for the prevalence of job opportunities, Reliance and Walsh **[*56]** misconstrued the of occupational disability contained in the policy. The following example will illustrate. One may readily imagine arcane or near-obsolete occupations, perhaps that of farrier n9 or pipe-organ builder, in which employment opportunities are exceedingly rare. The frequency or number of available openings for partially disabled farriers or pipe-organ builders has nothing to do, however, with defining the material duties of those positions. The relevant data is what tasks occupy the talents of those farriers or pipe-organ builders who are actually employed in the field, however few or numerous they might be. Should these occupations sadly die away all together, their practitioners will not be "disabled" but merely unemployed. Conversely, a farrier who cannot shoe horses cannot perform a material duty of that occupation, regardless of whether there are any job openings in the field.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 One who shoes horses.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

In fact, Reliance's approach to vocational surveys blurs the line between occupational **[*57]** and general disability policies. As noted, a general disability policy only provides benefits if the claimant is disabled from any work for which he is reasonably suited by education, experience, etc. The focus is what the claimant can do and what jobs exist; the existence of any suitable job that the claimant can do will disqualify the claimant. Occupational disability, as discussed, depends upon defining the claimant's regular occupation and then evaluating whether the claimant can perform that occupation.

Consequently, in Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 459-60 (9th Cir. 1996), the administrator erred when it construed an occupational disability plan to deny benefits when there was work available for which the claimant was qualified and that she could do with an accommodation. This was error even though the vocational experts used the same job description as the claimant's prior position. As explained in Ross v. Indiana State Teacher's Ass'n Ins. Trust, 159 F.3d 1001, 1011-12 (7th Cir. 1998), cert. denied, 525 U.S. 1177, 143 L. Ed. 2d 109, 119 S. Ct. 1113 (1999), **[*58]** in Saffle the administrator evaluated the claimant's employability with a modification of her duties, an accommodation that was "essentially outside of the realm of Saffle's regular job." 159 F.3d at 1011.

This "collapses the threshold for occupational disability into the standard for general, or permanent disability." Saffle, 85 F.3d at 459. The survey Reliance commissioned asked whether, after modifying Dr. Lasser's job to exclude stressful duties, work was available for him. Walsh interpreted the results of the survey to mean that if an orthopedic surgeon with these limitations could find employment in the field, he was not occupationally disabled. Left unanswered was whether those stressful duties were a material part of the duties of an orthopedic surgeon in Dr. Lasser's general type of practice.

Case 1:01-cv-00737-TK    Document 37    Filed 07/17/2002    Page 68 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                      Page 22 of 26

Some of the e-mail responses to the survey suggest that the occupational/general disability distinction was blurred in the minds of the respondents as well. For instance, some said that an orthopedic surgeon unable to do emergency or on-call duty could practice, but made clear that this practice would be sharply modified from the norm. One wrote: "there **[*59]** are jobs out there that orthopedic surgeons can do, ie. office practice only." RSL150. Another stated: "if in community-no; academic possible." RSL149. Indeed, this result appears clearly in the narrative finding submitted with the results of the survey, which held that "this type of work setting [i.e. one without emergency and/or on-call surgery] typically involves special circumstances and these circumstances are available only rarely or occasionally . . . ." RSL169.

This approach is appropriate for a general disability inquiry. It is not appropriate when considering an occupational disability claim. To repeat: the polestar is defining the "regular occupation" and whether the claimant can perform it, not whether the disabled claimant can find work. The survey does not permit one to form an opinion of what the material duties of Dr. Lasser's (or any other orthopedic surgeon's) "regular occupation" might be. In framing the survey, Reliance and its vocational survey vendor were proceeding from an interpretation of the policy that cannot be reconciled with its plain language. Saffle, 85 F.3d at 459. ("As manifest in Robertson's instructions to the experts, the Committee **[*60]** construed 'regular occupation' as 'work available for which she is qualified [that would have enabled her to work with her feet elevated' and to remain sedentary virtually always. This construction is inconsistent with the plain language of the Plan . . . .").

Thus both of the two sources of information upon which Walsh relied to inform him regarding the material duties of Dr. Lasser's occupation, the DOT and the vocational survey, were wholly inadequate. The DOT is not sufficiently detailed to provide any meaningful guidance in this case. The vocational survey was so flawed in its execution and misguided in its conception as to be worthless. Notwithstanding, Walsh disavows any general or common knowledge regarding what an orthopedic surgeon might normally do. Consequently, these two authorities form the sum of the information adduced by Reliance to answer the central question in this matter.

Here, Reliance falls back upon a procedural argument, contending that it was Dr. Lasser's burden to establish what the material duties of his regular occupation were and that he was unable to perform them. Claiming that Dr. Lasser has failed to carry this burden, Reliance maintains he has failed **[*61]** to prove the elements of coverage and that the company was free to deny the claim. This Court has recognized that ☏the burden of proving coverage rests upon the claimant, and that there is no duty on the insurer's part to investigate the substantive details of a claim. Lasser, 130 F. Supp. 2d at 628 (citing **Pinto, 214 F.3d at 394 n.8**). Contrary to the contentions of counsel, however, the Court does not agree that without the DOT and vocational survey the record is simply empty regarding the material duties of Dr. Lasser's occupation. On the contrary, while not as plentiful as Dr. Lasser might wish, he has adduced sufficient evidence to determine parameters of his occupation, at least with respect to emergency and on-call duties. Moreover, this evidence stands unrebutted.

The most direct of this evidence is Dr. Lasser's own affidavit. RSL473-79. Dr. Lasser testifies that he discontinued emergency and on-call duties, which, in conjunction with reduced hours, caused a dramatic drop in his income. When Reliance discontinued his disability benefits, Dr. Lasser resumed on-call and emergency surgery, although he avers that he did not resume full-time practice. **[*62]** Dr. Lasser did this, knowing that he risked his health, to increase his income to make up for the loss of benefits. From this, two points emerge. First, it is clear from the fact that Dr. Lasser discontinued emergency surgery and on-call duty in an attempt to alleviate stress in his occupation that these activities formed some measurable part of Dr. Lasser's practice before he became disabled. There would be little stress abatement in stopping an activity one seldom engaged in anyway. Second, the fluctuation in his income,

Case 1:01-cv-00737-TK   Document 37   Filed 07/17/2002   Page 69 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 23 of 26

partially cured by resuming emergency and on-call duties, indicates that these duties were significant to his overall professional activity.

Additional evidence as to the materiality of emergency and on-call duties lies in the medical opinions of the cardiologists. Walsh, testifying based upon prior experience, opined that the cardiologists' information came largely from Dr. Lasser. However, at least with respect to Dr. Lasser's treating cardiologist, it was in Dr. Lasser's interests accurately to inform him of his daily activities in order to obtain an effective program of rehabilitation. Indeed, it is based on this indicium of reliability that such out-of-court **[\*63]** statements by Dr. Lasser would be admissible under the Federal Rules of Evidence. Fed. R. Evid. 803(4); see 2 John W. Strong, McCormick on Evidence § 277 at 247 (4th ed. 1992).

Walsh explained that he does not usually credit the statements of physicians regarding the material duties of a claimant's occupation. He claimed that, in his experience, physicians rely on what their patients claim their professional duties are, and that the company's subsequent investigation frequently shows that the physician's assumptions regarding occupational requirements are in error. Tspt. at 104-05.

The Court cannot accept this as a reasonable basis for discounting entirely the cardiologists' assessment of Dr. Lasser's regular occupation. First of all, as already discussed at length, Reliance conducted no subsequent investigation worthy of the name. Thus, the only basis for discounting the cardiologists' opinions regarding Dr. Lasser's material occupational duties is Walsh's prior experience in other cases. However, there is no basis to suppose that Walsh's grounds for discounting the medical opinions in the unspecified other cases to which he refers are any more valid than in this one. When **[\*64]** one considers that the rationale advanced for discounting the medical testimony in those other cases may be Walsh's perceived experience in this case, the speciousness of his reasoning is apparent.

Nor is Dr. Lasser the only source of information regarding what an orthopedic surgeon is required to do. The cardiologists are, after all, medical professionals and can be expected to have some understanding of an orthopedic surgeon's duties. Dr. Aldrich wrote:

> Based on my knowledge of Dr. Lasser's cardiac condition and the demands of his profession, it is my opinion that he is disabled. I do not feel that he is capable of resuming all of the customary duties and responsibilities of an orthopedic on a full-time basis or at least that he could not do so without exposing himself to a high degree of risk.

RSL462; accord RSL470 ("Dr. Lasser cannot function at full capacity as an orthopedic surgeon without undue risk to his health and life.") (Dr. Lubow); RSL466 (Dr. Lasser's heart problems "have a direct and negative impact on his ability to perform the duties and responsibilities of a full time orthopedic surgeon") (Dr. Lowell); RSL93 ("I agree . . . that Dr. Lasser **[\*65]** is not capable of resuming all of the customary duties and responsibilities of an orthopedic surgeon.").

In his opinion letter, Walsh rejected the cardiologists' opinion that Dr. Lasser was disabled from his profession, arguing that they had no expertise in vocational matters. Knowledge of the material duties of a particular profession cannot logically be limited only to members of that profession nor to experts in vocational science. Others may have a working knowledge such matters. Moreover, Walsh's argument is seriously undermined by the fact that he was willing to assume that the consulting cardiologists were familiar with the duties of an orthopedic surgeon when he sought their opinion. Tspt. at 76-77. He directly inquired of Dr. Burke regarding those duties. Tspt. at 105-06. A claims administrator might, in his

Case 1:01-cv-00797-TK   Document 37   Filed 07/17/2002   Page 70 of 101



Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                     Page 24 of 26

discount the opinion of a treating or consulting physician on occupational matters in favor of evidence from a vocational expert. Here, however, there exists no such alternative evidence that could rationally be considered reliable, and the evidence supplied by the doctors and directly from Dr. Lasser stands unchallenged.

