IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRAIG M. HOWARD<br>Plaintiff | :<br>:<br>: |
| v. | : CIVIL ACTION NO. 1:CV-01-797<br>: (Judge Kane) |
| LIBERTY LIFE ASSURANCE<br>COMPANY OF BOSTON,<br>LIBERTY MUTUAL GROUP<br>Defendant | :<br>:<br>:<br>: |

FILED
HARRISBURG

NOV - 5 2002

MARY E. D'ANDREA, CLERK
Per_____
        DEPUTY CLERK

**MEMORANDUM AND DECISION**

**I.    INTRODUCTION**

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). Plaintiff is challenging an adverse long-term disability determination made by Defendant. There was a one-day bench trial of this matter on July 22, 2002. The Court now makes the following findings and fact and conclusions of law.

**II.   FINDINGS OF FACT**

1.  Plaintiff started working for Hershey Medical Center in May, 1985. Claim Form, Def. Tr. Br. Exh. 1 ("claim file") at 247.

2.  Plaintiff worked in the billing department as a staff assistant. His position was that of medical billing clerk, which involved data entry. He worked a regular eight hour day with two fifteen minute breaks and a half-hour lunch. Bednar letter, Pl. Tr. Br. Exh. J; Employer's Statement, claim file at 241.

3.  Through his employment with Hershey Medical Center, Plaintiff enrolled in a group long term disability insurance plan sponsored by Geisinger Health Systems, effective August 1, 1998. Defendant funds and administers the plan. Def. Tr. Br. Exh. 2 ("Plan").

4.  Plaintiff submitted a disability claim form on May 5, 2000. Claim file at 242-247.

5.  The claim form indicated that Plaintiff had last worked on January 2, 2000 and it was unknown when he would be able to return to work due to his disability, namely degenerative disk disease. Plaintiff indicated on the form that the disease began on

October 30, 1996. Claim file at 242, 244.

6. Plaintiff's treating physicians were Dr. Stephen Powers, neurosurgeon, Dr. Dan Gelb, orthopaedic surgeon, and Dr. Andrew Wren, general practitioner. Claim file at 244, 229.

7. Dr. Powers completed the Physician certification section of Plaintiff's claim form, indicating a diagnosis of recurrent herniated disc. Claim file at 243.[1]

8. The claim file includes a Employer's Statement, completed by an individual in Human Resources and received by Defendant on May 11, 2000. Claim file at 241.

9. On May 12, 2002, Felicia Boyd, a claims analyst employed by Defendant and assigned to Plaintiff's claim, requested supplemental forms from Plaintiff and medical records from Dr. Powers. Claim file at 239-40.

10. Mr. Howard completed Defendant's Activities Questionnaire and Supplementary Statement and returned them to Defendant on May 16, 2000. Claim file at 233-37.

11. After an authorization was received, Dr. Powers's office sent medical records to Defendant on June 12, 2000. Claim file at 228.

12. Hershey Medical Center transmitted medical records to Defendant. The records included treatment and surgery records from Dr. Powers, and correspondence from Plaintiff's other doctors, Dr. Gelb and the physicians at the Pain Clinic, relating to Plaintiff's treatment dating from January 14, 2000 forward. Claim file at 190-227.

13. The medical records in the claim file show that:

   a. Plaintiff had surgery for disk herniation in 1997 and again in 1998. Claim file at 202, 204.

   b. Dr. Powers first saw Plaintiff on January 14, 2000, and diagnosed him with recurrent disc herniation. Claim file at 200, 202. Dr. Powers indicated in his letter to Dr. Wren that Plainiff's pain was "starting to interfere with his ability to work." Claim file at 202.

   c. Plaintiff also received continuing treatment at the Pain Medicine and Palliative

---

[1]Defendant, in its Proposed Findings of Fact and Conclusions of Law (Doc. No. 25), asserts that on the second page of the physician's statement, Dr. Powers indicated a "Class 4 physical impairment." However, this page of the claim form is missing from the Court's copy of the claim file. Therefore, although Dr. Powers's alleged indication that Plaintiff could perform sedentary work was perhaps material to Defendant's disability determination, the Court will not make a finding regarding this indication.

