2 *

1: CV-01-1797

(55)

12/3/0.

# DEFENSE EXHIBIT INDEX

A.    PLAINTIFF'S COMPLAINT

B.    PLAINTIFF'S AMENDED COMPLAINT

C.    DEFENDANT'S ANSWER TO AMENDED COMPLAINT

D.    NOVEMBER 5, 2002 MEMORANDUM AND DECISION

E.    JUDGMENT IN CIVIL CASE

F.    COPY OF COURT'S OPINION IN JOEL ROSENBAUM v. UNUM LIFE INSURANCE CO. OF AMERICA, 2002 WL 1769899 (E.D. Pa.))

G.    COPY OF COURT'S OPINION IN GERALD L. SPRECHER v. AETNA U.S. HEALTHCARE, INC., 2002 WL 1917711 (E.D. Pa.))

H.    COPY OF COURT'S OPINION IN DIANE KIRKHUFF, ET AL. v. LINCOLN TECHNICAL INSTITUTE INC., ET AL., 2002 WL 1917711 (E.D. Pa.))

I.    COPY OF COURT'S OPINION IN LINDA BELL v. UNUMPROVIDENT CORPORATION, and Provident Life and Insurance Company, 222 F.Supp. 2d 692



MAY 04 '01 18:01 FR LIBERTY MUTUAL   617 574 5783 TO 912159850675   P.03

A

John C. Dowling, Esquire
Attorney I.D. # 07058
RHOADS & SINON LLP
1 South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731
ATTORNEYS FOR PLAINTIFF

| | |
|---|---|
| CRAIG M. HOWARD | : IN THE COURT OF COMMON PLEAS |
| | : DAUPHIN COUNTY, PENNSYLVANIA |
|         Plaintiff | : |
| | : CIVIL ACTION - LAW |
|         v. | : NO: *1596  5 2001* |
| | : |
| LIBERTY LIFE ASSURANCE | : |
| COMPANY OF BOSTON, LIBERTY | : |
| MUTUAL GROUP | : |
| | : |
|         Defendant | : JURY TRIAL DEMANDED |

## NOTICE

YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claim set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR YOU CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

DAUPHIN COUNTY LAWYER REFERRAL SERVICE
213 N. Front Street
Harrisburg, PA 17101
(717) 232-7536

MAY 02 2001 17:31 FR LIBERTY MUTUAL   6037453123 TO 16175745783   P.03

MAY 04 '01 18:01 FR LIBERTY MUTUAL    617 574 5783 TO 9121598506?5    P.04

## A V I S O

USTED HA SIDE DEMANDADO/A EN CORTE.  Si usted desea defenderse de las demandas que se presentan mas adelante en las siguientes paginas, debe tomar accion dentro de los proximos veinte (20) dias despues de la notificacion de esta Demanda y Aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la Corte por escrito sus defensas de, y objecciones a, las demandas presentadas aqui en contra suya.  Se le advierte de que si usted falla de tomar accion como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamacion o remedio solicitado por el demandante puede ser dictado en contra suya por la Corte sin mas aviso adicional.  Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE.  SI USTED NO TIENE UN ABOGADO O NO PUEDE PAGARLE A UNO, LLAME O VAYA A LA SIGUIENTE OFICINA PARA AVERIGUAR DONDE PUEDE ENCONTRAR ASISTENCIA LEGAL.

DAUPHIN COUNTY LAWYER REFERRAL SERVICE
213 N. Front Street
Harrisburg, PA  17101
(717) 232-7536

John C. Dowling, Esquire
Attorney I.D. # 07058
RHOADS & SINON LLP
1 South Market Square
P.O. Box 1146
Harrisburg, PA  17108-1146
(717) 233-5731
ATTORNEYS FOR PLAINTIFF

| | |
|---|---|
| CRAIG M. HOWARD | : IN THE COURT OF COMMON PLEAS |
| | : DAUPHIN COUNTY, PENNSYLVANIA |
| Plaintiff | : |
| | : CIVIL ACTION - LAW |
| v. | : NO: *1596 S 2001* |
| | : |
| LIBERTY LIFE ASSURANCE | : |
| COMPANY OF BOSTON, LIBERTY | : |
| MUTUAL GROUP | : |
| | : |
| Defendant | : JURY TRIAL DEMANDED |

## COMPLAINT

NOW COMES, Plaintiff, Craig M. Howard, through his attorneys, Rhoads & Sinon LLP, and files the within Complaint, as follows:

## PARTIES

1.      Plaintiff, Craig M. Howard, is an adult individual, 43 years of age, who resides at 25 South Lingle Avenue, Palmyra, Lebanon County, Pennsylvania.

2.      Defendant, Liberty Life Assurance Company of Boston (hereinafter "Liberty") is a company within the Liberty Mutual Group and is a corporation or like business entity, domiciled in the State of Massachusetts and licensed to transact business in the Commonwealth of Pennsylvania.

381229.1

3.     Defendant regularly conducts business in Dauphin County selling health insurance throughout Pennsylvania.

4.     Defendant has designated in its insurance contract hereafter set forth as agent for acceptance of legal services

> Penn State Geisinger Systems Services
> 100 North Academy Avenue
> Danville, PA  17822-1526

## COUNT I
## (BREACH OF CONTRACT)

5.     The averments of paragraph 1 through 4 are incorporated herein as more fully set forth.

6.     On or about August 1, 1998, Liberty issued to Penn State Geisinger Health System, a group benefits plan under plan number GF3-810-252761-01 (attached hereto and marked as Exhibit "1"), which policy provided coverage for the employees of the Milton S. Hershey Medical Center under Penn State Geisinger Health System.  The Plan Identification Numbers are a.) Employer IRS Identification No. 23-2164794; b) Plan No. LTD-513.

7.     Plaintiff became employed by the Milton S. Hershey Medical Center in 1987 as a Staff Assistant and as such was an employee of the employer Milton S. Hershey Medical Center under said insurance policy.

2

8.     The Penn State Geisinger long-term disability provision under which Plaintiff is covered, provides:

"Disability" or "Disabled" means:

i.     During the Elimination Period and the next 24 months of Disability you are unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness; and

ii.    After 24 months of benefits have been paid, you are unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

9.     Plaintiff has been totally and continuously disabled as said disability is defined above since January 1, 2000 and his long-term disability subject to 180 day elimination period was effective July 1, 2000.

10.    Plaintiff as an active, fulltime employee is entitled to 2/3 of his basic bimonthly wage of $1,045.60 for such time as his disability shall continue.

11.    Plaintiff has made claim upon Defendant for benefits to date totaling $18,820.00 and continuing into the future until Plaintiff's disability ceases.

12.    Plaintiff has performed all of the conditions of the insured's policy to be performed on his part.

13.    Plaintiff has made proper demand upon Defendant for payment of the benefits due and to be due in the future.

3

14.    Defendant through its authorized agent, servant or employee Chuck Johnson, (designated Appeal Review Consultant) through letter to Plaintiff's attorney of February 28, 2001, has denied Plaintiff's claim stating, "At this time, Mr. Howard's administrative rights to review have been exhausted and no further reviews will be conducted by Liberty Life Assurance Company of Boston", and concluding, "We have rendered our final determination of this claim and will now close our file".

## COUNT II
## (BAD FAITH)

15.    The averments of paragraph 1 through 14 are incorporated herein as more fully set forth.

16.    Pursuant to the insurance policy contracted between Plaintiff and Defendant, Defendant was under a duty at all times relevant hereto to act in good faith towards its insured, Plaintiff Craig M. Howard.

17.    The aforesaid duty included a requirement that Defendant consider the interest of Plaintiff as a factor in coming to a decision as to whether or not to accept this long term disability claim.

18.    Defendant materially breached the aforesaid duty of good faith toward Plaintiff and, pursuant to 42 Pa. C.S.A. § 8371 Defendant's conduct in such breach was in bad faith against Plaintiff in that Defendant had no reasonable basis for denying benefits and the Defendant knew or recklessly disregarded the lack of a reasonable basis for such denial in that:

4

MAY 04 '01 18:03 FR LIBERTY MUTUAL      617 574 5783 TO 912159850675      P.09

(a)   Recklessly ignored the extensive medical findings of Plaintiff's treating physicians attesting to his total disability as defined within the parameters of Defendant's insurance policy;

(b)   Recklessly relied on the incomplete and invalid findings of its own Medical Director who did not examine Plaintiff but merely reviewed his medical file, and on incomplete and incorrect examination by a physical therapist;

(c)   Failed to have Plaintiff examined by a physician of its choosing or to arrange for an independent medical examination;

(d)   Refused to pay Plaintiff's physician, Dr. Powers, for additional medical documentation in support of Plaintiff's claim;

(e)   Ignored a letter from Plaintiff's employer attesting to his inability to perform work allowing for hourly brakes as recommended by Plaintiff's doctor; and attesting to his inability to serve in his previous position at Hershey Medical Center; and

(f)   Advised Plaintiff that his claim was denied before receiving its Medical Director's findings or the results of its functional capacity evaluation.

19.   At all times relevant hereto Plaintiff fully complied with all obligations, terms and conditions of the aforesaid insurance policy with Defendant.

20.   As a result of Defendant's breach of its duty of good faith and Defendant's bad faith conduct as described above, Plaintiff is entitled to and hereby seeks damages pursuant to 42 Pa. C.S.A. §8371 as well as common law contractual remedies, as follows:

5

MAY 02 2001 17:32 FR LIBERTY MUTUAL      6093433123 TO 16175745783      P.09

(a)    Interest on the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus three percent (3%);

(b)    Punitive damages against the Defendant;

(c)    Court costs and attorney fees against the Defendant.

WHEREFORE, Plaintiff requests that this Honorable Court enter judgment against Defendants in an amount in excess of the applicable limits of arbitration.

RHOADS & SINON LLP

By: _____

John C. Dowling
One South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731

Attorneys for Plaintiffs

Date: _April 5, 2001_____

6

MAY 04 '01 18:04 FR LIBERTY MUTUAL    617 574 5783 TO 912159850675    P.11

## VERIFICATION

I hereby affirm that the following facts are correct:

I am the Plaintiff herein.

The attached Complaint is based upon information which I have furnished to my counsel and information which has been gathered by my counsel in preparation of my lawsuit. The language of the Complaint is that of counsel and not of me. I have read the Complaint and, to the extent that the Complaint is based on information which I have given to my counsel, it is true and correct to the best of my knowledge, information and belief. To the extent that the content of the Complaint is that of counsel, I have relied upon counsel in making this Verification. I hereby acknowledge that the facts set forth in the aforesaid Complaint are made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date: ___3/21/01___                    _____

                                        CRAIG M. HOWARD

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRAIG M. HOWARD | : | |
| Plaintiff | : | |
| | : | |
| v. | : CASE NO: 1:CV-01-797 | |
| | : | |
| LIBERTY LIFE ASSURANCE | : JUDGE KANE | |
| COMPANY OF BOSTON | : | |
| Defendant | : JURY TRIAL DEMANDED | |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. : | | |

FILED
HARRISBURG, PA

JUL 1 ? 200?

MARY E. D'ANDREA, CLE
Per _____
Deputy Clerk

*Amended* **COMPLAINT**

1.    Plaintiff, Craig M. Howard, is an adult individual, 43 years of age, who resides at 25 South Lingle Avenue, Palmyra, Lebanon County, Pennsylvania.

2.    Defendant, Liberty Life Assurance Company of Boston (hereinafter "Liberty") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 175 Berkeley Street, Boston, MA 02117.

3.     Defendant regularly conducts business in Dauphin County selling health insurance throughout Pennsylvania.

4.     This action arises under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 et seq., and jurisdiction of this Court is invoked under 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331.

5.     On or about August 1, 1998, Liberty issued to Penn State Geisinger Health System, a group benefits plan under plan number GF3-810-252761-01 (attached hereto and marked as Exhibit "1"), which policy provided coverage for the employees of the Milton S. Hershey Medical Center under Penn State Geisinger Health System.  The Plan Identification Numbers are a.) Employer IRS Identification No. 23-2164794; b) Plan No. LTD-513.

6.     Plaintiff became employed by the Milton S. Hershey Medical Center in 1987 as a Staff Assistant and as such was an employee of the employer Milton S. Hershey Medical Center under said insurance policy.

7.     The Penn State Geisinger long-term disability provision under which Plaintiff is covered, provides:

"Disability" or "Disabled" means:

i.     During the Elimination Period and the next 24 months of Disability you are unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness; and

ii.     After 24 months of benefits have been paid, you are unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

8.      Plaintiff has been totally and continuously disabled as said disability is defined above since January 1, 2000 and his long-term disability subject to 180 day elimination period was effective July 1, 2000.

9.      Plaintiff as an active, fulltime employee is entitled to 2/3 of his basic bimonthly wage of $1,045.60 for such time as his disability shall continue.

10.     Plaintiff has made claim upon Defendant for benefits due to date and continuing into the future until Plaintiff's disability ceases.

11.     Plaintiff has fully complied with all the conditions in order to receive such benefits.

12.     Plaintiff has made proper demand upon Defendant for payment of the benefits due and to be due in the future.

13.     Defendant through its authorized agent, servant or employee Chuck Johnson, (designated Appeal Review Consultant) through letter to Plaintiff's attorney of February 28, 2001, has denied Plaintiff's claim stating, "At this time, Mr. Howard's administrative rights to review have been exhausted and no further reviews will be conducted by Liberty Life Assurance

3

Company of Boston", and concluding, "We have rendered our final determination of this claim and will now close our file".

14.    The above-mentioned decision by Defendant which denied Plaintiff of the rights and benefits due Plaintiff under the above-mentioned disability policy was arbitrary, illegal, capricious, unreasonable, and not made in good faith and is breach of Defendant's fiduciary duty which is owed to Plaintiff, in that Defendant:

(a)    Recklessly ignored the extensive medical findings of Plaintiff's treating physicians attesting to his total disability as defined within the parameters of Defendant's insurance policy;

(b)    Recklessly relied on the incomplete and invalid findings of its own Medical Director who did not examine Plaintiff but merely reviewed his medical file, and on incomplete and incorrect examination by a physical therapist;

(c)    Failed to have Plaintiff examined by a physician of its choosing or to arrange for an independent medical examination;

(d)    Refused to pay Plaintiff's physician, Dr. Powers, for additional medical documentation in support of Plaintiff's claim;

(e)    Ignored a letter from Plaintiff's employer attesting to his inability to perform work allowing for hourly brakes as recommended by Plaintiff's doctor; and attesting to his inability to serve in his previous position at Hershey Medical Center; and

4

(f)     Advised Plaintiff that his claim was denied before receiving its Medical Director's findings or the results of its functional capacity evaluation.

15.    Defendant insurance company pays benefits out of its own funds.

16.    Defendant insurance company determines benefit eligibility and administers plan funds.

17.    Defendant insurance company both determines eligibility for benefits and pays the benefits out of its own funds.

18.    Therefore, there is a conflict of interest and bias amounting to an arbitrary and capricious denial decision.

19.    Defendant's decision as set forth above denies Plaintiff of the rights and benefits due under the above mentioned policy and was bias and prejudicial as the result of the inherent conflict of interest.

WHEREFORE, Plaintiff requests judgment be entered against Defendant as follows:

(a)    Ordering Defendant to pay Plaintiff all benefits due under said policy for continuing long-term disability benefits;

(b)    Awarding Plaintiff pre-judgment interest from the inception of Plaintiff's disability until the date of judgment;

(c)    Awarding Plaintiff attorney's fees, court costs and all other reasonable costs incurred; and

5

(d)    Granting Plaintiff such other and further relief as the court may deem just

and proper.

RHOADS & SINON LLP

By:    _____

John C. Dowling, Esquire
Attorney I.D. No. 07058
One South Market Square
P. O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731

Attorneys for Plaintiff

Date: _____

6

## VERIFICATION

I hereby affirm that the following facts are correct:

I am the Plaintiff herein.