Reliance is incorrect, therefore, **[*66]** when it argues that Dr. Lasser has failed to produce evidence in his favor on whether emergency and on-call duties were material duties of his regular occupation. It would surely have created a more compelling showing had Dr. Lasser consulted his own vocational experts. However, the circumstantial evidence of the fluctuation in his income, Dr. Lasser's own affidavit, the opinions of the cardiologists, and the evidence of causation provided by the psychiatrist Dr. Lieb cannot be disregarded. For Walsh to do so in this case was unreasonable, particularly in light of Reliance's failure to adduce reliable vocational evidence of its own.

### 3. Application of the Appropriate Standard and Summary of the Holding

Much effort has been expended by the Court in stating its view of the proper application of the "sliding scale" version of arbitrary and capricious review under the Pinto case. While this effort was necessary and well-spent, as a practical matter it now appears to have been an academic exercise. The Court finds that even under its most deferential iteration, arbitrary and capricious review requires that the denial of Dr. Lasser's benefits be reversed. It follows, of course, **[*67]** that under Pinto's heightened arbitrary and capricious standard, Reliance's decision cannot stand.

Disability benefits decisions are always important cases to the disabled employee. The importance of this case is only made more plain because Dr. Lasser's benefits are comparatively substantial in financial terms. Having tried this matter and having had the opportunity to evaluate the testimony and other evidence at first hand, the Court finds that the method by which Reliance analyzed this disability claim is simply not appropriate for a matter of this magnitude and importance to the persons involved.

On the contrary, Reliance has exhibited a level of care which, joined with an apparent predilection to rely on standardized techniques and categorizes, cannot be squared with the sensitive inquiry these important, sui generis cases require. The Court is constrained to note that Walsh is not highly experienced, having graduated from law school in 1995. It is perhaps not surprising that he should place undue weight on the DOT because it is widely used in his industry, at the expense of exercising his own critical faculties to determine whether the DOT is a useful guide in the case **[*68]** actually before him. Likewise, the Court finds that the numeric clarity of the New York Heart Association classification obscured in Walsh's mind the less easily quantified but real danger of a heart attack or other cardiac injury posed by occupational stress in Dr. Lasser's work.

Walsh is plainly an intelligent and capable young lawyer. The error here is institutional; Reliance invites error by placing an attorney such as Walsh in the role of sole and unreviewable decision-maker in this type of case. And the errors here are glaring. Counsel trumpets an alleged lack of "objective proof" of Dr. Lasser's condition and claims that such proof is a "requirement" of disability coverage. Yet the anatomical problems with Dr. Lasser's heart and the undeniable fact of his heart attack are surely objective indicators of a serious problem, and even Reliance does not deny that Dr. Lasser has a heart condition. Nor, for the reasons set forth, can the Court accept Reliance's arguments that the risk of future death or serious injury posed by continued employment cannot constitute a present disability.

Of course, flaws in methodology and errors of analysis are secondary and only reveal rather than **[*69]** constitute direct evidence of an arbitrary and capricious decision. It is the evidentiary record that controls. Overwhelming medical opinion in this case leaves no room for reasonable argument. Dr. Lasser is seriously ill, regardless of any quibble over whether

Case 1:01-cv-00797-YK   Document 37   Filed 07/17/2002   Page 71 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 25 of 26

the evidence of such disability is "objective" or otherwise. Continuing with his former professional activities without substantial modification of his duties and lessening of hours worked poses a medically unacceptable risk to his well-being. The policy requires no more.

Nor does Reliance's fall-back position, that emergency and on-call duties are not material to Dr. Lasser's occupation, carry the day for the insurer. Ignoring momentarily the profound conceptual flaws in the vocational survey commissioned by Reliance, that document indicates, at most, that orthopedic surgeons practice without being able to perform such duties only infrequently or in specialized and/or administrative work settings. What other evidence exists on the point shows that emergency and on-call duties are a substantial part of the occupation of a small-practice, orthopedic surgeon. Remaining true to the terms of the policy as covering occupational **[*70]** rather than general disability requires the conclusion that Dr. Lasser is disabled by virtue of his inability to perform these functions.

Reliance argues that there was at least some evidence in its favor and that this requires upholding its decision under the arbitrary and capricious standard. However, for the reasons expressed by the other doctors, Dr. Burke's opinion is too patently suspect to be considered over the numerous other contrary medical opinions. Dr. Burke's letter of rebuttal does not successfully address the flaws found in his opinion, and no other reasons have been advanced why Walsh properly could have given Dr. Burke any weight in his decision. The problems with the vocational analysis have also been explored. For the reasons expressed, the evidence adduced by Reliance simply does not support its position. It cannot, therefore, furnish sufficient grounds to uphold the decision under the arbitrary and capricious standard.

It should be obvious that, due to the special problems raised by the rule of Pinto, this Court has studied this record and considered the testimony of Walsh closely. The Court believes that, even under the regular arbitrary and capricious standard, **[*71]** the decision must be reversed. Applying the slightly less deferential standard appropriate where a structural conflict of interest exists, the Court would certainly set aside the denial of benefits. Because the Court finds that Dr. Lasser has established his entitlement to disability benefits under the policy at issue in this matter, the Court will enter judgment in his favor.

**CONCLUSION**

For the reasons set forth above, which constitute the Court's findings of fact and conclusions of law in this matter, the Court finds that defendant Reliance wrongly denied Dr. Lasser the disability insurance benefits he was entitled to under the policy of insurance that is the subject of this litigation. Pursuant to the terms of that policy and as provided by the Employee Retirement Income Security Act, Dr. Lasser is entitled to those disability benefits. Judgment will be entered in Dr. Lasser's favor accordingly.

An appropriate Order is attached.

Dated: June 13, 2001

ALFRED M. WOLIN, U.S.D.J.

**ORDER and JUDGMENT**

In accordance with the Court's Opinion filed herewith,

It is this 13TH day of June, 2001

ORDERED and ADJUDGED that judgment is hereby entered in favor of plaintiff **[*72]** Dr. Stephen P. Lasser ("Dr. Lasser") on his complaint against defendant Reliance Standard Life Insurance Company, and it is further

Case 1:01-cv-00797-YK   Document 37   Filed 07/17/2002   Page 72 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 8141                    Page 26 of 26

ORDERED that defendant Reliance Insurance Company ("Reliance") shall pay to plaintiff all benefits owing to Dr. Lasser under the policy of disability insurance that is the subject of this litigation consistent with the Opinion of the Court filed herewith, and it is further

ORDERED that the parties will confer with respect to the amount and schedule of payments due to Dr. Lasser under the terms of the policy, with respect to pre-judgment interest and with respect to any other matter, and the parties shall report to the Court within thirty (30) days of this Order either that (1) the parties have reached an agreement regarding the referred to in this paragraph, in which case the parties will submit a Consent Order to that effect for endorsement by the Court, or (2) that the parties are unable to agree and that additional intervention by the Court is required.

ALFRED M. WOLIN, U.S.D.J.

Service: **LEXSEE®**
Citation: **2001 U.S. Dist. LEXIS 8141**
View: Full
Date/Time: Monday, July 9, 2001 - 3:53 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2001 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 1:01-cv-00737-YK    Document 37    Filed 07/17/2002    Page 73 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 6604                    Page 1 of 10    E

Service: LEXSEE®
Citation: 2001 U.S. Dist. LEXIS 6604

*2001 U.S. Dist. LEXIS 6604, \**

CHARLES I. COHEN Plaintiff, v. STANDARD INSURANCE COMPANY Defendant.

CIVIL ACTION NO. 00-5971

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2001 U.S. Dist. LEXIS 6604

May 17, 2001, Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff filed an action to collect benefits under an insurance plan pursuant to the Employee Retirement Income Security Act (ERISA) § 502(a)(1)(b), 29 U.S.C.S. 1132(a)(1)(B). Plaintiff alleged that defendant wrongfully denied him partial disability benefits under the plan. The parties filed cross motions for summary judgment.

**OVERVIEW:** The court found that there was substantial evidence that defendant's conflict played a role in its decision to deny plaintiff's claim. Defendant concluded that plaintiff had not reduced his work hours in the face of credible contradictory evidence, and the fact that defendant relied on the opinion of its non treating physicians over plaintiff's treating physicians was suspect. Thus, the court applied a heightened form of the arbitrary and capricious standard of review. The court determined that defendant arbitrarily and capriciously denied plaintiff's claim. Defendant's denial merely rested upon its conclusion that objective medical evidence did not support the link between work stress and increased risk of accelerating heart disease. However, the plan did not state that plaintiff was required to prove his claim through the presentation of objective medical evidence. The court further concluded that defendant was entitled to benefits under the plan, and remand was inappropriate.

**OUTCOME:** The court granted plaintiff's motion for summary judgment and the relief he sought.

**CORE TERMS:** heart disease, stress, administrator, treating, decision to deny, claimant, arbitrary and capricious, administrative record, medical evidence, sickness, artery, played, cardiologist, coronary, disabled, blocked, standard of review, summary judgment, heightened, medical literature, increased risk, disability, capriciously, arbitrarily, patients, travel, pain, plan administrator, conflict of interest, disability benefits

### CORE CONCEPTS - ■ Hide Concepts

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) : Civil Claims & Remedies
💥   See 29 U.S.C.S. § 1132(a)(1)(B).

📄 Civil Procedure : Summary Judgment : Summary Judgment Standard
💥The standards by which a court decides a summary judgment motion do not change when the parties file cross motions. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) :
Procedures
When federal courts review whether an Administrator of an Employee Retirement
Income Security Act plan wrongfully denied disability benefits to a claimant, and the
disability plan grants the Administrator or fiduciary discretionary authority to
eligibility benefits, or to construe terms of the plan, that review is limited as federal
courts may only decide whether the denial was arbitrary or capricious. Under the
arbitrary and capricious (or abuse of discretion) standard of review, the district court
may overturn a decision of a plan Administrator only if it is without reason,
unsupported by substantial evidence or erroneous as a matter of law.