        Care Center at Hershey Medical Center ("Pain Clinic") from at least 1998. The doctors at the Pain Clinic conducted various procedures to alleviate Plaintiff's lower back and leg pains, including radiofrequency ablation and regular trigger point injections. Claim file at 204, 214, 217, 222. Dr. Zolyomi at the Pain Clinic indicated on January 24, 2000 that Plaintiff was "relatively comfortable" and "fairly functional." Claim file at 204-205.

    d.    Plaintiff had an MRI scan on January 20, 2000. Dr. Powers evaluated this and concluded that Plaintiff suffered from, among other things, a "significant recurrent disc" and a "free fragment of disc" on the L5 nerve root. Dr. Powers recommended another surgery to remove the recurrent disc. The surgery was not intended to improve Plaintiff's leg pain. Dr. Powers indicated that his goal was for Plaintiff to return to work by March 1, 2000. Claim file at 210-211.

    e.    Dr. Powers successfully performed the surgery on February 10, 2000. Claim file at 297-99.

    f.    On February 25, 2000, Dr. Powers reported that Plaintiff was doing "100% better." Dr. Powers released Plaintiff to work part-time beginning March 6, 2000 and full-time beginning March 27, 2000. Claim file at 220.

    g.    Approximately one month after the surgery, Plaintiff's leg pain subsided but his back pain increased to the level of pain before the operation. March 8, 2000 letter from Pain Clinic doctor, Claim file at 214. Dr. Zolyomi concluded that the acute pain was a result of the surgery and that it would gradually subside. Plaintiff was prescribed physical therapy and continued to take Vicodin and Naprosyn for pain management. Id.

    h.    On March 24, 2000, Dr. Powers stated that his exam of Plaintiff showed no evidence of radiculopathy. Dr. Powers stated that he would "support some limited disability in [Plaintiff's] case because of continued pain," however, Dr. Powers concluded that the pain was a symptom of "a chronic low back pain problem which is somewhat separate from the disc problem that he presented to me [previously.]" Claim file at 216.

    i.    On May 5, 2000, Dr. Powers reported that Plaintiff was not "in any shape to return to any type of activity which requires extended sitting." However, Dr. Powers also stated that Plaintiff could work where he would be able to sit and stand frequently, although that limitation was not compatible with his job as a billing clerk. Dr. Powers prescribed an anti-depressant, recommended follow up at the Pain Clinic, and released him from his care, since there was nothing on his exam "to suggest a new root problem or recurrent disc herniation." Claim file at 219.

14.    Debra Redfern, a registered nurse employed by Defendant, reviewed the medical

information in Plaintiff's claim file. Her incomplete notes are contained in the claim file at 181–186.[2]

15. Based on the medical records and a consultation with Ms. Redfern, Ms. Boyd determined that the objective medical evidence did not support a finding of total disability from Plaintiff's own occupation. Claim file at 178, 179, 187.[3]

16. On July 25, 2000, Defendant sent Plaintiff a letter of determination. Claim file at 171-175. The letter stated that the "current medical information that we have obtained does not demonstrate sufficient functional limitations to prevent you from performing all of the material and substantial duties of your occupation as Staff Assistant." Id. at 172. The letter explained the reasons for this determination, detailed the medical information on file, and informed Plaintiff of his rights under ERISA. Id. at 172-75.

17. On July 24, 2000, Dr. Powers wrote a letter to Ms. Boyd regarding Plaintiff's disability determination. He indicated that despite three back surgeries, Plaintiff "still has significant back pain and continues to be treated by the Pain Clinic here for his chronic pain disorder and depression." Dr. Powers attributed the chronic low back pain to a "significant spinal disease" and wrote that Plaintiff "is unable to sit for extended periods of time (more than five minutes or so at a stretch), and as such is incapable of working even a clerical or sedentary type job which requires his staying at a single work station." Dr. Powers concluded his letter by stating that he "would consider [Plaintiff] entirely disabled at this time from returning to any type of work activity. I do not expect his condition to improve, and in fact, I expect it to worsen as he gets older due to the degenerative nature of his condition." Claim file at 166.

18. Dr. Powers's letter was dated July 24, 2000, but was not received by Defendant until July 26, 2000 at the earliest, after it had made its disability determination. Claim file at 166 (received time indication on bottom of letter "Jul. 26 7:04 a.m."). The letter was again sent by Plaintiff by fax to Mr. Richard Adkins, Ms. Boyd's manager in the claims department, on July 31, 2000 as additional information to support Plaintiff's claim. Claim file at 163-65.