The attached Complaint is based upon information which I have furnished to my counsel and information which has been gathered by my counsel in preparation of my lawsuit. The language of the Complaint is that of counsel and not of me. I have read the Complaint and, to the extent that the Complaint is based on information which I have given to my counsel, it is true and correct to the best of my knowledge, information and belief. To the extent that the content of the Complaint is that of counsel, I have relied upon counsel in making this Verification. I hereby acknowledge that the facts set forth in the aforesaid Complaint are made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date: _7/6/01_

_____
CRAIG M. HOWARD

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CRAIG M. HOWARD | : |
| Plaintiff | : |
| | : |
| v. | : CASE NO: 1:CV-01-797 |
| | : |
| LIBERTY LIFE ASSURANCE | : JUDGE KANE |
| COMPANY OF BOSTON | : |
| | : |
| Defendant | : JURY TRIAL DEMANDED |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**CERTIFICATE OF SERVICE**

I, John C. Dowling, Esquire, hereby certify that a true and correct copy of the foregoing Plaintiff's Complaint was served this _1/_ day of July, 2001, via United States Mail, First Class, postage pre-paid, upon the following individual:

William C. Foster, Esquire
Kelly, McLaughlin & Foster
1617 J.F.K. Boulevard, Suite 1690
Philadelphia, PA 19103

RHOADS & SINON LLP

BY: _____
John C. Dowling, Esquire

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CRAIG M. HOWARD** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No.  1:CV-01-0797** |
| | : | |
| **v.** | : | |
| | : | **Judge Kane** |
| **LIBERTY LIFE ASSURANCE** | : | |
| **COMPANY OF BOSTON,** | : | |
| **LIBERTY MUTUAL GROUP** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**ANSWER TO AMENDED COMPLAINT
WITH AFFIRMATIVE DEFENSES**

The Answer with affirmative defenses of Defendant Liberty Life Assurance Company of Boston ("Liberty Life") to the Amended Complaint of Craig M. Howard respectfully represents as follows:

1.     Admitted that Plaintiff is an adult individual who resides at the  stated address. The remaining allegations of  this Paragraph are denied. Based upon documents that have been provided by Plaintiff to Liberty Life , Plaintiff is 44 years of age at the present time.

2.     Admitted.

3.     It is admitted that Liberty Life conducts business in Dauphin County, Pennsylvania and it is admitted that Liberty Life sells Group Long Term Disability insurance in the Commonwealth of Pennsylvania. The remaining allegations of Paragraph 3 are conclusions of law to which  no responsive pleading is required.

4.     Admitted.

5.     Denied as stated. It is admitted that a Plan identified as " Geisinger Health System

Welfare Plan" (the "Plan") was in existence on August 1, 1998 and it is admitted that identification numbers applicable to that Plan were IRS Identification No. 23-2164794 and Plan No. 513. It is furthermore admitted that Policy Number GF3-810-252761-01 (the "Policy") was issued by Liberty Life. This Policy provided certain disability coverages for certain individuals who meet the definition of disability set forth in the Policy. It is denied that the Policy is attached to Plaintiff's Complaint and marked Exhibit "1".

      6.      Liberty Life is without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph.

      7.      Denied as stated. It is averred, to the contrary, that the Policy provides, *inter alia*, as follows:

> "Disability" and "Disabled" means:
>
> i.      If you are eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability you are unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness; and

It is admitted that section (ii) of the definition of "Disability" and "Disabled" provides as set forth by Plaintiff.

      8.      Admitted in part; denied in part. It is admitted that Plaintiff has made a claim for disability benefits, asserting that he last worked in January 2, 2000 and it is admitted that the Elimination Period for persons entitled to disability benefits in accordance with the terms of the Plan's Certificate of Coverage is 180 days. It is denied that Plaintiff is entitled to disability benefits under the Policy because he does not meet the definition of disability set forth in the Policy. The

remaining allegations set forth in this Paragraph are denied.

9.    Denied. It is admitted that Plaintiff has made a claim for disability benefits and it is admitted that the benefits schedule provides for certain benefits for disabled persons. It is denied that Plaintiff is entitled to disability benefits under the Policy because he does not meet the definition of disability set forth in the Policy. The remaining allegations set forth in this Paragraph are denied.

10.    Admitted in part; denied in part. It is admitted that Plaintiff has made a claim for disability benefits upon Liberty Life. It is denied that Plaintiff is totally and permanently disabled and it is denied that he is entitled to benefits under the terms of the Policy. The remaining allegations of this Paragraph are denied.

11.    Admitted in part; denied in part. It is admitted that Plaintiff has made a claim for disability benefits upon Liberty Life. It is denied that Plaintiff has fully complied with the terms of the Policy to receive benefits, and it is denied that Plaintiff is totally and permanently disabled. The remaining allegations of this Paragraph are denied.

12.    Admitted in part; denied in part. It is admitted that Plaintiff has made a claim for disability benefits upon Liberty Life. It is denied that benefits are due and are to be due to Plaintiff in the future. The remaining allegations of this Paragraph are denied.

13.    It is admitted that Chuck Johnson, an Appeal Review Consultant employed by Liberty Life, wrote a letter dated February 28, 2001 and it is admitted that this letter, inter alia. made the statements set forth in this Paragraph. The remaining allegations contained in this Paragraph are denied as the correspondence dated February 28, 2001 is a document which speaks for itself. By way of further response, additional information was also set forth in this letter. A copy

3

of this letter is attached hereto and marked Exhibit "A".

14(a)-(f).    Denied. The allegations contained in Paragraphs 14(a) through (f), inclusive, are conclusions of law which are denied.  By way of further response, it is denied that Defendant Liberty Life acted in an arbitrary, illegal, capricious, unreasonable, reckless, not in good faith, or breached its fiduciary duty at any time or in any manner.  It is averred, to the contrary, that Liberty Life properly handled Plaintiff's claim at all times. Further,  Plaintiff is not entitled to disability benefits under the Policy because he does not meet the definition of disability set forth in the Policy.

15.    Denied as stated.  It is admitted that Liberty Life pays Long Term Disability benefits to claimants who qualify for such benefits under certain policies of insurance and it is admitted that these payments are made from funds derived from premium payments made to Liberty Life by its policyholders.

16.    It is admitted that Liberty Life determines eligibility for benefits under the  Policy of Insurance referred to at paragraph 5 of this Complaint.

17.    Denied as stated.  It is admitted that Liberty Life determines eligibility for benefits and pays Long Term Disability benefits to claimants who qualify for such benefits under certain policies of insurance and it is admitted that these payments are made from funds derived from premium payments made to Liberty Life by its policyholders .

18.    Denied. The allegations contained in this Paragraph are conclusions of law which are denied. By way of further response, it is denied that that the decisions made by Liberty Life in this case resulted from any alleged conflict of interest or bias. It is also denied that Liberty Life acted in an arbitrary or capricious manner in the handling of this claim.

19.    Denied.  The allegations contained in this Paragraph are conclusions of law which

4

are denied. By way of further response, it is denied that Plaintiff is entitled to benefits under the terms of the Policy, and it is denied that Liberty Life acted with bias or prejudice toward Plaintiff.

WHEREFORE, Defendant Liberty Life Assurance Company of Boston respectfully requests that this Honorable Court dismiss Plaintiff's Complaint with prejudice.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, controlled and limited the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA")

## SECOND AFFIRMATIVE DEFENSE

At all times material hereto, Liberty Life acted  reasonably and in good faith.

## THIRD AFFIRMATIVE DEFENSE

Liberty Life's actions were supported by substantial evidence. These actions were not arbitrary, capricious or an abuse of discretion.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claim does not fall within the scope of coverage of the Policy referred to in this Answer and it is barred by the terms, conditions, definitions, exclusions and limitations set forth in that Policy.

## FIFTH AFFIRMATIVE DEFENSE

Liberty Life provided adequate written notice of the denial to Plaintiff.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a cause of action or claim upon which relief can be granted.

5

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claim is precluded by the determination of Liberty Life that Mr. Howard is not entitled to benefits. This denial was appealed by the claimant pursuant to the provisions of the Plan of Geisinger Health System, which Plan was established pursuant to the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA"), and, February 28, 2001, Liberty Life upheld the denial. This determination is final and, as a result of it, Plaintiff is not entitled to proceed with this claim.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff asserts state law claims, all such claims are barred and preempted by the provisions of the Employee Retirement Income Security Act 29 U.S.C. §1001 et seq. ("ERISA")

## NINTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff's complaint seeks to assert claims for breach of contract, breach of the obligation of good faith and fair dealing and claims of bad faith denial of benefits, all such claims are barred and preempted by the provisions of the Employee Retirement Income Security Act 29 U.S.C. §1001 et seq.("ERISA")

WHEREFORE, Defendant Liberty Life Assurance Company of Boston respectfully requests that the Court enter an Order dismissing the Complaint of Plaintiff, with prejudice, and entering judgment in its favor.

KELLY, McLAUGHLIN & FOSTER

By: _____
William C. Foster, Esquire
Identification No. 03511
Attorneys for Defendant
Liberty Life Assurance Company
of Boston

7

EXHIBIT A



**Liberty Mutual**

Liberty Mutual Group

Group Disability Claims
PO Box 1525
Dover, NH 03821
(603) 749-2600

February 28, 2001

Rhoads & Sinon, LLP
Attorneys at Law
Attn: John Dowling
One South Market Square
PO Box 1146
Harrisburg PA  17108-1146

RE:    Long Term Disability Benefits
       Penn State Geisinger
       Claimant:    Mr. Craig Howard
       Claim #: 641498

Dear Attorney Dowling:

We have completed our review of your request for reconsideration of Mr. Craig Howard's Long Term Disability claim and have determined we are unable to alter our original decision to deny his benefits.

As stated in our letter of July 25, 2000, the Penn State Geisinger Long Term Disability policy, under which he is covered, states:

*"Disability" or "Disabled" means:*

i. *During the Elimination Period and the next 24 months of Disability you are unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness; and*

ii. *After 24 months of benefits have been paid, you are unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.*

The basis for Mr. Howard's denial was outlined in our letter of July 25, 2000, which is enclosed for your review.

we offer more secure lives.

February 28, 2001
Craig Howard
Page 3.

We received your letter dated December 19, 2000, on Mr. Howard's behalf, and the additional documentation. However, this information was already contained in Mr. Howard's file. On January 16, 2001, Mr. Howard informed us that Dr. Powers' office never received the copy of the FCE. We faxed another copy of the evaluation to Dr. Powers' office, attention Jamie, on January 17, 2001, asking for Dr. Powers' comment. We sent you a letter updating you on the status of Mr. Howard's appeal and asked for any additional medical records you wished to be part of Mr. Howard's appeal be submitted by January 31, 2001. To date, we have not received any additional medical documentation or a response from Dr. Powers.

In our attempt to provide a full and fair review, we referred Mr. Howard's file to our Medical Director, Dr. Edward Crouch. On February 7, 2001, Dr. Crouch called Dr. Powers' office in order to schedule a time convenient for Dr. Powers to discuss Mr. Howard's condition. Dr. Crouch was informed to call back on Monday, February 12, 2001. Dr. Crouch called back on February 12, 2001, and left a message asking Dr. Powers to return his call. To date, there has been no response from Dr. Powers' office to discuss the patient or to schedule a time to discuss the patient.

Mr. Howard's occupation, as a Staff Assistant, is considered sedentary and no heavy lifting is involved. He has the ability to modify positions or activities based upon physical need. Thus, it has been determined that Mr. Howard has the physical functional capacity to perform the material and substantial duties of his occupation. Therefore, he does not meet the definition of disability under the terms of Penn State Geisinger's disability policy and no benefits are payable.

Under ERISA guidelines, Mr. Howard was entitled to appeal the determination made by Liberty Life Assurance Company of Boston, and submit any additional information wished to be considered as part of the appeal. Liberty Life Assurance Company of Boston conducted a full and fair review of the appeal and accompanying materials and notified you and Mr. Howard of the results of that review. At this time, Mr. Howard's administrative rights to review have been exhausted and no further reviews will be conducted by Liberty Life Assurance Company of Boston.

*February 28, 2001*
*Craig Howard*
*Page 2.*

We received Mr. Howard's appeal letter and a medical narrative from Dr. Powers on July 31, 2000. As outlined in our letter of October 6, 2000, we were in the process of obtaining authorization from Dr. Powers to proceed with a Functional Capacities Evaluation. This was completed and the exam was scheduled for September 22, 2000. At that time, Mr. Howard informed us that he would be unable to attend that exam and that he recently had an exam performed by the Social Security Administration. Mr. Howard agreed to obtain a copy of the evaluation and submit it to us for review.

On October 25, 2000, we received a copy of Mr. Howard's Social Security award letter, a letter from Ms. Mary Bednar at Hershey Medical Center, and the first page of the evaluation performed on May 11, 2000, by Dr. Stuart A. Hartman, D.O. for the Social Security Administration. On November 3, 2000, we received the remainder of the exam from Dr. Hartman.

Based on the results of this examination, it was determined we would schedule an additional FCE, with a physical therapist. The Functional Capacities Evaluation was performed on November 9, 2000. After performing a battery of tests, the results of the evaluation concluded:

> *The results of this evaluation indicate that Craig M. Howard is best suited for a sedentary and/or light work category for an 8 hour day (US Dept. of Labor). His maximum occasional lifts were 31 and 21 pounds. His sitting tolerance was demonstrated on an occasional basis and required frequent positional changes. He tolerated standing and walking on a frequent basis.*

> *It is the opinion of this evaluation team that these results represent Mr. Howard's minimal capabilities and not his maximal capabilities.*

The results of this examination were forwarded to Dr. Powers, Mr. Howard's treating physician, for comment and additional medical documentation if he disagreed with the findings. On December 20, 2000, we received a fax from Dr. Powers' office stating that pre-payment of $250.00 was needed in order to provide any comment.

February 28, 2001
Craig Howard
Page 4.

Determinations made by Liberty Life Assurance Company of Boston are based on the provisions outlined in the Penn State Geisinger policy. These provisions are not contingent on decisions made by the Social Security Administration.

We have rendered our final determination of this claim and will now close our file.

Sincerely,

Chuck Johnson
Appeal Review Consultant

cc:    Craig Howard
       25 S Lingle Ave
       Palmyra PA  17078

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRAIG M. HOWARD | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 1:CV-01-0797 |
| | : | |
| v. | : | |
| | : | |
| LIBERTY LIFE ASSURANCE | : | JURY TRIAL DEMANDED |
| COMPANY OF BOSTON, | : | |
| LIBERTY MUTUAL GROUP | : | |
| | : | |
| Defendant. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, William C. Foster, Esquire, hereby certify that a true and correct copy of Defendant

Liberty Life Assurance Company of Boston's Answer to Plaintiff's Amended Complaint with

Affirmative Defenses was served this 1st day of August, 2001, via UPS Overnight Mail, postage

pre-paid, upon the following individual:

John C. Dowling, Esquire
Rhoads & Sinon, LLP
1 South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146

KELLY, McLAUGHLIN & FOSTER

By: _____

WILLIAM C. FOSTER, ESQUIRE
Attorney for Defendant
Liberty Life Assurance Company of Boston

Dated: 8/1/01

8

D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG M. HOWARD                    :
      Plaintiff                          :
                                     :
      v.                                 :    CIVIL ACTION NO. 1:CV-01-797
                                       :    (Judge Kane)
LIBERTY LIFE ASSURANCE             :
COMPANY OF BOSTON,                 :
LIBERTY MUTUAL GROUP               :
      Defendant                          :

**FILED**
HARRISBURG

NOV – 5 2002

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## MEMORANDUM AND DECISION

### I.    INTRODUCTION

      This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§ 1001 et seq. ("ERISA"). Plaintiff is challenging an adverse long-term disability determination

made by Defendant. There was a one-day bench trial of this matter on July 22, 2002. The Court

now makes the following findings and fact and conclusions of law.

### II.    FINDINGS OF FACT

1.    Plaintiff started working for Hershey Medical Center in May, 1985. Claim Form, Def.
      Tr. Br. Exh. 1 ("claim file") at 247.

2.    Plaintiff worked in the billing department as a staff assistant. His position was that of
      medical billing clerk, which involved data entry. He worked a regular eight hour day
      with two fifteen minute breaks and a half-hour lunch. Bednar letter, Pl. Tr. Br. Exh. J;
      Employer's Statement, claim file at 241.

3.    Through his employment with Hershey Medical Center, Plaintiff enrolled in a group long
      term disability insurance plan sponsored by Geisinger Health Systems, effective August
      1, 1998. Defendant funds and administers the plan. Def. Tr. Br. Exh. 2 ("Plan").

4.    Plaintiff submitted a disability claim form on May 5, 2000. Claim file at 242-247.

5.    The claim form indicated that Plaintiff had last worked on January 2, 2000 and it was
      unknown when he would be able to return to work due to his disability, namely
      degenerative disk disease. Plaintiff indicated on the form that the disease began on

October 30, 1996.  Claim file at 242, 244.

6.   Plaintiff's treating physicians were Dr. Stephen Powers, neurosurgeon, Dr. Dan Gelb, orthopaedic surgeon, and Dr. Andrew Wren, general practitioner.  Claim file at 244, 229.

7.   Dr. Powers completed the Physician certification section of Plaintiff's claim form, indicating a diagnosis of recurrent herniated disc.  Claim file at 243.[1]

8.   The claim file includes a Employer's Statement, completed by an individual in Human Resources and received by Defendant on May 11, 2000.  Claim file at 241.

9.   On May 12, 2002, Felicia Boyd, a claims analyst employed by Defendant and assigned to Plaintiff's claim, requested supplemental forms from Plaintiff and medical records from Dr. Powers.  Claim file at 239-40.