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) :
Procedures
When an administrator of an Employee Retirement Income Security Act plan operates
the plan with a conflict of interest, courts must weigh the conflict as a factor in
determining whether there was an abuse of discretion. When an insurance company
funds and administers a plan, it has a conflict of interest, and courts must apply a
heightened form of the arbitrary and capricious standard of review. The Third Circuit
has adopted a "sliding scale" approach to review under a "heightened" arbitrary and
capricious standard, and has concluded that the intensity of review should increase in
proportion to the intensity of the conflict. When determining the severity of a conflict,
courts may consider the following factors: the sophistication of the parties, the
information accessible to the parties, the exact financial relationship of the parties, the
information accessible to the parties, the exact financial relationship between the
insurer and the employer, and the current status of the fiduciary and the stability of
the employing company.

📄 Labor & Employment Law : Employee Retirement Income Security Act (ERISA) :
Procedures
Heightened scrutiny is required when an insurance company is both plan administrator
and funder. When applying the heightened form of the arbitrary and capricious
standard, courts should be deferential, but not absolutely deferential, and the greater
the evidence of conflict on the part of the administrator, the less deferential the abuse
of discretion standard. Thus, courts must not only look at the result and whether it is
supported by reason, but also at the process by which that result was achieved.


**JUDGES:** [*1]  Clarence C. Newcomer, S.J.

**OPINIONBY:** Clarence C. Newcomer

**OPINION:**

**MEMORANDUM**

Newcomer, S.J.

This is an action to collect benefits under an insurance plan pursuant to the Employee
Retirement Income Security Act ("ERISA") section 502(a)(1)(b), 29 U.S.C. 1132(a)(1)(B). n1
The parties' cross motions for summary judgment, and their responses thereto, are now
before the Court.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

1 Section 502 provides that:

A civil action may be brought--

(1) a participant or beneficiary--

(B) recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. 1132(a)(1)(B).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

## I. BACKGROUND

Plaintiff, Charles I. Cohen, is a 55 year old labor law partner at the Washington, D.C. office of Morgan, Lewis & Bockius LLP ("Morgan Lewis"), a law firm with its administrative offices in Philadelphia, Pennsylvania. The defendant, **[*2]** Standard Insurance Company ("Standard"), is an insurance company with its principal place of business in Portland, Oregon.

In 1992, defendant sold Morgan Lewis a Group Long-Term Disability Insurance Policy (the "Plan") which had an effective date of April 1, 1992. The Plan provides partial disability coverage to a participant who is "working in [his] own occupation but, as a result of Injury or Pregnancy, [is] unable to earn more than the Own Occupation Income Level." The Plan further provides that "Sickness means your sickness, illness or disease" and that "Injury means an injury to your body." Additionally, an attorney's "Own Occupation" means his "speciality in the practice of law."

Plaintiff joined Morgan Lewis as a partner in September 1996, after he completed a two year presidential appointment with the National Labor Relations Board. In October, 1996 plaintiff experienced chest pains which led him to seek medical treatment. Upon receiving medical treatment, plaintiff's doctors diagnosed him with serious coronary artery disease. Among other things, plaintiff's left anterior descending artery was 95 percent blocked, and his right coronary artery was 100 percent **[*3]** blocked. Consequently, plaintiff received a stent in the left anterior descending artery, but the right coronary artery remained completely blocked. n2

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 Notably, there is a history of heart disease in plaintiff's family. His father suffered a heart attack when he was 50 years old, and several of his other relatives have suffered heart disease.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Despite participating in various trials of medication intended to improve his condition, plaintiff again began to suffer chest pain at work. These pains would last from ten minutes to nine hours, and in May, 1998, plaintiff underwent a second cardiac catheterization. This procedure revealed that plaintiff's left anterior descending artery was 50% blocked, and his right

Case 1:01-cv-00797-TK   Document 37   Filed 07/17/2002   Page 76 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 6604                    Page 4 of 10

coronary artery remained 100% blocked.

Plaintiff's treating cardiologist, Dr. David Pearle, concluded that plaintiff was experiencing angina due to myochardial ischemia. Additionally, Dr. Pearl recommended that plaintiff reduce his work hours because he determined that plaintiff's condition was aggravated **[*4]** by work stress. In light of Dr. Pearle's recommendation, plaintiff reduced his workload and began a part time schedule in August 1998 which resulted in a reduction in plaintiff's compensation.

Then, on August 18, 1998, plaintiff submitted a Long Term Disability Claim to defendant stating that he suffered from coronary artery disease, and that he experiences chest pain when under stress at work. In a November 17, 1998 letter, defendant denied plaintiff's claim concluding that plaintiff was not partially disabled. Defendant's conclusion was based upon the opinions of two consulting physicians, Dr. Bradley Fancher who is board certified in internal medicine, and Dr. Henry DeMots who is a board certified cardiologist and professor of cardiology at Oregon Health Sciences University. More specifically, Dr. DeMots concluded that plaintiff can perform both sedentary work and work which requires significant physical activity. In addition, Dr. DeMots concluded that work stress would not place the plaintiff at risk of a heart attack or death. Dr. Fancher's opinion concurred with Dr. DeMots' opinion. These doctors formed their opinions after reviewing the medical records assembled in connection **[*5]** with plaintiff's claim, but neither examined plaintiff or consulted with plaintiff's treating physicians before providing their opinions. Plaintiff's claim was further denied because defendant found that plaintiff had not actually altered his work hours, his travel schedule or his compensation as plaintiff had claimed.

On January 11, 1999, plaintiff appealed this denial to defendant, and again provided records showing his reduced hours and compensation. Plaintiff also submitted letters from his treating physicians including Dr. Pearle. Among other things, Dr. Pearle's letter recommended that plaintiff retire, or make "major job changes" "based upon the occurrence of angina and myocardial ischemia on a recurrent basis." In addition, Francis M. Malone, the managing partner of Morgan Lewis, and Charles P. O'Connor, then Chairman of the Labor and Employment section of Morgan Lewis, both wrote to defendant on plaintiff's behalf in support of his appeal. Mr. O'Connor's letter stated that Mr. O'Connor had personally observed plaintiff suffer a cardiac event in the middle of a business meeting.

Defendant submitted plaintiff's appeal to Dr. DeMots for his evaluation, and on February 22, 1999, defendant **[*6]** reaffirmed its denial of plaintiff's claim. Defendant denied plaintiff's claim primarily because Dr. DeMots concluded that the risk of a heart attack does not increase when one works. Dr. DeMots acknowledged that some medical literature supports the view of plaintiff's physician, Dr. Pearle, that work related stress is a risk for patients with artherosclerosis, but noted that neither the American College of Cardiology ("ACC") nor the American Heart Association ("AHA") support this view. Further, Dr. DeMots stated that "the impact of work is negligible and is just as likely to be positive rather than negative."

After defendant denied plaintiff's appeal, defendant forwarded plaintiff's file to defendant's Quality Assurance Unit for additional review. At that time, plaintiff submitted a letter from Dr. Pearle that addressed the opinions of Dr. DeMotts. Defendant again denied plaintiff's claim in a letter dated August 10, 1999. Once again, defendant concluded that plaintiff's medical condition did not prevent him from working full time, and contended that plaintiff had not actually altered his work hours, his travel schedule and his income.

The determination of the Quality Assurance **[*7]** Unit exhausted the administrative review of plaintiff's claim. However, on December 10, 1999 plaintiff requested reconsideration of his claim, and submitted evidence that plaintiff had altered his work hours, his travel schedule, his practice and his income. Then, on January 10, 2000, plaintiff supplemented his request with a letter that advised defendant that he had recently applied for life insurance with



defendant. That letter further explained that defendant denied plaintiff life insurance on January 4, 2000 because plaintiff was "an unacceptable mortality risk."

On January 28, 2000, defendant denied plaintiff's request for reconsideration in a letter. In that letter, defendant abandoned its claim that plaintiff had reduced his hours, and his compensation, but continued to maintain that plaintiff's heart condition would not be adversely affected by work related stress. Additionally, that letter attempted to address plaintiff's argument that defendant's denial of plaintiff's claim was flawed because defendant's physicians had not treated plaintiff.

Then, on July 24, 2000, plaintiff's counsel submitted another request that defendant reconsider plaintiff's claim. With this request, **[*8]** plaintiff submitted a medical report completed by Dr. Alan Rozanski, a nationally recognized cardiologist affiliated with both the University Hospital of Columbia University College of Physicians and Surgeons, and the St. Luke's Roosevelt Hospital Center. After examining plaintiff, Dr. Rozanski concluded that plaintiff's heart condition required plaintiff to reduce his work hours, or to stop working. Dr. Rozanski formed his opinion after examining plaintiff on May 30, 2000. Plaintiff also submitted several articles from established medical publications that document the link between work stress and an increased risk of accelerating existing heart disease.

Upon a review of plaintiff's July 24, 2000 request for reconsideration, defendant once again denied plaintiff's claim in a September 28, 2000 letter. In that letter, defendant again argued that its physicians' opinions were not flawed because they did not treat plaintiff, and contended that there is no link between work stress and an increased risk of accelerating existing heart disease. To support that view, defendant included an article with the letter that set forth the position of the AHA and ACC. n3 However, that article sets **[*9]** forth the position of the AHA and ACC for patients who do not already suffer from heart disease stating that it applies to "prevention in persons without established [coronary heart disease]. Once coronary atherosclerotic disease becomes clinically manifest, the risk for future coronary events is much higher than for patients without [coronary heart disease]..." This letter represented the final communication between the parties prior to the filing of the instant suit.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 Scott M. Grundy et. al., Assessment of Cardiovascular Risk by Use of Multiple Risk Factor Assessment Equations 1348, 1349 (Oct. 1999).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The Plan empowers defendant full and complete discretion to make all decisions regarding coverage stating:

> [Standard has] full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.