19. Plaintiff formally appealed Defendant's disability determination and Ms. Boyd sent him a letter on August 10, 2000 acknowledging receipt of his request for review. Claim file at 160.

---

[2]The notes are incomplete since several of the sections abruptly cut off and are not contained in full in the claim file. See, e.g., "info note" and "assessment note" sections at 186. However, the notes seem to be accurate summaries of the medical documentation.

[3]Ms. Boyd's recommendation was apparently approved by her manager, but the copies of the claim information forms provided are illegible. Claim file at 176-177.

20. Ms. Boyd discussed the new letter sent by Dr. Powers with Ms. Redfern, who indicated that the letter did not support Plaintiff being totally disabled from his own occupation. Ms. Redfern suggested a Functional Capacities Evaluation ("FCE") and pharmacy check. Claim file at 161.

21. A pharmacy check was requested by Ms. Boyd on August 10, 2000. Claim file at 158. The pharmacy check was completed by Intertel, Inc. on August 22, 2000. 148-48, 155. On August 31, 2000, Intertel provided copies of pharmacy reports from Rite Aid Pharmacy in Palmyra, Pennsylvania, where Plaintiff had filled nine prescriptions between 1994 and 1997, and Palmyra Pharmacy in Palmyra, Pennsylvania, where Plaintiff had filled approximately fifty prescriptions since 1998. Claim file at 131-140.

22. Sometime before August 23, 2000, Ms. Redfern attempted to get a prescription for a FCE from Dr. Powers. Claim file at 152. A prescription not signed by Dr. Powers was written for a FCE and faxed to Defendant on August 23, 2000. Claim file at 151. Another prescription for a FCE, written by Dr. Powers, was sent to Defendant on October 23, 2000. Claim file at 110.

23. In October and November of 2000, Plaintiff sent additional information to Mr. Adkins after filing his appeal. This information included:

   a. The July 24, 2000 letter of Dr. Powers discussed above at No. 16. Claim file at 115.

   b. Plaintiff's Pennsylvania Bureau of Disability Determination, dated May 11, 2000 with the first page of an evaluation by Dr. Stuart Hartman. SSA found Plaintiff disabled as of December 24, 1999 and awarded him $1024 monthly benefits. Claim file at 113, 116. Plaintiff re-sent Dr. Hartman's report in full on November 2, 2000, Claim file at 106-107. Dr. Hartman's report diagnosed Plaintiff with chronic low back pain, degenerative disc disease, failed back surgery syndrome, and a right sacroiliac syndrome. Dr. Hartman concluded that Plaintiff is "functionally limited due to poor mobility but his strength is functional." Claim file at 106. He indicated that he completed a "medical source statement of claimant's ability to perform work-related activities," which was included in the transmission at 104-105. This statement indicates that Dr. Hartman found Plaintiff able to lift and carry up to ten pounds, stand and walk for one to two hours per day, and sit for up to four hours with frequent position changes. Claim file at 105.

   c. A letter written by Dr. Gelb on October 13, 1999. The letter states that Plaintiff is under Dr. Gelb's care for failed back surgery syndrome and Dr. Gelb "consider[s] Plaintiff] to be permanently completely disabled." It provides no further detail or

5

       medical basis for this conclusion. Claim file at 114.[4]

    d.    A letter written to Mr. Adkins from Mary Bednar, Plaintiff's employer, on October 18, 2000. Ms. Bednar stated that "it is not possible for a billing clerk to remove themselves from the work space for five or ten minutes hourly." She asked Mr. Adkins to reconsider the disability determination as Plaintiff "is unable to serve in his previous position at Hershey Medical Center." Claim file at 112.

    e.    Undated MRI reports sent by Plaintiff on November 2, 2000. Claim file at 100-103. The report of Plaintiff's lumbar spine and lower thoracic spine is from the MRI ordered by Dr. Powers in January, 2000. The findings were indicated in Dr. Powers's treatment notes which were included in Plaintiff's original claim file. This report did not add anything to the medical evidence. Claim file at 101-102. The other MRI report is related to complaints of neck pain, the first indication of this complaint in the file. Claim file at 100. See also Notes of Testimony (hereafter "NT") at 31 (Plaintiff testifying that Dr. Powers referred him to the "doctor which [sic] did my neck operation" in May, 2001). The reviewing doctor was Dr. Huq, not someone indicated by Plaintiff as a treating physician in other documents. This report is beyond the scope of Defendant's disability investigation since it was unrelated to the disability claimed by Plaintiff.