10.  Mr. Howard completed Defendant's Activities Questionnaire and Supplementary Statement and returned them to Defendant on May 16, 2000.  Claim file at 233-37.

11.  After an authorization was received, Dr. Powers's office sent medical records to Defendant on June 12, 2000.  Claim file at 228.

12.  Hershey Medical Center transmitted medical records to Defendant.  The records included treatment and surgery records from Dr. Powers, and correspondence from Plaintiff's other doctors, Dr. Gelb and the physicians at the Pain Clinic, relating to Plaintiff's treatment dating from January 14, 2000 forward.  Claim file at 190-227.

13.  The medical records in the claim file show that:

   a.   Plaintiff had surgery for disk herniation in 1997 and again in 1998.  Claim file at 202, 204.

   b.   Dr. Powers first saw Plaintiff on January 14, 2000, and diagnosed him with recurrent disc herniation.  Claim file at 200, 202.  Dr. Powers indicated in his letter to Dr. Wren that Plainiff's pain was "starting to interfere with his ability to work."  Claim file at 202.

   c.   Plaintiff also received continuing treatment at the Pain Medicine and Palliative

---

[1]Defendant, in its Proposed Findings of Fact and Conclusions of Law (Doc. No. 25), asserts that on the second page of the physician's statement, Dr. Powers indicated a "Class 4 physical impairment."  However, this page of the claim form is missing from the Court's copy of the claim file.  Therefore, although Dr. Powers's alleged indication that Plaintiff could perform sedentary work was perhaps material to Defendant's disability determination, the Court will not make a finding regarding this indication.

Care Center at Hershey Medical Center ("Pain Clinic") from at least 1998. The doctors at the Pain Clinic conducted various procedures to alleviate Plaintiff's lower back and leg pains, including radiofrequency ablation and regular trigger point injections. Claim file at 204, 214, 217, 222. Dr. Zolyomi at the Pain Clinic indicated on January 24, 2000 that Plaintiff was "relatively comfortable" and "fairly functional." Claim file at 204-205.

d.    Plaintiff had an MRI scan on January 20, 2000. Dr. Powers evaluated this and concluded that Plaintiff suffered from, among other things, a "significant recurrent disc" and a "free fragment of disc" on the L5 nerve root. Dr. Powers recommended another surgery to remove the recurrent disc. The surgery was not intended to improve Plaintiff's leg pain. Dr. Powers indicated that his goal was for Plaintiff to return to work by March 1, 2000. Claim file at 210-211.

e.    Dr. Powers successfully performed the surgery on February 10, 2000. Claim file at 297-99.

f.    On February 25, 2000, Dr. Powers reported that Plaintiff was doing "100% better." Dr. Powers released Plaintiff to work part-time beginning March 6, 2000 and full-time beginning March 27, 2000. Claim file at 220.

g.    Approximately one month after the surgery, Plaintiff's leg pain subsided but his back pain increased to the level of pain before the operation. March 8, 2000 letter from Pain Clinic doctor, Claim file at 214. Dr. Zolyomi concluded that the acute pain was a result of the surgery and that it would gradually subside. Plaintiff was prescribed physical therapy and continued to take Vicodin and Naprosyn for pain management. Id.

h.    On March 24, 2000, Dr. Powers stated that his exam of Plaintiff showed no evidence of radiculopathy. Dr. Powers stated that he would "support some limited disability in [Plaintiff's] case because of continued pain," however, Dr. Powers concluded that the pain was a symptom of "a chronic low back pain problem which is somewhat separate from the disc problem that he presented to me [previously.]" Claim file at 216.

i.    On May 5, 2000, Dr. Powers reported that Plaintiff was not "in any shape to return to any type of activity which requires extended sitting." However, Dr. Powers also stated that Plaintiff could work where he would be able to sit and stand frequently, although that limitation was not compatible with his job as a billing clerk. Dr. Powers prescribed an anti-depressant, recommended follow up at the Pain Clinic, and released him from his care, since there was nothing on his exam "to suggest a new root problem or recurrent disc herniation." Claim file at 219.

14.    Debra Redfern, a registered nurse employed by Defendant, reviewed the medical

3

information in Plaintiff's claim file. Her incomplete notes are contained in the claim file at 181–186.[2]

15.  Based on the medical records and a consultation with Ms. Redfern, Ms. Boyd determined that the objective medical evidence did not support a finding of total disability from Plaintiff's own occupation. Claim file at 178, 179, 187.[3]

16.  On July 25, 2000, Defendant sent Plaintiff a letter of determination. Claim file at 171-175. The letter stated that the "current medical information that we have obtained does not demonstrate sufficient functional limitations to prevent you from performing all of the material and substantial duties of your occupation as Staff Assistant." Id. at 172. The letter explained the reasons for this determination, detailed the medical information on file, and informed Plaintiff of his rights under ERISA. Id. at 172-75.

17.  On July 24, 2000, Dr. Powers wrote a letter to Ms. Boyd regarding Plaintiff's disability determination. He indicated that despite three back surgeries, Plaintiff "still has significant back pain and continues to be treated by the Pain Clinic here for his chronic pain disorder and depression." Dr. Powers attributed the chronic low back pain to a "significant spinal disease" and wrote that Plaintiff "is unable to sit for extended periods of time (more than five minutes or so at a stretch), and as such is incapable of working even a clerical or sedentary type job which requires his staying at a single work station." Dr. Powers concluded his letter by stating that he "would consider [Plaintiff] entirely disabled at this time from returning to any type of work activity. I do not expect his condition to improve, and in fact, I expect it to worsen as he gets older due to the degenerative nature of his condition." Claim file at 166.

18.  Dr. Powers's letter was dated July 24, 2000, but was not received by Defendant until July 26, 2000 at the earliest, after it had made its disability determination. Claim file at 166 (received time indication on bottom of letter "Jul. 26 7:04 a.m."). The letter was again sent by Plaintiff by fax to Mr. Richard Adkins, Ms. Boyd's manager in the claims department, on July 31, 2000 as additional information to support Plaintiff's claim. Claim file at 163-65.

19.  Plaintiff formally appealed Defendant's disability determination and Ms. Boyd sent him a letter on August 10, 2000 acknowledging receipt of his request for review. Claim file at 160.

---

[2] The notes are incomplete since several of the sections abruptly cut off and are not contained in full in the claim file. See, e.g., "info note" and "assessment note" sections at 186. However, the notes seem to be accurate summaries of the medical documentation.

[3] Ms. Boyd's recommendation was apparently approved by her manager, but the copies of the claim information forms provided are illegible. Claim file at 176-177.

20.   Ms. Boyd discussed the new letter sent by Dr. Powers with Ms. Redfern, who indicated
      that the letter did not support Plaintiff being totally disabled from his own occupation.
      Ms. Redfern suggested a Functional Capacities Evaluation ("FCE") and pharmacy check.
      Claim file at 161.

21.   A pharmacy check was requested by Ms. Boyd on August 10, 2000. Claim file at 158.
      The pharmacy check was completed by Intertel, Inc. on August 22, 2000. 148-48, 155.
      On August 31, 2000, Intertel provided copies of pharmacy reports from Rite Aid
      Pharmacy in Palmyra, Pennsylvania, where Plaintiff had filled nine prescriptions between
      1994 and 1997, and Palmyra Pharmacy in Palmyra, Pennsylvania, where Plaintiff had
      filled approximately fifty prescriptions since 1998. Claim file at 131-140.

22.   Sometime before August 23, 2000, Ms. Redfern attempted to get a prescription for a FCE
      from Dr. Powers. Claim file at 152. A prescription not signed by Dr. Powers was written
      for a FCE and faxed to Defendant on August 23, 2000. Claim file at 151. Another
      prescription for a FCE, written by Dr. Powers, was sent to Defendant on October 23,
      2000. Claim file at 110.

23.   In October and November of 2000, Plaintiff sent additional information to Mr. Adkins
      after filing his appeal. This information included:

      a.   The July 24, 2000 letter of Dr. Powers discussed above at No. 16. Claim file at
           115.

      b.   Plaintiff's Pennsylvania Bureau of Disability Determination, dated May 11, 2000
           with the first page of an evaluation by Dr. Stuart Hartman. SSA found Plaintiff
           disabled as of December 24, 1999 and awarded him $1024 monthly benefits.
           Claim file at 113, 116. Plaintiff re-sent Dr. Hartman's report in full on November
           2, 2000, Claim file at 106-107. Dr. Hartman's report diagnosed Plaintiff with
           chronic low back pain, degenerative disc disease, failed back surgery syndrome,
           and a right sacroiliac syndrome. Dr. Hartman concluded that Plaintiff is
           "functionally limited due to poor mobility but his strength is functional." Claim
           file at 106. He indicated that he completed a "medical source statement of
           claimant's ability to perform work-related activities," which was included in the
           transmission at 104-105. This statement indicates that Dr. Hartman found
           Plaintiff able to lift and carry up to ten pounds, stand and walk for one to two
           hours per day, and sit for up to four hours with frequent position changes. Claim
           file at 105.

      c.   A letter written by Dr. Gelb on October 13, 1999. The letter states that Plaintiff is
           under Dr. Gelb's care for failed back surgery syndrome and Dr. Gelb "consider[s
           Plaintiff] to be permanently completely disabled." It provides no further detail or

5

medical basis for this conclusion. Claim file at 114.[4]

    d.    A letter written to Mr. Adkins from Mary Bednar, Plaintiff's employer, on October 18, 2000. Ms. Bednar stated that "it is not possible for a billing clerk to remove themselves from the work space for five or ten minutes hourly." She asked Mr. Adkins to reconsider the disability determination as Plaintiff "is unable to serve in his previous position at Hershey Medical Center." Claim file at 112.

    e.    Undated MRI reports sent by Plaintiff on November 2, 2000. Claim file at 100-103. The report of Plaintiff's lumbar spine and lower thoracic spine is from the MRI ordered by Dr. Powers in January, 2000. The findings were indicated in Dr. Powers's treatment notes which were included in Plaintiff's original claim file. This report did not add anything to the medical evidence. Claim file at 101-102. The other MRI report is related to complaints of neck pain, the first indication of this complaint in the file. Claim file at 100. See also Notes of Testimony (hereafter "NT") at 31 (Plaintiff testifying that Dr. Powers referred him to the "doctor which [sic] did my neck operation" in May, 2001). The reviewing doctor was Dr. Huq, not someone indicated by Plaintiff as a treating physician in other documents. This report is beyond the scope of Defendant's disability investigation since it was unrelated to the disability claimed by Plaintiff.

24.    A FCE was scheduled for Plaintiff to occur sometime in September or October. Claim file at 119, 129. This FCE was cancelled at the request of Mr. Adkins because Plaintiff stated that he had already done a FCE through the Social Security Administration ("SSA") and that Mr. Johnson,[5] an employee of Defendant, agreed that he would accept that FCE rather than conduct another one. Claim file at 129; NT at 13-14, 20-24.

25.    The report that Plaintiff thought was an FCE was not in fact an FCE, but a SSA medical source statement (discussed above at 22(e)). Defendant re-scheduled a FCE for Plaintiff. This confusion about the SSA determination and FCE led to a delay in the appeal that was not the fault of Plaintiff or Defendant. NT 20-24.

26.    Ms. Boyd requested a "non-medical investigation" (surveillance) on November 3, 2000 with Claims Verification Inc. ("CVI"). The surveillance was to take place on the day of Plaintiff's scheduled FCE, November 6, 2000, and the following day. Claim file at 95,

---

[4] It is unclear whether Defendant had this letter when it made its initial disability determination on July 25, 2000. Ms. Boyd faxed this letter with other documents to Paula Colello on October 10, 2000 in reference to an investigation of a complaint filed by Plaintiff with the Pennsylvania Insurance Department. Claim file at 124, 128.

[5] Plaintiff refers to Mr. Johnson as both Chuck, NT at 13, and Joe, NT 24. It appears that he is referring to Chuck Johnson, an appeal review consultant employed by Defendant. See claims file at 25-26.

97, 152.

27. The FCE scheduled for November 6, 2000 was postponed due to doctor illness. The surveillance was also re-scheduled. Claim file at 85, 93.

28. Surveillance of Plaintiff was conducted on November 8-11, 2000 by CVI. Claim file at 57-63, 86-89, 92. CVI concluded that Plaintiff was not employed but made no conclusions as to his disability. Claim file at 61.

29. Health South, Inc. conducted a FCE of Plaintiff on November 9, 2000. Defendant received a copy of the FCE Report on November 20, 2000. Claim file at 67-80.

30. The results of the FCE indicated that Plaintiff could perform a sedentary or light work occupation for an eight hour day. Claim file at 79. The report indicated that Plaintiff could sit for two hours in an eight hour day with breaks every twenty minutes. Claim file at 67.

31. On November 28, 2000, Ms. Boyd wrote to Dr. Powers and requested his review of the FCE. Claim file at 56. On November 29, 2000, Ms. Boyd sent another letter to Dr. Powers correcting an error from the first letter. Id. at 55. Ms. Boyd requested that Dr. Powers comment on whether Plaintiff was capable of doing sedentary work. She requested that if Dr. Powers concluded Plaintiff was not capable of performing sedentary to light work, that he submit "objective medical" [sic] to support that finding.

32. Defendant gave Dr. Powers ample opportunity to respond to its repeated requests for review of Plaintiff's FCE. E.g., claim file at 26 (faxing another copy of the FCE to Dr. Powers for comment on January 17, 2001); Note from Dr. Edward Crouch, medical director employed by Defendant; claim file at 3-4 (detailing Dr. Crouch's attempt to consult with Dr. Powers).

33. Defendant learned on January 23, 2001 that Dr. Powers required a $250 fee for reviewing the FCE. Claim file at 6. Defendant did not pay this fee but provided this information to Plaintiff's attorney. Plaintiff's attorney did not pay the fee and Dr. Powers's comments were never obtained.

34. Defendant gave Plaintiff's attorney the opportunity to submit additional evidence for the appeal. Claim file at 24-25. Plaintiff's attorney never did so beyond his December 19, 2000 submission duplicating documents already contained in the claim file. Id. at 30-48.

35. At some point, Defendant received Plaintiff's pre-2000 medical records. Claim file at 249-87. These records were outside the scope of the claimed disability[6] and were not

---

[6] The medical documents were within the scope of the investigation insofar as they related to a pre-existing condition of Plaintiff. Defendant was perhaps investigating the possibility of denial of benefits on that basis. See Plan at 38 (excluding disabilities caused or

7

utilized by Defendant in the disability determination.

36.   Defendant determined that none of the new evidence required changing the original eligibility determination.   Mr. Johnson sent a letter to Plaintiff's attorney explaining Defendant's decision to uphold its denial of benefits.   Claim file exhibits A-D.

37.   Plaintiff filed this action on April 5, 2001 in the Court of Common Pleas of Dauphin County.   It was properly removed to this Court by Defendant on May 7, 2001.   (Notice of Removal, Doc. No. 1).

## III.   CONCLUSIONS OF LAW

This Court has original jurisdiction pursuant to  28 U.S.C. § 1331 to decide questions arising under ERISA.  29 U.S.C. § 1132(e)(1).

### A.   Standard of Judicial Review

In Firestone Tire & Rubber Co. v. Bruch, the United States Supreme Court held that de novo review of benefit determinations by fiduciaries or plan administrators under ERISA is appropriate " unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms[.]" 489 U.S. 101, 115 (1989). Where an administrator or fiduciary has the discretion to interpret the plan in deciding a claimant's eligibility for benefits, an administrator's interpretation is entitled to the arbitrary and capricious standard of review and "will not be disturbed if reasonable." Id. at 111.  The Firestone Court further noted that where an administrator or fiduciary is acting under a conflict of interest, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Id. at 115 (citing Restatement (Second) of Trusts § 187, Comment d (1959)).  The Third Circuit instructed that the conflict should be taken into account with a "heightened arbitrary and capricious" standard of review, using a sliding scale method. Pinto v.

---

contributed by a pre-existing condition which begins in first twelve months of coverage).

Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000); see also Smathers v. Multi-Tool

Inc., 298 F.3d 191 (3d Cir. 2002) (applying Pinto's sliding scale where employer had conflict of

interest).

Here, section seven of the policy gives the Defendant discretion over interpretive and

factual determinations. The provision of the policy at issue here states:

> **Who Has the Authority For Interpretation of This Plan?**
> We [Defendant] shall possess the authority, in our sole discretion, to construe the
> terms of this plan and to determine benefit eligibility hereunder. Our decisions
> regarding construction of the terms of this plan and benefit eligibility shall be
> conclusive and binding.

Plan at 42. Further, the Defendant both funds the plan and makes eligibility determinations

under the plan, giving rise to an inherent conflict of interest, and thus triggering **Pinto's** sliding

scale methodology. 214 F.3d 377; Smathers, 298 F.3d at 197. The parties agree both that

Defendant has Firestone discretion and that Pinto's sliding scale analysis is implicated. Def. Tr.