> [Standard's] authority includes, **[*10]** but is not limited to:

> 1. The right to resolve all matters when a review has been requested;

Case 1:01-cv-00737-YK    Document 37    Filed 07/17/2002    Page 78 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 6604                    Page 6 of 10

2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

3. The sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy, any decision [Standard] makes in the exercise of our authority is conclusive and binding.

In this suit, plaintiff alleges that defendant wrongfully denied plaintiff partial disability benefits under the Plan. As explained above, the parties have filed cross motions for summary judgment.

## II. DISCUSSION

The standards by which a court decides a summary judgment motion do not change when the parties file cross motions. See Southeastern Pa. Transit Auth. v. Pennsylvania Pub. Util. Common, 826 F. Supp. 1506 (E.D.Pa. 1993). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact **[*11]** and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c) (1994).

When federal courts review whether an Administrator wrongfully denied disability benefits to a claimant, and the disability plan grants the Administrator or fiduciary discretionary authority to determine eligibility benefits, or to construe terms of the plan, that review is limited as federal courts may only decide whether the denial was arbitrary or capricious. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989). "Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of a Plan Administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3rd Cir. 1993) (quoting Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500 (W.D.Pa. 1989)).

However, when an Administrator or fiduciary operates the plan with a conflict of interest, courts must weigh the conflict as a factor in determining whether there was an abuse of discretion. **[*12]** See Firestone, 489 U.S. at 115. Accordingly, in Pinto v. Reliance Standard Life Ins. Co., the Third Circuit held that when an insurance company funds and administers a plan, it has a conflict of interest, and courts must apply a heightened form of the arbitrary and capricious standard of review. See Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3rd Cir. 2000).

In Pinto, the Third Circuit adopted a "sliding scale" approach to review under a "heightened" arbitrary and capricious standard, and concluded that the intensity of review should increase in proportion to the intensity of the conflict. See Friess v. Reliance Standard Life Ins. Co., 122 F. Supp. 2d 566, 572 (E.D.Pa. 2000) (citing Pinto, 214 F.3d at 393). When determining the severity of a conflict, courts may consider the following factors: the sophistication of the parties, the information accessible to the parties, the exact financial relationship of the parties, the information accessible to the parties, the exact financial relationship between the insurer and the employer, and the current status of the fiduciary and the stability of the **[*13]** the employing company. See Pinto, 214 F.3d at 392.

In this case, the parties do not dispute that defendant had discretionary authority to determine whether plaintiff qualified for benefits, nor do they dispute that defendant both

funded and administered the Plan. However, the parties disagree over what standard of review the court should apply, and whether defendant wrongfully denied plaintiff benefits.

Accordingly, the Court first decides the appropriate standard of review to apply here. As the Pinto Court stated, "'heightened scrutiny is required when an insurance company is both plan administrator and funder." Pinto, 214 F.3d at 392. When applying the heightened form of the arbitrary and capricious standard, courts should be deferential, but not absolutely deferential, and "'the greater the evidence of conflict on the part of the administrator, the less deferential [the] abuse of discretion standard." See id. at 392 (quoting Vega v. National Life Ins. Services, Inc., 188 F.3d 287, 297 (5th Cir. 1999). Thus, courts must not only look at the result and whether it is supported by reason, but also at the process **[*14]** by which that result was achieved. See Pinto, 214 F.3d at 392.

Here, there is substantial evidence that defendant's conflict played a role in its decision to deny plaintiff's claim. First, defendant concluded that plaintiff had not reduced his work hours, his travel schedule, or his compensation, and continued to adhere to that conclusion in the face of credible contradictory evidence. Second, that defendant relied upon the opinion of its non treating physicians over plaintiff's treating physicians is suspect. Defendant's physicians, one of whom is not even a cardiologist, based their opinions on cold test results contained in plaintiff's medical files, while plaintiff's treating physicians concluded that plaintiff should reduce his work hours after examining plaintiff and forming professional opinions based upon what they personally observed. Other courts have admonished Standard for this practice. See e.g., Palmer v. University Med. Group and Standard Ins. Co., 994 F. Supp. 1221, 1235 (D.Or. 1998); Clausen v. Standard Ins. Co., 961 F. Supp. 1446, 1455 (D.Colo. 1997).

Other evidence further demonstrates that defendant's conflict **[*15]** played a significant role in its decision to deny plaintiff's claim. Looking at defendant's final decision, this Court "sees a selectivity that appears self serving," n4 not only when it adopted its non treating physicians' opinions, but also when it rejected the medical evidence that plaintiff submitted support his contention that plaintiff's work stress increases his risk of heart complications. Indeed, in its September 28, 2000 letter, defendant recognized that Dr. Rozanski has spent the majority of his career investigating the relationship between atherosclerotic heart disease and stress, is a thoroughly credentialed cardiologist, and has concluded that such a relationship exists. That letter further acknowledged that articles from well established medical publications also conclude that a relationship exists. However, defendant rejected those opinions, in part because of the position of the ACC and AHA. However, as explained earlier, the article defendant relied upon to prove that the position of the ACC and AHA is contrary to plaintiff's position sets forth the position of the AHA and ACC for patients *who do not* already suffer from heart disease. In this case, both sides **[*16]** agree that plaintiff suffers from heart disease. That defendant credited plaintiff's evidence in support of his claim, rejected it, and did so while relying upon inapposite medical literature is disturbing, and presents evidence that defendant's conflict fueled its denial of plaintiff's claim. n5

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 Pinto, 214 F.3d at 377.

n5 Now, defendant has supplemented the administrative record with an affidavit from Dr. DeMots that refers the Court to additional articles that purport to deny the link between work stress and heart disease. However, whether other articles exist to support Dr. DeMots' conclusion is irrelevant. That defendant relied upon an inapposite article is evidence that defendant's conflict played a role in its decision to deny plaintiff's benefits regardless of the existence of other articles.

- - - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - -

Case 1:01-cv-00797-TK    Document 37    Filed 07/17/2002    Page 80 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 6604                    Page 8 of 10

The record reveals more evidence supports this Court's conclusion that defendant's conflict improperly influenced its decision to deny plaintiff's claim. However, the evidence the Court has **[*17]** already reviewed in today's opinion warrants a heightened standard of review that does not afford substantial deference to the Administrator's decision. Accordingly, the Court views the facts before the administrator with "a high degree of skepticism." See Pinto, 214 F.3d at 395.

Defendant argues that even if a conflict of interest existed, under the additional factors a court may consider under Pinto, its conflict played an insignificant role in its decision to deny plaintiff's claim. The Court disagrees. Although plaintiff is an attorney, he is a labor attorney and there is no evidence in the record that he is sophisticated in insurance or medical matters. Defendant argues that plaintiff was given access to all of the information defendant relied upon to make its decision, was represented by counsel, and that Morgan Lewis purchased a group life insurance policy from defendant in 1997. However, no evidence suggests that plaintiff's sophistication, or any other factor made it less likely defendant's conflict of interest played a role in its decision to deny plaintiff's claim. Indeed, the evidence the Court recounted above suggests otherwise. Moreover, defendant always **[*18]** retained the power to grant or deny plaintiff's claim, and in a case such as plaintiff's, Standard had "an active incentive to deny [plaintiff's claim] in order to keep costs down and keep [itself] competitive so that companies will choose to use [it] as their [insurer]..." Pinto, 214 F.3d at 388.

Having decided the appropriate standard of review, the Court turns to whether defendant arbitrarily and capriciously denied plaintiff's claim. First, the evidence demonstrating that defendant's conflict influenced its decision to deny plaintiff's claim, also demonstrates that plaintiff arbitrarily and capriciously denied plaintiff's claim.

Additionally, at the conclusion of plaintiff's claim process, defendant's denial merely rested upon its conclusion that objective medical evidence does not support the link between work stress and increased risk of accelerating heart disease. However, the Plan does not state that plaintiff is required to prove his claim through the presentation of objective medical evidence. n6 Instead the plan requires a claimant to prove disability "as a result of sickness, injury, or pregnancy," and sickness is defined as "sickness, illness, **[*19]** or disease." n7

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 Although Standard's denial letters do not use the words "objective medical evidence", Dr. Demots' opinion, as expressed in an October 27, 1998 letter he wrote to Standard, says that plaintiff's symptoms are all subjective, and "are not accompanied by objective evidence of ischemia." However, the plan never requires a claimant to prove his disability with objective evidence. Moreover, it is clear that defendant's decision to deny plaintiff's claim ultimately rested upon Dr. DeMots' opinion, and his conclusion that objective medical literature denies the link between work stress and an increased risk of heart disease. Thus, defendant did deny plaintiff's claim because it concluded a lack of objective medical evidence supported plaintiff's claim.

n7 In its response, defendant contends that under the section entitled "Allocation of Authority", the Plan grants defendant "the right to determine. . . d. [the] sufficiency and the amount of information we may reasonably require to determine [the claimant's eligibility for benefits]. Accordingly, defendant argues the Plan empowers defendant to require plaintiff to submit objective medical evidence in support of his claim. However, defendant's reading of the Plan is overly broad, especially in light of the more specific language that sets out what a claimant must do to prove he is disabled. At best, the above clause is ambiguous, and under the rule of contra proferentem, the language must be construed against the defendant. See Heasley v. Beasley & Blake Corp., 2 F.3d 1249, 1257 (3rd Cir. 1993) (adopting the doctrine

Case 1:01-cv-00797-TFH   Document 37   Filed 07/17/2002   Page 81 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 6604                     Page 9 of 10

of contra proferentem in ERISA insurance cases to construe ambiguous terms of a plan).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*20]**

In a closely analogous case, the Third Circuit held that it was arbitrary and capricious for the plan administrator to require the claimant to submit clinical evidence of the etiology of his allegedly disabling symptoms when the Plan did not impose such a requirement. See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 442-43 (3rd Cir. 1997). In Mitchell, the Third Circuit concluded that the plaintiff had submitted sufficient evidence of his disability claim when he provided copies of his medical records, his medical history, and his treating physicians' opinions that he was disabled. See id.