24.    A FCE was scheduled for Plaintiff to occur sometime in September or October. Claim file at 119, 129. This FCE was cancelled at the request of Mr. Adkins because Plaintiff stated that he had already done a FCE through the Social Security Administration ("SSA") and that Mr. Johnson,[5] an employee of Defendant, agreed that he would accept that FCE rather than conduct another one. Claim file at 129; NT at 13-14, 20-24.

25.    The report that Plaintiff thought was an FCE was not in fact an FCE, but a SSA medical source statement (discussed above at 22(e)). Defendant re-scheduled a FCE for Plaintiff. This confusion about the SSA determination and FCE led to a delay in the appeal that was not the fault of Plaintiff or Defendant. NT 20-24.

26.    Ms. Boyd requested a "non-medical investigation" (surveillance) on November 3, 2000 with Claims Verification Inc. ("CVI"). The surveillance was to take place on the day of Plaintiff's scheduled FCE, November 6, 2000, and the following day. Claim file at 95,

---

[4] It is unclear whether Defendant had this letter when it made its initial disability determination on July 25, 2000. Ms. Boyd faxed this letter with other documents to Paula Colello on October 10, 2000 in reference to an investigation of a complaint filed by Plaintiff with the Pennsylvania Insurance Department. Claim file at 124, 128.

[5] Plaintiff refers to Mr. Johnson as both Chuck, NT at 13, and Joe, NT 24. It appears that he is referring to Chuck Johnson, an appeal review consultant employed by Defendant. See claims file at 25-26.

        97, 152.

27. The FCE scheduled for November 6, 2000 was postponed due to doctor illness. The surveillance was also re-scheduled. Claim file at 85, 93.

28. Surveillance of Plaintiff was conducted on November 8-11, 2000 by CVI. Claim file at 57-63, 86-89, 92. CVI concluded that Plaintiff was not employed but made no conclusions as to his disability. Claim file at 61.

29. Health South, Inc. conducted a FCE of Plaintiff on November 9, 2000. Defendant received a copy of the FCE Report on November 20, 2000. Claim file at 67-80.

30. The results of the FCE indicated that Plaintiff could perform a sedentary or light work occupation for an eight hour day. Claim file at 79. The report indicated that Plaintiff could sit for two hours in an eight hour day with breaks every twenty minutes. Claim file at 67.

31. On November 28, 2000, Ms. Boyd wrote to Dr. Powers and requested his review of the FCE. Claim file at 56. On November 29, 2000, Ms. Boyd sent another letter to Dr. Powers correcting an error from the first letter. Id. at 55. Ms. Boyd requested that Dr. Powers comment on whether Plaintiff was capable of doing sedentary work. She requested that if Dr. Powers concluded Plaintiff was not capable of performing sedentary to light work, that he submit "objective medical" [sic] to support that finding.

32. Defendant gave Dr. Powers ample opportunity to respond to its repeated requests for review of Plaintiff's FCE. E.g., claim file at 26 (faxing another copy of the FCE to Dr. Powers for comment on January 17, 2001); Note from Dr. Edward Crouch, medical director employed by Defendant; claim file at 3-4 (detailing Dr. Crouch's attempt to consult with Dr. Powers).

33. Defendant learned on January 23, 2001 that Dr. Powers required a $250 fee for reviewing the FCE. Claim file at 6. Defendant did not pay this fee but provided this information to Plaintiff's attorney. Plaintiff's attorney did not pay the fee and Dr. Powers's comments were never obtained.

34. Defendant gave Plaintiff's attorney the opportunity to submit additional evidence for the appeal. Claim file at 24-25. Plaintiff's attorney never did so beyond his December 19, 2000 submission duplicating documents already contained in the claim file. Id. at 30-48.

35. At some point, Defendant received Plaintiff's pre-2000 medical records. Claim file at 249-87. These records were outside the scope of the claimed disability[6] and were not

---

[6] The medical documents were within the scope of the investigation insofar as they related to a pre-existing condition of Plaintiff. Defendant was perhaps investigating the possibility of denial of benefits on that basis. See Plan at 38 (excluding disabilities caused or

7

utilized by Defendant in the disability determination.