Br. at 9; Pl. Tr. Br. at 5. The parties differ on how far they believe the scale should slide.

Unfortunately, although Plaintiff argues for a low level of deference on the sliding scale,

he has not submitted any specific evidence of the degree of conflict of interest or how it may

have affected Defendant's decision to deny disability benefits. This lack of evidence makes it

difficult for the Court to follow the Pinto Court's approach and "take into account the

sophistication of the parties, the information accessible to the parties, and the exact financial

arrangement between the insurer and the company." Pinto, 214 F.3d at 392. Because there is no

evidence that the conflict here is "extraordinary," the Court will apply the heightened arbitrary

and capricious standard from Pinto, but we will remain on the deferential side of the sliding

scale. In the course of the heightened scrutiny, however, we will "conduct a more penetrating

review of administrator's decisionmaking process than would normally be conducted under the

arbitrary and capricious standard." Smathers, 298 F.3d at 199.

**B.    Scope of Evidence**

Under an arbitrary and capricious standard, the evidence on appeal is limited to that

which was before the plan administrator at the time of the final decision. Mitchell v. Eastman

Kodak Co., 113 F.3d 433, 340 (3d Cir. 1997); Ernest v. Plan Admin'r of Textron Insured

Benefits Plan, 124 F. Supp.2d 884, 893 (M.D. Pa. 2000); see also Smathers v. Multi-Tool, Inc.,

298 F.3d 191, 199-200 (3d Cir. 2002), quoting Levinson v. Reliance Std. Life Ins. Co., 245 F.3d

1321, 1326 (11th Cir. 2001) ("Whether a claim decision is arbitrary and capricious requires a

determination whether there was a reasonable basis for the administrator's decision, based upon

the facts as known to the administrator at the time the decision was made.") (emphasis added,

internal quotations omitted).

The Pinto Court did not address whether this scope of evidence would expand when the

standard is heightened arbitrary and capricious, however, other District Courts in the Third

Circuit have declined to broaden the record on appeal under the less deferential standard. E.g.,

Oslowski v. Life Ins. Co. of North America, 139 F. Supp. 2d 668, 675-676 (W.D. Pa. 2001);

O'Sullivan v. Metropolitan Life Ins. Co., 114 F. Supp. 3d 303, 309-310 (D.N.J. 2000). The

O'Sullivan court reasoned that looking beyond the administrative record would circumvent

ERISA's purpose in encouraging resolution of disputes on the administrative level. 114 F. Supp.

3d at 309. Furthermore, the court explained, a claimant can supplement the file with additional

evidence on reconsideration, which would be included in the claim file and thus reviewable in

the district court. Id. at 309-310.

In this case, there were two denials of benefits, one on July 25, 2000 and the other on

February 28, 2001, and the file remained open throughout that time. The claims analyst invited

Plaintiff and his attorney to submit additional evidence and neither did so. Claim file at 24-25.

Plaintiff's counsel now claims that Defendant did not have proper evidence of Plaintiff's job

duties, but they had ample opportunity to provide this evidence for the file before the final

determination. The Court sees no reason to depart from the general rule and consider evidence

that was not before the claims analyst. Thus the evidence which the Court will consider when

reviewing the final disability determination is limited to the claim file through February 28, 2001

and the terms of the plan itself.[7]

### C.    Defendant's Disability Determination

When applying the heightened arbitrary and capricious standard of review, the Court is

"deferential, but not absolutely deferential." Pinto, 214 F.3d at 393. "A plan administrator's

decision will be overturned only if it is clearly not supported by the evidence in the record or the

administrator has failed to comply with the procedures required by the plan. A court is not free to

substitute its own judgment for that of the defendants in determining eligibility for plan

benefits." Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.,

---

[7]Evidence outside the claim file discussed in section III.C.1 of this memorandum, i.e. the claim procedure manual, is used only to explore the alleged conflict of interest and will not be used for any other reason. Further, this opinion is consistent with the determination of the Court at the bench trial on July 22, 2002 that additional evidence could be heard. (See Order denying motion in limine, Doc. No. 40). The evidence presented might have been useful to the Court not in reviewing the administrative determination, but in analyzing the appropriate standard of review. Furthermore, had the Court decided that a heightened standard of review closer to de novo review was appropriate, the additional evidence presented at trial may have been allowed to enter into the review of the final determination. Luby v. Teamsters Health, Welfare & Pension Trust Funds, 944 F.2d 1176, 1184 (3d Cir. 1991); but see Lasser v. Reliance Standard Life Ins. Co., 130 F. Supp. 2d 616, 628 -630 (D.N.J. 2001) (suggesting that supplementing the administrative record may be forbidden by Pinto's placement of the burden on the beneficiary, and that remand would be the more appropriate judicial tool where the record is deficient. Pinto, 214 F.3d at 394, n. 8.

222 F.3d 123, 129 (3d Cir.2000) (internal quotations omitted). However, "[a]ny deference we

might ordinarily afford this decision will be tempered due to [Defendant's] conflict of interest."

Smathers v. Multi-Tool, Inc., 298 F.3d 191, 200 (3d Cir. 2002).

      *1.*    *The Process*

      The Third Circuit has directed the district courts in ERISA cases with heightened

arbitrary and capricious review to consider not only the reasonableness of the result, but the

reasonableness of the process by which it was achieved. Pinto, 214 F.3d at 393; see also Cimino

v. Reliance Standard Life Ins. Co., 2001 WL 253791, at *3 (E.D. Pa. 2001) (noting that the

"defining feature" of the heightened arbitrary and capricious standard of review is looking at the

process by which the result was achieved). In Pinto, the Court determined that under a highly

deferential standard, it would uphold the decision of the insurance administrator despite the fact

that a de novo review would yield the opposite result. 214 F.3d at 393. In looking at the

process, the Court pointed to several "procedural anomalies" that moved them to the "far end of

the arbitrary and capricious range," so that they "examine[d] the facts before the administrator

with a high degree of skepticism." Id. at 393-94.

      Here, there is no evidence that Defendant's procedures were not followed or that they did

anything but conduct a good faith, reasonable investigation. The assertions made by Plaintiff in

its proposed findings of fact regarding supposed procedural irregularities based on its

examination of the claims procedure manual are simply wrong. For example, Plaintiff asks this

Court to find that "Defendant did not follow up with Plaintiff's treating physicians as to their

conclusions of total disability." Pl. Proposed Findings of Fact 1(c). The evidence in the claim

file of repeated telephone calls and letters to Dr. Powers shows exactly the opposite. Plaintiff

asserts that "[t]he employer's statement required [in claims manual at 25-26 of Claims

12

Investigation section] was not obtained." Pl. Proposed Findings of Fact 1(e). The record shows

that this form was in fact obtained. Claim file at 241. Plaintiff argues that Defendant was

required by its internal procedures to conduct an Independent Medical Examination ("IME") of

Plaintiff and failed to comply with procedures by not conducting the IME. Pl. Proposed Finding

of Facts 1(h) and 8; Pl. Tr. Br. at 9. A closer reading of the claim manual reveals that an IME is

not required, but that claims analysts may use an IME as a tool "to assist them in evaluating

disability claims." Claims manual, Pl. Tr. Exh. 1, Claims Investigations at 50. The manual goes

on to give examples of when an IME would be helpful and the procedures to follow when

conducting an IME. Id. at 51-55. Nowhere is there a requirement that one be conducted, as

Plaintiff asserts; in fact, the manual specifies that "[b]efore recommending an IME, all other

ways of obtaining the necessary medical information need to be explored." Id. at 52. There are

many other examples where Plaintiff's proffered "procedural anomalies" are simply mis-readings

of the claims manual and claim file.

    The only arguable irregularity in the claim procedure was the time it took Defendant to

process the appeal, which should ordinarily be done in under 60 days, and in special

circumstances, no more than 120 days. Summary Plan Description, Plan at 56. Thus, Defendant

did not comply with its procedures in processing the appeal when it took 202 days, 82 days

beyond the maximum allowed. Id. There is also no indication in the record that Plaintiff was

notified of the reasons for the time extension beyond the regular 60 days, as required by the Plan.

Id. However, the delay was almost entirely attributable to Defendant's diligence in attempting to

contact Plaintiff's treating physician and giving him time to respond to the FCE results, re-

scheduling the FCE due to a misunderstanding with Plaintiff, and waiting for Plaintiff to provide

the results of a non-existent FCE report that was supposedly conducted by the SSA. Defendant

13

kept Plaintiff, and later Plaintiff's counsel, appraised of this situation. Therefore, Plaintiff had the notice required by the Plan.

Furthermore, this "anomaly" is not sufficient to warrant less deferential review of the merits of the decision, especially since it indicates the care shown by Defendant in handling Plaintiff's claim. This certainly is not the kind of procedural anomaly noted in <u>Pinto</u> or subsequent decisions. 214 F.3d at 392-94; <u>see also, e.g.</u>, <u>Skretvedt v. E.I. DuPont de Nemours & Co.</u>, 268 F.3d 167, 174-176 (3d Cir. 2001); <u>Freiss v. Reliance Std. Life Ins. Co.</u>, 122 F. Supp. 2d 566, 573-75 (E.D. Pa. 2000) (granting summary judgment was precluded since potential procedural anomalies presented issue of fact as to whether administrator acted arbitrarily and capriciously in denying disability benefits). The record further shows that Defendant complied with its procedures in both of its denial letters and the time frame on the initial decision. <u>See</u> Summary Plan Description, Plan at 55. It is also significant that Plaintiff was given the opportunity to submit additional evidence in support of his claim. <u>See Ernest</u>, 124 F. Supp. 2d at 895 (finding that insurance company gave plaintiff "adequate opportunity to supplement his claim file prior to [defendant's] final denial" and that the evidence was still insufficient to prove his inability to work in his or a reasonably related occupation).

Plaintiff has made much of the fact that Defendant was willing to spend approximately $2,000 conducing surveillance of Plaintiff but was unwilling to spend $250 to pay the fee Dr. Powers required to review the FCE. Pl. Tr. Br. at 8, 11. However, the Court finds that Defendant did not have a legal obligation to pay this fee. While Defendant was financially responsible for the surveillance and the FCE it requested, section four of the Plan, Disability Income Benefits, specifies that proof of a disability must be given "at our [Defendant's] request and at your [Plaintiff's] expense." Plan at 20. Defendant requested the review in order to

14

reconcile what it saw as a discrepancy between Dr. Powers's early reports and his July 24, 2000

letter citing Plaintiff's total disability.   When it learned that the doctor wanted $250 to review

the FCE, Defendant made the reasonable determination that the doctor's comments on the FCE

were not necessary to its determination on appeal, although it gave Plaintiff's counsel the

opportunity to secure the comments and submit additional evidence.

In sum, other than the delay in processing the appeal, which did not prejudice Plaintiff

but rather accommodated him, the Court's examination of the process Defendant followed in

making the disability determination does not reveal anything which warrants a less deferential

review of the merits of the determination.

> 2.    *The Merits*

The issue then is whether Defendant's decision to deny Plaintiff's claim is "without

reason, unsupported by substantial evidence or erroneous as a matter of law."  Abnathya v.

Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993); Ayers v. Maple Press Co., 168 F. Supp.

2d 349, 353 (M.D. Pa. 2001).

Based on the medical information before it, Defendant determined that Plaintiff did not

meet the definition of disabled under the plan.  The group policy issued by Defendant states that

"disability" or "disabled" means:

> i. if you are eligible for the 24 Month Own Occupation Benefit, "Disability" or
> "Disabled" means during the Elimination Period[8] and the next 24 months of
> Disability you are unable to perform all of the material and substantial duties of
> your occupation[9] on an Active Employment basis because of an Injury or

---

[8]Plaintiff's elimination period was 180 days.  Schedule of Benefits, Plan at 3.

[9] "'Material and Substantial Duties' means responsibilities that are normally required to
perform your Own Occupation, or any other occupation, and cannot be reasonably eliminated or
modified."  Plan at 9.

15

Sickness; and

ii. After 24 months of benefits have been paid, you are unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

Plan at 6-7.

As Defendant explained to Plaintiff, and as is clearly spelled out in the plan itself, the "own occupation" disability determination is not based on whether the claimant can actually perform in his or her own job. Rather, it means "your occupation as it is normally performed in the national economy. Work Tasks performed for a specific employer or at a specific location will not be used to determine Disability." Plan at 9. Therefore, Defendant reasonably put little weight on Ms. Bednar's letter stating that Plaintiff could not be accommodated in his current job.

There is ample evidence in the claim file to support Defendant's final determination. For example, up until his July 24, 2000 letter, all medical information from Dr. Powers indicated that Plaintiff would be able to work a sedentary to light job, including Dr. Powers's own release of Plaintiff to work. On March 24, 2000, even while stating that he would support "some limited disability," Dr. Powers stated that the disability would be because of chronic pain somewhat unrelated to the disc disease for which Plaintiff had sought the doctor's care and for which he was claiming disability benefits. Even on May 5, 2000, when Dr. Powers stated that Plaintiff was not "in any shape to return to any type of activity which requires extended sitting," he released Plaintiff from his care since there was nothing to suggest the return of the disc herniation. The medical records further show that Plaintiff was receiving pain relief from his treatment at the Pain Clinic and his pain medications. On January 24, 2000, during the claimed disability period, a doctor at the pain clinic reported that Plaintiff was "relatively comfortable" and "fairly functional."

16

Defendant was not required under the plan or the law to follow the SSA determination. E.g., Marx v. Meridian Bancorp, Inc., 32 Fed. Appx. 645, 647 (3d Cir. 2002) (unpublished); Rendulic v. Kaiser Aluminum & Chemical Corp., 166 F. Supp. 2d 326, 340 (W.D. Pa. 2001); Dorsey v. Provident Life and Acc. Ins. Co., 167 F.Supp.2d 846, 856, n. 11 (E.D. Pa. 2001), Russell v. Paul Revere Life Ins. Co., 148 F.Supp.2d 392, 409 (D. Del. 2001). The Russell court ruled that "a plan administrator is in no way bound by the determination of the Social Security Administration." 148 F. Supp. 2d at 409 (citing Moats v. United Mine Workers of Amer. Health & Retirement Funds, 981 F.2d 685, 689 (3d Cir. 1992)). The court continues: "a plan administrator's decision on ERISA disability that differs from that of the SSA is not arbitrary and capricious provided it is reasonable and supported by substantial evidence." Id. Here, Defendant considered the SSA determination and made a different determination that was reasonable and supported by the evidence. Contentions by Plaintiff that Defendant was required to follow the SSA decision or "promised" to follow the decision are inapposite. Dr. Hartman's report is not inconsistent with Defendant's FCE findings, stating that Plaintiff was capable of sitting for up to four hours per day with frequent position changes. It was not unreasonable for Defendant to make a determination different than the Social Security disability determination.

In sum, the Court finds that it was not unreasonable for Defendant to conclude that Plaintiff did not qualify for disability benefits under the plan. While the claim file contained some evidence of disability, it also contained substantial evidence that Plaintiff did not meet the plan's definition of disability. It was not unreasonable for Defendant to find that Plaintiff was not totally disabled during the elimination period, and the Court will not uproot the decision of the administrator.

## IV.  **CONCLUSION**

Under a heightened arbitrary and capricious standard of review, this Court will not disturb Defendant's interpretation or application of its long term disability plan because it is reasonable and supported by substantial evidence.  Defendant's argument that the disability award be set off by SSA benefits is moot in light of this decision.

## V.    __ORDER__

AND NOW, this 5th day of Nov, 2002, for the reasons stated herein, it is

ORDERED THAT judgment be entered against the Plaintiff and in favor of the Defendant on all

claims.  The Clerk of Court is directed to close the file.

Yvette Kane
United States District Judge

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

## MIDDLE DISTRICT OF PENNSYLVANIA

### JUDGMENT IN A CIVIL CASE

CRAIG M. HOWARD,
                    **Plaintiff**


                              **v.**                     CASE NUMBER: 1:CV-01-797

LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON, LIBERTY MUTUAL GROUP,          **FILED**
                    **Defendant**         **HARRISBURG**

                                          NOV - 5 2002

                                          MARY E. D'ANDREA, CLERK
                                          Per_____
                                              DEPUTY CLERK

☐   **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried
    and the jury has rendered its verdict.

X   **Decision by Court.** This action came to trial or hearing before the court. The issues have been
    tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED**  that judgment be and is hereby entered in
favor of defendant Liberty Life Assurance Company of Boston, Liberty Mutual
Group and against plaintiff Craig M. Howard.