Here, defendant admits that plaintiff suffers from serious heart disease, does not dispute his medical history, his current symptoms or the qualifications of his treating physicians. Moreover, plaintiff submitted substantial objective evidence, namely the opinions of his treating physicians, and objective medical literature, to defendant that he is disabled. Thus, plaintiff has done more than what was required of him under the specific terms of the Plan. Yet, defendant still denied his claim. Under these circumstances, and in light of the evidence demonstrating that defendant's **[*21]** conflict influenced its decision to deny plaintiff's claim, the Court finds that defendant arbitrarily and capriciously denied plaintiff's claim for disability benefits. The Court further concludes that defendant is entitled to benefits under the Plan, and remand is inappropriate here. As explained above, plaintiff has done more than what was required of him under the specific terms of the Plan to prove he is entitled to disability benefits under it. Additionally, the Administrator considered all of the evidence in the administrative record, and defendant fails to argue that the administrative record lacks any necessary evidence. n8 Because the defendant arbitrarily and capriciously denied plaintiff's claim, and because the Court has fully reviewed the administrative record, determined that plaintiff is disabled within the meaning of the Plan, and found that the administrative record is complete, the Court will grant plaintiff's Motion for Summary Judgment and the relief he seeks, and will not remand this case. See Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1327-28 (11th Cir. 2001) (holding the district court's decision not to remand was appropriate **[*22]** where the administrative record was complete, the administrator reached an arbitrary and capricious result, and the district court concluded the claimant was disabled); see also Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1464 (9th Cir. 1997) (suggesting burden is on plan to build up adequate and relevant information to make a decision on the claim); Sandoval v. Aetna Life and Casualty Ins. Co., 967 F.2d 377, 381 (10th Cir. 1992) (denying beneficiary's request for remand to consider evidence never presented to administrator before administrator completed review); Friess v. Reliance Standard Ins. Co., 122 F. Supp. 2d 566, 573 (E.D.Pa. 2000) (explaining that the Court's decision should rest upon "the historic facts that informed the administrator's decision").

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 Indeed, in its pre trial memorandum, submitted in anticipation of trial, defendant states that "defendant does not anticipate offering any documentary evidence beyond the Administrative File, which was submitted to the Court in support of the defendant's motion for summary judgment." (Defendant's Pretrial Memorandum, at 2).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*23]**

An appropriate Order will follow.

Clarence C. Newcomer, S.J.

Case 1:01-cv-00797-YK    Document 37    Filed 07/17/2002    Page 82 of 101

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 6604    Page 10 of 10

Service:   **LEXSEE®**
Citation:   **2001 U.S. Dist. LEXIS 6604**
View:   Full
Date/Time:   Monday, July 30, 2001 - 1:56 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2001 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

 Penn State Geisinger
Health System

 000032

Arthritis, Bone & Joint C
M C HO89
P.O. Box 550
Hershey, PA  17033-0850
717 531 5638 Tel
717 531 4205 Fax

**Adult Reconstruction**
Vincent D. Pellegrini, Jr., MD
Charles M. Davis III, MD, PhD
William M. Parrish, MD

**Arthroscopic Surgery**
717 531 5007 Tel
Kevin P. Black, MD
Scott A. Lynch, MD
Wayne J. Sebastianelli, MD

**Foot & Ankle**
Paul J. Juliano, MD

**Hand/Upper Extremity**
Sanjiv H. Naidu, MD, PhD
Vincent D. Pellegrini, Jr., MD

**Pediatric Orthopaedics**
717 531 7123 Tel
Lee S. Segal, MD
Edwards P. Schwentker, MD
David M. Wallach, MD

**Radiology**
Judy S. Blebea, MD

**Rehabilitation**
717 531 7123 Tel
Edwards P. Schwentker, MD
Jonathan L. Costa, MD, PhD
Stuart A. Hartman, DO

**Rheumatology**
Barbara E. Ostrov, MD
George S. Wineburgh, MD

**Spine**
Daniel E. Gelb, MD
Steven C. Ludwig, MD

**Traumatology**
J. Spence Reid, MD
Paul J. Juliano, MD
David C. Goodspeed, MD

**Musculoskeletal Oncology**
William M. Parrish, MD

**Musculoskeletal Research**
Henry J. Donahue, PhD
Qian Chen, PhD
Christopher R. Jacobs, PhD

October 13, 1999

To Whom It May Concern:

**Re:  Craig Howard**
**# 048278**

Craig Howard is currently under my care for failed back surgery syndrome.  I consider him to be permanently completely disabled.

If you have any further questions, please do not hesitate to contact my office.

Sincerely,

Daniel E. Gelb, M.D.
Assistant Professor

DEG/jh



000031

PENNSTATE

The Milton S. Hershey
Medical Center

Section of Neurosurgery
M C H110
P O Box 850
Hershey, PA 17033-0850
717 531 8807 Tel
717 531 3858 Fax

Stephen K. Powers, M.D.
Professor & Chief
Section of Neurosurgery

July 24, 2000

Liberty Mutual
Attn: Felicia Boyd
Fax:  888-443-4212

RE:   Craig M. Howard
      MSHMC# 048278

Dear Ms. Boyd:

I'm writing to you regarding my patient Craig Howard M. Howard, who has applied for disability. I operated on Craig on February 10th of this year for a right L4-5 recurrent disc herniation and right L5 radiculopathy. Craig has a complicated history, in that he has undergone prior lumbar operations for back and bilateral leg pain and numbness. He also has a history of hypertriglyceridemia and hyperlipidemia, as well as high blood pressure and hepatitis.

He has undergone two prior lumbar operations, one by an orthopaedic surgeon in the Harrisburg area and another by an orthopaedic spine surgeon at the Hershey Medical Center. He has been treated in the Anesthesia Pain Clinic for chronic back pain. In spite of relief of his leg pain following the surgery that I performed for recurrent disc in February of this year, the patient still has significant back pain and continues to be treated by the Pain Clinic here for his chronic pain disorder and depression. In addition to his lower lumbar problem, he has a central and left paracentral herniated disc at T12-L1, and this is causing some central canal stenosis at that level, along with some moderate central canal stenosis at L1-2 due to disc bulge.

Craig has significant spinal disease which is responsible for his chronic low back pain. He is unable to sit for extended periods of time (more than five or so minutes at a stretch), and as such, is incapable of working even a clerical or sedentary type job which requires his staying at a single work station. I would consider him entirely disabled at this time from returning to any type of work activity. I do not expect his condition to improve, and in fact, I expect it to worsen as he gets older due to the degenerative nature of his condition.

Should you have any questions, please feel free to address them to me.

Sincerely,

Stephen K. Powers, MD
Professor and Chief
Section of Neurosurgery

SKP:gcc
cc:  Mr. Craig M. Howard, 25 S. Lingle Avenue, Palmyra, PA 17078
f:\howard072400

The Milton S. Hershey Medical Center of The Pennsylvania State University • College of Medicine
An Equal Opportunity University

HARRISBURG
BRANCH



DATE DICTATED

PENNSYLVANIA BUREAU OF DISABILITY DETERMINATION  000107
1171 S. Cameron Street, Room 200, Harrisburg, PA 17104-2594
TRANSCRIPTION OF TELERECORDED MESSAGE

STUART A. HARTMAN, DO                    ADJUDICATOR: M. HINTON
4TH & WILLOW STREET, 3RD FL
LEBANON PA 17046                          RE:  HOWARD, CRAIG M.

                                         SSN:  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

TDM#:  0041292675                        DATE:  05/11/2000 #203653

Phone:  717-272-1050

Mr. Howard was seen for a physiatric disability evaluation on
05/10/2000 at my Lebanon office. He is complaining of low back and
right leg pain. He has had problems for years and for a long time
he treated with a chiropractor. However, he got progressively worse
to the point where he had an evaluation and in 1996 started with
epidural steroid injections. He indicated that he is getting these
monthly and they helped him somewhat. In between, he started to get
trigger point injections at Hershey when his epidural wore off. He
subsequently went on to have an L3-4-5 disc surgery in 1997 by Dr.
Rubbo. This helped for about a month and then a year later he saw
Dr. Gelb and went on to have disc surgery again in approximately
August of 98. He did okay for a little while and then again had
persistent symptoms and followed with Dr. Gelb who recommended
fusion. He in-between he had rhizotomies which helped for 3-4
months and then the symptoms returned. He states that he has left
leg numbness which Dr. Powers at Hershey thinks is coming from
either a thoracic or a cervical herniated disc. He subsequently
went on and had disc surgery by Dr. Powers at Hershey which was
done on 02/10/2000 and again it helped his pain for about a month
and then it returned. I reviewed Dr. Powers' report which indicates
he had a right L4-5 recurrent, reoperation/hemilaminectomy and
microdiscectomy.

Mr. Howard states that the weather affects his symptoms. He mostly
gets shooting pain from the low back to the right knee. It
occasionally is worse at night. He uses ice and heat. Twisting
activities make it worse. He has the numbness in the left leg. He
had a muscle stim unit which helped in the past. He is now
receiving physical therapy 1-2 times a week at the Sports Med
Center and does stretches but has not had any pool therapy. When he
lays on his right side with a foam pillow between his knees this
helps.

He has not had any recent diagnostic studies.

His past history is remarkable for hypertension and 3 back
surgeries.

STUART A. HARTMAN, ~ HOWARD    CRAIG M  SS● 180-**-9933 p 1

SOCIAL HISTORY                                              000100

He  smokes 1/2 a pack a day and has decreased since being off work.
He  does  not  drink  and  drinks  1-2  cups  of  coffee  a  day  or
caffeinated beverages.