36. Defendant determined that none of the new evidence required changing the original eligibility determination. Mr. Johnson sent a letter to Plaintiff's attorney explaining Defendant's decision to uphold its denial of benefits. Claim file exhibits A-D.

37. Plaintiff filed this action on April 5, 2001 in the Court of Common Pleas of Dauphin County. It was properly removed to this Court by Defendant on May 7, 2001. (Notice of Removal, Doc. No. 1).

## III. CONCLUSIONS OF LAW

This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 to decide questions arising under ERISA. 29 U.S.C. § 1132(e)(1).

### A. Standard of Judicial Review

In Firestone Tire & Rubber Co. v. Bruch, the United States Supreme Court held that de novo review of benefit determinations by fiduciaries or plan administrators under ERISA is appropriate " unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms[.]" 489 U.S. 101, 115 (1989). Where an administrator or fiduciary has the discretion to interpret the plan in deciding a claimant's eligibility for benefits, an administrator's interpretation is entitled to the arbitrary and capricious standard of review and "will not be disturbed if reasonable." Id. at 111. The Firestone Court further noted that where an administrator or fiduciary is acting under a conflict of interest, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Id. at 115 (citing Restatement (Second) of Trusts § 187, Comment d (1959)). The Third Circuit instructed that the conflict should be taken into account with a "heightened arbitrary and capricious" standard of review, using a sliding scale method. Pinto v.

---

contributed by a pre-existing condition which begins in first twelve months of coverage).

8

Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000); see also Smathers v. Multi-Tool Inc., 298 F.3d 191 (3d Cir. 2002) (applying Pinto's sliding scale where employer had conflict of interest).

Here, section seven of the policy gives the Defendant discretion over interpretive and factual determinations. The provision of the policy at issue here states:

> **Who Has the Authority For Interpretation of This Plan?**
> We [Defendant] shall possess the authority, in our sole discretion, to construe the terms of this plan and to determine benefit eligibility hereunder. Our decisions regarding construction of the terms of this plan and benefit eligibility shall be conclusive and binding.

Plan at 42. Further, the Defendant both funds the plan and makes eligibility determinations under the plan, giving rise to an inherent conflict of interest, and thus triggering Pinto's sliding scale methodology. 214 F.3d 377; Smathers, 298 F.3d at 197. The parties agree both that Defendant has Firestone discretion and that Pinto's sliding scale analysis is implicated. Def. Tr. Br. at 9; Pl. Tr. Br. at 5. The parties differ on how far they believe the scale should slide.

Unfortunately, although Plaintiff argues for a low level of deference on the sliding scale, he has not submitted any specific evidence of the degree of conflict of interest or how it may have affected Defendant's decision to deny disability benefits. This lack of evidence makes it difficult for the Court to follow the Pinto Court's approach and "take into account the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company." Pinto, 214 F.3d at 392. Because there is no evidence that the conflict here is "extraordinary," the Court will apply the heightened arbitrary and capricious standard from Pinto, but we will remain on the deferential side of the sliding scale. In the course of the heightened scrutiny, however, we will "conduct a more penetrating review of administrator's decisionmaking process than would normally be conducted under the

9

arbitrary and capricious standard." Smathers, 298 F.3d at 199.

### B. Scope of Evidence

Under an arbitrary and capricious standard, the evidence on appeal is limited to that which was before the plan administrator at the time of the final decision. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 340 (3d Cir. 1997); Ernest v. Plan Admin'r of Textron Insured Benefits Plan, 124 F. Supp.2d 884, 893 (M.D. Pa. 2000); see also Smathers v. Multi-Tool, Inc., 298 F.3d 191, 199-200 (3d Cir. 2002), quoting Levinson v. Reliance Std. Life Ins. Co., 245 F.3d 1321, 1326 (11th Cir. 2001) ("Whether a claim decision is arbitrary and capricious requires a determination whether there was a reasonable basis for the administrator's decision, based upon the facts as known to the administrator at the time the decision was made.") (emphasis added, internal quotations omitted).

The Pinto Court did not address whether this scope of evidence would expand when the standard is heightened arbitrary and capricious, however, other District Courts in the Third Circuit have declined to broaden the record on appeal under the less deferential standard. E.g., Oslowski v. Life Ins. Co. of North America, 139 F. Supp. 2d 668, 675-676 (W.D. Pa. 2001); O'Sullivan v. Metropolitan Life Ins. Co., 114 F. Supp. 3d 303, 309-310 (D.N.J. 2000). The O'Sullivan court reasoned that looking beyond the administrative record would circumvent ERISA's purpose in encouraging resolution of disputes on the administrative level. 114 F. Supp. 3d at 309. Furthermore, the court explained, a claimant can supplement the file with additional evidence on reconsideration, which would be included in the claim file and thus reviewable in the district court. Id. at 309-310.