**Date:** November 5, 2002            Mary E.  D'Andrea, Clerk of Court

                                      (By) Jennifer Kennedy, Deputy Clerk

Case No: 1:01-cv-797    Document No: 50,   1 Copy Printed: Nov, 5, 2002  10:17 AM

William C. Foster
wfoster@linkkmf.com
Kelly McLaughlin & Foster
1617 John F. Kennedy Boulevard
Suite 1690
Philadelphia, PA 19103

Failed faxing to: 12158146880
Failure reason: remote is not a fax terminal

Slip Copy
28 Employee Benefits Cas. 2022
**(Cite as: 2002 WL 1769899 (E.D.Pa.))**

Page 1

United States District Court, E.D. Pennsylvania.

Joel ROSENBAUM, Plaintiff,

v.

UNUM LIFE INSURANCE CO. OF AMERICA,
Defendant.

**No. CIV.A. 01-6758.**

July 29, 2002.

*OPINION*

NEWCOMER, S.J.

*1 Presently before the Court is Defendant's Motion to Dismiss and Plaintiff's Answer. For the reasons outlined below, this Court will grant Defendant's motion, in part.

## BACKGROUND

Plaintiff brought suit after being denied long-term disability insurance benefits under the Defendant's employee benefit plan, which is governed by the Employee Retirement Income Security Act (ERISA). Defendant moves to dismiss Plaintiff's state law claims by arguing ERISA preemption. With the exception of Count X, a bad faith claim brought under 42 Pa.C.S. § 8371 (Pennsylvania's bad faith statute for insurance claims), the parties agree that Plaintiff's state law claims under the employee benefit plan are preempted.

## DISCUSSION

In his Answer to Defendant's Motion to Dismiss, Plaintiff concedes that, with the exception of his bad faith claim (Count X), his state law claims (Counts I, III, V, VII, IX) are preempted by ERISA. I, therefore, dismiss these claims without further discussion and turn to the key issue before this Court, that is, whether Pennsylvania's bad faith statute for insurance claims, 42 Pa.C.S. § 8371, is preempted by ERISA. While this issue has not been addressed by the Third Circuit, this Court has, in the past, consistently answered this question in the affirmative. In fact, no court has yet found to the contrary. However, a new trend in the federal law, led by the United States Supreme Court's decision in *Unum Life Insurance Co. of America v. Ward,* 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999), and its recent decision in *Rush Prudential HMO, Inc. v. Moran,* --- U.S. ----, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002), warrants a re-examination of this important question.

At the heart of this issue is ERISA's saving clause, which exempts from preemption "any law of any State which regulates insurance." ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A). The Supreme Court has applied the following two prong approach in determining whether a statute "regulates insurance." First, the Court considers whether from a "common-sense view of the matter," the state statute in question regulates insurance. *UNUM,* 526 U.S. at 367. Second, the Court considers the following three factors in determining whether "the regulation fits within the 'business of insurance' as that phrase is used in the McCarran-Ferguson Act," 59 Stat. 33, as amended, 15 U.S.C. § 1011 et seq.:

  (0) Whether the practice has the effect of transferring or spreading a policyholder's risk;

  (1) Whether the practice is an integral part of the policy relationship between the insurer and the insured;

  (2) Whether the practice is limited to entities within the insurance industry.

*UNUM,* 526 U.S. at 367. *UNUM* marked a significant change in the application of the Common-sense/McCarran-Ferguson Test. For the first time, the Court explained that a state statute need not meet each of the McCarran-Ferguson factors in order to qualify for ERISA's saving clause. [FN1] *Id.* at 373 ("[W]e reject UNUM's assertion that a state regulation must satisfy all three McCarran-Ferguson factors in order to 'regulate insurance.' ") Rather, the *UNUM* Court found that the McCarran-Ferguson factors are " 'considerations to be weighed' in determining whether a state law regulates insurance." *Id.* This decision clarified the Court's previous rulings (i.e., *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)), which have been solely interpreted to require compliance with each of the McCarran-Ferguson factors. *UNUM,* 526 U.S. at 373. Most recently, in *Rush,* the Supreme Court reaffirmed *UNUM's* holding by finding an Illinois State statute qualified under ERISA's saving clause by meeting two of the McCarran-Ferguson factors. *Rush,* --- U.S. at ----, 122 S.Ct. at 2163. We turn now to an application of the Common-sense/McCarran-Ferguson Test with regard to § 8371.

  FN1. Despite the guidance offered by *UNUM* and *Rush,* it is not clear whether a statute must satisfy more than one of the McCarran-Ferguson factors in order to be

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 2
28 Employee Benefits Cas. 2022
**(Cite as: 2002 WL 1769899 (E.D.Pa.))**

covered by ERISA's savings clause. Further, the Third Circuit has not ruled on this issue.

## I. Common-sense View

**\*2** A common-sense view of ERISA's saving clause clearly establishes that Pennsylvania's bad faith statute "regulates insurance" and is specific to the insurance industry. In fact, one need look no further than the statute's title, "Actions on insurance policies," in discerning its scope. Furthermore, the statute limits its application to "action[s] arising under an insurance policy...." Finally, the Pennsylvania Supreme Court has recognized a distinction between those remedies available at common law and those available through the instant statute with regard to bad faith claims. *The Birth Center v. St. Paul Companies, Inc.,* 787 A.2d 376, 403 2001 Pa. Lexis 2759 (Pa.2001). The Court's holding in *Birth Center* emphasizes the particular focus of this statute concerning the insurance industry. Thus, it is clear that the legislative intent behind § 8371 was to "regulate insurance."

## II. McCarran-Ferguson Test

### A. Spreading Policyholder's Risk

Because it serves solely as a special damages section, it is doubtful that the provisions of § 8371 spread a policyholder's risk. Since the McCarran-Ferguson factors are mere guideposts and need not be unanimously met, we shall move on to a consideration of the second factor. *Rush,* --- U.S. at ----, 122 S.Ct. at 2163.

### B. Integral Part of the Policy Relationship

This Court is mindful of its previous finding that § 8371 did not play an integral part in the policy relationship between the insurer and the insured. *Zimnoch v. ITT Hartford, et al.,* 2000 U.S. Dist. LEXIS 2846, Civ.A. No. 99-6594 at \*18 (E.D.Pa. March 14, 2000) (Newcomer, J.). However, in light of the Supreme Court's recent holding in *Rush* and this Court's subsequent re-examination of *UNUM,* this Court concludes that its previous finding is no longer suitable.

In *UNUM,* the Supreme Court found that a California statute requiring an insurer to "prove prejudice before enforcing a timeliness-of-claim provision" created a mandatory contract term between the two parties. *UNUM,* 526 U.S. at 375. In *Rush,* the Court examined an Illinois statute requiring HMOs to provide independent review of disputes with primary care physicians, and to cover any costs deemed medically necessary by the independent reviewer. The Court found that the statute provided a "legal right to the insured" and an "obvious" contractual requirement which was "an integral part of the policy relationship." *Rush,* --- U.S. at ----, 122 S.Ct. at 2164. These cases suggest that a statute plays an integral part in the policy where it affords the parties rights or remedies other than those originally bargained for, in effect creating a new mandatory contract term.

Just as the statutory provisions in *UNUM* and *Rush* afford the parties rights or remedies other than those originally bargained for, § 8371 creates mandatory contract terms providing for special damages. Here, the insured gain the right to pursue the following remedies: punitive damages, attorney fees and a specified amount of interest. Therefore, the Court finds that the statute clearly plays an integral role in the policy relationship.

**\*3** Although other Supreme Court cases, such as *Pilot Life,* address preemption of bad faith claim law, this Court cautions the reader not to confuse the case at hand with cases like *Pilot Life.* In *Pilot Life* the Supreme Court found that the Mississippi law of bad faith did not satisfy the second factor of the McCarran-Ferguson Test. *Pilot Life,* 481 U.S. at 51. However, *Pilot Life* dealt with common law claims of bad faith unspecific to the insurance industry, while the bad faith claim before this Court is derived from a statute specific to the insurance industry. *Id.* Consequently, the *Pilot Life* Court found the bad faith law's connection to the policy relationship to be "attenuated at best" based on the fact that it was "developed from general principles of tort and contract law available in any Mississippi breach of contract case." *Id.* In addition, "the common law of bad faith does not define the terms of the relationship ... it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages." *Id.* In contrast, § 8371 provides particular remedies for incidents of bad faith and was designed exclusively for use in the insurance industry. Specifically, it allows the court to award a particular amount of interest, assess attorney's fees and award punitive damages where breaches of insurance contracts are concerned.

### C. Limited to Entities within the Insurance Industry

Slip Copy                                                                 Page 3
28 Employee Benefits Cas. 2022
**(Cite as: 2002 WL 1769899 (E.D.Pa.))**

The third factor, which requires the statute to be limited to entities within the insurance industry, is satisfied for many of the same reasons that the statute satisfies the requirements of the common-sense test. *Rush,* --- U.S. at ----, 122 S.Ct. at 2164.

CONCLUSION

In conclusion, this Court finds that the Common-sense View Test is easily satisfied by § 8371. Furthermore, factors two and three of the McCarran-Ferguson Test are also satisfied. Therefore, this Court holds that § 8371 is not preempted by ERISA as it falls under ERISA's saving clause.

AN APPROPRIATE ORDER WILL FOLLOW.

*ORDER*

AND NOW, this day of July, 2002, upon consideration of Defendant's Motion to Dismiss (Document 2) and Plaintiff's Answer, it is hereby ORDERED that said motion is GRANTED, in part, and DENIED, in part. Specifically, Counts II, IV, VI and VIII are DISMISSED.

AND SO IT IS ORDERED.

2002 WL 1769899 (E.D.Pa.), 28 Employee Benefits Cas. 2022

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                 Page 1
28 Employee Benefits Cas. 2321
(Cite as: 2002 WL 1917711 (E.D.Pa.))

United States District Court, E.D. Pennsylvania.

Gerald L. SPRECHER, Plaintiff,
v.
AETNA U.S. HEALTHCARE. INC., Defendant.

**No. CIV.A. 02-CV-00580.**

Aug. 19, 2002.

*MEMORANDUM*

BUCKWALTER, J.

**\*1** Currently before the Court is Defendant's Motion to Dismiss Counts I (ERISA) and II (Bad Faith) of Plaintiff's Complaint. Defendant argues that Plaintiff's ERISA claim should be dismissed because he has not exhausted his administrative remedies as provided under the subject ERISA Benefits Plan. [FN1] Defendant further argues that Plaintiff's bad faith claim under 42 Pa. Cons.Stat. Ann. § 8371 is preempted. For the reasons stated below, Defendant's motion is Denied as to Count I of Plaintiff's Complaint and Granted with respect to Count II of Plaintiff's Complaint.

> FN1. 1. The subject ERISA Benefits Plan was filed in its entirety with the Court on February 4, 2002 as part of Plaintiff's Complaint.

I. FACTS

Plaintiff filed this suit after Defendant partially denied payment for surgical services Plaintiff received November 22 through 25, 2000 after suffering a heart attack. It is undisputed that Plaintiff obtained approval for the surgical procedures, as well as for his admission to the hospital, prior to undergoing any treatment as required under the ERISA Benefits Plan. Despite receiving prior approval, on December 22, 2000, Defendant issued a statement denying payment totaling $258.00 for treatment rendered by Plaintiff's surgical group on grounds that there was no evidence that services had been pre- authorized. On January 3, 2001, Defendant issued a statement denying payment totaling $6,125.00 for treatment rendered by Plaintiff's surgical group, again on grounds that there was no evidence that services had been pre-authorized.

Plaintiff contested both denials of benefits by placing a telephone call to Defendant and pointing out that he had obtained pre-certification. Upon checking Plaintiff's file, Defendant realized that pre-certification had been obtained, however, it did not immediately or fully reverse its denial determination. On February 8, 2001, Defendant issued a statement showing that it had paid the $258.00 that it had previously refused to pay on the statement of December 22, 2000. On February 27, 2001, Defendant issued a statement showing that it had paid $3247.40 of the $6125.00 that it had previously refused to pay on January 3, 2000. This statement specified that Aetna would not make full payment because the charges exceeded the usual and prevailing fee.

Plaintiff's surgical group contested this partial denial. Defendant responded by way of letter dated April 27, 2001, stating that it had reviewed its benefits determination and concluded that its original, partial reimbursement was correct. However, on May 15, 2001, Defendant issued a revised statement for the bills totaling $6125.00, which specified that it would pay $3,642.00, but that the balance had been denied as exceeding the usual and prevailing fee. Thus, Defendant altered its already revised benefits determination and increased the permitted fees by some $395.00.

By letter dated November 29, 2001, Plaintiff requested that Defendant provide the statistical profiles of physicians' charges for the sameor similar services in a geographic area that it relied upon in making its benefits determinations. Defendant failed to respond to Plaintiff's November 29, 2001 letter. Plaintiff now brings the instant action, seeking payment for the balance of his medical bills for treatment rendered after he suffered his heart attack.

II. STANDARD

**\*2** Under Fed.R.Civ.P. 12(b)(6), the party moving for dismissal has the burden of proving that no claim has been stated. *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991). To prevail, the movant must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45- 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). A complaint should be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59, 65

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
28 Employee Benefits Cas. 2321
(Cite as: 2002 WL 1917711 (E.D.Pa.))

Page 2

(1984).

## III. DISCUSSION

### A. Count I--ERISA

Defendant argues that Plaintiff's ERISA claim should be dismissed for failure to exhaust administrative remedies. "Except in limited circumstances ... a federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan." *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir.2002).

Pursuant to the terms of the ERISA Plan at issue, Plaintiff had the right to appeal any denial of benefits. The procedure set forth in the ERISA Plan required Plaintiff to submit an appeal in writing within 90 days from the date Defendant issued its denial. Further, if Plaintiff disagreed with that appeal decision, he had the right to a second appeal. It is not clear that Plaintiff technically appealed Defendant's benefit determinations as outlined in the Plan. In particular, it appears that Plaintiff failed to meet the writing requirement. However, it is clear that Plaintiff contested the denial of benefits, once by telephone to dispute the incorrect denial on grounds that his medical treatment had not been pre-authorized and once by Plaintiff's surgical group on his behalf after partial payment was made for submitted medical bills. It is also clear that Defendant responded to Plaintiff's challenges by amending its benefits determination in favor of Plaintiff.

Despite Plaintiff's challenges, Defendant argues that Plaintiff did not avail himself of the two levels of appeal afforded him and instead of taking an administrative appeal, he precipitously filed this lawsuit. Defendant characterizes Plaintiff's challenges as requests to reconsider its initial reimbursement amount, and does not recognize Plaintiff's attempts to resolve the benefit dispute as an appeal within the meaning of the Plan. The record currently before the Court is lacking the required writing stipulated by the appeal procedures, however, it appears that Defendant in effect waived the writing requirement by responding to Plaintiff's oral challenges.

At the pleading stage I must give Plaintiff the benefit of all reasonable inferences. Because it is apparent that Plaintiff, in some manner, petitioned Defendant to reconsider its decisions to deny benefits and Defendant so responded, I find that Plaintiff has adequately pled that he met his administrative requirements before filing suit.

### B. Count II--Bad Faith

**\*3** Next, Defendant argues that Plaintiff's bad faith statute is preempted by ERISA. Pennsylvania's bad faith statute, 42 Pa. Cons.Stat. Ann. § 8371, provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
> 1. Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> 2. Award punitive damages against the insurer.
> 3. Assess court costs and attorney fees against the insurer.

District courts in the Eastern District of Pennsylvania have consistently held that Pennsylvania's bad faith statute is preempted by ERISA. However, in a very recent Eastern District opinion, the Honorable Judge Newcomer re-examined this issue in light of a "new trend in the federal law" established by two recent United States Supreme Court decisions, *Rush Prudential HMO, Inc. v. Moran*, --- U.S. ----, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002) and *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999). Judge Newcomer held that Pennsylvania's bad faith statute is not preempted by ERISA as it falls under ERISA's saving clause. *See Rosenbaum v. UNUM Life Ins. Co. of Am.*, No. CIV.A. 01-6758, 2002 WL 1769899, at *3 (E.D.Pa. Jul.29, 2002). For the reasons stated below, I respectfully disagree with the *Rosenbaum* decision and find that Pennsylvania's bad faith statute is preempted by ERISA.

The ERISA preemption clause, ERISA § 514(a), 29 U.S.C. § 1144(a), provides:

> Except as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....

There is no dispute that the Pennsylvania statute relates to the subject employee benefit plan, thus placing it within the broad sweep of the preemption clause.

ERISA's saving clause, however, exempts from preemption "any law of any State which regulates

Not Reported in F.Supp.2d
28 Employee Benefits Cas. 2321
(Cite as: 2002 WL 1917711 (E.D.Pa.))

insurance." ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A). In order to determine whether a state law "regulates insurance" within the meaning of the saving clause, first, a court must determine whether, from a "common-sense view of the matter," the state statute in question regulates insurance. *UNUM Life Ins. Co.,* 526 U.S. at 367, 119 S.Ct. at 1386 (citations omitted). Second, consideration of three factors is employed to determine whether the regulation fits within the "business of insurance" as that phrase is used in the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U.S.C. § 1011 et seq.: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Id.* The parties dispute whether Pennsylvania's bad faith statute regulates insurance for purposes of ERISA's saving clause, preventing it from being pre-empted.