He previously worked doing physician billing at Hershey and he sits
all day. He has been off since January 4.

He  takes Vicodin-ES, 3-4 a day; Naprosyn. He thinks he might be on
Elavil  at bedtime and in the past Percocet made him weird. He felt
lethargic. He denies any drug allergies.

Physical  examination  reveals  a  pleasant,  cooperative,  alert and
oriented 5'10 1/2" tall, 210 pound gentleman. He is 42 years old.
He is not significantly overweight. His lumbar curve is normal with
a  well-healed  scar. Lower extremity range was functional with hip
range of motion and his knees being normal. Ankles were normal. His
lumbosacral  flexion  was  to 40 degrees with marked restriction at
the right sacroiliac region. Reflexes at the knees were +2/4 and at
the  right ankle -1-2/4 and absent at the left ankle. Sensation was
decreased  in  the  left  leg generally. Strength is normal- in the
lower extremities. Straight leg raising was 40 degrees on the right
and  45 on the left with a lot of pulling and his sitting root test
produced  pulling.  He  is  generally  tender  at  the  lumbosacral
paraspinal  region  but  especially  at the right sacroiliac region
which  reproduced some pain. He was only able to do 1/2 a squat and
his  mobility was very slow and antalgic. His tone was normal. Gait
was with a slightly flexed posture.

Mr.  Howard  is  suffering  from  chronic  low  back  pain  with
degenerative  disc  disease,  failed  back  surgery syndrome, and a
right sacroiliac syndrome.

I have completed the medical source statement of claimant's ability
to  perform  work-related  activities and he is functionally limited
due  to  poor  mobility  but  his  strength  is  functional. He had
significant tightness in the hamstring muscles.

Feel   free   to   contact   me  for  any  further  information  or
clarifications.

                                              STUART A. HARTMAN, DO

SAH/MEDQUIST339

"THIS  TRANSCRIPTION  WAS  MADE  FROM THE RECORDING OF THE VOICE OF
STUART  A. HARTMAN, DO.  A COPY OF THIS REPORT HAS BEEN SENT TO THE
DOCTOR FOR REVIEW AND SIGNATURE."

000043



PHYSICAL CAPACITIES FORM

Return To:

Liberty Life Assurance Company of Boston
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525
Phone No: 1-800-210-0268
Fax No.: (603) 743-6422

EMPLOYEE/CLAIMANT NAME: Craig M Howard

CLAIM NO.: 641498                                    S.S. NO.: 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

EMPLOYER/SPONSOR: Hershey Medical Center

## TO BE COMPLETED BY PHYSICIAN/PHYSICAL THERAPIST:

### PHYSICAL CAPACITY:

Please indicate the number of hours the above person can perform each activity listed below, in an average 8 hour work day.
*Please note: Hours do not have to add up to 8.*

| Activity | # of Hours | (Need breaks?) Yes | No | How often? |
|---|---|---|---|---|
| Sitting | 2 | ✓ | | 20 |
| Standing | 8 | | | |
| Walking | 4 | | | |
| Squatting | 3 | ✓ | | As Needed |
| Bending (at waist) | Not | Recommended | | |
| Kneeling | 2 | | | |
| Climbing Stairs | 1 | ✓ | | As needed |
| Climbing Ladders | Not | Recommended | | |
| On the Job Driving | 1/2 | | | |

| Activity | # of Hours | (Need breaks?) Yes | No | How often? |
|---|---|---|---|---|
| Pushing | 2 | | | |
| Pulling | 2 | | | |
| Reaching -above shoulder level | 1 | | | |
| Reaching -at shoulder level | 1 | | | |
| Reaching -below shoulder level | 6 | | | |
| Repetitive Movements (please circle): | Right | Left | (Both) | 8 |
| Handling/Grasping | | | | 8 |
| Fine Finger Dexterity | | | | 8 |

### LIFTING CAPACITY:

Please indicate person's lifting/carrying ability:

| | times per day | | times per day |
|---|---|---|---|
| 10 LBS. OR LESS ✓ | | 30 LBS. TO 40 LBS. | |
| 10 LBS. TO 20 LBS. ✓ | Occasionally | 40 LBS. TO 50 LBS. | |
| 20 LBS. TO 30 LBS. | | 50 LBS. AND OVER | |

Can the person work 8 hours per workday? Yes  If not, please indicate how many hours and provide medical reasons to support your opinion. Also indicate if and when you anticipate he/she can work 8 hours per workday.

**ADDITIONAL COMMENTS:** Please add any comments which would assist us in our understanding of specific limitations and restrictions.
Patient demonstrates poor sitting tolerance; However demonstrates standing & walking tolerance.
Sitting tolerance required frequent positional changes.

NAME OF ATTENDING PHYSICIAN: _____  DEGREE: _____  PHONE: _____

STREET ADDRESS: _____  CITY: _____  STATE: _____  ZIP CODE: _____

SIGNATURE: _____  DATE: _____  TAX ID. OR S.S. NO.: _____

DP 411 Rev. 2/00

PENNSTATE

The Milton S. Hershey Medical Center
The College of Medicine

Finance Administration
500 University Drive
Room H1246/Mail Code H142
P. O. Box 850
Hershey PA 17033-0850
Phone: (717) 531-8810
FAX: (717) 531-4162
mbednar@psu.edu

**Mary K. Bednar**
Chief Financial Officer
Hershey Medical Center

October 18, 2000

Mr. Adkins
Liberty Mutual
P. O. Box 30302
Tampa FL 33630-3302

RE: Craig Howard
SSN: 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

Dear Mr. Adkins:

I am writing on behalf of Craig Howard. Craig is presently on Disability from the M. S. Hershey Medical Center. Mr. Howard had indicated that his long-term disability coverage is in question, due to the nature of his position. Craig was employed here under the title "Staff Assistant". Craig's job function was as a billing clerk. This job requires data entry and retrieval at a personal computer. A normal day is 8 hours long, with two fifteen minute breaks (morning and afternoon) and a half hour for lunch.

Due to the nature of the information being handled and the billing deadlines observed, it is not possible for a billing clerk to remove themselves from the work space for five or ten minutes hourly. The workflow is designed for maximum efficiency, and a staff person absent from their cubicle multiple times throughout the day does not meet that requirement for productive employment.

I am asking that you reconsider Mr. Howard's eligibility for the disability insurance he elected to pay for as a benefit of his employment. He is unable to serve in his previous position at the Hershey Medical Center.

Should you require anything further, or have any questions, please do not hesitate to call me. Thank you.

Sincerely,

Mary K. Bednar
Chief Financial Officer
The M. S. Hershey Medical Center

HOWARD-DISAB

000219

# PENNSTATE


1855

College of Medicine
University Hospital · Children's Hospital
The Milton S. Hershey Medical Center

Stephen K. Powers, M.D., FACS
Professor and Chief
Division of Neurosurgery

P.O. Box 850
Hershey, Pennsylvania 1
(717) 531-8807
Fax: (717) 531-3858

May 5, 2000

Dr. Andrew J. Wren
121 Nyes Road
Harrisburg, PA 17112

RE:    Craig M. Howard
       HMC# 048278

Dear Andy:

Craig returned to see me today at the Nyes Road office. He is carrying with him his disability papers from work. We talked a bit, and he is not, I think, in any shape to return to any type of activity which requires extended sitting. I understand he has been laid off from his job over at Hershey in the billing office.

He may, in my opinion, return to work where he can sit and stand frequently, but this doesn't fit with his current job description. He seems very depressed. There were points where I thought he was going to break into tears. I've therefore started him on Elavil 25 mg q Hs for the next week, to be increased to 50 mg q Hs. There are no findings on his exam to suggest a new root problem or recurrent disc herniation.

I'm recommending that he be followed up in the Anesthesia Pain Clinic. He might benefit from seeing their psychologist, Dr. Blackall over there. I'm releasing him from my care. Good luck with him in the future.

Sincerely,

Stephen K. Powers, MD
Professor and Chief
Section of Neurosurgery

SKP:gcc

cc: Ms. Cheryl Hoffman, RN, 121 Nyes Road, Harrisburg, PA 17112

f: 050500

An Equal Opportunity University



# LIBERTY MUTUAL MDS Service Notes

000130

**Liberty Life Assurance Company of Boston**

Claim #: 641498    Service ID: 12180054

Nurse: **DEBRA REDFERN**

Note Date: 7/21/2000

Info Note

Group Disability
P.O. Box 242484
Charlotte, NC 28224-2484
(800) 291-0112
Fax: (888) 443-4212

CASE WAS RECEIVED TO GMMC W REQUEST BY THE DCM TO DO A FILE REVIEW. CLMT IS 43 Y/O WHO WORKS WITH PENN STATE AS A STAFF ASSISTANT. DOD IS 1/3/2000. DX OF CERVICAL DISC DISORDER. MEDICAL FILE CONTAIN INFORMATION IN THE FILE FR -------- REQUEST BY THE DCM WAS TO REVIEW FILES TO DETERMINE IF THE EE IS TD FROM OWN OCCUPATION. 12/2/96 EXAM BY DR ROBERT MAURER 10/30/96 CLTM PRESENTED W C/O LUMBOSACRAL SPINE PAIN. HE WAS REFERRED BY DR JONES & CUMMINGS FOR MRI. CLTM REPORTS HIS SYMPTOMS BEGAN IN 1/92 IN WHICH THEY WAXED AND WANED OVER THE MONTHS. PAIN WAS IN LB RADIATING INTO BOTH LEGS. PAIN HAD PROGRESSIVELY WORSEN &
IS NOW INTOLERABLE. MRI CONFIRMED HNP AT SEVERAL LEVELS. TRX PLAN WAS STEROID INJECTIONS AND REFERRAL WAS MADE TO DR WIECKS (PAIN MANAGEMENT CLINIC). OV NOTES DATE 12/24/96 FR DR WIECKS, THANKED DR CUMMINGS FOR REFERRAL OF THE CLTM TO THE PAIN CLINIC FOR EVALUATION & TREATMENT. OV NOTES INDICATE THE CLTM WAS FIRST SEEN 10/31/96. HE HAD A SERIES OF EPIDURAL STERIOD INJECTIONS. FIRST 2 TREATMENTS PROVIDED GOOD PAIN RELIEF. 3/5/97 NOTE INDICATED CLMT HAD A SURGICAL PROCEDURE DONE. DX WAS EXTRUDED HERNIATED NUCLEUS PULPOSUS, L4-L5,WITH BULGING DISC AT L5-S1 WITH NERVE