In this case, there were two denials of benefits, one on July 25, 2000 and the other on February 28, 2001, and the file remained open throughout that time. The claims analyst invited

Plaintiff and his attorney to submit additional evidence and neither did so. Claim file at 24-25. Plaintiff's counsel now claims that Defendant did not have proper evidence of Plaintiff's job duties, but they had ample opportunity to provide this evidence for the file before the final determination. The Court sees no reason to depart from the general rule and consider evidence that was not before the claims analyst. Thus the evidence which the Court will consider when reviewing the final disability determination is limited to the claim file through February 28, 2001 and the terms of the plan itself.[7]

### C.  Defendant's Disability Determination

When applying the heightened arbitrary and capricious standard of review, the Court is "deferential, but not absolutely deferential." Pinto, 214 F.3d at 393. "A plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan. A court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.,

---

[7] Evidence outside the claim file discussed in section III.C.1 of this memorandum, i.e. the claim procedure manual, is used only to explore the alleged conflict of interest and will not be used for any other reason. Further, this opinion is consistent with the determination of the Court at the bench trial on July 22, 2002 that additional evidence could be heard. (See Order denying motion in limine, Doc. No. 40). The evidence presented might have been useful to the Court not in reviewing the administrative determination, but in analyzing the appropriate standard of review. Furthermore, had the Court decided that a heightened standard of review closer to de novo review was appropriate, the additional evidence presented at trial may have been allowed to enter into the review of the final determination. Luby v. Teamsters Health, Welfare & Pension Trust Funds, 944 F.2d 1176, 1184 (3d Cir. 1991); but see Lasser v. Reliance Standard Life Ins. Co., 130 F. Supp. 2d 616, 628 -630 (D.N.J. 2001) (suggesting that supplementing the administrative record may be forbidden by Pinto's placement of the burden on the beneficiary, and that remand would be the more appropriate judicial tool where the record is deficient. Pinto, 214 F.3d at 394, n. 8.

11

222 F.3d 123, 129 (3d Cir.2000) (internal quotations omitted). However, "[a]ny deference we might ordinarily afford this decision will be tempered due to [Defendant's] conflict of interest." Smathers v. Multi-Tool, Inc., 298 F.3d 191, 200 (3d Cir. 2002).

    *1.*    *The Process*

The Third Circuit has directed the district courts in ERISA cases with heightened arbitrary and capricious review to consider not only the reasonableness of the result, but the reasonableness of the process by which it was achieved. Pinto, 214 F.3d at 393; see also Cimino v. Reliance Standard Life Ins. Co., 2001 WL 253791, at *3 (E.D. Pa. 2001) (noting that the "defining feature" of the heightened arbitrary and capricious standard of review is looking at the process by which the result was achieved). In Pinto, the Court determined that under a highly deferential standard, it would uphold the decision of the insurance administrator despite the fact that a de novo review would yield the opposite result. 214 F.3d at 393. In looking at the process, the Court pointed to several "procedural anomalies" that moved them to the "far end of the arbitrary and capricious range," so that they "examine[d] the facts before the administrator with a high degree of skepticism." Id. at 393-94.

Here, there is no evidence that Defendant's procedures were not followed or that they did anything but conduct a good faith, reasonable investigation. The assertions made by Plaintiff in its proposed findings of fact regarding supposed procedural irregularities based on its examination of the claims procedure manual are simply wrong. For example, Plaintiff asks this Court to find that "Defendant did not follow up with Plaintiff's treating physicians as to their conclusions of total disability." Pl. Proposed Findings of Fact 1(c). The evidence in the claim file of repeated telephone calls and letters to Dr. Powers shows exactly the opposite. Plaintiff asserts that "[t]he employer's statement required [in claims manual at 25-26 of Claims