1. Common-Sense View

*4 In order for a state law to regulate insurance from a common-sense view of the matter, "a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." *Rush Prudential,* --- U.S. at ----, 122 S.Ct. at 2159 (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 50, 107 S.Ct. 1549, 1554, 95 L.Ed.2d 39 (1987)). The plain language of Pennsylvania's bad faith statute suggests that the state law "regulates insurance" because § 8371 is applicable only to insurers in actions arising under an insurance policy. In addition, this statute is never applied outside the insurance industry. Therefore, Pennsylvania's bad faith statute appears to satisfy the common-sense view of a state law that regulates insurance.

2. McCarran-Ferguson Test

It is now established that a state regulation need not satisfy all three McCarran-Ferguson factors in order to "regulate insurance" under ERISA's saving clause. *See Rush Prudential,* --- U.S. at ----, 122 S.Ct. at 2163, *UNUM Life Ins. Co.,* 526 U.S. at 373, 119 S.Ct. at 1389. The first question, (addressed above), is whether the law in dispute fits a common-sense understanding of insurance regulation, (Pennsylvania's bad faith statute arguably does), then the McCarran-Ferguson factors are used as checking points or guideposts to confirm that the state rule does in fact regulate insurance, not separate essential elements that must each be satisfied to save the

State's law. *See id.,* 526 U.S. at 374, 119 S.Ct. at 1389.

The first McCarran-Ferguson factor asks whether the state law "ha[s] the effect of transferring or spreading a policyholder's risk." *Rush Prudential,* --- U.S. at ----, 122 S.Ct. at 2163, *UNUM Life Ins. Co.,* 526 U.S. at 374, 119 S.Ct. at 1389. This factor requires an examination into whether Pennsylvania's bad faith statute alters "the allocation of risk for which the parties initially contracted." *UNUM Life Ins. Co.,* 526 U.S. at 374, 119 S.Ct. at 1389. In the instant litigation, the subject ERISA Plan provided health care benefits to Plaintiff. Thus, Defendant assumed the financial risk of providing the medical benefits promised in return for premiums paid for by Plaintiff's employer on behalf of Plaintiff.

Plaintiff argues that Pennsylvania's bad faith statute satisfies the McCarran- Ferguson "risk-spreading" factor because it transfers the risk that a policyholder's claim will be improperly handled from the policyholder to the insurer. However, Plaintiff's argument misses the mark because this is not the type of risk for which the parties initially contracted. The availability of punitive damages and interest penalties to a policyholder whose insurer has improperly processed a claim for benefits does not allocate risk typical of medical insurance. At most, this may cause the insurer to raise premiums, which it would then pass on to the policyholder. However, an insurer's method for recuperating losses resulting from unsuccessful litigation does not alter the risk bearing arrangement of medical insurance: that the insurer will pay covered medical expenses, at any cost, and the insured will pay the stipulated premium. Furthermore, ERISA already accounts for the risk that a policyholder's claim will be improperly handled through its exclusive remedial scheme, without necessitating resort to state laws allowing alternative remedies. *See* ERISA § 502(a), 29 U.S.C. § 1132(a). I find that Pennsylvania's bad faith statute does not serve to spread the policyholder's risk. Therefore, the first McCarran-Ferguson factor does not aid in verifying the common-sense view that Pennsylvania's bad faith statute regulates insurance within the meaning of ERISA's saving clause.

The second McCarran-Ferguson factor, finding that the state statute serves as "an integral part of the policy relationship between the insurer and the insured," requires that the state statute in some manner control the terms of the insurance relationship by changing the bargain between insurer and insured. *See UNUM Life Ins. Co.,* 526 U.S. at

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
28 Employee Benefits Cas. 2321
(Cite as: 2002 WL 1917711 (E.D.Pa.))

374, 119 S.Ct. at 1389.

**\*5** In *UNUM Life Ins.*, the United States Supreme Court held that California's notice-prejudice rule met McCarran-Ferguson's second factor because it effectively created a mandatory contract term and thus, dictated the terms of the relationship between the insurer and the insured. In that case, the subject insurance policy contained a provision that required the insured to furnish proofs of claim to the insurer within a specified time limit. All untimely claims would be strictly denied by the insurer. California's notice- prejudice rule, however, superseded this policy provision by providing that an insurer could not avoid liability in cases where a claim was not filed in a timely manner absent proof that the insurer was actually prejudiced because of the delay. In other words, the state statute effectively barred enforcement of the policy's time limitation on submitting claims. Therefore, the Supreme Court held that the California rule served as an integral part of the policy relationship between the insurer and the insured by forcing a mandatory contract term upon the parties that had not been otherwise agreed upon. *See UNUM Life Ins. Co.*, 526 U.S. at 374, 119 S.Ct. at 1389-90.

The United States Supreme Court further illustrated this principal in *Rush Prudential*, holding that an Illinois state law was not preempted by ERISA. The state law in dispute in that case required HMOs to provide a mechanism for review by an independent physician when the patient's primary care physician and HMO disagreed about the medical necessity of a treatment proposed by the primary care physician. The Supreme Court found that this review process affected the "policy relationship" between HMOs and covered persons because it provided a legal right to the insured, enforceable against the HMO, to obtain an authoritative determination of the HMO's medical obligations, a legal right which was not enforceable under the terms of the insurance contract alone. *Rush Prudential*, --- U.S. at ----, 122 S.Ct. at 2164. Without the state law, the *Rush Prudential* policy only provided for coverage determinations based upon whether the HMO, in its broad discretion, found the service "medically necessary" pursuant to specified criterial set forth in the policy. Therefore, the state law created an "extra layer of [independent] review," which translated the parties original contract for insurance. *See Rush Prudential.* --- U.S. at ----, 122 S.Ct. at 2163.

Pennsylvania's bad faith statute, on the other hand, does not alter the terms of the contract between the insurer and the insured. Insurer's have the obligation to act in good faith. However, a state statute providing a remedy for breach of this obligation does not have the effect of creating a new, mandatory contract term. Pennsylvania's bad faith statute creates an opportunity for a policyholder, whose claim has been improperly handled by the insured, to seek punitive damages and interest penalties. This opportunity is the insured's unilateral choice to seek certain, specified damages. This creates a deterrence for insurance carriers to refuse to pay a claim when there is no reasonably credible basis to deny it. The deterrence, however, does not change the bargain between the insurer and the insured that the insurer will act in good faith.

**\*6** The insurance regulations involved in *UNUM Life Ins. Co.* and *Rush Prudential* supplemented and supplanted the procedures in which the insurer was to engage in making benefits determinations, procedures which were differently defined in the respective insurance contracts. Pennsylvania's bad faith statute in no way effects claims-procedures provided for in the policy, but rather declares only that whatever terms have been agreed upon in the insurance contract, a policy holder may obtain punitive damages and interest penalties when an insurance carrier improperly processes a claim for benefits. Pennsylvania's bad faith statute "does not define the terms of the relationship between the insurer and the insured," *Pilot Life,* 481 U.S. at 51, 107 S.Ct. at 1555, nor does it "translat[e] the relationship under the ... agreement into concrete terms of specific obligation or freedom from duty." *Rush Prudential*, --- U.S. at ----, 122 S.Ct. at 2163. The statute affects the parties after the procedures initially agreed upon by the insurer and the insured have been fully complied with, albeit improperly. Therefore, I find that Pennsylvania's bad faith statute does not serve as "an integral part of the policy relationship between the insurer and the insured." Consequently, the second McCarran-Ferguson factor does not confirm the common-sense view that Pennsylvania's bad faith statute regulates insurance within the meaning of ERISA's saving clause.

The final McCarran-Ferguson factor, that the law be aimed at a "practice ... limited to entities within the insurance industry," is met for the same reasons that Pennsylvania bad faith statute satisfies the requirements of the common- sense test. *See Rush Prudential,* --- U.S. at ----, 122 S.Ct. at 2164. However, meeting this one prong of the McCarran-Ferguson test does not guide the Court to save Pennsylvania's bad faith statute from preemption.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
28 Employee Benefits Cas. 2321
(Cite as: 2002 WL 1917711 (E.D.Pa.))

Page 5

Although the statute at issue is aimed at the insurance industry, this alone is not enough to lead the Court to a finding that the statute "regulates insurance" in a manner which would exempt the State statute from preemption.

3. Categorical Preemption

**\*7** As a second and alternative theory that Pennsylvania's bad faith statute should not be saved from preemption, it is evident that the state statute, and its provision for interest penalties and punitive damages, is more akin to an "alternative remedy," which is categorically preempted by ERISA. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). *Pilot Life* established that it was Congress' clearly expressed intent that the civil enforcement provisions of ERISA § 502(a), 29 U.S.C. § 1132(a), be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries. *See Pilot Life,* 481 U.S. at 52, 107 S.Ct. 1549, 95 L.Ed.2d 39. Even if I were to hold Pennsylvania's bad faith statute was a law which regulates insurance within the meaning of ERISA's saving clause, (which I donot), the *Pilot Life* rule carves out a limited exception to the saving clause when state insurance laws allow plan participants "to obtain remedies under state law that Congress rejected in ERISA." *Pilot Life,* 481 U.S. at 54, 107 S.Ct. at 1556. I believe preemption of Pennsylvania's bad faith statute is proper under this analysis as well.

Congress intended ERISA § 502(a), 29 U.S.C. 1132(a), to be the exclusive remedy for rights guaranteed under ERISA. *Id.* Therefore, even a state law "regulating insurance" will be pre-empted if it provides a separate vehicle to assert a claim for benefits outside of, or in addition to, ERISA's remedial scheme or enlarges that claim beyond the benefits available in any action brought under § 1132(a). *See Pilot Life,* 481 U.S. at 54, 107 S.Ct. at 1556, *Rush Prudential,* --- U.S. at ----, 122 S.Ct. at 2167.

The question therefore, is whether Pennsylvania's bad faith statute provides such a vehicle. I conclude that it clearly does. ERISA's enforcement scheme authorizes an action to recover benefits, obtain a declaratory judgment that one is entitled to benefits, and to enjoin an improper refusal to pay benefits. 29 U.S.C. § 1132(a). ERISA's civil enforcement provision also authorizes suits to seek removal of the fiduciary as well as claims for attorney's fees. *Id.* In contrast, punitive damages and interest penalties are not provided for under ERISA. Thus, Pennsylvania's

bad faith statute, authorizing punitive damages and interest penalties, would significantly expand the potential scope of ultimate liability imposed upon employers by the ERISA scheme. In short, the relief ultimately available would not be what ERISA authorizes in a suit for benefits under § 1132(a). Therefore, because Pennsylvania's bad faith statute provides a form of ultimate relief in a judicial forum that adds to the judicial remedies provided by ERISA, it is incompatible with ERISA's exclusive enforcement scheme and falls within *Pilot Life's* categorical preemption.

IV. CONCLUSION

**\*8** Defendant's Motion to Dismiss as it relates to Count I of Plaintiff's Compliant is Denied. However, because Pennsylvania bad faith statue does not regulate insurance, within the meaning of ERISA's saving clause and there is a clear expression of congressional intent that ERISA's civil enforcement scheme be exclusive, Defendant's Motion to Dismiss Count II of Plaintiff's Complaint is Granted and Plaintiff's bad faith claim is Dismissed.

An appropriate Order follows.

ORDER

AND NOW, this 19th day of August, 2002, upon consideration of Defendant's Motion to Dismiss (Docket No. 3), Plaintiff's response in opposition thereto (Docket No. 4), along with other matters of record, it is hereby ORDERED that Defendant's motion is DENIED part and GRANTED in part.

Defendant's Motion to Dismiss Count I of Plaintiff's Complaint (ERISA) in DENIED. Defendant's Motion to Dismiss Count II of Plaintiff's Complaint (Bad Faith) is GRANTED. Plaintiff's bad faith claim pursuant to 42 Pa. Cons.Stat. Ann. § 8371 is DISMISSED.

2002 WL 1917711 (E.D.Pa.), 28 Employee Benefits Cas. 2321

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

221 F.Supp.2d 572                                                      Page 1
**(Cite as: 221 F.Supp.2d 572, 2002 WL 31015204 (E.D.Pa.))**

United States District Court,
E.D. Pennsylvania.

Diane KIRKHUFF, et al.
v.
LINCOLN TECHNICAL INSTITUTE INC., et al.
Ross P. Bartimus
v.
Lincoln Technical Institute, Inc., et al.
Robert C. Radle
v.
Lincoln Technical Institute, Inc., et al.

**Civil Action Nos. 02-483, 02-2043, 02-2044.**

Sept. 6, 2002.

Employees sued employer, alleging violations of the Employee Retirement Income Security Act (ERISA) regarding the alleged cancellation or deletion of life insurance benefits. On the employees' motions to amend each complaint to add a claim for punitive damages under Pennsylvania's bad faith statute, the District Court, Bartle, J., held that Pennsylvania's bad faith statute was not a law "which regulates insurance," so as to survive ERISA preemption under ERISA's savings clause.

Motions denied.

West Headnotes

**[1] Insurance** 🔑1117(1)
217k1117(1) Most Cited Cases

**[1] States** 🔑18.41
360k18.41 Most Cited Cases

Pennsylvania's bad faith statute, while directed solely to the insurance industry, was not a law "which regulates insurance," so as to survive ERISA preemption under ERISA's savings clause, as the bad faith statute authorized remedies which were not authorized by ERISA, specifically, punitive damages and interest three percent above prime. Employee Retirement Income Security Act of 1974, § 514(a), (b)(2)(A), 29 U.S.C.A. § 1144(a), (b)(2)(A); 42 Pa.C.S.A. § 8371.

**[2] Insurance** 🔑1117(1)
217k1117(1) Most Cited Cases

**[2] States** 🔑18.41

360k18.41 Most Cited Cases

In determining whether a state law is a law regulating insurance, so as to survive ERISA preemption under ERISA's savings clause, court should begin with a common sense view of the matter, then test that result against three factors, none of which are necessarily determinative: (1) whether the law has the effect of transferring or spreading a policyholder's risk; (2) whether it is an integral part of the policy relationship between insurer and insured; and (3) whether it is limited to entities within the insurance industry. Employee Retirement Income Security Act of 1974, § 514(a), (b)(2)(A), 29 U.S.C.A. § 1144(a), (b)(2)(A).

**[3] Pensions** 🔑22
296k22 Most Cited Cases

**[3] States** 🔑18.51
360k18.51 Most Cited Cases

Even if a state statute would otherwise fit within ERISA's preemption savings clause, it is nevertheless preempted by ERISA if it permits claimants to obtain remedies that Congress rejected in ERISA. Employee Retirement Income Security Act of 1974, § 514(a), (b)(2)(A), 29 U.S.C.A. § 1144(a), (b)(2)(A).
*573 Jane Roach, Stroudsburg, PA, for Diane Kirkhuff.

Joseph M. Profy, Kenneth M. Kolaski, Andrew J. Soven, Reed, Smith, Shaw & McClay, Philadelphia, PA, for Lincoln Technical Institute, Inc.

Lincoln Technical Institute, Inc., West Orange, NJ, pro se.

Kristofor T. Henning, Stephen A. Serfass, Drinker Biddle & Reath LLP, Philadelphia, PA, for The United States Life Insurance Company in the City of New York.

*MEMORANDUM*

BARTLE, District Judge.

**\*\*1** These are actions alleging violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Before the court are motions to amend each complaint to add a claim for punitive damages under Pennsylvania's bad faith statute, 42 Pa.Cons.Stat.Ann. § 8371.

221 F.Supp.2d 572                                                                                             Page 2
**(Cite as: 221 F.Supp.2d 572, 2002 WL 31015204 (E.D.Pa.))**

Plaintiffs are employees of defendant Lincoln Technical Institute, Inc. They are participants in an employee welfare benefit plan providing insurance benefits through a group life insurance policy issued by defendant The United States Life Insurance Company in the City of New York. Plaintiffs contend that certain benefits have been cancelled or deleted in violation of ERISA.

Plaintiffs' motions to amend were triggered by a recent decision by our colleague Judge Clarence C. Newcomer in *Rosenbaum v. Unum Life Ins. Co. of Am.,* Civil Action No. 01-6758 (E.D.Pa.), allowing a bad faith claim to proceed in an ERISA action. Shortly thereafter, our colleague Judge Ronald L. Buckwalter reached the opposite result in *Sprecher v. Aetna U.S. Healthcare, Inc.,* Civil Action No. 02-580 (E.D.Pa.). He concluded that ERISA preempted such a cause of action.