Assessment Note

INFORMATION IN THE MEDICAL FILE AS STATED BY DR POWEL LIST THE CLMTS RESTRICTIONS
AND LIMITATIONS AS NO PROLONGED SITTING. HE IS RELEASED TO RTW IN AN ENVIRONMENT IN WHICH HE CAN SIT AND STAND FREQUENTLY ( FREQ CHANGE IN POSITION). IT IS REASONABLE TO EXPECT THAT THE CURRENT R&L ARE APPROPRIATED BASED ON THE DX THAT THE CLTM HAD. HE WAS INSTRUCTED TO RTW ON PT STARTING 3/7/2000 W RTW FT ON

000198



# LIBERTY MUTUMD XService Notes

Liberty Life Assurance Company of Boston

Group Disability
P.O. Box 242484
Charlotte, NC 28224-2484
(800) 291-0112
Fax: (888) 443-4212

Claim #:  641498       Service ID:  12180057

Nurse:  DEBRA REDFERN

Note Date:  7/21/2000

Info Note

RELIEF. OV 1/17/2000 CLMT HAD REPEAT MRI DONE WHICH SHOWS THAT HE HAS A SIGNIFICANT RECURRENT DISC AT L4-L5 WITH A FREE FRAGMENT OF DISC EXTENDING DOWN ALONG THE RIGHT L5 NERVE ROOT & THEN VENTRAL TO THE THECAL SAC. HE HAD MULTIPLE LEVELS OF SPONDYLOSIS & DISC DISEASE CHANGES. TRX PLAN WAS TO SCHEDULE TO CLTM FOR A RE-OPERATION AT THE L4-L5 LEVEL WITH THE INTENTION OF REMOVING THE RECURRENT DISC. THIS WAS SCHEDULED WITH THE PLAN TO HAVE THE CLTM RTW BY 3/1/2000. OV NOTE 2/25/2000 INDICATE THE CLMT RETURNED FOR FU, WAS REPORTED TO BE DOING 100% BETTER. MINIMAL LEG PAIN & THIS WAS WITH STRAIGHT LEG RAISING BEYOND 90%. THERE IS NO RADIATING PAIN INTO THE LEG. STRENGTH IN HIS DORSIFLEXION & EVERSION OF THE RIGHT FOOT IS NORMAL. DR POWERS FEEL THE CLMT HAS BEEN WALKING AROUND FOR SOME TIME WITH THIS LARGE DISC HERNIATION IN HIS BACK & STATES THAT HE
FELT IT WAS MISSED BY THE PREVIOUS CONSULTANT. OV NOTES OF 5/5/2000 FR DR POWERS LIST THE RESTRICTIONS AND LIMITATION AS INDICATED THE CLTM IS NOT ABLE TO RETURN TO
ANY ACTIVITY IN WHICH HE IS REQUIRED TO SIT OF EXTENDED PERIODS OF TIME. HE WAS RELEASED TO RTW WHERE HE CAN SIT & STAND FREQUENTLY. DR POWERS IN HIS NOTE STATES THERE IS NO



# LIBERTY MUTUAL Service Notes

000184

Liberty Life Assurance Company of Boston

Group Disability
P.O. Box 242484
Charlotte, NC 28224-2484
(800) 291-0112
Fax: (888) 443-4212

Claim #: 641498    Service ID: 12180056

Nurse: DEBRA REDFERN

Note Date: 7/21/2000

Info Note

PHYSICAL THERAPY, EMG & NERVE CONDUCTION STUDIES SUPPORTED HIS DX OF FAILED BACKSYNDROME. OV FROM 1/99 TO 3/17/99 CLMT WAS SEEN BY DR GELB AT PAIN MANAGEMENT CLINIC FOR C/O BACK PAIN. TRIGGER INJECTION, FACET BLOCK NERVE INJECTIONS WERE DONE, BONE SCAN DONE (WHICH CONFIRMED DISC DISEASE & INVOLVEMENT OF THE L5-L6 FACETS ON THE RIGHT SIDE. CLMTS DX AT THIS TIME ALSO INCLUDED SPONDYLOSIS, MYOFASCIAL PAIN & ARTHROPATHY BASED ON BONE SCAN. 4/21/99 DX W LUMBAR DEGENERATIVE DISK DISEASE & A FAILED BACK SURGERYSYNDROME. CONDITION HAS GOTTEN WORST. RECENT FLARE UP. CURRENTLY ON VICODIN & FINDING IT DIFFICULT TO WORK C/O LOW BACK PAIN TO RIGHT LEG & LEFT THIGH NUMBNESS . NO BOWEL
 AND BLADDER INVOLVEMENT. 4/26/99 NOTE FROM DR TRAVER INDICATE CLTM AS SEEN BY HIM FOR C/O BACK PAIN. STERIOD INJECTIONS HAVE BEEN DONE PROVIDING ONLY TEMPORARY RELIEF. FACET NERVE INJECTIONS FOR THE RIGHT L5-6 FACET NERVES ALSO PROVIDE RELIEF OF UP TO 75% DX AT THIS TIME WAS ARTHROPATHY AT THE RIGHT L5-6 FACET NERVES. THE REQUEST FR DR TARVER WAS FOR THE CLTM TO HAVE A RADIOFREQUENCY ABLATION OF THE RIGHT L5-L6 & L6 FACET NERVES TO INCREASE REHABILITATIVE POTENTIAL & TO GET AT LEAST 6MOS TO 24 MOS PAIN



000131

# LIBERTY MUTUAL Service Notes

Liberty Life Assurance Company
of Boston

**Claim #:** 641498    **Service ID:** 12180060

**Nurse:** DEBRA REDFERN

**Note Date:** 7/21/2000

Group Disability
P.O. Box 242484
Charlotte, NC 28224-2484
(800) 291-0112
Fax: (888) 443-4212

**Info Note**

CASE DISCUSS W THE DCM, REVIEWED THE INFORMATION THAT WAS OBTAINED FR THE FR THAT WAS DONE. INFORMATION IN THE FILE INDICATES THAT CLMT HAS HAD MULTIPLE SURGERIES TO HIS BACK. LOV NOTE INDICATE THAT IN 1/2000 CLTM WAS DX BY MRI AS HAVING A HERNIATED DISK, THIS WAS CORRECTED VIA SURGERY. OV NOTE OF 2/2000 INDICATE CLMT DID WELL FROM THIS PROCEDURE AND WAS TO RTW ON 3/7/2000 ON A PART TIME BASIS, EXPECTED TO RTW FT 3/27/2000. THE OV NOTES INDICATE THAT THE SURGICAL PROCEDURE WAS SUCCESSFUL & CLT WAS TO RTWON THIS DATE. R&L WAS THAT HE NEEDED TO BE ABLE TO CHANGE POSITIONS FREQUENTLY (SIT TO STAND).

**Action Note**

CASE REMOVED FR ASSIGNMENT 7/20/2000

**Assessment Note**

NO OBJECTIVE MEDICAL TO SUPPORT CLMT BEING UNABLE TO RTW AS OF 3/27/2000. RESTRICTION & LIMITATION OF NO PROLONGED SITTING OR STANDING. CLTM WORKS AS A DATE ENTRY CLERK & R&L ARE WITHIN HIS SCOPE OF SERVICE. DCM AGREES WITH THIS CASE AND HAS REQUESTED THAT CASE BE CLOSED TO GMMC.

**A Member of the Liberty Mutual Group**

000167

## RECORD OF CONVERSATION

| Date: 7-25-00 | Time: 105 pm | Claim #: |
| --- | --- | --- |
| | | Analyst Name: *Felicia Boyd* |
| **Conversation With:** Name: Craig Howard | ☑ Claimant | ☐ Analyst Telephoned |
| | ☐ Policyholder | ☑ Telephoned Analyst |
| | ☐ Manager Disability | ☑ Conversation |
| Telephone: ( ) | ☐ Other | ☐ Voice Mail |
| Claimant Name: Craig Howard | Social Security Number: | Policyholder Name: Penn State |

Conversation:

Called back to say that he spoke w/his atty and his dr ofc and mgr @ work.

His mgr said he spoke w/his mgr and they will not allow him to rtw if he had to be flexible and chg positions. He is expected to sit 7 1/2 hrs a day w/out any flexibility. His dr is writing a ltr to explain why he is disabled. I explained to him that he must appeal the denial in writing and submit addtl info to support condition. He asked how long will it take for us to rvw appeal. Told him we have fm 60-120 days to rvw app Craig said we are just jerking him around w/his mone

000001 N

During the investigation conducted on Saturday, November 11, 2000, the claimant was observed to be wearing a dark t-shirt and blue jeans.

**Verbal Report**:   On Wednesday, November 8, 2000, I contacted Mrs. Boyd and advised her of the developments surrounding this file. At that time, I was instructed to follow up with the remainder of the surveillance assignment.

On Thursday, November 9, 2000, I left a voice mail recording for Mrs. Boyd regarding developments on this assignment.