12

Investigation section] was not obtained." Pl. Proposed Findings of Fact 1(e). The record shows that this form was in fact obtained. Claim file at 241. Plaintiff argues that Defendant was required by its internal procedures to conduct an Independent Medical Examination ("IME") of Plaintiff and failed to comply with procedures by not conducting the IME. Pl. Proposed Finding of Facts 1(h) and 8; Pl. Tr. Br. at 9. A closer reading of the claim manual reveals that an IME is not required, but that claims analysts <u>may</u> use an IME as a tool "to assist them in evaluating disability claims." Claims manual, Pl. Tr. Exh. 1, Claims Investigations at 50. The manual goes on to give examples of when an IME would be helpful and the procedures to follow when conducting an IME. Id. at 51-55. Nowhere is there a requirement that one be conducted, as Plaintiff asserts; in fact, the manual specifies that "[b]efore recommending an IME, all other ways of obtaining the necessary medical information need to be explored." Id. at 52. There are many other examples where Plaintiff's proffered "procedural anomalies" are simply mis-readings of the claims manual and claim file.

The only arguable irregularity in the claim procedure was the time it took Defendant to process the appeal, which should ordinarily be done in under 60 days, and in special circumstances, no more than 120 days. Summary Plan Description, Plan at 56. Thus, Defendant did not comply with its procedures in processing the appeal when it took 202 days, 82 days beyond the maximum allowed. Id. There is also no indication in the record that Plaintiff was notified of the reasons for the time extension beyond the regular 60 days, as required by the Plan. Id. However, the delay was almost entirely attributable to Defendant's diligence in attempting to contact Plaintiff's treating physician and giving him time to respond to the FCE results, re-scheduling the FCE due to a misunderstanding with Plaintiff, and waiting for Plaintiff to provide the results of a non-existent FCE report that was supposedly conducted by the SSA. Defendant

13

kept Plaintiff, and later Plaintiff's counsel, appraised of this situation. Therefore, Plaintiff had the notice required by the Plan.

Furthermore, this "anomaly" is not sufficient to warrant less deferential review of the merits of the decision, especially since it indicates the care shown by Defendant in handling Plaintiff's claim. This certainly is not the kind of procedural anomaly noted in Pinto or subsequent decisions. 214 F.3d at 392-94; see also, e.g., Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 174-176 (3d Cir. 2001); Freiss v. Reliance Std. Life Ins. Co., 122 F. Supp. 2d 566, 573-75 (E.D. Pa. 2000) (granting summary judgment was precluded since potential procedural anomalies presented issue of fact as to whether administrator acted arbitrarily and capriciously in denying disability benefits). The record further shows that Defendant complied with its procedures in both of its denial letters and the time frame on the initial decision. See Summary Plan Description, Plan at 55. It is also significant that Plaintiff was given the opportunity to submit additional evidence in support of his claim. See Ernest, 124 F. Supp. 2d at 895 (finding that insurance company gave plaintiff "adequate opportunity to supplement his claim file prior to [defendant's] final denial" and that the evidence was still insufficient to prove his inability to work in his or a reasonably related occupation).

Plaintiff has made much of the fact that Defendant was willing to spend approximately $2,000 conducing surveillance of Plaintiff but was unwilling to spend $250 to pay the fee Dr. Powers required to review the FCE. Pl. Tr. Br. at 8, 11. However, the Court finds that Defendant did not have a legal obligation to pay this fee. While Defendant was financially responsible for the surveillance and the FCE it requested, section four of the Plan, Disability Income Benefits, specifies that proof of a disability must be given "at our [Defendant's] request and at your [Plaintiff's] expense." Plan at 20. Defendant requested the review in order to

reconcile what it saw as a discrepancy between Dr. Powers's early reports and his July 24, 2000 letter citing Plaintiff's total disability. When it learned that the doctor wanted $250 to review the FCE, Defendant made the reasonable determination that the doctor's comments on the FCE were not necessary to its determination on appeal, although it gave Plaintiff's counsel the opportunity to secure the comments and submit additional evidence.

In sum, other than the delay in processing the appeal, which did not prejudice Plaintiff but rather accommodated him, the Court's examination of the process Defendant followed in making the disability determination does not reveal anything which warrants a less deferential review of the merits of the determination.

    2.    *The Merits*

The issue then is whether Defendant's decision to deny Plaintiff's claim is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993); Ayers v. Maple Press Co., 168 F. Supp. 2d 349, 353 (M.D. Pa. 2001).