Rule 15 of the Federal Rules of Civil Procedure provides that "leave [to amend] shall be freely given when justice so requires." However, leave should be denied when the amendment would be futile, that is, when the amendment does not state a claim for relief. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

The Pennsylvania bad faith statute provides:
   In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
   (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
   (2) Award punitive damages against the insurer.
   (3) Assess court costs and attorney fees against the insurer.
42 Pa.Cons.Stat.Ann. § 8371.

ERISA, which expansively regulates employee benefit plans, contains a broad preemption provision:
   Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....
29 U.S.C. § 1144(a).

[1] It is undisputed that the Pennsylvania bad faith statute relates to employee *574 benefit plans and thus comes within the embrace of this preemptive language. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47-48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

This, however, does not end our analysis. To complicate matters, ERISA proceeds to give back part of what it takes away. It exempts from preemption "any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A). We must therefore determine whether the bad faith statute is a law which regulates insurance so as to survive under this saving clause.

[2] The question of the interplay of the preemption and saving clauses of ERISA has "occupie[d] a substantial share of [the Supreme Court's] time." *Rush Prudential HMO, Inc. v. Moran,* --- U.S. ----, ----, 122 S.Ct. 2151, 2158, 153 L.Ed.2d 375 (2002). In a series of opinions, the Court has developed a multi-faceted test for deciding whether a particular state law is on one side of the line or the other. *E.g., id.* 122 S.Ct. at 2159; *UNUM Life Ins. Co. of Am. v. Ward,* 526 U.S. 358, 367-68, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999); *Pilot Life,* 481 U.S. at 48-49, 107 S.Ct. 1549. In its latest pronouncement on the subject, the Supreme Court reiterated that we must first start with a " 'common sense view of the matter' " in deciding whether a particular law is " 'specifically directed toward [the insurance] industry.' " *Rush,* 122 S.Ct. at 2159. We must then test this result against the three factors used to determine whether the state insurance laws are exempt from preemption under the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq. The three factors are:
   **2 (1) whether the practice [or law] has the effect of transferring or spreading a policyholder's risk;
   (2) whether the practice [or law] is an integral part of the policy relationship between the insurer and the insured; and
   (3) whether the practice [or law] is limited to entities within the insurance industry.
*Id.* 122 S.Ct. at 2163; *UNUM,* 526 U.S. at 367, 119 S.Ct. 1380. The Supreme Court has cautioned that these are merely "guideposts." *Rush,* 122 S.Ct. at 2163. None is necessarily determinative on the issue of preemption. *UNUM,* 526 U.S. at 373, 119 S.Ct. 1380.

For the reasons stated in *Sprecher* and *Rosenbaum,* we agree that under a common sense view the Pennsylvania bad faith statute is directed specifically toward the insurance industry. One need only look at its language. Furthermore, we agree that the statute does not involve the transferring or spreading of risks. However, as to the second McCarran-Ferguson factor we find the reasoning in *Sprecher* persuasive that the bad faith statute does not constitute an integral part of the relationship between the insurer and insured. Finally, we concur with both *Sprecher* and *Rosenbaum* that the statute is limited by its

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

221 F.Supp.2d 572                                                              Page 3
(Cite as: 221 F.Supp.2d 572, 2002 WL 31015204 (E.D.Pa.))

express terms "to an action arising under an insurance policy," and thus to entities within the insurance industry.

[3] Nonetheless, even if the statute would otherwise fit within the saving clause, preemption still wins the day if "state law permits claimants to obtain remedies that Congress rejected in ERISA." *Rush,* 122 S.Ct. at 2165; *Pilot Life,* 481 U.S. at 54, 107 S.Ct. 1549. The Supreme Court in *Rush* specifically declared that any state law that "added to the judicial remedies provided by ERISA ... violates ERISA's policy of inducing employers to offer benefits by assuring a predictable set of liabilities, under uniform standards or primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Rush,* 122 S.Ct. at 2166.

*575 Under ERISA, a participant or beneficiary may seek benefits due; enforce and clarify rights under the plan; and obtain equitable relief to enjoin or redress violations, or to enforce provisions of the plan. 29 U.S.C. § 1132(a). In addition, one may seek to remove a fiduciary, and to recover losses to a plan resulting from a breach of fiduciary duty. 29 U.S.C. § § 1109 and 1132(a). ERISA also permits the awarding of attorney's fees. 29 U.S.C. § 1132(g). Unlike the Pennsylvania bad faith statute, ERISA nowhere authorizes a participant or beneficiary to obtain punitive damages or interest 3% above prime. *See Pilot Life,* 481 U.S. at 54, 107 S.Ct. 1549.

The Supreme Court ruled in *Pilot Life,* an ERISA case involving a claim under the Mississippi common law of bad faith applicable in both the insurance and non-insurance context, that the remedies set forth in ERISA are exclusive and that a remedy for punitive damages is not to be implied. The Court held the Mississippi common law allowing punitive damages to be preempted. *Id.* at 57, 107 S.Ct. 1549; *see Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 147-48, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). As *Pilot Life* made clear, "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive." *Pilot Life,* 481 U.S. at 54, 107 S.Ct. 1549.

**3 The more recent Supreme Court decision in *Rush* is not to the contrary. There Illinois state law provided for an independent medical review of a patient's claim when it is disputed by his or her health maintenance organization (HMO). The HMO had a contract to provide medical services under an

employee benefit plan covered by ERISA. Under the ERISA plan, the HMO had the "broadest possible discretion" in determining whether the medical services were "medically necessary." The Court ruled that the state law was merely akin to requiring a second opinion and nothing more than a procedure for the administrative review of benefit determinations. In deciding that the Illinois insurance law in issue was not preempted, the Supreme Court explained that it "provides no new cause of action under state law and authorizes no new form of ultimate relief." *Rush,* 122 S.Ct. at 2167.

In contrast, the Pennsylvania bad faith statute provides a new cause of action and a new form of ultimate relief. No common law remedy existed in the Commonwealth for bad faith conduct on the part of an insurer. *D'Ambrosio v. Pa. Nat'l Mut. Cas. Ins. Co.,* 494 Pa. 501, 431 A.2d 966, 970 (1981). To rectify what it saw as a deficiency in the common law, the Pennsylvania General Assembly enacted the bad faith statute in 1990. *Terletsky v. Prudential Prop. & Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (1994). The purpose of the enactment is " 'to provide a statutory remedy to an insured when the insurer denied benefits in bad faith.' " *O'Donnell ex rel. Mitro v. Allstate Ins. Co.,* 1999 Pa.Super 161, 734 A.2d 901, 905 (1999). In sum, the Pennsylvania bad faith statute creates a separate form of relief not only beyond what had heretofore been available in the Commonwealth but with its allowance of punitive damages supplies a remedy not authorized by Congress under ERISA.

We recognize that in *Pilot Life* the Mississippi common law of bad faith, unlike its Pennsylvania statutory counterpart, affected entities beyond the insurance industry. For this reason, the Mississippi law clearly did not survive under ERISA's saving clause for laws merely regulating insurance. *576 However, we do not think this distinction between the laws of these two states is significant in light of the Supreme Court pronouncements in that and later cases that the preemptive effect of ERISA is broad with respect to remedies. In our view, the Supreme Court's decision would have been the same even if Mississippi had had a narrower law. Otherwise a state could easily circumvent *Pilot Life* and ERISA by passing a specific statute like the one before us or even by enacting two separate bad faith statutes, one to deal with recalcitrant insurers and a similar one to deal with all other malefactors. Such a result would effectively upset, if not nullify, the nationally uniform remedies of ERISA.

As the Supreme Court has emphasized in its recent

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

221 F.Supp.2d 572                                                                                                     Page 4
**(Cite as: 221 F.Supp.2d 572, 2002 WL 31015204 (E.D.Pa.))**

ruling in *Rush,* "the civil enforcement provisions [of ERISA] are of such extraordinarily preemptive power that they override even the 'well-pleaded complaint' rule for establishing the conditions under which a cause of action may be removed to a federal forum." *Rush,* 122 S.Ct. at 2165. Consequently, even though the Pennsylvania law in issue allowing the award of punitive damages is directed solely toward the insurance industry, we agree with *Sprecher* that it conflicts with the carefully crafted and exclusive remedial scheme of ERISA and is preempted.

**\*\*4** Since pursuit of any claims by plaintiffs under the Pennsylvania bad faith statute, 42 Pa.Cons.Stat.Ann. § 8371, in these ERISA actions would be futile, the motions of plaintiffs to amend their complaints will be DENIED.

*ORDER*

AND NOW, this 6th day of September, 2002, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motions of plaintiffs in each of these three actions to amend their complaints to add a claim under 42 Pa.Cons.Stat.Ann. § 8371 are DENIED.

221 F.Supp.2d 572, 2002 WL 31015204 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

222 F.Supp.2d 692
28 Employee Benefits Cas. 2850
**(Cite as: 222 F.Supp.2d 692)**

Page 1

United States District Court, E.D. Pennsylvania.

Linda BELL,
v.
UNUMPROVIDENT CORPORATION and
Provident Life and Insurance Company.

**No. CIV.A. 02-2418.**

Sept. 19, 2002.

Employee sued insurer and administrator of an Employee Retirement Income Security Act (ERISA) plan offering disability insurance benefits, asserting a claim for breach of contract. Defendants removed the action from state court. On the employee's motion to remand, and a defense motion to dismiss, the District Court, Baylson, J., held that: (1) notice starting the 30-day removal period ran from the time employee served her complaint, and (2) claim under the Pennsylvania bad faith statute did not fall under ERISA's preemption savings clause.

Motion to dismiss granted in part, and motion to remand denied.

West Headnotes

**[1] Removal of Cases** ⟨key⟩**79(1)**
334k79(1) Most Cited Cases

Notice starting the 30-day removal period ran from the time employee served her complaint on insurer and administrator of an ERISA plan, not from the earlier date of service of a writ of summons; it was not until the complaint was served that defendants had notice, from the pleadings themselves, that there was diversity of citizenship and the amount in controversy was in excess of $75,000, thus establishing the requisites for federal diversity of citizenship jurisdiction, and also that the nature of the employee's claim was under a benefit program, and thus was, at least arguably, subject to ERISA preemption. 28 U.S.C.A. § 1446(b); Employee Retirement Income Security Act of 1974, § 514(a), 29 U.S.C.A. § 1144(a).

**[2] Pensions** ⟨key⟩**22**
296k22 Most Cited Cases

**[2] States** ⟨key⟩**18.51**
360k18.51 Most Cited Cases

State law claim is completely preempted by ERISA when the claim falls within the scope of ERISA's civil enforcement provision. Employee Retirement Income Security Act of 1974, § § 502(a), 514(a), 29 U.S.C.A. § § 1132(a), 1144(a).

**[3] Insurance** ⟨key⟩**1117(4)**
217k1117(4) Most Cited Cases

**[3] States** ⟨key⟩**18.41**
360k18.41 Most Cited Cases

Claim against disability insurer and ERISA plan administrator under the Pennsylvania insurance bad faith statute did not fall under ERISA's preemption savings clause, which exempted from preemption "any law of any state which regulates insurance"; the bad faith statute did not serve to spread the policyholder's risk, but provided a tort remedy for bad faith, including types of damages not allowed under ERISA, and it did not alter the terms of the contract between the insurer and the insured, but only provided for a damage remedy for bad faith. McCarran-Ferguson Act, § 1 et seq., 15 U.S.C.A. § 1011 et seq.; Employee Retirement Income Security Act of 1974, § 514(a), (b)(2)(A), 29 U.S.C.A. § 1144(a), (b)(2)(A); 42 Pa.C.S.A. § 8371.

**[4] Insurance** ⟨key⟩**1117(1)**
217k1117(1) Most Cited Cases

**[4] States** ⟨key⟩**18.41**
360k18.41 Most Cited Cases

To determine whether a state law "regulates insurance" within the meaning of ERISA's preemption savings clause, a court must first determine whether, from a common sense view of the matter, the state statute in question regulates insurance, and secondly, must then consider the three traditional factors under the McCarran-Ferguson Act to determine whether the regulation fits within the "business of insurance": whether the practice has the effect of transferring or spreading a policyholder's risk; whether the practice is an integral part of the policy relationship between the insurer and the insured; and whether the practice is limited to entities within the insurance industry. McCarran-Ferguson Act, § 1 et seq., 15 U.S.C.A. § 1011 et seq.; Employee Retirement Income Security Act of 1974, § 514(a), (b)(2)(A), 29 U.S.C.A. § 1144(a), (b)(2)(A).

***693** Andrew R. Spiegel, Law Offices of Andrew R.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

222 F.Supp.2d 692
28 Employee Benefits Cas. 2850
**(Cite as: 222 F.Supp.2d 692)**

Spiegel, Philadelphia, PA, for plaintiff.

Andrew F. Susko, White and Williams, Philadelphia, PA, for defendants.

### *MEMORANDUM*

Baylson, District Judge.

The issues presented by this case are the timeliness of removal, relating to the contents of the initial pleadings filed in state court; and whether Plaintiff's claims, principally under the Pennsylvania Insurance Bad Faith Statute, are subject to preemption. Before this Court is the Motion to Dismiss by the defendants UNUMProvident Corporation and Provident Life and Insurance Company ("Defendants") and the Motion to Remand by the plaintiff Linda Bell ("Plaintiff"). Oral argument was held on August 21, 2002. For the reasons set forth below, Defendants' Motion to Dismiss will be granted in part, and Plaintiff's Motion to Remand will be denied.

### I. *Background*

This case was started by Writ of Summons in the Court of Common Pleas of Philadelphia County, February Term, 2002, No. 1639, which was filed on February 11, 2002. The Civil Cover Sheet to the Writ of Summons indicated that the claim *694 was for breach of contract and that the amount in controversy was more than $50,000. No further details were provided from the initial pleadings. [FN1]

> FN1. Under Pennsylvania practice, an "initial pleading," as that term is used in 28 U.S.C. § 1446(b), may be the actual Writ of Summons itself, *see* Pa. R. Civ. P. 1007, but the Civil Cover Sheet, which is required under the local rules of the Court of Common Pleas of Philadelphia County, is not considered part of the initial pleading. *See* Phila. Civ. R. 205.2(A)(9)(b).

Defendants were served with the Writ of Summons on February 17, 2002, and filed a Praecipe demanding that Plaintiff file a Complaint. The Complaint was filed in the Court of Common Pleas of Philadelphia County on April 9, 2002, following which Defendants filed a Notice of Removal in this Court on April 25, 2002. As is obvious from the

above chronology, the Notice of Removal was more than thirty days from service of the Writ of Summons, but less than thirty days from the service of the Complaint.

Plaintiff has filed a Motion to Remand the case to the Court of Common Pleas on the grounds that the removal was not within thirty days as required by 28 U.S.C. § 1446(b). Plaintiff argues that the Writ of Summons itself made clear that there was diversity of citizenship, and that Defendants knew from negotiations that had taken place between the parties, or should have known from doing their own investigation of the matter, that the "amount in controversy" was more than the federal jurisdictional requisite of $75,000.

Defendants oppose the Petition to Remand on the grounds that the "four corners" of the pleadings do not disclose that the amount in controversy is more than $75,000 and that Defendants' subjective knowledge, whether secured from negotiations with Plaintiff's counsel or its own investigation of the file, is irrelevant.

Defendants' Notice of Removal also relied on the complete preemption provided by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* under the doctrine of *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Defendants assert that they were not apprised of the appropriate allegations allowing removal until the actual Complaint was served on April 9, 2002, and that their Notice of Removal was timely because it was filed within thirty days after service of the Complaint.

### II. *Analysis*

#### A. *Defendants' Removal*

[1] The leading case in this Circuit on the issue of what constitutes notice starting the thirty-day removal period is *Foster v. Mutual Fire Marine & Inland Insurance Co.*, 986 F.2d 48 (3d Cir.1993). In this case, Judge Higginbotham reviewed contradictory district court opinions within the Circuit and rejected any concept that the knowledge of the defendants, outside the contents of the pleadings, would warrant the running of the thirty-day period. As Judge Higginbotham concluded, "the relevant test is not what the defendants purportedly knew, but what these documents said." *Foster*, 986 F.2d at 54. He also held that for something to be

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

222 F.Supp.2d 692
28 Employee Benefits Cas. 2850
**(Cite as: 222 F.Supp.2d 692)**

considered a "pleading", "it must be something of the type filed with a court." *Id.* Judge Higginbotham concluded: "We hold that § 1446(b) requires defendants to file their Notices of Removal within thirty days after receiving a writ of summons, praecipe, or complaint which in themselves provide adequate notice of federal jurisdiction as noted above." *Id.* [FN2]

> FN2. Defendants assert that the listing of the address of Plaintiff as in Philadelphia only denominates a residence, which is not necessarily the same as citizenship, which is the jurisdictional requisite under 28 U.S.C. § 1332(a). "In order to establish jurisdiction under 28 U.S.C. § 1332, the citizenship of the parties, and not merely their residences or addresses, must be alleged." *Robinson v. Nutter,* No. C.A. 94-5578, 1995 WL 61158, at *2 (E.D.Pa. Feb.14, 1995) (citing *Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir.1972)).