On Friday, November 10, 2000, I contacted Mrs. Boyd and advised her of developments of this file. At that time, I was instructed to follow up with an additional day of surveillance on a weekend day

On Saturday, November 11, 2000, I contacted Mrs. Boyd and advised her of the developments of this investigation, via voice mail.

**Conclusion and Recommendations**:  Based on surveillance conducted to date, there is no evidence or indication the claimant is employed.  During the course of surveillance, the claimant was found to be inactive on the first day of surveillance.  During the second day of surveillance the claimant was observed to walk and move about without using a cane, crutches or other visible supporting device.  He was observed to arrive at the scheduled medical appointment at approximately 8:40 AM and then departed at approximately 11:04 AM.  On the third day of surveillance the claimant was not able to be confirmed within the residence, and during an activity check, an unidentified female told me that a gentleman by the name of Craig resided there, but she did not know his last name.  On the last day of surveillance conducted, the claimant was confirmed to be within the residence, but he was not observed until later in the day as he exited the residence and stood on the front porch for a very brief time period before returning back into the residence out of view.

It does not appear additional surveillance/investigation is warranted at this time. However, should you determine it is warranted, please advise and we will handle accordingly.

**Case Status**:  Open/Pending further instructions.

Thank you very much for this opportunity to have been of service. Should you have any questions regarding this investigation, you can contact me at (610) 878-9575.

Enc:  Videotape (1)

000036

# RECORD OF CONVERSATION

| Date:<br>11-15-00 | Time:<br>1145am | Claim #:<br>Analyst Name:<br>*Felicia Boyd* |
|---|---|---|
| Conversation With:<br><br>Name: Mike Sanford<br><br>Telephone:<br>( ) | ☐ Claimant<br>☐ Policyholder<br>☐ Manager Disability<br>☑ Other CVI | ☐ Analyst Telephoned<br>☑ Telephoned Analyst<br>☑ Conversation<br>☐ Voice Mail |
| Claimant Name:<br>Craig Howard | Social Security Number: | Policyholder Name:<br>Penn State |

Conversation:

Called to give me some update.
Confirmed oo that ee was @ home all day long.
Appears that he does not do much or anything
Have no vehicle or other forms of transportation.
It appears that ee lives upstairs in a home/duplex
Wish they had more info but don't.
Told Mike to discontinue a non med assessment.
He said ok.

000052

# P A S T   D U E   S T A T E M E N T

STATEMENT DATE: 12/18/2000        DEC 27 2000

641498

CLAIMS
VERIFICATION
INCORPOR...

Felicia Boyd
Liberty Life Insurance Company
2810 Coliseum Center Drive
Suite 250
Charlotte, NC  28217

YOUR FILE NO: 6431498
INSURED     : Craig Howard
DATE OF LOSS: 07/01/2000
SUBJECT NAME: Craig Howard
SOCIAL SEC #: 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
CVI FILE NO : PAG-11A0-009

Description for Open Invoice # **PAG02076**                                Totals

| | | | | |
|---|---|---|---|---|
| Flat-Rate Surveillance | 7.5 | @ $45.00 | 11/08/2000 | $495.00 |
| Flat-Rate Surveillance | 7.5 | @ $45.00 | 11/09/2000 | $495.00 |
| Flat-Rate Surveillance | 3.5 | @ $45.00 | 11/10/2000 | $315.00 |
| Flat-Rate Surveillance | 7.5 | @ $45.00 | 11/11/2000 | $495.00 |
| Videotape Copy | 1.0 | @ $15.00 | | $0.00 |
| | | | Finance Charges | 27.00 |
| | | | Invoice Total | $1,827.00 |

=====================================================================

## TRANSACTION HISTORY FOR CVI FILE # PAG-11A0-009

| Transaction Date | Type | Invoice# | Dates of Service/ Check Number | Amount | Finance Charges | Balan |
|---|---|---|---|---|---|---|
| 11/08/2000 | Invoice | PAG02061 | 11/06/00 | 247.50 | 0.00 | 24 |
| 11/13/2000 | Invoice | PAG02076 | 11/08/00-11/11/00 | 1800.00 | 27.00 | 2,07 |
| 11/27/2000 | Payment | PAG02061 | CK# 25741249 | -247.50 | 0.00 | 1,82 |

| BALANCE DUE: | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | T |
|---|---|---|---|---|---|
| | $0.00 | $1,827.00 | $0.00 | $0.00 | $1,82 |

**A friendly reminder...Your account is over-due.  Please send a check toda**

Tax Identification Number: 59-2106154

**Claims Verification Incorporated**

Corporate Headquarters:  1166 West Newport Center Drive, Suite 212, Deerfield Beach, FL  33442-7791
U.S. & Canada Toll Free:  1-800-486-2202 · U.S. & Canada Toll Free Fax:  1-800-486-2022

Alabama · Connecticut · Delaware · Florida · Georgia · Kentucky · Maine · Maryland · Massachusetts · Mississippi · New Hampshire · New Jersey
New York · North Carolina · Pennsylvania · Rhode Island · South Carolina · Tennessee · Vermont · Virginia · Washington, D.C. · West Virginia

INVOICE FOR PROFESSIONAL SERVICES                         000082

INVOICE NUMBER:  PAG02061
INVOICE DATE....:  11/08/00
OUR FILE #.........:  PAG-11A0-009

**REFERENCE INFORMATION:**

Client File #....:  6431498
Add'l File #...:
Insured.........:  Craig Howard
Subject.........:  Howard, Craig
Date of Loss..:  07/01/00
S.S. Number..:  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
Investigator...:  J. Davies

Felicia Boyd
Liberty Life Insurance Company
2810 Coliseum Center Drive
Suite 250
Charlotte, NC  28217

---

Description                                                    Totals

PA Flat-Rate Surveillance            2.0 Hrs on-site    on 11/06/00        2
                                     State Sales Tax

                                     PLEASE REMIT        $        2

Flat-rate surveillance includes travel, mileage, original videotape, written report, and administration, based on
$ 495 for 7½ hours on-site in PA, increased/decreased by $45/hr.

DUE UPON RECEIPT
A SERVICE CHARGE OF 1 1/2% PER MONTH WILL BE ADDED AFTER 30 DAYS.
TO INSURE PROPER CREDIT PLEASE RETURN BOTTOM PORTION TO THE ADDRESS BELOW WITH REMITTAN
1166 W. Newport Center Drive, Suite 212   Deerfield Beach, FL 33442-7791
(954) 429-8855 / Toll Free: 800-486-2202  Federal ID Number: 59-2106154

( DETACH ALONG PERFORATION )

CLIENT:
Felicia Boyd
Liberty Life Insurance Compa
2810 Coliseum Center Drive
Suite 250
Charlotte, NC  28217

REMIT TO:                              Invoice Number...: PAG0206
                                       Invoice Date.......: 11/08/00
                                       Our File Number..: PAG-11A0
CLAIMS VERIFICATION, INC.              Invoice Amount...:  $247.50
1166 W. NEWPORT CENTER DRIVE
SUITE 212
DEERFIELD BEACH, FL 33442-7791         Amount Paid.....: _____

**TELEPHONE DOCUMENTATION**

000005

CLAIMANT: _Craig Howard_       DATE: _1.23.01_

SS NUMBER: _____       PHONE: _( )_

POLICY: _Penn St._       CLAIM NO.: _641498_

SPOKE WITH: _____

S/w clmt clmt & nurse (Jaimie)

Dr. wants $250.00 for comments
on Fee

wait to hear from attorney

*CResP*

## Foster, William C.

| | |
|---|---|
| From: | Rabkin, Lee [Lee.Rabkin@LibertyMutual.com] |
| t: | Saturday, May 12, 2001 10:43 AM |
| o: | 'Foster, William C.' |
| Subject: | RE: Howard Answer |

Bill

I reviewed the claim file and the answer and have these comments.

1. Our records show a date of birth of 4/15/57, which would make Howard age 44 at the time of our answer.

2. Last two sentences. I would reword to say "Liberty Mutual Group" is not an entity which is subject to suit but is a name used to refer to a group of companies. Liberty Life is one of the companies in that group."

4. The Certificate of Coverage designates Geisinger as the agent for service of legal process for the Plan--not for the insurer.

9. I don't have a copy of the policy yet, but the Schedule of Benefits in the Certificate of Coverage and the Claim file indicate a 180 day elimination period.

10. Schedule is misspelled in line 2.

12. Deny??

Delete extra "e" at tend of line 1.

2υ Delete the period after Bad Faith in line 3.

Eleventh Affirmative defense. Liberty never paid benefits in this case, but we would want to offset for Social Security Benefits in the event Howard is found entitle to LTD.

Lee
> Lee Rabkin
> Assistant Vice President, Corporate Legal
> Liberty Mutual Insurance Company
> Tel: 617-574-5811
> Fax:617-574-5783
> Lee.Rabkin@LibertyMutual.com
>
> This e-mail, and any attachments thereto, is intended only for the use of
> the addressee(s) named herein and may contain legally privileged and/or
> confidential information. If you are not the intended recipient of this
> e-mail, you are hereby notified that any dissemination, distribution or
> copying of this e-mail, and any attachments thereto, is strictly
> prohibited. If you have received this e-mail in error, please notify me
> via return e-mail and via telephone at 617-574-5811 and permanently delete
> the original and any copy of any e-mail and any printout thereof.
>
>
> -----Original Message-----
> From: Foster, William C. [SMTP:wfoster@LinkKmf.com]
      nt: Friday, May 11, 2001 3:37 PM
      : 'Lee.Rabkin@LibertyMutual.com'
> Subject:  Howard Answer
>

1

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July, 2002, a true and correct copy of the foregoing "Exhibits to Plaintiff's Trial Brief" was served by United States Mail, upon the following:

William C. Foster, Esquire
Kelly, McLaughlin & Foster, LLP
1617 J.F.K. Boulevard, Suite 1690
Philadelphia, PA 19103


Cynthia L. Zucaro

437007.1