Based on the medical information before it, Defendant determined that Plaintiff did not meet the definition of disabled under the plan. The group policy issued by Defendant states that "disability" or "disabled" means:

> i. if you are eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period[8] and the next 24 months of Disability you are unable to perform all of the material and substantial duties of your occupation[9] on an Active Employment basis because of an Injury or

---

[8]Plaintiff's elimination period was 180 days. Schedule of Benefits, Plan at 3.

[9] "'Material and Substantial Duties' means responsibilities that are normally required to perform your Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." Plan at 9.

15

>Sickness; and
>ii. After 24 months of benefits have been paid, you are unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

Plan at 6-7.

As Defendant explained to Plaintiff, and as is clearly spelled out in the plan itself, the "own occupation" disability determination is not based on whether the claimant can actually perform in his or her own job. Rather, it means "your occupation as it is normally performed in the national economy. Work Tasks performed for a specific employer or at a specific location will not be used to determine Disability." Plan at 9. Therefore, Defendant reasonably put little weight on Ms. Bednar's letter stating that Plaintiff could not be accommodated in his current job.

There is ample evidence in the claim file to support Defendant's final determination. For example, up until his July 24, 2000 letter, all medical information from Dr. Powers indicated that Plaintiff would be able to work a sedentary to light job, including Dr. Powers's own release of Plaintiff to work. On March 24, 2000, even while stating that he would support "some limited disability," Dr. Powers stated that the disability would be because of chronic pain somewhat unrelated to the disc disease for which Plaintiff had sought the doctor's care and for which he was claiming disability benefits. Even on May 5, 2000, when Dr. Powers stated that Plaintiff was not "in any shape to return to any type of activity which requires extended sitting," he released Plaintiff from his care since there was nothing to suggest the return of the disc herniation. The medical records further show that Plaintiff was receiving pain relief from his treatment at the Pain Clinic and his pain medications. On January 24, 2000, during the claimed disability period, a doctor at the pain clinic reported that Plaintiff was "relatively comfortable" and "fairly functional."

16

Defendant was not required under the plan or the law to follow the SSA determination. E.g., Marx v. Meridian Bancorp, Inc., 32 Fed. Appx. 645, 647 (3d Cir. 2002) (unpublished); Rendulic v. Kaiser Aluminum & Chemical Corp., 166 F. Supp. 2d 326, 340 (W.D. Pa. 2001); Dorsey v. Provident Life and Acc. Ins. Co., 167 F.Supp.2d 846, 856, n. 11 (E.D. Pa. 2001), Russell v. Paul Revere Life Ins. Co., 148 F.Supp.2d 392, 409 (D. Del. 2001). The Russell court ruled that "a plan administrator is in no way bound by the determination of the Social Security Administration." 148 F. Supp. 2d at 409 (citing Moats v. United Mine Workers of Amer. Health & Retirement Funds, 981 F.2d 685, 689 (3d Cir. 1992)). The court continues: "a plan administrator's decision on ERISA disability that differs from that of the SSA is not arbitrary and capricious provided it is reasonable and supported by substantial evidence." Id. Here, Defendant considered the SSA determination and made a different determination that was reasonable and supported by the evidence. Contentions by Plaintiff that Defendant was required to follow the SSA decision or "promised" to follow the decision are inapposite. Dr. Hartman's report is not inconsistent with Defendant's FCE findings, stating that Plaintiff was capable of sitting for up to four hours per day with frequent position changes. It was not unreasonable for Defendant to make a determination different than the Social Security disability determination.

In sum, the Court finds that it was not unreasonable for Defendant to conclude that Plaintiff did not qualify for disability benefits under the plan. While the claim file contained some evidence of disability, it also contained substantial evidence that Plaintiff did not meet the plan's definition of disability. It was not unreasonable for Defendant to find that Plaintiff was not totally disabled during the elimination period, and the Court will not uproot the decision of the administrator.

17

## IV. **CONCLUSION**

Under a heightened arbitrary and capricious standard of review, this Court will not disturb Defendant's interpretation or application of its long term disability plan because it is reasonable and supported by substantial evidence. Defendant's argument that the disability award be set off by SSA benefits is moot in light of this decision.

V.   **ORDER**

AND NOW, this 5th day of Nov, 2002, for the reasons stated herein, it is ORDERED THAT judgment be entered against the Plaintiff and in favor of the Defendant on all claims. The Clerk of Court is directed to close the file.

*/s/ Yvette Kane*
Yvette Kane
United States District Judge