**\*695** Based on the above facts, this Court holds that the Notice of Removal was timely because it was not until April 9, 2002, when Plaintiff served her Complaint on Defendants, that Defendants had notice, from the pleadings themselves, that there was diversity of citizenship and the amount in controversy was in excess of $75,000, thus establishing the requisites for federal diversity of citizenship jurisdiction, 28 U.S.C. § 1332(a)(1), but also that the nature of Plaintiff's claim was under a benefit program, thus was, at least arguably, subject to ERISA preemption. *See Robinson v. Nutter,* No. C.A. 94-5578, 1995 WL 61158, at *2 (E.D.Pa. Feb.14, 1995).

B. *Defendants' Motion to Dismiss*

Having found that Defendants timely filed their Notice of Removal, this Court must now consider Defendants' Motion to Dismiss Counts II--IV of the Complaint.

Count I charges breach of contract, and alleges that Defendants have failed to provide to Plaintiff the benefits to which Plaintiff is entitled. Defendant does not move to dismiss this Count, but to re-characterize it as a claim for denial of benefits under ERISA. [FN3]

> FN3. *Metropolitan Life Insurance Co. v.*

*Taylor,* 481 U.S. 58, 60 n. 1, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), states that a civil action may be brought by a participant or beneficiary of an ERISA plan "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." (citing § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)).

Count II charges bad faith under the Pennsylvania bad faith statute, 42 Pa. Cons.Stat. Ann. § 8371 ("Section 8371"), which provides:

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
(2) Award punitive damages against the insurer.
(3) Assess court costs and attorney fees against the insurer."

Count III charges that Defendants have violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 78 Pa. Cons.Stat. Ann. § 201-1, and also contains a cross reference to Defendants' alleged bad faith, specifically citing Section 8371. Count III seeks monetary damages including compensatory damages, interest, attorneys fees, and costs.

Count IV charges misrepresentation, fraud and deceit, including another cross reference to the bad faith statute, Section 8371, and seeks compensatory damages, attorneys fees, interest, costs, treble damages, damages for delay, and punitive damages.

Count V charges breach of duty of good faith and fair dealing, and although it incorporates all of the prior paragraphs, there is no specific reference to the bad faith statute.

1. *Supreme Court Preemption Cases*

The question presented is whether Counts II--V are preempted by ERISA. In *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. **\*696** 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), decided the same day as *Metropolitan Life,* the Court held that state law suits concerning either improper processing of claims for benefits, or common-law contract and tort claims, seeking damages under a benefit plan, were preempted by ERISA:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

222 F.Supp.2d 692
28 Employee Benefits Cas. 2850
**(Cite as: 222 F.Supp.2d 692)**

Page 4

"The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."
*Pilot Life,* 481 U.S. at 54, 107 S.Ct. 1549.

[2] *Metropolitan Life* also holds that claims arising out of employee benefit plans are subject to complete federal preemption under § 514(a), 29 U.S.C. § 1144(a), which provides that the rights, regulations, and remedies afforded under the statute "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...." § 514(a), 29 U.S.C. § 1144(a); *Metropolitan Life,* 481 U.S. at 62, 107 S.Ct. 1542. ERISA's broad definition of "state law" includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). A state law claim is completely preempted when the claim falls within the scope of ERISA's civil enforcement provision, § 502(a), § 29 U.S.C. § 1132(a); *Metropolitan Life,* 481 U.S. at 62-63, 107 S.Ct. 1542.

In *Pilot Life,* an injured employee brought a common-law bad faith claim against the insurance company that issued the ERISA disability benefit plan to the plaintiff's employer. *Pilot Life,* 481 U.S. at 43, 107 S.Ct. 1549. The Supreme Court held that the Mississippi common law of bad faith, which was applicable in both the insurance and non-insurance contexts and allowed punitive damages, was preempted by ERISA because the remedies set forth in ERISA were intended to be exclusive. *Id.* at 57, 107 S.Ct. 1549.

Based on *Pilot Life* and other similar decisions, the opinions of this Court were fairly unanimous in holding that claims brought under Pennsylvania's bad faith statute are preempted by ERISA.

Plaintiff asserts, in opposing Defendants' Motion, that two recent decisions by the Supreme Court, in *UNUM Life Insurance Co. of America v. Ward,* 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999), and *Rush Prudential HMO, Inc. v. Moran,* --- U.S. --- -, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002), require a change in the preemption analysis.

There is no dispute that Plaintiff's subject disability insurance policy is an employee welfare benefit plan governed by ERISA. *See* 29 U.S.C. § 1002(1). Plaintiff's claims are claims to recover benefits due under an ERISA plan. *See* Compl. ¶¶ 13, 14, 15.

[3][4] Plaintiff asserts that the claim under the Pennsylvania bad faith statute is not subject to preemption, but is exempted under the so-called ERISA savings clause, which exempts from preemption "any law of any state which regulates insurance". § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A). In order to determine whether a state law "regulates insurance" within the meaning of the savings clause, a court must first determine whether, from a "common sense view of the matter", the state statute in question regulates insurance and secondly, must then consider the three traditional factors under the McCarran- Ferguson Act, 15 U.S.C. § 1011 *et seq.* to determine whether the regulation fits within the "business of insurance":
   **\*697** 1. Whether the practice has the effect of transferring or spreading a policyholder's risk;
   2. Whether the practice is an integral part of the policy relationship between the insurer and the insured;
   3. Whether the practice is limited to entities within the insurance industry.
*Ward,* 526 U.S. at 367, 119 S.Ct. 1380.

In the *Ward* case, and according to some commentators for the first time, the Supreme Court held that a state regulation need not satisfy all three McCarran-Ferguson factors in order to "regulate insurance" under ERISA's savings clause. *Id.* at 373, 119 S.Ct. 1380. Citing *Pilot Life,* the Supreme Court indicated that the McCarran-Ferguson factors are "considerations [to be] weighed in determining whether a state law regulates insurance," *id.* (citing *Pilot Life,* 481 U.S. at 49, 107 S.Ct. 1549), and that "[n]one of these criteria is necessarily determinative in itself[.]" *Id.*

*2. Cases in this District*

Three judges in this district have recently issued opinions which differ on the impact of *Ward* and *Rush* on the preemption issue. In *Rosenbaum v. UNUM Life Insurance Co.,* C.A. No. 01-6758, 2002 WL 1769899, at \*1-3 (E.D.Pa. July 29, 2002), Judge Newcomer wrote that *Ward* and *Rush* had significantly changed the landscape, and a claim under Pennsylvania's bad faith statute was not preempted by ERISA because the bad faith statute was a form of insurance regulation. Citing a decision of the Pennsylvania Supreme Court in *The Birth Center, St. Paul Companies, Inc.,* 567 Pa. 386, 787 A.2d 376 (2001), Judge Newcomer held that the legislative intent behind the Pennsylvania bad faith statute was to regulate insurance. *Id.* at \*2.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

However, Judge Buckwalter, in *Sprecher v. Aetna U.S. Healthcare, Inc.,* C.A. No. 02-00580, 2002 WL 1917711, at \*7 (E.D.Pa. Aug.19, 2002), reached an opposite conclusion and held that because the Pennsylvania bad faith statute primarily allowed tort claims for relief not provided by ERISA, such as interest and punitive damages, that it was inconsistent with ERISA and therefore preempted.

In *Kirkhuff v. Lincoln Technical Institute, Inc.,* 221 F.Supp.2d 572, ----, 2002 WL 31015204, \*3-4, 2002 U.S. Dist. LEXIS 17196, at \*11 (E.D.Pa. Sept. 6, 2002), Judge Bartle arrived at the same conclusion as Judge Buckwalter, that Section 8371 did not regulate insurance within the meaning of ERISA's savings clause and that a Section 8371 claim was thus preempted. Judge Bartle noted that "even though the Pennsylvania law in issue allowing the award of punitive damages is directed solely toward the insurance industry, we agree with *Sprecher* that it conflicts with the carefully crafted and exclusive remedial scheme of ERISA and is preempted." *Id.*

In approaching this issue, which may remain a matter of difference among the judges of this Court until the Third Circuit or the United States Supreme Court rules, we must first consider, as instructed in *Ward,* the common sense view, and then the McCarran-Ferguson test. There is no dispute among Judge Newcomer, Judge Buckwalter, and Judge Bartle, that under the common sense test, Pennsylvania's bad faith statute "regulates" insurance, if only because it is applicable only to insurers in actions arising under an insurance policy and is never applied outside the insurance industry. [FN4]

> FN4. The statute exclusively provides for damage actions. There may be some room for dispute as to whether a statute providing for damages against insurers is the same as a statute "regulating" insurance.

\*698 Turning to the McCarran-Ferguson test, and as the Supreme Court said in *Ward,* a statute need not meet each of the test's factors in order to "regulate insurance" within the meaning of ERISA's savings clause. *Ward,* 526 U.S. at 373, 119 S.Ct. 1380. Rather, the McCarran-Ferguson prongs are relevant factors to be used as "guideposts" to analyze whether the state rule regulates insurance. *Id.* at 374, 119 S.Ct. 1380.

Essentially for the reasons adopted by Judge Buckwalter in *Sprecher,* Pennsylvania's bad faith statute does not serve to spread the policyholder's risk. Rather, it provides a tort remedy for bad faith, including types of damages that are not allowed under ERISA. It is true that if an insurer is held liable, then premiums may rise, but this does not directly relate to the spreading of risk.

As to the second requirement concerning the policy relationship, Section 8371 does not alter the terms of the contract between the insurer and the insured, but only provides for a damage remedy for bad faith. The availability of punitive damages provides some incentive for insurance companies to handle insurance claims with good faith, but this does not change the policy relationship itself.

Turning to the final McCarran-Ferguson factor, the Pennsylvania bad faith statute is clearly limited to entities within the insurance industry because it is only available for claims by a policyholder against the insurance company. However, meeting only this one of the three McCarran-Ferguson prongs does not save the Pennsylvania bad faith statute from preemption.

### 3. *Ward and Rush Do Not Change the Rule in Pilot Life*

It is important to examine *Ward* and *Rush* to see how those opinions turned on the nature of the state regulations at issue in each case, which can be distinguished from the Pennsylvania bad faith statute in the instant case.

In *Ward,* the defendant insurer issued a long-term group disability policy to the plaintiff's California employer with all premiums deducted from the plaintiff's pay. *Ward,* 526 U.S. at 364-65, 119 S.Ct. 1380. The ERISA policy provided that proofs of claim be furnished to the defendant within a certain time from the onset of disability. *Id.* at 364, 119 S.Ct. 1380. The plaintiff became permanently disabled but submitted his proof of claim too late under the policy terms, and his claim was denied as untimely. *Id.* at 365, 119 S.Ct. 1380. The plaintiff brought an ERISA action to recover the disability benefits under the plan. *Id.*

The district court granted the defendant's motion for summary judgment, and the plaintiff appealed to the United States Court of Appeals for the Ninth Circuit, which held that California's notice-prejudice rule, requiring the insurer to prove that it suffered

substantial prejudice from the insured's failure to give timely notice of a claim, was saved from preemption as a law that "regulates insurance." *Id.* at 366, 119 S.Ct. 1380. After finding that the California notice-prejudice rule satisfied the common sense view and the second and third prongs of the McCarran-Ferguson test, the Supreme Court affirmed the Ninth Circuit's holding that the notice-prejudice rule regulates insurance within the meaning of ERISA's savings clause. *Id.* at 374-76, 119 S.Ct. 1380.

In *Rush,* the plaintiff employee received medical coverage from her employer's ERISA welfare benefit plan issued by the defendant health maintenance organization ("HMO"). *Rush,* 122 S.Ct. at 2156. The terms of the policy dictated that the defendant would provide insureds only with services it deemed "medically necessary" *699 through its exercise of the "broadest possible discretion." *Id.* After the plaintiff developed chronic shoulder pain, the defendant repeatedly denied the plaintiff's requests for surgery. *Id.* The plaintiff then made a written demand for an independent medical review of her claim as provided by the Illinois HMO Act, which requires HMOs to provide a second opinion from a physician unaffiliated with the HMO on the medical necessity of a covered service proposed by the primary care physician in the event of a dispute between the primary care physician and the HMO. *Id.* at 2156-57. The defendant HMO did not provide the independent review, and the plaintiff had the surgery and submitted a reimbursement claim to the defendant. *Id.* at 2157. The plaintiff sued in state court for reimbursement, and the defendant removed to federal court arguing that the plaintiff stated a claim for ERISA benefits that was completely preempted. *Id.* at 2157-58. The district court agreed with the defendant and dismissed the plaintiff's claims. *Id.* at 2158.

On appeal, the United States Court of Appeals for the Seventh Circuit reversed the district court, holding that the Illinois HMO Act regulated insurance and was thus saved from preemption. *Id.* The Supreme Court affirmed, finding that the law satisfied the common sense test and the second and third prongs of the McCarran-Ferguson test and thus regulated insurance within the meaning of ERISA's savings clause. *Id.* at 2159-64. Additionally, the law was not preempted because it "provides no new cause of action under state law and authorizes no new form of ultimate relief." *Id.* at 2167.

The instant case may be distinguished from *Ward* and *Rush* because in each of those cases, the state

regulations at issue, the California notice-prejudice rule and the Illinois HMO Act respectively, were strictly concerned with the processing of insurance claims and did not provide alternative or additional remedies unauthorized by ERISA. In this case, the Pennsylvania bad faith statute specifically authorizes punitive damages and interest at three percent above the prime rate, separate remedies not authorized by Congress under ERISA. *See* 42 Pa. Cons.Stat. Ann. § 8371; § 502, 29 U.S.C. § 1132.

In *Pilot Life,* as the Supreme Court noted, the:
"complaint contained three counts: 'Tortious Breach of Contract'; 'Breach of Fiduciary Duties'; and 'Fraud in the Inducement.' ... Dedeaux [the plaintiff] sought '[d]amages for failure to provide benefits under the insurance policy in a sum to be determined at the time of trial,' '[g]eneral damages for mental and emotional distress and other incidental damages in the sum of $250,000.00,' and '[p]unitive and exemplary damages in the sum of $500,000.00.' "
*Pilot Life,* 481 U.S. at 43-44, 107 S.Ct. 1549.

The Court summarized the parties' contentions as follows:
"Although Dedeaux's complaint pleaded several state common law causes of action, before this Court Dedeaux has described only one of the three counts-- called 'tortious breach of contract' in the complaint, and 'the Mississippi law of bad faith' in respondent's brief--as protected from the pre-emptive effect of § 514(a). The Mississippi law of bad faith, Dedeaux argues, is a law 'which regulates insurance,' and thus is saved from pre-emption by § 514(b)(2)(A)."
*Id.* at 48, 107 S.Ct. 1549.

After reviewing Mississippi law, the Court unanimously concluded that the state's laws, under which plaintiff was suing, did not fall within ERISA's saving clause. *Pilot Life* specifically concerned bad faith claims, but *Ward* and *Rush* did *700 not. Also, there is not a whisper in either *Ward* or *Rush* which purports to overrule *Pilot Life,* and which must still be considered as controlling the present dispute and requiring dismissal of Plaintiff's Counts II--IV.

Therefore, this Court's finding that Section 8371 does not regulate insurance within the meaning of ERISA's savings clause follows *Pilot Life* and does not contradict *Ward* and *Rush.*

III. *Conclusion*

222 F.Supp.2d 692
28 Employee Benefits Cas. 2850
**(Cite as: 222 F.Supp.2d 692)**

Having found that Section 8371 does not "regulate insurance" within the meaning of ERISA's savings clause, Counts II, III, and IV of Plaintiff's Complaint are preempted and will be dismissed. Although Count V alleges a breach of the duty to act in good faith and does not specifically refer to Section 8371, it states a claim for ERISA benefits, and is thus preempted and dismissed. Count I will be restyled as an ERISA complaint.

An appropriate Order follows.

### ORDER

AND NOW, this 19th day of September, 2002, after considering Defendants' Motion to Dismiss, Plaintiff's Motion to Remand, Defendants' Response to Plaintiff's Motion to Remand, and the oral arguments of counsel, it is hereby

ORDERED that Defendants' Motion to Dismiss is GRANTED with prejudice as to Counts II, III, IV, and V of Plaintiff's Complaint.

Count I of Plaintiff's Complaint is restyled as an ERISA claim, and shall be answered by Defendants within ten days.

Plaintiff's Motion to Remand is DENIED.

222 F.Supp.2d 692, 28 Employee Benefits Cas. 2850

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works