2 G

(57)
12/16/02

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ORIGINAL

CRAIG M. HOWARD
Plaintiff :
:
v. : CASE NO: 1:CV-01-797
:
LIBERTY LIFE ASSURANCE : JUDGE KANE
COMPANY OF BOSTON, :
LIBERTY MUTUAL GROUP, :
Defendant : JURY TRIAL DEMANDED
.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

FILED
HARRISBURG, PA
DEC 13 2002
MARY E. D'ANDREA, CLERK
Per ______ Deputy Clerk

**INDEX OF**
**EXHIBITS FOR PLAINTIFF'S REPLY BRIEF**

1. Plaisted v. Geisinger Medical Center, 2002 U.S. Dist. LEXIS 19842, at *29 (M.D. Pa., Oct. 15, 2002)

2. Vanguard Savings and Loan Ass'n v. Banks, 1995 U.S. Dist. LEXIS 8799, at *6 (E.D. Pa. 1995)

3. In re Nahc, Inc. Securities Litigation, 306 F.3d 1314, 2002 U.S. App. LEXIS 20846, at *41 (3d Cir. 2002)

4. Rosenbaum v. UNUM Life Ins. Co. of America, 2002 U.S. Dist. LEXIS 14155 (E.D. Pa. 2002)

5. Norman v. Paul Revere Life Ins. Co., 2000 U.S. Dist. LEXIS 21478, at *5 (W.D. Wash. 2000)

6. Plaintiff's Letter to Defendant's Counsel William C. Foster, Esq., dated October 1, 2002

LEXSEE 2002 U.S. Dist. LEXIS 19842

**ANDREW E. PLAISTED and STEPHANIE L. PLAISTED, individually and as administrators of the estate of ANDREW D. PLAISTED, Plaintiffs v. GEISINGER MEDICAL CENTER and GEISINGER CLINIC, Defendants**

**No. 4:CV-01-1074**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

***2002 U.S. Dist. LEXIS 19842***

**October 15, 2002, Decided**

**October 15, 2002, Filed**

**DISPOSITION:**
[*1] Plaintiffs' motions to compel deposition answers were granted. Stephanie Plaisted's Motion for Leave to File First Amended Complaint was granted. Defendants' Motion for Reconsideration, or in the Alternative, Application for Certification for Immediate Appeal was denied.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** In a medical malpractice action, plaintiffs, parents of a deceased child, sought to compel deposition answers notwithstanding defense counsel's instructions not to answer, and defendants, a medical center and clinic, moved for reconsideration of the court's prior denial of their motion made pursuant to Fed. R. Civ. P. 35(a).

**OVERVIEW:** The parents alleged that defendants failed, inter alia, to monitor properly and correct their son's serum sodium levels, causing his brain to swell massively, which resulted ultimately in his death. The parents sought to compel deposition answers of four physicians who were in some way involved in their son's care. They alleged that during the deposition of each doctor, defense counsel engaged in improper behavior as defined in Fed. R. Civ. P. 30(d)(1). The alleged improprieties included making lengthy coaching instructions, instructing witnesses not to answer certain questions, and leaving the deposition room on two occasions while a question was pending. The court adopted the guidelines for attorney behavior at depositions announced in Hall v. Clifton Precision. The court found that defense counsel acted improperly under the guidelines set forth in Hall and in Rule 30, and it was therefore appropriate for the parents to re-depose each witness in the areas where their answers were incomplete or where they were not permitted to answer questions. Regarding defendants' motion to reconsider, the court found that defendants failed to meet the "good cause" test of Rule 35.

**OUTCOME:** The court granted the parents' motion to compel deposition answers from the four physicians, and the court denied defendants' motion for reconsideration.

**LexisNexis(TM) HEADNOTES - Core Concepts**

***Civil Procedure > Discovery Methods > Motions to Compel***
[HN1] It is under Fed. R. Civ. P. 37 that a court is, upon motion of a party, empowered to issue an order compelling discovery where a deponent failed to answer a question propounded or submitted under Rule 30. Fed. R. Civ. P. 37(a)(2)(B).

***Civil Procedure > Discovery Methods > Oral Depositions***
[HN2] The Third Circuit adopts the guidelines for attorney behavior at depositions announced in Hall v. Clifton Precision. Although Hall was decided before the 1993 amendments to the Federal Rules of Civil Procedure, the decision considers Fed. R. Civ. P. 30(d), a proposed amendment at the time, and incorporates it into the guidelines it sets forth. Rule 30 governs oral depositions and provides, in relevant part, that: Any

objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion to protect the deponent or party from annoyance, embarrassment, or oppression. Fed. R. Civ. P. 30(d)(1). Aimed at reducing the number of interruptions during depositions, Rule 30 sets forth the general rule that counsel should not engage in any conduct during a deposition that would not be allowed in the presence of a judicial officer.

***Civil Procedure > Discovery Methods > Oral Depositions***
[HN3] The guidelines set forth in Hall v. Clifton Precision include: All objections, except those which would be waived if not made at the deposition under Fed. R. Civ. P. 32(d)(3), and those necessary to assert a privilege, to enforce a limitation on evidence directed by the court, or to present a protective motion shall be preserved. Therefore, those objections need not and shall not be made during the course of depositions. Counsel shall not direct or request that a witness not answer a question, unless that counsel has objected to the question on the ground that the answer is protected by a privilege or a limitation on evidence directed by the court. Counsel shall not make objections or statements which might suggest an answer to a witness. Counsels' statements when making objections should be succinct and verbally economical, stating the basis of the objection and nothing more. Counsel and their witness-clients shall not engage in private, off-the-record conferences during depositions or during breaks or recesses, except for the purpose of deciding whether to assert a privilege.

***Civil Procedure > Discovery Methods > Oral Depositions***
[HN4] The guidelines set forth in Hall v. Clifton Precision include: Any conferences which occur pursuant to, or in violation of the guideline prohibiting off-the-record conferences between counsel and witnesses during breaks or recesses are a proper subject for inquiry by deposing counsel to ascertain whet her there has been any witness-coaching and, if so, what. Any conferences which occur pursuant to, or in violation of [the guideline prohibiting off-the-record conferences between counsel and witnesses during breaks or recesses] shall be noted on the record by the counsel who participated in the conference. The purpose and outcome of the conference shall also be noted on the record.

***Civil Procedure > Discovery Methods > Oral Depositions***
[HN5] Attorneys are permitted to make objections during oral depositions. After the objection has been noted on the record, however, the examination shall proceed, with the testimony being taken subject to the objections. Fed. R. Civ. P. 30(c). This is so because it is not the prerogative of counsel, but of the court, to rule on objections.

***Civil Procedure > Disclosure & Discovery > Undue Burden***
[HN6] Fed. R. Civ. P. 26(b)(2) provides in part that the frequency or extent of use of the discovery methods otherwise permitted under these rules shall be limited by the court if it determines that: the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive. The determination as to whether certain discovery is cumulative or available from another source is for the court to make.

***Civil Procedure > Discovery Methods > Oral Depositions***
[HN7] Directions to a deponent not to answer a question can be even more disruptive than objections.

***Civil Procedure > Disclosure & Discovery > Relevance***
[HN8] Fed. R. Civ. P. 26(b)(1) provides that parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party and that relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

***Civil Procedure > Discovery Methods > Oral Depositions***
[HN9] Under Fed. R. Civ. P. 30, instructions not to answer are limited to those situations where counsel is protecting a privilege, enforcing a court-imposed limitation, or preparing to present a protective motion. A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer.

***Civil Procedure > Discovery Methods > Oral Depositions***
***Legal Ethics > Client Relations > Attorney-Client Privilege***
[HN10] Under Fed. R. Civ. P. 30(c), examination at a deposition is to proceed as it does at trial. During a civil trial, a witness and his lawyer are not permitted to confer at their pleasure during the witness's testimony. The same is true at a deposition. Any such conference is not covered by the attorney-client privilege and that the

deposing attorney is therefore entitled to inquire about the content thereof. However a conference is permissible if its purpose is to determine whether to assert a privilege. However, when such a conference occurs, the conferring attorney should place on the record the fact that the conference occurred, the subject of the conference, and the decision reached as to whether to assert a privilege.

***Civil Procedure > Discovery Methods > Physical & Mental Examinations***
[HN11] Fed. R. Civ. P. 35(a) provides: Order for Examination. When the mental or physical condition (including the blood group) of a party or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in the party's custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. Both the "good cause" and "in controversy" requirements of Rule 35(a) must be satisfied by the affidavit of a licensed physician.

***Civil Procedure > Relief From Judgment > Motions for New Trial***
[HN12] Fed. R. Civ. P. 59(e), prescribing a 10-day time limit on motions to alter or amend judgments, makes clear that the district court possesses the power to alter or amend a judgment after its entry. The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.

***Civil Procedure > Discovery Methods > Physical & Mental Examinations***
[HN13] It is true that the court may order examination under Fed. R. Civ. P. 35 if the proposed examiners will perform tests not undertaken in the prior examinations. However, new tests are not sufficient cause for ordering an additional examination unless the moving party satisfies the court that the new test will likely yield results not achieved in the prior examinations.

***Civil Procedure > Discovery Methods > Physical & Mental Examinations***
[HN14] Even if good cause for ordering the examination is established, the decision of whether to order a mental or physical examination under Fed. R. Civ. P. 35 is still within the sound discretion of the court. Although the rule is to be construed liberally in favor of granting the examination, the court must still balance the right of the party to be examined to avoid personal invasion against the moving party's right to a fair trial.

***Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders***
[HN15] *28 U.S.C.S. § 1292*(b) provides that: When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order.

***Civil Procedure > Discovery Methods > Physical & Mental Examinations***
[HN16] There is little doubt that a question is not controlling if the litigation would be conducted in the same way no matter how it were decided.

**COUNSEL:**
For ANDREW E. PLAISTED, STEPHANIE L. PLAISTED, plaintiffs: Charles P. Hehmeyer, Raynes, McCarty, Binder, Ross & Mundy, Philadelphia, PA.

For GEISINGER MEDICAL CENTER/ DANVILLE, GEISINGER CLINIC, defendants: Allan H. Starr, White & Williams, Anna Marie Bryan, White and Williams, LLP, Philadelphia, PA.

**JUDGES:**
James F. McClure, Jr., United States District Judge.

**OPINIONBY:**
James F. McClure, Jr.

**OPINION:**

**MEMORANDUM**

October 15, 2002

**BACKGROUND:**

Plaintiffs Andrew E. Plaisted and Stephanie L. Plaisted, individually and as administrators of the estate of their son, Andrew D. Plaisted (Drew), commenced this medical malpractice action against defendants Geisinger Medical Center and Geisinger Clinic (collectively, Geisinger). We have diversity jurisdiction. See *28 U.S.C. § 1332*.

Plaintiffs allege that agents of defendants [*2] failed, *inter alia,* to monitor properly and correct Drew's serum sodium levels on December 25, 2000 and December 26, 2000, while he was admitted to the Geisinger pediatric intensive care unit. This failure allegedly caused Drew's brain to swell massively, resulting ultimately in his death.

This opinion addresses two outstanding motions by plaintiffs to compel deposition answers notwithstanding defense counsel's instructions not to answer. The motions followed the depositions of Dr. Richard Salerno, Dr. Frederick Emge, Dr. Robert Brown, and Dr. Scott Mitchell; all four physicians are Geisinger employees, and all four were in some way involved in Drew's care. Plaintiffs allege that during the deposition of each doctor, defense counsel engaged in improper behavior as defined by Federal Rule of Civil Procedure 30(d)(1). The alleged improprieties include making lengthy coaching objections, instructing witnesses not to answer certain questions, and leaving the deposition room on two occasions while a question was pending.

Plaintiffs ask that they be permitted to re-depose Salerno, Emge, Brown, and Mitchell in the areas not completed because of the alleged improper behavior. Plaintiffs [*3] also ask that they be permitted to question Brown as to what, if anything, defense counsel discussed with him during the two breaks she took during his deposition while a question was pending.

We will grant plaintiffs' motions to re-depose each doctor in the areas that were not permitted by, or were obstructed by, defense counsel and to question Brown about what, if anything, defense counsel discussed with him during the two breaks she took during his deposition while a question was pending.

**DISCUSSION:**

**I. STATEMENT OF RELEVANT FACTS**

Plaintiffs allege that Geisinger physicians failed, *inter alia,* to monitor and correct Drew's serum sodium while he was a patient at Geisinger. Drew's serum sodium fell from 140 mmol/ L to 121 mmol/ L over the course of approximately 24 hours from December 25 to December 26, 2000. Plaintiffs allege that the decrease in serum sodium resulted in osmotic brain swelling and, a day later, Drew's death. To that end, as part of the discovery process, plaintiffs' counsel conducted depositions of several Geisinger physicians involved in Drew's care, including Salerno, Emge, Brown, and Mitchell. Plaintiffs allege that defense counsel engaged [*4] in improper behavior during each of the depositions. The allegations of impropriety include instructing witnesses not to answer certain questions, making disruptive and "coaching" objections, and leaving the deposition room while a question was pending.

We have reviewed each deposition in its entirety before making our decision on the motions. When, in this opinion, we refer to a deposition, it is to the entire deposition of each witness as provided by defendants (Rec. Doc. No. 20, Exs. A, B, & C; Rec. Doc. No. 23, Ex. A), rather than to the excerpts provided by plaintiffs.

A. SALERNO DEPOSITION

Salerno was the attending physician in charge of Drew's care during the period from December 25, 2000 to December 26, 2000, when Drew's sodium level dropped from 140 to 121. During Salerno's deposition, plaintiffs' counsel asked him about an order he had written to change the amount of a prescribed sedative administered to Drew. Specifically, plaintiffs' counsel asked why Salerno changed the prescription. (Salerno Dep. at 75, lines 8-14.) After Salerno responded that he could only speculate as to the reason for the prescription change, plaintiffs' counsel asked him if the reason he changed [*5] the prescription was in order to keep Drew sedated. (Salerno Dep. at 75, lines 16-18.) Defense counsel instructed Salerno not to answer the question, as follows:

Q Isn't it likely, Doctor, that the reason that you wrote that order was because [Drew] required more frequent dosages ... to remain sedated?

[Defense Counsel]: Objection. Don't answer. The doctor just said he can only speculate. Asked an answered.

[Plaintiffs' Counsel]: I'm going to ask that you answer the question, Doctor.

[Defense Counsel]: Don't answer the question.

Q Can you think of any other reason why you would have upped the time for him to receive [the prescribed sedative] from two hours -- every two hours as needed to every one hour as needed other than he was requiring more frequent administration to remain sedated?

[Defense Counsel]: Objection. That's counsel's statement and he is not a physician. He just said he can only speculate. Don't answer the question.

Q It's a different question. I'm going to ask you to answer the question.

[Defense Counsel]: Well --

Q I'm going to ask you to answer the question.

[Defense Counsel]: Objection. Don't answer. [*6]

Q I want to know is there any other reason that you're aware of that he would have required [the prescribed sedative] more frequently other than that he was beginning to wake up and needed it more frequently to remain sedated?

[Defense Counsel]: Objection. Don't answer. Asked and answered. You can sit and stare at the witness all you want. I told him not to answer. Next question. (Salerno Dep. at 75, line 16-76, line 22.)

B. EMGE DEPOSITION

Emge was the attending physician in charge of Drew's care when he was admitted to Geisinger on December 25, 2000. Plaintiffs' counsel took Emge's deposition on January 31, 2002.

In addition to his role as attending physician at Drew's admission, Emge was the pediatric cardiologist on call during the period from December 25, 2000 to December 26, 2000, when Drew's sodium level dropped from 140 to 121. Mitchell consulted Emge in the early morning hours of December 26, 2000 because Drew had developed a cardiac arrhythmia. Emge indicated in his consult note that Mitchell had reported no change in lab values, even though the report of blood gases for December 26, 2000 at 2:05 a.m. indicates that Drew's serum sodium level had fallen [*7] to 128 mmol/ L. (See Pls.' Exs. 3 & 4, Rec. Doc. No. 14.)

Plaintiffs' counsel asked Emge what he considered to be the maximum allowable rate of drop of serum sodium in a child Drew's age before the brain would begin to swell. (Emge Dep. at 124, lines 14-19.) After Emge responded, plaintiffs' counsel attempted to pursue the question further. Defense counsel refused to allow Emge to answer certain questions. At one point, defense counsel instructed plaintiffs' counsel to "ask the question, and I'll consider whether I'll let him answer it or not." (Emge Dep. at 127, lines 9-10.) After some four pages of instructions from defense counsel not to answer, plaintiffs' counsel proceeded with questions on a different topic. (See Emge Dep. at 128-132.)

C. BROWN DEPOSITION

Brown is the pathologist who performed Drew's autopsy and wrote his final autopsy report. Plaintiffs' counsel took Brown's deposition on April 23, 2002. In his preparation of Drew's final autopsy report, Brown relied in part upon the report of Dr. Javad Towfighi, a neuropathologist at Hershey Medical Center, who, at Brown's request, had performed the autopsy of Drew's brain. At the time he prepared the final report, [*8] Brown was also in possession of a letter from Dr. Holmes Morton, a metabolic consultant, to Towfighi in which Morton hypothesizes that Drew may have died from brain swelling caused by a rapid decrease in serum sodium. (See Pls.' Ex. 6, Rec. Doc. No. 14.)

Plaintiffs' counsel attempted to ask Brown about certain discrepancies between his and Towfighi's findings. Throughout this portion of the questioning process, defense counsel engaged in lengthy objections that plaintiffs allege were designed to coach the witness before she allowed Brown to answer. (See Brown Dep. at 68, line 8-74, line 5.) Defense counsel interjected multiple objections during follow-up questioning in this area that plaintiffs allege "disrupted the flow of questioning and made it impossible to create a proper record." (Pls.' Mot. Compel, Rec. Doc. No. 11, P 59; see also Brown Dep. at 74, line 7-77, line 22.) When plaintiffs' counsel asked Brown whether he recalled if Towfighi had spoken to him about Morton's findings and their consistency with Towfighi's, Brown adopted in his answer the language defense counsel used in her objection, as follows:

Q Yes. But my question was did Dr. Towfighi talk [*9] to you about whether Dr. Morton's discussion of hyponatremia in Drew Plaisted causing brain swelling, did he talk to you at all about whether that made sense in this context and was consistent with his report?

[Defense Counsel]: I'm objecting because this witness's conversations with Dr. Towfighi, I think, were thoroughly explored before. And the witness has already testified a couple of times that he received a letter from Dr. Towfighi, and he vaguely recalls perhaps a telephone conversation, but he didn't -- he didn't tell you at all that he remembered specifics. So now you are probing him again on specifics. He has already told you that he only had, at best, a vague recollection of a possible conversation. I think that's a fair restatement of his testimony.

[Brown]: I don't remember a specific conversation about the specifics of your question.
(Brown Dep. at 128, line 10-129, line 2.)

Throughout the course of the deposition, defense counsel made repeated objections and instructed Brown not to answer before allowing him to answer several questions, such as whether Towfighi's failure to perform an ultrastructural examination on Drew's brain resulted in the lack [*10] of evidence of damage to certain brain cells, whether Brown had considered that Drew had suffered no brain damage prior to his arrival at Geisinger, whether Brown could give an estimate as to a

range of time he believed Drew had stopped breathing prior to his arrival at Geisinger, and whether certain of Drew's brain injuries might have resulted from blood flow compromise after his brain had swelled. (See Brown Dep. at 77, line 7-80, line 6; 81, line 13-82, line 20; 85, line 12-87, line 10; 121, line 6-122, line 17.)

Defense counsel refused to allow Brown to answer several questions, including how Brown knew that Drew ever went through a period where he wasn't breathing prior to his admission to the hospital, whether a rapid drop in serum sodium can cause water to leave the blood vessels and cause swelling in the brain, whether Drew's brain injury could have occurred after his admission to Geisinger, and whether Brown did anything to investigate various concerns raised by Morton. (See Brown Dep. at 83, line 6-84, line 11; 111, line 18-112, line 22; 123, line 4-125, line 15; 130, line 5-132, line 5; 132, line 22-133, line 9.)

On two separate occasions during Brown's deposition, [*11] defense counsel left the room while a question was pending. The first time, plaintiffs' counsel asked Brown how he interpreted certain language in Towfighi's report. Defense counsel instructed Brown not to answer. (Brown Dep. at 92, line 2-25.) Plaintiffs' counsel pursued the question, as follows:

Q I never asked you that question. Are you refusing to answer it?

[Defense Counsel]: We're going to take a break for five minutes and I'll decide whether he does. Let's step out for a minute. It's 12:44 on the record. I'm stepping out for a minute.

[Plaintiffs' Counsel]: You know the rules in federal court. You can't discuss this question with him, Anna.

[Defense Counsel]: I'm a lawyer who's licensed here and I know the rulings.

(Whereupon, a recess was taken from 12:44 until 12:46 p.m.) (Brown Dep. at 93, line 1-12.)

Brown answered the question after the recess. (Id. at line 24.) Defense counsel left the room again when plaintiffs' counsel asked Brown whether, as a general truism, when serum sodium drops rapidly it can cause water to shift from blood vessels to the brain. Defense counsel made repeated objections before announcing "that [question] [*12] won't be answered. I have an urgent call I have to make." (Brown Dep. at 116, line 18-19.) After a seven-minute recess, Brown answered the question.

D. MITCHELL DEPOSITION

Mitchell was the Geisinger resident in charge of Drew's care during the period from December 25, 2000 to December 26, 2000, when Drew's sodium level dropped from 140 to 121. Defense counsel refused to allow Mitchell to answer several questions, including what Mitchell's pediatric textbook says about the connection between decreasing serum sodium and the risk of brain swelling in children, whether Mitchell considered Drew to be at risk of intra cranial pressure due to pre-admission hypoglycemia and respiratory arrest, whether intra cranial pressure is a possible cause of a specific condition Mitchell had considered in Drew's diagnosis, and whether Mitchell considered whether there was risk to giving Drew as much fluid he received if he was not severely dehydrated. (See Mitchell Dep. at 136, line 3-23; 171, line 1-172, line 5; 172, line 7-173, line 11; 194, line 11-196, line 25.)

**II. STANDARD**

[HN1] It is under Federal Rule of Civil Procedure 37 that a court is, upon motion of a party, empowered to issue [*13] an order compelling discovery where "a deponent failed to answer a question propounded or submitted under Rule[] 30." FED. R. CIV. P. 37(a)(2)(B). As required by the rule, plaintiffs have included certification that they have in good faith conferred with defendants in an effort to secure the requested information without court action. (See Rec. Doc. No. 13; Rec. Doc. No. 15.)

**III. PLAINTIFFS' MOTION**

Plaintiffs ask that they be permitted to re-depose "liberally" Salerno, Emge, Brown, and Mitchell in the areas not completed because of defense counsel's objections and instructions not to answer at each witness's deposition. Plaintiffs also ask that they be permitted to ask Brown about conversations with defense counsel while questions were pending. Although they are entitled to do so, plaintiffs do not ask for sanctions.

The Third Circuit has yet to address the issues presented by this motion. Given that, [HN2] we adopt the guidelines for attorney behavior at depositions announced in *Hall v. Clifton Precision, 150 F.R.D. 525 (E.D. Pa. 1993).* Although Hall was decided before the 1993 amendments to the Federal Rules of Civil Procedure, the decision considers [*14] Rule 30(d), a proposed amendment at the time, and incorporates it into the guidelines it sets forth. See *Hall, 150 F.R.D. at 530.* Rule 30 governs oral depositions and provides, in relevant part, that:

Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. A person may instruct a deponent not to answer

only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion [to protect the deponent or party from annoyance, embarrassment, or oppression].

FED. R. CIV. P. 30(d)(1). "Aimed at reducing the number of interruptions during depositions," Rule 30 sets forth the general rule that "counsel should not engage in any conduct during a deposition that would not be allowed in the presence of a judicial officer." FED. R. CIV. P. 30 advisory committee's note.

Hall "has received substantial attention in the legal literature" and has been adopted by various courts. 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 30.43[6] (3d ed. 2000). See, e.g., *O'Brien v. Amtrak, 163 F.R.D. 232, 236 (E.D. Pa. 1995)* (indicating a willingness [*15] to use the Hall guidelines). We believe that Hall has established clear, workable guidelines that we find particularly applicable to the instant motions. Those guidelines most applicable include the following:

[HN3] All objections, except those which would be waived if not made at the deposition under [Rule 32(d)(3)], and those necessary to assert a privilege, to enforce a limitation on evidence directed by the court, or to present [a protective motion] shall be preserved. Therefore, those objections need not and shall not be made during the course of depositions.

Counsel shall not direct or request that a witness not answer a question, unless that counsel has objected to the question on the ground that the answer is protected by a privilege or a limitation on evidence directed by the court.

Counsel shall not make objections or statements which might suggest an answer to a witness. Counsels' statements when making objections should be succinct and verbally economical, stating the basis of the objection and nothing more.

Counsel and their witness-clients shall not engage in private, off-the-record conferences during depositions or during breaks or recesses, [*16] except for the purpose of deciding whether to assert a privilege.

[HN4] Any conferences which occur pursuant to, or in violation of [the guideline prohibiting off-the-record conferences between counsel and witnesses during breaks or recesses] are a proper subject for inquiry by deposing counsel to ascertain whether there has been any witness-coaching and, if so, what.

Any conferences which occur pursuant to, or in violation of [the guideline prohibiting off-the-record conferences between counsel and witnesses during breaks or recesses] shall be noted on the record by the counsel who participated in the conference. The purpose and outcome of the conference shall also be noted on the record.

*Hall, 150 F.R.D. at 531-32.*

Having adopted the guidelines set forth in Hall and Rule 30, we will now discuss each of plaintiffs' allegations of impropriety -- lengthy coaching objections, instructions not to answer, and leaving the deposition room with a question pending -- separately.

A. COACHING OBJECTIONS

[HN5] Attorneys are permitted to make objections during oral depositions. After the objection has been noted on the record, however, "the examination shall [*17] proceed, with the testimony being taken subject to the objections." FED. R. CIV. P. 30(c). This is so because "it is not the prerogative of counsel, but of the court, to rule on objections." 10 Fed. Proc., L. Ed. § 26:298 (footnote omitted). At each deposition in question in this motion, the parties stipulated that objections except as to form are reserved to time of trial. (See Salerno Dep. at 3; Emge Dep. at 4; Brown Dep. at 3; Mitchell Dep. at 3.)

We find that defense counsel did not state her objections concisely and in a non-argumentative and non-suggestive manner during each deposition. We also find that although she had stipulated that she would, defense counsel did not reserve her objections except as to form to time of trial. Defendants argue that counsel's objections were not coaching and that they were "appropriate and necessary" when each deposition is considered as a whole in light of each witness's role in the litigation. (Defs.' Br. Opp'n, Rec. Doc. No. 19, at 2; Defs.' Br. Opp'n, Rec. Doc. No. 22, at 2.)

Relying on Federal Rule of Civil Procedure 26(b)(2), defendants contend that counsel's objections were necessary because the discovery sought in each deposition [*18] was "unreasonably cumulative or duplicative" or was "obtainable from some other source that is more convenient, less burdensome." (Defs.' Br. Opp'n, Rec. Doc. No. 19, at 2.) [HN6] Rule 26(b)(2) provides in part that "the frequency or extent of use of the discovery methods otherwise permitted under these rules ... shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive." Defendants have failed to recognize that under Rule 26, the determination as to whether certain discovery is cumulative or available from another source is for the

court to make. Defense counsel took it upon herself to make this determination at the depositions of Salerno, Emge, Brown, and Mitchell. That was simply improper. Moreover, we find it hard to believe that defense counsel would act in front of this court in the same manner she did at any of the four depositions at issue here. As an officer of the court, defense counsel should have been aware of the provisions of Rule 30 at the time of each deposition. Objections that go on for pages and that result in [*19] an incomplete answer or in the witness's adoption of counsel's statement are suggestive. For these reasons, we find it appropriate to give plaintiffs' counsel the opportunity to re-depose Salerno, Emge, Brown, and Mitchell in those areas where their answers were rendered incomplete or tainted due to defense counsel's objections.

B. INSTRUCTIONS NOT TO ANSWER

[HN7] "Directions to a deponent not to answer a question can be even more disruptive than objections." FED. R. CIV. P. 30 advisory committee's note. The defendants admit that each instruction not to answer was not necessary to preserve a privilege. In addition, defense counsel was neither enforcing a limitation imposed by this court nor preparing to present a protective motion when she instructed her witnesses not to answer questions. Defendants nevertheless deny that any such instruction was improper. In each instance where an instruction not to answer was given, defendants maintain that the question was either properly directed to another witness or had been answered and further questioning "asked for pure speculation, was irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence." (Defs.' Resp. [*20] , Rec. Doc. No. 18, PP 25, 42; Defs.' Resp., Rec. Doc. No. 21, P 8.)

[HN8] Rule 26 provides in further part that "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party" and that "relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1). After having reviewed each deposition in question in its entirety, we find that the types of questions that defense counsel prohibited Salerno, Emge, Brown, and Mitchell from answering do not appear to be irrelevant or not reasonably calculated to lead to the discovery of admissible evidence. All four physicians were in some way involved in Drew's care, and the information sought by plaintiffs' counsel in each deposition was not so far removed from the facts of the case to make it undiscoverable. In addition, even if a question may be properly directed to one particular person, the posing of that question to another may lead to the discovery of admissible evidence.

In any event, [HN9] under Rule 30, instructions not to answer are limited to those situations where counsel is [*21] protecting a privilege, enforcing a court-imposed limitation, or preparing to present a protective motion. "A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer." *Hall, 150 F.R.D. at 528* (footnote omitted). Defense counsel was not engaged in any practice permitted under Rule 30 when she gave instructions not to answer questions. We therefore find it appropriate to allow plaintiffs' counsel to re-depose Salerno, Emge, Brown, and Mitchell in those areas where defense counsel refused to allow them to answer questions.

C. LEAVING THE DEPOSITION ROOM WITH A QUESTION PENDING

Defense counsel admits to having taken two breaks during Brown's testimony, but she denies that a question was pending at either break. Rather, defendants allege that at each point during Brown's deposition where defense counsel took a break, each question "had already been answered several times." (Defs.' Resp., Rec. Doc. No. 18 PP 72, 73.) After the first break, however, the first sentence [*22] on the record is plaintiffs' counsel asking Brown if he remembered the question. (See Brown Dep. at 93, line 13-15.) The first sentence on the record after the second break is defense counsel asking, "Do you want to read back the last question? I think there had been a question pending." (Brown Dep. at 116, line 23-24.)

[HN10] Under Rule 30(c), examination at a deposition is to proceed as it does at trial. See FED. R. CIV. P. 30(c). "During a civil trial, a witness and his ... lawyer are not permitted to confer at their pleasure during the witness's testimony .... The same is true at a deposition." *Hall, 150 F.R.D. at 528.* As did the court in Hall, we find that any such conference is not covered by the attorney-client privilege and that the deposing attorney is therefore entitled to inquire about the content thereof. See *Hall, 150 F.R.D. at 529 n.7.* We also find, however, that a conference is permissible if its purpose is to determine whether to assert a privilege. "However, when such a conference occurs, the conferring attorney should place on the record the fact that the conference occurred, the subject of the conference, and the decision reached [*23] as to whether to assert a privilege." *Hall, 150 F.R.D. at 529-30.*

Defense counsel did not indicate on the record that either break she took during Brown's deposition was to determine whether to assert a privilege. However, defense counsel specifically denies that any improper

discussions took place during the breaks and claims that "the deposition transcripts are clear on this matter." ( *Defs.' Resp., Rec. Doc. No. 18 P 102.)* We disagree. The deposition transcripts show only that defense counsel took two separate breaks with a question pending at each. The transcripts do not indicate what, if anything, defense counsel and Brown discussed at the break. We therefore find it unclear whether any improper discussions took place. Defense counsel has indicated that she is willing to provide written affidavits as to the lack of improper discussions during the breaks in Brown's deposition. While we find this unnecessary, we think it is proper to allow plaintiffs' counsel to question Brown about any discussion that took place during the two breaks.

**CONCLUSION:**

Defense counsel acted improperly under the guidelines for attorney conduct at depositions [*24] set forth in Hall and in Rule 30 when, during four separate depositions, she made repeated objections, instructed witnesses not to answer certain questions, and left the deposition room while a question was pending. We therefore find it appropriate to allow plaintiffs' counsel to re-depose each witness in the areas where their answers were incomplete or where they were not permitted to answer questions because of defense counsel's improper behavior. We also find it appropriate to permit plaintiffs' counsel to pose questions to Brown about any discussion that may have taken place during the two breaks defense counsel improperly took during his deposition.

We note that defendants have requested oral argument. Given the manner in which defense counsel conducted herself at each deposition, it is obvious to us that she engaged in the alleged improper behavior. We therefore find that oral argument is unnecessary. An appropriate order follows.

James F. McClure, Jr.

United States District Judge

**ORDER (# 1)**

October 15, 2002

For the reasons set forth in the accompanying memorandum,

**IT IS ORDERED THAT:**

1. Plaintiffs' motions to compel deposition answers (Rec. Doc. [*25] No. 11; Rec. Doc. No. 15) are granted.

2. Defendants shall produce Salerno, Emge, Brown, and Mitchell for re-deposition on the subjects outlined in plaintiffs' motion. Plaintiffs' counsel shall be permitted liberal re-questioning in all areas that were the subject of improper objections and instructions not to answer.

3. Plaintiffs' counsel shall be permitted to ask Brown questions regarding any conversations with defense counsel on the two occasions when defense counsel took breaks while questions were pending.

4. Re-deposition shall occur at a mutually agreeable time at Geisinger Medical Center within thirty (30) days of this Order. Unless otherwise agreed, defendants must make Salerno, Emge, Brown, and Mitchell available on the same day. Discovery is extended for the sole purpose of allowing for these four re-depositions.

5. Depositions shall otherwise be conducted in compliance with this Order.

6. Further violations of Rule 30 by defense counsel in this matter may result in an award of sanctions and costs to plaintiffs.

James F. McClure, Jr.

United States District Judge

**ORDER (# 2)**

October 15, 2002

**BACKGROUND:**

Plaintiffs Andrew E. Plaisted and [*26] Stephanie L. Plaisted, individually and as administrators of the estate of their son, Andrew D. Plaisted (Drew), commenced this medical malpractice action against defendants Geisinger Medical Center and Geisinger Clinic (collectively, defendants or Geisinger). We have diversity jurisdiction. See *28 U.S.C. § 1332.*

Plaintiffs allege that agents of defendants failed, *inter alia,* to monitor properly and correct Drew's serum sodium levels on December 25, 2000 and December 26, 2000, while he was admitted to the Geisinger pediatric intensive care unit. This failure allegedly caused Drew's brain to swell massively, resulting ultimately in his death.

Before the court is a motion by plaintiff Stephanie Plaisted (Mrs. Plaisted) for leave to file an amendment to plaintiffs' complaint. Mrs. Plaisted wishes to add a claim of negligent infliction of emotional distress against defendants. In her motion, Mrs. Plaisted claims that (1) she witnessed defendants allegedly injuring Drew; and (2) as a result of her perception of injury to her son, she has suffered physical injury in the form of nightmares, anxiety, and sleep disturbance.

Defendants oppose Mrs. Plaisted's [*27] motion and state that (1) amendment at this stage in the proceedings would unfairly prejudice defendants because it may require additional depositions, written discovery, medical records, and expert review; and (2) the court should deny the motion because the proposed amendment fails to state a claim on which relief may be granted and, as such, is futile.

For the reasons that follow, we conclude that there is sufficient reason to allow Mrs. Plaisted the opportunity to prove her negligent infliction claim. We will therefore grant her motion to file an amended complaint.

**DISCUSSION:**

**I. STATEMENT OF RELEVANT FACTS**

We recite herein the facts as alleged in plaintiffs' instant motion.

Drew died on December 27, 2000. Plaintiffs watched Drew's physical condition grow worse over an approximately 24-hour period from December 26 to December 27, 2000. Plaintiffs were present on the hospital floor when Drew began to deteriorate, and were present in Drew's room when hospital staff made efforts to save his life. Plaintiffs ultimately had to agree to discontinue Drew's life support and decide whether to authorize an autopsy. Having watched their son die caused shock, distress, and [*28] mental and emotional disturbance to plaintiffs.

Mrs. Plaisted suffered physical injury in relation to her contemporaneous perception of Drew's injury in the form of depression, nightmares, anxiety, and sleep disturbance and has been treated by a social worker in relation to her injury.

Mrs. Plaisted now proposes to amend plaintiffs' complaint to add a claim of negligent infliction of emotional distress against Geisinger.

**II. DIVERSITY JURISDICTION**

A federal court sitting in diversity must apply state substantive law and federal procedural law. *Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000)* (citing *Erie R.R. v. Tompkins, 304 U.S. 64, 78, 82 L. Ed. 1188, 58 S. Ct. 817, 11 Ohio Op. 246 (1938))*. We will therefore look to federal law to determine when a federal court may grant leave to amend and whether defendants would be prejudiced by the addition of a negligent infliction claim. We will look to Pennsylvania law to determine whether, as defendants allege, Mrs. Plaisted's proposed amendment is futile.

**III. STANDARD**

Under Federal Rule of Civil Procedure 15(a), after a responsive pleading has been served, "a party may amend the party's [*29] pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). Because defendants have not given written consent to Mrs. Plaisted's proposed amendment, her only recourse is to amend by leave of court.

The authority to grant a motion for leave to amend a complaint is "addressed to the sound discretion of the district court." *Cureton v. NCAA, 252 F.3d 267, 272 (3d Cir. 2001);* see also *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*. Generally, a "liberal, pro-amendment ethos dominates the intent and judicial construction of Rule 15(a)." 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 15.14[1] (3d ed. 2000) (footnote omitted). In Foman, the Supreme Court set forth a list of factors that would justify a district court's denial of leave to amend, including "undue delay, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of [the] amendment." *Foman, 371 U.S. at 182.*

**IV. LEAVE TO AMEND**

Defendants argue that they will be unfairly prejudiced if Mrs. [*30] Plaisted is permitted to bring a negligent infliction claim at this point in the litigation. Defendants also argue that amendment of plaintiffs' complaint to include a claim of negligent infliction would be futile, as they allege the claim is legally deficient under Pennsylvania law. We consider each argument separately.

A. UNFAIR PREJUDICE

Defendants allege that they will be unfairly prejudiced if we grant Mrs. Plaisted leave to file an amended complaint. According to defendants, the majority of discovery has been conducted, and the addition of a new claim "would force defendants to conduct additional depositions, pursue additional written discovery and medical records, and possibly require expert review." (Defs.' Br. Opp'n, Rec. Doc. No. 31 at 5.)

We note that "the passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become ... prejudicial, placing an unfair burden on the opposing party." *Adams v. Gould, 739 F.2d 858, 868 (3d Cir. 1984)* (internal quotation marks omitted). While it is true that Mrs. Plaisted offers no explanation for having waited a year before seeking to add a [*31] negligent infliction claim, the motion is within the statute of limitations, and we find that the delay in filing does not





unfairly burden defendants. (See *Plaisted Mot., Rec. Doc. No. 26 P 15.)*

The claim adds no new parties and "does not alter the litigation landscape in this case materially." (Plaisted Br. Supp., Rec. Doc. No. 28 at 2.) Plaintiffs have indicated that they will consent to re-deposition of Mrs. Plaisted on any issues raised by the amendment. ( *Plaisted Mot., Rec. Doc. No. 26 P 19.)* In addition, any other discovery required involves one plaintiff and one discrete issue. Trial is scheduled for December 9, 2002, and we find that defendants have ample time to prepare. We therefore find that the Foman factors of undue delay and undue prejudice do not apply to this case.

B. FUTILITY

Defendants argue that Mrs. Plaisted's claim of negligent infliction fails to state a claim on which relief may be granted and that amendment would therefore be futile. We disagree. Under Pennsylvania law, a court considers three factors when evaluating a claim of negligent infliction of emotional distress:

(1) Whether plaintiff was located near [*32] the scene of the accident ...;

(2) Whether the shock resulted from a direct emotional impact on plaintiff from the sensory and contemporaneous observance of the accident ...; and

(3) Whether plaintiff and victim were closely related.

*Sinn v. Burd, 486 Pa. 146, 404 A.2d 672, 685 (Pa. 1979).* In addition, the person seeking damages under a claim of negligent infliction must suffer physical injury as a result of actually having witnessed the harm. *Mazzagatti v. Everingham by Everingham, 512 Pa. 266, 516 A.2d 672, 679 (Pa. 1986).*

In *Love v. Cramer, 414 Pa. Super. 231, 606 A.2d 1175 (Pa. Super. 1992),* the Pennsylvania Superior Court reversed a trial court order granting defendants' motion to dismiss a claim for negligent infliction where the plaintiff watched her mother die of a heart attack after a doctor had ignored her mother's symptoms of heart disease. The court found that the plaintiff's "sensory and contemporaneous observance of her mother's fatal heart attack" was sufficient under Pennsylvania law to state a cause of action for negligent infliction. *Love, 606 A.2d at 1177.* The court further found [*33] that, when proving a negligent infliction claim, a plaintiff does not have to show that the alleged negligence took place at the time of the accident. Rather, "it is enough if the negligence constituted the proximate cause of the injury and of the resulting emotional trauma." Id.

We do not at this time evaluate the merits of Mrs. Plaisted's claim for negligent infliction of emotional distress. We do, however, note that Mrs. Plaisted alleges having witnessed fatal injury to her son caused by defendants' negligence and physical injury as a result of having witnessed the harm. Mrs. Plaisted "may be unable to ultimately prove a causal connection between her injuries and the ... alleged negligence, [but] she should at least be given the opportunity to do so." Id. at 1178. We find that the Foman factor of futility of amendment does not apply in this case. Thus, we will grant Mrs. Plaisted leave to amend plaintiffs' complaint.

**CONCLUSION:**

Mrs. Plaisted's having waited to bring a claim for negligent infliction of emotional distress until approximately one year after the filing of plaintiffs' original complaint does not unduly prejudice plaintiffs. In addition, [*34] we are unable to say at this point in the litigation that Mrs. Plaisted's claim for negligent infliction of emotional distress fails to state a claim on which relief may be granted; amendment to include the claim is therefore not futile. We find that justice requires that we grant Mrs. Plaisted leave to amend plaintiffs' complaint to include a claim for negligent infliction of emotional distress.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1. Stephanie Plaisted's Motion for Leave to File First Amended Complaint (Rec. Doc. No. 26) is granted.

2. The clerk is directed to file and docket plaintiffs' First Amended Complaint (Rec. Doc. No. 29, Ex. 2).

3. The First Amended Complaint is deemed served and defendants shall respond to the First Amended Complaint no later than ten (10) days from the date of this Order.

4. Discovery is extended through November 18, 2002 to the extent necessary for defendants to prepare for trial on Mrs. Plaisted's new claim of negligent infliction of emotional distress.

James F. McClure, Jr.

United States District Judge

**ORDER (# 3)**

October 15, 2002

**BACKGROUND:**

Plaintiffs Andrew E. Plaisted and Stephanie L. Plaisted, individually [*35] and as administrators of the estate of their son, Andrew D. Plaisted (Drew),

commenced this medical malpractice action against defendants Geisinger Medical Center and Geisinger Clinic (collectively, defendants or Geisinger). We have diversity jurisdiction. See *28 U.S.C. § 1332.*

Plaintiffs allege that agents of defendants failed, *inter alia,* to monitor properly and correct Drew's serum sodium levels on December 25, 2000 and December 26, 2000, while he was admitted to the Geisinger pediatric intensive care unit. This failure allegedly caused Drew's brain to swell massively, resulting ultimately in his death.

On August 22, 2002, we entered an Order Granting Plaintiffs' Motion for Order Barring Defendants from Altering or Cutting the Brain of Deceased Plaintiff, Andrew D. Plaisted. (Order Barring Defendants from Altering Drew's Brain) (Rec. Doc. No. 43.) We found that defendants did not meet the "good cause" requirement of Federal Rule of Civil Procedure 35 because they failed to provide any explanation as to why additional samples of Drew's brain are necessary. (Id. at 5.) Before the court is defendants' motion for reconsideration of our Order Barring [*36] Defendants from Altering Drew's Brain. In the alternative, defendants request that we amend the Order Barring Defendants from Altering Drew's Brain to confer jurisdiction upon the Third Circuit for an interlocutory appeal under *28 U.S.C. § 1292*(b).

We find that defendants have again failed to meet the "good cause" requirement of Rule 35(a). We also find that the Order Barring Defendants from Altering Drew's Brain does not "involve[] a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *28 U.S.C. § 1292*(b). We therefore decline to amend the Order Barring Defendants from Altering Drew's Brain to allow for an interlocutory appeal. We will therefore deny defendants' motion.

**DISCUSSION:**

**I. STATEMENT OF RELEVANT FACTS**

We state herein the facts as alleged in defendants' instant motion

On July 17, 2002, plaintiffs filed a motion requesting an order from the court to prohibit additional tissue sampling of Drew's brain. In their motion, plaintiffs argued that samples taken [*37] previous to the initiation of this lawsuit by defendants' consulting neuropathologist Dr. Javad Towfighi are sufficient for neuropathology review. In support of their argument, plaintiffs provided the affidavit of Dr. Jan Leestma, a board-certified neuropathologist, stating that the samples taken by Towfighi are adequate for neuroanalysis.

On August 22, 2002, we entered an Order Barring Defendants from Altering Drew's Brain. In the order, we found that defendants failed to establish "good cause" as required under Federal Rule of Civil Procedure 35(a), which governs the physical and mental examinations of persons. The rule provides as follows:

**[HN11] (a) Order for Examination.** When the mental or physical condition (including the blood group) of a party or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in the party's custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to [*38] all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

FED. R. CIV. P. 35(a). We noted that "both the 'good cause' and 'in controversy' requirements of [Rule 35(a)] must be satisfied by the affidavit of a licensed physician." (Rec. Doc. No. 43 at 5) (quoting *In re Certain Asbestos Cases, 113 F.R.D. 612, 614 (N.D. Tex. 1986).* We found that defendants' conclusory assertion that the determination of whether additional brain tissue samples are necessary was reserved for their then-unnamed expert was insufficient to establish "good cause" under Rule 35(a) for ordering the further examination of Drew's brain.

**II. STANDARD**

[HN12] Federal Rule of Civil Procedure 59(e), prescribing a ten-day time limit on motions to alter or amend judgments, "makes clear that the district court possesses the power ... to alter or amend a judgment after its entry." FED. R. CIV. P. 59 advisory committee's note. "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1986)* [*39] (citation omitted).

**III. DEFENDANTS' MOTION**

Defendants request that we vacate our Order Barring Defendants from Altering Drew's Brain in order to allow their expert to make additional microscopic sections of Drew's brain for testing. It remains undisputed that Rule 35(a) applies to the instant matter and that the physical condition of Drew's brain is "in controversy." In their motion for reconsideration, defendants again argue that

they have met the "good cause" requirement of Rule 35(a). To that end, defendants have provided an affidavit of Dr. Floyd Gilles, Head of the Neuropathology Program at the Children's Hospital in Los Angeles. Gilles states that he needs additional microscopic sections of Drew's brain to perform a comprehensive neuropathological review. Defendants point to the affidavit and Gilles's statements as the newly discovered evidence they present.

In the alternative, defendants ask that we amend our Order Barring Defendants from Altering Drew's Brain to include the language prescribed by *28 U.S.C. § 1292*(b), thereby permitting a petition for an immediate appeal to be filed by defendants. In support of this request, defendants contend [*40] that the granting of plaintiffs' motion in this matter involves a controlling question of law as to which there is a substantial ground for difference of opinion. Specifically, defendants point to a substantial ground for difference of opinion as to whether they have met the "good cause" requirement of Rule 35(a). Defendants further contend that an immediate appeal of the Order Barring Defendants from Altering Drew's Brain will advance the ultimate termination of this matter because additional sections of Drew's brain will allow for a comprehensive neuropathological review. Defendants allege that such a review is essential in the determination of Drew's cause of death.

A. NEWLY DISCOVERED EVIDENCE

According to plaintiffs, Gilles's affidavit "fails to meet the threshold standard of new evidence not previously available" because defendants could have provided the affidavit in response to plaintiffs' original motion. (Pls. Mem. Opp'n, Rec. Doc. No. 45 at 2.) We agree. In *Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1986),* the defendant filed a motion for reconsideration of the granting of plaintiff's motion for summary judgment. Defendant supported his [*41] motion with a "lengthy affidavit." *Harsco, 779 F.2d at 908.* The court denied the motion for reconsideration. *Id. at 909.* Holding that the district court did not err in denying the defendant's motion for summary judgment, the Third Circuit found that defendant submitted no new evidence when he "filed only his own affidavit containing evidence that was available prior to the summary judgment." Id.

Likewise, we believe that defendants have submitted no new evidence with the instant motion, inasmuch as Gilles's opinion that he needs additional microscopic sections of Drew's brain for a comprehensive evaluation was available to defendants prior to our Order Barring Defendants from Altering Drew's Brain. This is evidenced by defendants' statement prior to our Order Barring Defendants from Altering Drew's Brain that "whether or not additional tissue samples are necessary is a clinical judgement that is clearly reserved for respondents' expert." (Defs.' Br. Opp'n, Rec. Doc. No. 40 at 4.) This statement indicates that at the time of our Order Barring Defendants from Altering Drew's Brain, defendants had an expert who had made a clinical judgment that additional [*42] tissue samples were necessary -- the exact judgment Gilles makes in his affidavit. Under Harsco, then, we are not required to consider Gilles's affidavit in our disposition of the instant motion. See *Harsco, 779 F.2d at 909.*

B. GOOD CAUSE REQUIREMENT

Assuming, *arguendo,* that Gilles's affidavit does constitute newly discovered evidence, we nonetheless find that defendants have again failed to meet the "good cause" requirement of Rule 35(a). Defendants emphasize repeatedly that Gilles "opines that evidence critical to the defense may only be found" in portions of Drew's brain that have not yet been sectioned. (Defs.' Mem. Supp., Rec. Doc. No. 46 at 2.) Specifically, defendants assert that Gilles wants to section the herniated portions of the parahippocampal gyri and biventral lobes of the cerebellum. (Id. at 2.)

[HN13] It is true that "the court may order ... examination [under Rule 35] if the proposed examiners will perform tests not undertaken in the prior examinations." 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 35.04[2] (3d ed. 2000). However, "new tests are not sufficient cause for ordering an additional examination ... unless the moving [*43] party satisfies the court that the new test will likely yield results not achieved in the prior examinations." Id. Defendants have provided nothing but Gilles's own opinion in their attempt to establish that his test will yield new results, *i.e.,* a "definite diagnosis." (Defs.' Mem. Supp., Rec. Doc. No. 46, Exs. A & B.) In contrast, plaintiffs provide affidavits from two board-certified neuropathologists as well as a report and deposition testimony from defendants' own consultant indicating that Towfighi's original samples were sufficient to complete a neuropathological evaluation of Drew's brain. (Pls.' Mem. Opp'n, Rec. Doc. No. 45, Exs. 1, 2, 3, & 4.)

Moreover, as we noted in our Order Barring Defendants from Altering Drew's Brain, [HN14] "even if good cause for ordering the examination is established, the decision of whether to order a mental or physical examination under Rule 35 is still within the sound discretion of the court." 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 35.05[1] (citing *Great West Life Assurance Co. v. Levithan, 153 F.R.D. 74, 76 (E.D. Pa. 1994)).* (Rec. Doc. No. 43 at 8.)

"Although the rule is to be construed liberally in favor [*44] of granting the examination, the court must still balance the right of the party to be examined to avoid personal invasion against the moving party's right to a fair trial." 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 35.05[1] (footnotes and citations omitted). (Rec. Doc. No. 43 at 8.)

As we found in our Order Barring Defendants from Altering Drew's Brain, we again find not only that defendants' have failed to show "good cause" for ordering additional review and cutting of Drew's brain, but also that plaintiffs' right to avoid further invasion of their son's brain outweighs defendants' asserted, but unsubstantiated, need to do additional sectioning of Drew's brain. The denial of defendants' request will have no perceived effect on their right to a fair trial. (See Rec. Doc. No. 43 at 9.)

C. INTERLOCUTORY APPEAL

Defendants ask that we amend our Order Barring Defendants from Altering Drew's Brain to permit a petition for an immediate appeal to be filed by defendants. [HN15] *28 U.S.C. § 1292*(b) provides that:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that [*45] such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order ...."

Defendants base their request on the assertion that our having granted plaintiffs' motion involves a controlling question of law as to which there is a substantial ground for difference of opinion with respect to whether or not the "good cause" requirement of Rule 35 has been met.

First, we point out that whether defendants have met the "good cause" requirement is essentially a question of fact. To be sure, we had to decide the legal question of whether defendants met a legal standard of "good cause" set forth in a federal rule. However, to make that determination, we examined the facts set forth by both parties as to what, if any, cause defendants showed as to why they should be allowed to cut Drew's brain. See *Johnson v. Alldredge, 488 F.2d 820, 822 (3d Cir. 1973)* [*46] (expressing doubt as to appropriateness for § 1292(b) review of question comprehending factual and legal matters).

We also find that the question of whether defendants have met the Rule 35 "good cause" requirement is not controlling. [HN16] "There is little doubt that a question is not controlling if the litigation would be conducted in the same way no matter how it were decided." 16 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3930 (2d Ed. 1996). Our having found that defendants did not meet the "good cause" requirement of Rule 35 will have little impact on the litigation other than the proof that defendants offer at trial. This determination is closely connected to the question of whether an immediate appeal of our Order Barring Defendants from Altering Drew's Brain will advance ultimate termination of the litigation. We find that it will not. We therefore decline to amend the Order Barring Defendants from Altering Drew's Brain to allow for an interlocutory appeal.

**CONCLUSION:**

We find that defendants have failed to produce newly discovered evidence in their motion for reconsideration. Considering for the sake of argument the evidence defendants claim as [*47] newly discovered, Gilles's affidavit, we find that defendants have again failed to meet the "good cause" standard prescribed by Rule 35. Because the question of whether defendants met the Rule 35 "good cause" standard is not a controlling question of law, we will not amend our Order Barring Defendants from Altering Drew's Brain to allow for interlocutory appeal under *28 U.S.C. § 1292*(b). For all of the foregoing reasons, defendants' motion to reconsider is denied.

We note that plaintiffs ask for an Order compelling Geisinger to produce a neuropathology expert report as soon as possible. (Pls.' Mem. Opp'n, Rec. Doc. No. 45 at 6.) According to plaintiffs, defense counsel has taken the position that Geisinger is not obligated to produce its neuropathology report in this matter until we decide the instant motion. Plaintiffs' proper recourse is to file a Motion for Order Compelling Disclosure or Discovery. See FED. R. CIV. P. 37. We therefore decline to issue the requested order at this time.

**NOW, THEREFORE, IT IS ORDERED THAT:**

Defendants' Motion for Reconsideration, or in the Alternative, Application for Certification for Immediate Appeal (Rec. Doc. [*48] No. 44) is denied.

James F. McClure, Jr.

United States District Judge

2

LEXSEE 1995 U.S. Dist. LEXIS 8799

**VANGUARD SAVINGS AND LOAN ASSOCIATION AND VSL SERVICE CORP., Plaintiffs, v. BARTON M. BANKS, et al., Defendants**

**CIVIL ACTION NO. 93-4627**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

***1995 U.S. Dist. LEXIS 8799***

**June 26, 1995, Decided**
**June 27, 1995, FILED, ENTERED**

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff savings and loan filed a motion to amend its complaint against defendant former employees so that the complaint would comply with a change in the law governing the Racketeer Influenced Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1961* et seq.

**OVERVIEW:** The former employees contended that the savings and loan unreasonably delayed filing the motion. Specifically, the former employees argued that the savings and loan filed its RICO case statement after the change in law. The former employees further alleged that the savings and loan was unreasonably dilatory because it filed the motion four months after the change in law had been decided. Finally, the former employees argued that they would have been unduly prejudiced by an amendment to the complaint. The court granted the savings and loan's motion. The court held that the savings and loan filed its case statement nearly a year before the change in law. The court found that even if the savings and loan had waited four months to file the complaint, such a delay was not "undue" for purposes of a Fed. R. Civ. P. 15(a) motion to amend. The court further determined that the former employees would not be unduly prejudiced by the amendment because the central theory underlying the RICO claim was to remain the same.

**OUTCOME:** The court granted the savings and loan's motion to amend its complaint against the former employees so that the complaint would comply with a change in the law.

**LexisNexis(TM) HEADNOTES - Core Concepts**

***Securities Law > Bases for Liability > Racketeer Influenced & Corrupt Organizations***
[HN1] The Racketeer Influenced Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1962*(c) prohibits any "person" employed by or associated with any "enterprise" from conducting or participating in the conduct of such enterprise's affairs through a pattern of racketeering activity.

***Securities Law > Bases for Liability > Racketeer Influenced & Corrupt Organizations***
[HN2] A Racketeer Influenced Corrupt Organizations Act enterprise is properly viewed as the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity. A victim corporation "drained of its own money" by pilfering officers and employees could not reasonably be viewed as the enterprise through which the persons carried out their racketeering activity. Rather, in such an instance, the proper enterprise would be the association of employees who are victimizing the corporation, while the victim corporation would not be the enterprise, but instead the *18 U.S.C.S. § 1962*(c) claimant.

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings***
[HN3] Under Fed. R. Civ. P. 15(a), if a party moves to amend its pleading to comply with a recent change in the applicable law, the court should freely grant the motion. A court should deny a motion to amend the pleadings only if: 1) the movant has acted in bad faith; 2) there has been undue delay; or 3) the amendment will unduly prejudice the nonmoving party.

**COUNSEL:**
[*1] For For VANGUARD SAVINGS AND LOAN ASSOCIATION, VSL SERVICE CORPORATION, PLAINTIFFS: DAVID J. STUTMAN, IRA B. SILVERSTEIN, STEPHANIE RESNICK, LISA A. CARNEY, FOX, ROTHSCHILD, O'BRIEN & FRANKEL, PHILA, PA.

For BARTON M. BANKS, DAVID BANKS, DEBRA WEIDMAN, BANKS, BANKS & WEIDMAN, DEFENDANTS: WALTER WEIR, JR., JONATHAN J. BART, PATTERSON & WEIR, PHILA, PA. For ABNER GREEN, DEFENDANT: STEPHEN H. SKALE, PHILA, PA. For MURRAY D. LEVIN, MICHAEL GRADESS, DEFENDANTS: ROBERT S. GOLDSTEIN, MURLAND & ASSOC., PHILA, PA. For HARRIET R. BANKS, DEFENDANT: RICHARD M. ROSENBLEETH, GRANT S. PALMER, BLANK, ROME, COMISKY & MC CAULEY, PHILA, PA. For KOPPLE & GOTTLEIB, CPA, DEFENDANT: PHILIP B. TORAN, JAY S. ROTHMAN, MARSHALL, DENNEHEY, WARNER, COLEMAN AND GOGGIN, PHILA, PA.

For BARTON M. BANKS, DAVID BANKS, DEBRA WEIDMAN, BANKS, BANKS & WEIDMAN, KATHLEEN A. KUNYCZKA, THIRD-PARTY PLAINTIFFS: WALTER WEIR, JR., JONATHAN J. BART, PATTERSON & WEIR, PHILA, PA. For HERBERT BASS, IRA SILVERSTEIN, CECIL MAIDMAN, THIRD-PARTY DEFENDANTS: JEFFREY B. MC CARRON, SWARTZ, CAMPBELL & DETWEILER, PHILA, PA.

**JUDGES:**
JUDGE JAMES MCGIRR KELLY

**OPINIONBY:**
JAMES MCGIRR KELLY

**OPINION:**

**MEMORANDUM**

**J.M. KELLY, J.**

[*2] **JUNE 26, 1995**

Presently before the court is Plaintiff Vanguard Savings and Loan's ("Plaintiff" or "Vanguard") Motion to File an Amended Complaint pursuant to Federal Rule of Civil Procedure 15 (a). The motion seeks to amend three paragraphs of the original complaint to comply with a change in the law governing the Racketeer Influenced Corrupt Organizations Act ("RICO"). *18 U.S.C. § 1961,* et seq. This court has jurisdiction over the matter pursuant to *28 U.S.C. § 1331* and § 1367. For the following reasons, plaintiff's motion is granted.

**1. Factual Background and RICO Pleading Requirements**

Vanguard is a savings and loan institution organized and operating under the laws of the Commonwealth of Pennsylvania. Defendants Barton Banks, David Banks, Debra Weidman, Abner Green, Leonard Rosenfeldt, Murray Levin and Harriet Banks (the "Banks defendants") n1 are former officers, managers and employees of the plaintiff. In the complaint, plaintiff claimed the Banks defendants engaged in numerous schemes to drain Vanguard of its assets and use depositor funds for their own purposes. The complaint sought relief based on several legal theories including fraud, professional [*3] negligence, breach of contract, and breach of fiduciary duties. Plaintiff also sued the Banks defendants under section 1962(c) of the Racketeer Influenced Corrupt Organizations Act ("RICO"). See *18 U.S.C. § 1962*(c). The RICO claim is the subject of this motion to amend.

n1 Banks, Banks & Weidman, a law firm whose principals are Barton Banks, David Banks and Debra Weidman, is also a defendant in the RICO claim.

[HN1] "Section 1962(c) of RICO prohibits any 'person' employed by or associated with any 'enterprise' from conducting or participating in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Glessner v. Kenny, 952 F.2d 702, 710-14 (3d Cir. 1991).* At the time plaintiff filed its complaint, the Court of Appeals for the Third Circuit had held that in a RICO case where corporate officers allegedly victimized a corporation through pilfering and embezzlement, the plaintiff should designate the corporate officers as the defendant "persons" and the victimized corporation as [*4] the RICO "enterprise." *Glessner, 952 F.2d at 710-14;* see also *Petro-Tech, Inc. v. Western, 824 F.2d 1349, 1359 (3d Cir. 1987).*

As mentioned before, the complaint alleged the Banks defendants drained Vanguard of its resources through various fraudulent schemes. Therefore, based on the above cases, when plaintiff filed its complaint, it appeared the proper RICO "persons" were the Banks defendants and the appropriate "enterprise" was Vanguard. This is precisely how plaintiff framed its RICO claim in the complaint and RICO Case Statement. See Complaint at PP 86, 111 and 118.

After plaintiff filed its complaint and RICO Case Statement, the Third Circuit decided *Jaguar Cars v. Royal Oaks Motor Company, 46 F.3d 258 (3d Cir. 1995).* In Jaguar, the court embraced a new definition of a RICO "enterprise." Following the United States Supreme Court opinions in *Reves v. Ernst & Young, 122 L. Ed. 2d 525, 113 S. Ct. 1163 (1993),* and *National Organization for Women v. Scheidler, 127 L. Ed. 2d 99, 114 S. Ct. 798 (1994),* the court stated that [HN2] a RICO enterprise "is properly viewed as the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." [*5] *Jaguar, 46 F.3d at 267.* To illustrate this rule, the court explained:

[A] victim corporation 'drained of its own money' by pilfering officers and employees could not reasonably be viewed as the enterprise through which the persons carried out their racketeering activity. Rather, in such an instance, the proper enterprise would be the association of employees who are victimizing the corporation, while the victim corporation would not be the enterprise, but instead the § 1962(c) claimant.

Id.

Obviously, this opinion significantly changed pleading requirements in RICO cases. Prior to Jaguar, if corporate officers victimized their own corporation through fraud, pilfering or embezzlement, the law required plaintiff to designate the corporation as the RICO "enterprise." In light of Jaguar, however, it is now clear the proper "enterprise" in such a case is not the victim corporation, but the association of employees through which the defendant persons conducted their racketeering activity. *Jaguar, 46 F.3d at 266.*

Plaintiff now seeks to amend its RICO claim to comply with this recent change in the law. Specifically, plaintiff wants to designate the [*6] association of the Banks defendants as the RICO "enterprise."

**2. Plaintiff's motion to amend in granted.**

[HN3] Under Rule 15(a), if a party moves to amend its pleading to comply with a recent change in the applicable law, the court should freely grant the motion. *Gregory v. Harris-Teeter, 728 F. Supp. 1259 (W.D.N.C. 1990).* A court should deny a motion to amend the pleadings only if: 1) the movant has acted in bad faith; 2) there has been undue delay; or 3) the amendment will unduly prejudice the nonmoving party. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).*

It is clear that plaintiff seeks to amend its RICO claim to comply with a recent change in the law. When plaintiff filed its original complaint, Third Circuit law seemingly required it to label Vanguard as the RICO "enterprise." In light of Jaguar, however, it is obvious the Banks defendants are the proper "enterprise." Accordingly the court should grant the motion unless defendants can show bad faith, unreasonable delay or undue prejudice. *Foman, 371 U.S. at 182.*

Defendants argue plaintiff unreasonably delayed filing this motion. To support this contention, they set forth two arguments. First, they claim [*7] plaintiff filed its RICO Case Statement after Jaguar had been decided. Accordingly, they allege that any delay is unreasonable because plaintiff should have designated the Banks defendants as the "enterprise" in the first place. This argument is baseless. Contrary to defendants' contention, plaintiff filed its RICO Case Statement nearly one year before the Third Circuit decided Jaguar. Therefore, based on the applicable law at that time, it was appropriate for plaintiff to designate Vanguard as the RICO "enterprise."

Secondly, defendants claim plaintiff was unreasonably dilatory because it filed this motion four months after Jaguar had been decided. This argument is both factually incorrect an legally unpersuasive. The Third Circuit decided Jaguar on January 18, 1995. On February 14, 1995, that court denied a motion for rehearing en banc. Plaintiff filed this motion on April 7, 1995, which is less than two months after the final Jaguar decision. Moreover, even if plaintiff had waited four months, such a delay is not "undue" for purposes of a Rule 15(a) motion to amend. See e.g. *Morongo Band of Mission Indians v. Rose, 893 F.2d 1074 (9th Cir. 1990)*(a [*8] two year delay between complaint and motion to amend is not by itself sufficient to deny motion); *Middle Atlantic Utilities Co. v. S.M.W. Development Corp., 392 F.2d 380 (2d Cir. 1968)*(three year delay is not alone a sufficient reason to deny motion to amend).

Finally, defendants argue they will be unduly prejudiced by this amendment. They claim plaintiff is attempting to introduce a new theory into the case at the end of discovery. This argument also lacks merit. Although this amendment will technically change the designated "enterprise", the central theory underlying the RICO claim remains the same. Before the amendment, plaintiff needed to prove the Banks defendants fraudulently drained Vanguard of its assets through a pattern of racketeering activity. After the amendment, plaintiff must prove the same allegations to prevail on its RICO claim. Because there is no change in the substantive issues of this case, defendants will not be unduly prejudiced. Accordingly, plaintiff's motion is granted.

An appropriate Order follows.

**ORDER**

AND NOW, on this 26TH day of June, 1995, after careful consideration of Plaintiff Vanguard Savings and Loan's ("Plaintiff") Motion [*9] to Amend the Complaint Pursuant to Federal Rule of Civil Procedure 15(a), the Responses of the Defendants, the Plaintiff's Reply, and for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that Plaintiff's Motion is GRANTED.

BY THE COURT:

JAMES McGIRR KELLY, J.

3

LEXSEE 306 F.3d 1314

**IN RE NAHC, INC. SECURITIES LITIGATION; Jack Brady, Roger W. Svec, Jacob A. Salzmann, David Fisher, Chris Pietrafitta, Frank J. Siefert, Franz Schleicher, Barry Weisberg and Bruce Bardone, Appellants**

**No. 01-4132**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

***306 F.3d 1314; 2002 U.S. App. LEXIS 20846***

**July 18, 2002, Submitted Under Third Circuit LAR 34.1(a)**

**October 3, 2002, Filed**

**SUBSEQUENT HISTORY:**
[**1] As Amended October 16, 2002.

**PRIOR HISTORY:**
Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. No. 00-cv-4020). District Judge: Honorable Lowell A. Reed, Jr. *In re NAHC, Inc. Secs. Litig., 2001 U.S. Dist. LEXIS 16754; Fed. Sec. L. Rep. (CCH) P91,614.*

**DISPOSITION:**
Judgment of the district court affirmed.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** In a consolidated action, plaintiff shareholders brought a securities fraud action in the United States District Court for the Eastern District of Pennsylvania against defendants, a corporation, its officers and directors, the author of an opinion letter, and an accounting firm. The district court dismissed the case. The shareholders appealed.

**OVERVIEW:** The shareholders claimed that defendants made false and misleading statements concerning, inter alia, the impact of federal legislation on its business and divestiture of the corporation's operating divisions. The shareholders also alleged that defendants overstated goodwill. The district court found that the claims relating to goodwill were time-barred, and the appellate court, applying an inquiry notice standard, agreed. A series of disclosures more than one year before suit was filed constituted "storm warnings" sufficient to put the shareholders on notice that goodwill had been overstated. The remaining claims against the corporation and its officers and directors failed to meet the heightened pleading requirements of the Private Securities Litigation Reform Act, *15 U.S.C.S. § 78u-4* et seq. The claims against the remaining parties were either time-barred or rendered immaterial by other disclosures. The district court was entitled to take judicial notice of documents relied upon in the complaint, documents filed with the Securities and Exchange Commission, and stock price data. As amendment of the complaint would have been futile, leave to amend was properly denied.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(TM) HEADNOTES - Core Concepts**

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action***
***Civil Procedure > Appeals > Standards of Review > De Novo Review***
[HN1] An appellate court exercises de novo review of a district court's dismissal under Fed. R. Civ. P. 12(b)(6) and must accept as true all material allegations in the complaint, but the appellate court need not accept as true unsupported conclusions and unwarranted inferences.

***Civil Procedure > Appeals > Standards of Review > Abuse of Discretion***
***Evidence > Procedural Considerations > Judicial Notice***
[HN2] A court's decision whether to take judicial notice of certain facts is reviewed for abuse of discretion.





***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings***
***Civil Procedure > Appeals > Standards of Review > Abuse of Discretion***
[HN3] An appellate court reviews a district court's denial of leave to amend the complaint for abuse of discretion.

***Securities Law > Bases for Liability > Deceptive Devices***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
[HN4] Claims arising under § 10(b) *(15 U.S.C.S. § 78j*(b)) of the Securities Exchange Act of 1934 are governed by the limitations rule set forth in § 9(e) *(15 U.S.C.S. § 78i*(e)) of the Exchange Act: No action shall be maintained to enforce any liability created under § 78i, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

***Securities Law > Bases for Liability > Deceptive Devices***
[HN5] In securities fraud actions, courts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information in question.

***Securities Law > Bases for Liability > Deceptive Devices***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
[HN6] With respect to when the limitations period begins to run in a securities fraud action, other courts of appeals, and district courts within the Third Circuit, have generally applied an inquiry notice standard, coupled with some form of reasonable diligence requirement, in determining whether a plaintiff's securities claims are timely filed. The United States Court of Appeals for the Fourth Circuit is not inclined to follow the actual notice analysis of the United States Court of Appeals for the Ninth Circuit, and accepts the approach followed by the other courts of appeals and the district courts in the Third Circuit.

***Securities Law > Bases for Liability > Deceptive Devices***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
[HN7] To the extent a securities fraud plaintiff was on inquiry notice of the basis for claims more than one year prior to bringing the action, his or her claim is subsequently time-barred by the requisite statute of limitations.

***Securities Law > Bases for Liability > Deceptive Devices***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
[HN8] Under the "inquiry notice" standard, the one-year limitations period for securities fraud actions begins to run when the plaintiffs discovered or in the exercise of reasonable diligence should have discovered the basis for their claim against the defendant. Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had sufficient information of possible wrongdoing to place them on "inquiry notice" or to excite "storm warnings" of culpable activity. The test for "storm warnings" is an objective one, based on whether a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning. The plaintiffs need not know all of the details or "narrow aspects" of the alleged fraud to trigger the limitations period; instead, the period begins to run from the time at which the plaintiffs should have discovered the general fraudulent scheme.

***Securities Law > Bases for Liability > Misleading Statements***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
[HN9] Under the "inquiry notice" standard for determining when the limitations period begins to run in a securities fraud action, storm warnings may take numerous forms. They may include substantial conflicts between oral representations of the brokers and the text of the prospectus, the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.

***Securities Law > Bases for Liability > Misleading Statements***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
[HN10] Once on inquiry notice, securities fraud plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims, and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period.

***Securities Law > Bases for Liability > Misleading Statements***
***Governments > Legislation > Statutes of Limitations > Time Limitations***





[HN11] In a securities fraud action, once the existence of storm warnings has been adequately established the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries. If plaintiffs do not investigate the storm warnings, they are deemed on inquiry notice of their claims.

***Securities Law > Bases for Liability > Misleading Statements***
[HN12] To state a valid securities fraud claim under Rule 10b-5, *17 C.F.R. § 240.10b-5*, a plaintiff must first establish that defendant, in connection with the purchase or sale of a security, made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. The plaintiff must additionally establish that the defendant acted with scienter and that plaintiff's reasonable reliance on defendant's misstatement proximately caused him injury.

***Securities Law > Bases for Liability > Private Securities Litigation***
[HN13] A party asserting a claim under the federal securities laws must meet the heightened pleading standard set forth under the Private Securities Litigation Reform Act (PSLRA), *15 U.S.C.S. § 78u-4* et seq., enacted in 1997 to restrict abuses in securities class-action litigation. First, the PSLRA requires a party alleging a Rule 10b-5, *17 C.F.R. § 240.10b-5*, violation to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. *15 U.S.C.S. § 78u-4*(b)(1). Second, the PSLRA requires that a securities fraud complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *15 U.S.C.S. § 78u-4*(b)(2).

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements***
***Securities Law > Bases for Liability > Private Securities Litigation***
[HN14] Complaints alleging securities fraud must comply with Fed. R. Civ. P. 9(b), which provides that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. Rule 9(b)'s provision allowing state of mind to be averred generally conflicts with the requirement under the Private Securities Litigation Reform Act (PSLRA), *15 U.S.C.S. § 78u-4* et seq., that plaintiffs state with particularity facts giving rise to a strong inference of scienter. In that sense, the PSLRA supersedes Fed. R. Civ. P. 9(b) as it relates to Rule 10b-5, *17 C.F.R. § 240.10b-5*, actions.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies***
[HN15] See *17 C.F.R. § 240.14a-9.*

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies***
[HN16] To prevail on a claim under § 14(a) *(15 U.S.C.S. § 78n*(a)) of the Securities Exchange Act of 1934, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies***
***Securities Law > Bases for Liability > Private Securities Litigation***
[HN17] Under the heightened pleading standard of the Private Securities Litigation Reform Act, *15 U.S.C.S. § 78u-4* et seq., the complaint in an action under § 14(a) *(15 U.S.C.S. § 78n*(a)) of the Securities Exchange Act of 1934 must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, all facts with particularity on which that belief is formed. *15 U.S.C.S. § 78u-4*(b)(1).

***Securities Law > Bases for Liability > Deceptive Devices***
[HN18] Under § 10(b) *(15 U.S.C.S. § 78j*(b)) of the Securities Exchange Act of 1934, a private cause of action arises when purchasers or sellers can identify a false representation of material fact or omission that makes a disclosed statement materially misleading. However, a fact or omission is material only if there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available to the investor.

***Securities Law > Bases for Liability > Deceptive Devices***
[HN19] To be actionable as securities fraud, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events. Defendants are not obligated to predict future events unless there is reason to believe that they will occur.

***Securities Law > Bases for Liability > Deceptive Devices***

[HN20] In an "efficient" market, the concept of materiality translates into information that alters the price of the firm's stock. If the disclosure of certain information has no effect on stock prices, it follows that the information disclosed was immaterial as a matter of law.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies***

***Securities Law > Bases for Liability > Deceptive Devices***

[HN21] Information is deemed material for purposes of a claim under § 14(a) *(15 U.S.C.S. § 78n*(a)) of the Securities Exchange Act of 1934 if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. The test for materiality is whether there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. This definition of materiality is the same for claims under both § 10(b) *(15 U.S.C.S. § 78j*(b)) of the Securities Exchange Act of 1934 and § 14(a).

***Evidence > Procedural Considerations > Judicial Notice***

[HN22] Fed. R. Evid. 201(b) permits a district court to take judicial notice of facts that are not subject to reasonable dispute in that they are either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Under Rule 201(d), a district court must take judicial notice if requested by a party and supplied with the necessary information.

***Evidence > Procedural Considerations > Judicial Notice***

[HN23] A court may consider a document integral to or explicitly relied upon in the complaint on a motion to dismiss.

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings***

[HN24] Normally, leave to amend is granted when a complaint is dismissed on Fed. R. Civ. P. 9(b) failure to plead with particularity grounds. However, leave to replead is often denied on other grounds, such as undue delay, bad faith, dilatory motive, prejudice and futility.

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings***

[HN25] An amendment would be futile when a complaint, as amended, would fail to state a claim upon which relief could be granted.

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings***

[HN26] A bare request in an opposition to a motion to dismiss--without any indication of the particular grounds on which amendment is sought--does not constitute a motion within the contemplation of Fed. R. Civ. P. 15(a).

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings***

***Securities Law > Bases for Liability > Private Securities Litigation***

[HN27] The Private Securities Litigation Reform Act, *15 U.S.C.S. § 78u-4* et seq., limits the application of Fed. R. Civ. P. 15 in securities fraud cases.

***Securities Law > Bases for Liability > Private Securities Litigation***

[HN28] The stay of discovery procedures under the Private Securities Litigation Reform Act (PSLRA), *15 U.S.C.S. § 78u-4* et seq., was intended by Congress to protect innocent defendants from having to pay nuisance settlements in securities fraud actions in which a foundation for the suit cannot be pleaded; rather than lead to the conclusion that plaintiffs should receive more leniency in amending their pleadings, the stay of discovery procedures adopted in conjunction with the heightened pleading standards under the PSLRA is a reflection of the objective of Congress to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.

**COUNSEL:**

John F. Innelli, Michael J. Molder, Innelli and Molder, Philadelphia, PA. Mark Levine, Stull, Stull & Brody, New York, NY. Peter S. Linden, Kirby, McInerney & Squire, LLP, New York, NY, Attorneys for Appellants, Jack Brady, Roger W. Svec, Jacob A. Salzmann, David Fisher, Chris Pietrafitta, Frank J. Siefert, Franz Schleicher, Barry Weisberg and Bruce Bardone.

Timothy C. Russell, Spector, Gadson & Rosen, P.C., Philadelphia, PA. David W. R. Wawro, Edward J. Henderson, Torys LLP, New York, NY. Mark C. Hansen, Kellogg, Huber, Hansen, Todd, & Evans, P.L.L.C., Washington, D.C., Attorneys for Appellees, NAHC, Inc., John Foster, Timothy Foster, James W. McLane and Robert E. Healy, Jr.

John W. Frazier, IV, John E. Caruso, Jill Baisinger, Montgomery, McCracken, Walker & Rhoads, LLP,

Philadelphia, PA, Attorneys for Appellee, PriceWaterhouseCoopers.

Martin Flumenbaum, Maria T. Vullo, Robyn M. Sorid, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY. Howard M. Klein, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, [**2] PA, Attorneys for Appellee, Wasserstein Perella & Co., Inc.

**JUDGES:**
Before: McKEE, FUENTES and ALDISERT, Circuit Judges.

**OPINIONBY:**
ALDISERT

**OPINION:**

[*1318]

OPINION OF THE COURT

ALDISERT, Circuit Judge.

A number of shareholders n1 of NovaCare, Inc.'s (now known as NAHC, Inc.) ("NovaCare" or "Company") appeal from the dismissal of their consolidated amended complaint ("the Complaint") by the district court pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA"), *15 U.S.C. § § 78u-4* et seq. They also appeal from the court's granting of NovaCare's motion for judicial notice. Undergirding this appeal are § § 10(b), 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), *15 U.S.C. § § 78j*(b), 78n(a) and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder, *17 C.F.R. § § 240.10b-5* and 240.14a-9.

n1 Jack Brady, Roger W. Svec, Jacob A. Salzmann, David Fisher, Chris Pietrafitta, Frank J. Siefert, Franz Schleicher, Barry Weisberg and Bruce Bardone.

[**3]

The district court applied an "inquiry notice" standard to determine when the limitations period begins to run in a securities fraud action. Appellants contend that the court should have applied an actual notice standard. We have adopted an inquiry notice standard in the context of a case brought under the Racketeer Influenced and Corrupt Oranization Act ("RICO"), *18 U.S.C. § § 1961*-1968. See *Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 251 (3d Cir. 2001).* We have not, however, decided the precise standard in the context of a securities fraud claim. We do so now and conclude that the district court did not err in applying this standard and dismissing, as time-barred, the majority of Appellants' contentions. We also decide that the large number of other issues raised by Appellants were properly decided by the district court and affirm its judgment of dismissal in all respects.

I.

NovaCare, a national provider of physical rehabilitation and employee benefits management services, operated in three [*1319] industry segments: (1) long-term care services, consisting of physical rehabilitation services; (2) outpatient services, comprising physical rehabilitation and occupational health services ("PROH") as well as orthotic and prosthetic services ("O & P"); and (3) [**4] employee benefits management services, through a majority-owned subsidiary, NovaCare Employee Services, Inc. ("NCES"). The Company experienced substantial growth from its inception in 1985; by the end of the fiscal year ending June 30, 1998, NovaCare claimed the nation's highest market share in the long-term care and orthotic and prosthetic rehabilitation markets. It was also the nation's second largest provider of outpatient physical rehabilitation and occupational health services, and, through NCES, was the second largest employee services provider.

Traditionally, long-term care services had been NovaCare's core business, and in fiscal 1998, it still accounted for approximately 40% of the Company's net revenues and 60% of its operating income. By the beginning of the relevant period in May of 1998, NovaCare common stock, listed on the New York Stock Exchange, traded generally in the range of $ 12 to $ 14 per share.

The future of the long-term care services business was about to change, however. For many years, nursing homes had been reimbursed for therapy services on a cost-basis, subject to guidelines designed to ensure that costs were reasonable. On May 12, 1998, the Health [**5] Care Financing Administration ("HCFA") issued preliminary regulations implementing the Balanced Budget Act of 1997 (the "BBA"). The regulations drastically altered the method of reimbursement by Medicare and Medicaid to long-term care providers of contract therapy services, switching from reimbursement on a cost basis to reimbursement based on a per diem and specific fee schedule structure. Approximately one week following the issuance of the HCFA guidelines, 10 NovaCare executives collectively sold nearly 600,000 shares of NovaCare stock. One of the executives was Defendant T. Foster, who sold roughly $ 4.1 million in shares on May 20, 1998.

Following implementation of the HCFA guidelines, NovaCare reported increasingly diminished revenues for its long-term care services segment in each quarter of the 1999 fiscal year. The Balanced Budget Act's impact on NovaCare's long-term care business eventually led to a significant decline in the Company's stock price listing. It then issued a warning in its 1998 Annual Report:

Due to the extensive nature of the reimbursement changes specified by the BBA, the uncertainty regarding the application of fee schedules and an annual cap on [**6] Medicare Part B services, the effect these changes may have on the demand for services and management's inability to predict what portion of the PPS and fee schedule rates that NovaCare will be able to receive based on negotiated term of service contracts with its customers, the Company is unable to determine the impact that the BBA will have on its financial position on results of operations.

App. at 331.

On September 22, 1998, after the Company announced expectations of significant declines in first quarter earnings as a result of unanticipated delays in the transition to the new reimbursement system, the Company's stock dropped by approximately $ 3 per share from $ 7 to $ 4. By April 1, 1999, NovaCare was trading at $ 1.188. Notwithstanding the new statute's materially adverse effect on the Company's financial condition, the Company did not adjust the value of goodwill as an asset of the long-term care division in the financial [*1320] statements on the Securities and Exchange Commission ("SEC") Form 10-K for the 1998 fiscal year (the "1998 Form 10-K") or on the SEC Forms 10-Q for the first and second quarter of the 1999 fiscal year (the "1st Quarter 10-Q" and "2nd Quarter 10-Q, [**7] " respectively).

From April 1999 onwards, NovaCare began to implement a series of restructuring plans to retire its bank debt and improve its capital structure, and this ultimately resulted in the sale of all of the Company's operating lines of business. On April 5, 1999, the Company announced that it had entered into an agreement to sell its Orthotic and Prosthetic business to Hanger Orthopedic Group, Inc. for $ 455 million. On May 28, 1999, NovaCare announced that it had agreed to divest its long-term care services business to Chance Murphy, Inc. for only nominal consideration.

On May 30, 1999, T. Foster, McLane and Healy renegotiated their employment contracts, providing for transaction and retention bonuses tied to the sale of NCES, the sale of PROH, and the earlier of either the liquidation of the Company or June 30, 2000.

On August 16, 1999, the board of directors of NovaCare announced that it had approved a proposal to sell the PROH division and the Company's shares in NCES to satisfy the Company's outstanding debentures, and to reinvest or to liquidate and distribute to stockholders any remaining proceeds (the "Restructuring Plan"). On August 13, 1999, NovaCare filed with [**8] the SEC, and mailed to its shareholders, proxy materials announcing a special meeting for the shareholders to vote on the Restructuring Plan (the "Proxy Statement"). The Proxy Statement estimated that the proceeds available for distribution in the event of a liquidation would range from $ 1.76 to $ 3.94 per common share. On September 8, 1999, the Company announced that it had entered into an agreement, subject to shareholder approval of the Restructuring Plan, to sell its shares in NCES to an investment group at $ 2.50 per share, amounting to approximately $ 48.5 million. On September 10, the Company filed and sent additional proxy materials, which included an opinion letter by Wasserstein assessing the fairness of the NCES transaction.

On September 20, 1999, the Company filed an SEC Form 10-K for the 1999 fiscal year. The Company did not reassess its goodwill in light of the Restructuring Plan or adjust the value of goodwill as an asset in the 1999 Form 10-K's financial statements.

The shareholders of NovaCare approved the Restructuring Plan on September 21, 1999. On October 4, 1999, the Company announced that it had agreed to sell the PROH division to Select Medical Corporation [**9] ("Select Medical") for approximately $ 200 million in cash and debt assumption.

On November 22, 1999, the Company filed its Form 10-Q with the SEC, releasing its financial results for the first quarter of the 2000 fiscal year. This Form 10-Q disclosed the following developments:

(a) Hanger had claimed there was a $ 29 million shortfall in NovaCare's calculation of the O & P division's working capital, for which NovaCare was responsible pursuant to the sale agreement's working capital guarantee;

(b) NovaCare was writing off assets that it had retained from the long-term care services business, and that between the write-off and the working capital guarantee that it provided to Chance Murphy, the Company would incur roughly $ 24.4 million in losses related to the long-term care services business;

(c) NovaCare had placed more than $ 13 million in escrow in support of the guarantee to the NCES investors

for four years of gross profits from a services [*1321] agreement with the PROH business, a guarantee on which NovaCare was required to perform when Select Medical declined to enter into the agreement; and

(d) the Company had to hold in escrow $ 36.8 million of the sale [**10] proceeds from the PROH sale, and pay $ 26 million in transaction costs and other liabilities, so NovaCare would receive only $ 99 million in cash proceeds from Select Medical.

App. at 6. The Form 10-Q also revealed that as a result of the foregoing developments, the estimated liquidation value now ranged from $ 0.10 to $ 1.00 per share. On November 26, 1999, the first day of trading following the release of Form 10-Q, NovaCare's stock price dropped 75% to $ 0.125 per share. On November 14, 2000, NovaCare disclosed that there would be no liquidated dividend, and that the Company held insufficient funds to satisfy its outstanding debt.

Because of the broadband attack launched by the Appellants before us, it is necessary to set forth, in considerable detail, the comprehensive nature of the district court proceedings, and the seven separate contentions of reversible error asserted in this appeal.

II.

On August 9, 2000, Jack Brady filed a complaint against NovaCare, a certain number of its officers and directors, and Wasserstein Perella & Co. The complaint asserted that defendants had misrepresented NovaCare's divestiture of its four operating businesses during 1999. It alleged [**11] claims under § § 10(b), 14(a) and 20(a) of the Exchange Act and the rules thereunder on behalf of stockholders who purchased NovaCare stock from May 20, 1998, through November 22, 1999, or who were eligible to vote on a restructuring plan in September 1999. Brady published notice of the action in accordance with the PSLRA, *15 U.S.C. § 78u-4*(a)(3).

On September 19, 2000, Chris Pietrafitta filed a complaint against the same defendants and also PriceWaterhouseCoopers LLP ("PwC"), alleging claims arising from the impact of the BBA on NovaCare's long-term care services business. The district court consolidated all pending actions, appointed lead plaintiffs and approved the selection of lead plaintiff's counsel.

On February 20, 2001, Appellants filed a consolidated and amended Complaint, incorporating the allegations of six previously filed complaints. On March 12, 2001, the district court granted plaintiffs leave to file a further amendment to correct certain misstated allegations in the consolidated Complaint.

Count I of the Complaint asserted Rule 10b-5 claims against the NovaCare Defendants. The plaintiffs alleged that the NovaCare Defendants engaged in a course [**12] of conduct from May 20, 1998, to November 22, 1999, in which they knowingly or recklessly issued materially false and misleading financial statements and failed to disclose significant terms of various asset sales in order to artificially inflate and maintain the price of NovaCare common stock.

The district court categorized the claims contained in Count I into six groups: (A) failure to adjust the goodwill of the long-term care services division in light of the BBA's impact; (B) failure to disclose that proceeds from the sale of the O & P division would be reduced because of overstated working capital; (C) failure to disclose that proceeds from the sale of the long-term care division would be reduced because of (i) overstated working capital and (ii) uncollectible accounts receivable; (D) failure to disclose that proceeds from the sale of the NCES division would be reduced because (i) the purchaser of [*1322] PROH would not enter into an employment services contract with NCES, nor assume the Company's guarantee of the contract and (ii) NovaCare had placed funds in escrow to support the guarantee of the employment services contract; (E) failure to disclose that proceeds from the sale of the [**13] PROH division would be materially reduced because (i) the Company would lose the funds escrowed in support of the financial representations in the sales agreement due to the overstatement of the PROH working capital and accounts receivable and (ii) the Company would place $ 36 million in escrow in support of the financial representations and would incur $ 26 million in transactions costs and liabilities; and (F) failure to adjust the Company's goodwill despite the planned sale of all operating assets under the Restructuring Plan.

Count II of the Complaint asserted Rule 10b-5 claims against PwC, averring that PwC issued materially false and misleading audit reports for NovaCare's 1998 and 1999 Forms 10-K.

Count III of the Complaint asserted Rule 10b-5 claims against Wasserstein for issuing a materially false and misleading fairness opinion regarding the NCES transaction in the proxy materials.

Count IV of the Complaint asserted § 20(a) claims against the Individual Defendants, as control persons of the Company during the time of the alleged underlying violations of Rule 10b-5 and Rule 14a-9.

Count V of the Complaint asserted Rule 14a-9 claims against all of the defendants except [**14] PwC for issuing proxy materials with materially false or





misleading statements regarding Claims (B) through (E) of Count I of the Complaint as listed above.

On April 20, 2001, the NovaCare defendants filed a motion to dismiss the amended Complaint and a motion for judicial notice of certain press releases and SEC filings referred to in the Complaint, other SEC documents filed during the relevant period, and NovaCare's published stock price throughout the alleged class periods.

On October 17, 2001, the district court issued a Memorandum and Order dismissing the consolidated amended Complaint under Rule 12(b)(6). In re NAHC Sec. Litig., Master File No. 00-4020 (E.D. Pa. Oct. 17, 2001) (hereinafter "D. Ct. Op."). The district court concluded that: (1) Appellants' claim arising from the impact of the BBA on NovaCare's long-term services business was time-barred under the relevant statute of limitations; (2) most of Appellants' other claims under § 10(b) of the Exchange Act failed to plead any misrepresentations; and (3) that Appellants' remaining § 10(b) claims were either based on alleged misrepresentations that were immaterial as a matter of law, or were not alleged to have been [**15] made with the requisite scienter. Furthermore, the district court held that Appellants' claims under § 14(a) of the Exchange Act failed to plead material misrepresentations or transactional causation and that Appellants' claims under § 20(a) of the Exchange Act were not viable in the absence of sufficiently pleaded claims under § 10(b) or § 14(a). The district court therefore entered an Order which dismissed the Complaint. Furthermore, the court denied Appellants the opportunity to further amend their Complaint, determining that any further efforts to amend would be futile. This appeal followed.

III.

The district court had jurisdiction of the underlying action pursuant to *15 U.S.C. § 78aa*. We have appellate jurisdiction pursuant to *28 U.S.C. § 1291*.

[HN1] We exercise de novo review of the district court's dismissal under Rule 12(b)(6), *Maio v. Aetna, Inc., 221 F.3d 472, 481 (3d Cir. 2000),* and must accept as true all material [*1323] allegations in the complaint, but we need not accept as true "unsupported conclusions and unwarranted inferences." *Id. at 485 n.12* (quoting *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998)).* [**16]

Furthermore, [HN2] a court's decision whether to take judicial notice of certain facts is reviewed for abuse of discretion. *Lozano v. Ashcroft, 258 F.3d 1160, 1164 (10th Cir. 2001)* (citing *United States v. Wolny, 133 F.3d 758, 764-765 (10th Cir. 1998)).*

Finally, [HN3] we review the district court's denial of leave to amend the complaint for abuse of discretion. *Singletary v. Pa. Dep't of Corrs., 266 F.3d 186, 193 (3d Cir. 2001)* (citing *Urrutia v. Harrisburg County Police Dept., 91 F.3d 451, 457 (3d Cir. 1996)).*

IV.

This appeal requires us to determine whether the district court properly dismissed Appellants' consolidated Complaint alleging various violations of the Securities and Exchange Act of 1934. n2 The district [*1324] court initially determined that Appellants' "overstatement of goodwill" claim, located in Count I of the Complaint, was time-barred because Appellants were on inquiry notice for more than one year prior to the filing of their claim.

n2 Appellants' original Complaint was extremely convoluted. However, the district court did an outstanding job of organizing the varied, haphazard claims into a coherent, intelligible structure:

Count I of the Complaint asserts Rule 10b-5 claims against the NovaCare Defendants. The plaintiffs allege that the NovaCare Defendants engaged in a course of conduct from May 20, 1998, to November 22, 1999, in which they knowingly or recklessly issued materially false and misleading financial statements and failed to disclose significant terms of various asset sales in order to artificially inflate and maintain the price of NovaCare common stock. Although allegations of the misrepresentations are strewn throughout the Complaint, for purposes of convenience and clarity, and as guided by the motion papers and responses of the parties, I will categorize the claims brought against the NovaCare Defendants in Count I of the Complaint into the following six groups:

Claim (A): failure to adjust the goodwill of the long-term care services division in light of the BBA's impact;

Claim (B): failure to disclose that proceeds from the sale of the O & P division would be reduced because of overstated working capital;

Claim (C): failure to disclose that proceeds from the sale of the long-term care division would be reduced because of (i) overstated working capital and (ii) uncollectible accounts receivable;

Claim (D): failure to disclose that proceeds from the sale of the NCES division would be reduced because (i) the purchaser of PROH would not enter into an employment services contract with NCES, nor assume the Company's guarantee of the contract; and (ii) NovaCare had placed funds in escrow to support the guarantee of the employment services contract;

Claim (E): failure to disclose that proceeds from the sale of the PROH division would be materially reduced because (i) the Company would lose the funds escrowed in support of the financial representations in the sales agreement due to the overstatement of the PROH working capital and accounts receivable, and (ii) the Company would place $ 36 million in escrow in support of the financial representations and would incur $ 26 million in transactions costs and liabilities; and

Claim (F): failure to adjust the Company's goodwill despite the planned sale of all operating assets under the Restructuring Plan.

Count II of the Complaint asserts Rule 10b-5 claims against PwC. The plaintiffs claim that PwC issued materially false and misleading audit reports for NovaCare's 1998 and 1999 Forms 10-K.

Count III of the Complaint asserts Rule 10b-5 claims against Wasserstein for issuing a materially false and misleading fairness opinion regarding the NCES transaction in the proxy materials.

Count IV of the Complaint asserts Section 20(a) claims against the Individual Defendants, as control persons of the Company during the time of the alleged underlying violations of Rule 10b-5 and Rule 14a-9.

Count V of the Complaint asserts Rule 14a-9 claims against all of the defendants except PwC for issuing proxy materials with materially false or misleading statements regarding Claims (B) through (E) of Count I of the Complaint as listed above.

D. Ct. Op. at 7-8 (internal citations omitted).

[**17]

A.

Before the district court, Appellants asserted that the NovaCare Appellees knowingly overstated the value of their long-term care services business by failing to write down goodwill in the financial statements presented in NovaCare's Annual and Quarterly Reports filed in fiscal 1998 and 1999. Appellants further alleged that this overstatement was a violation of generally accepted accounting principles. The district court determined that this claim was time-barred because Appellants were on inquiry notice of the claim for more than a year before actually filing it.

In *Lampf v. Gilbertson, 501 U.S. 350, 364, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991),* the Court determined that [HN4] claims arising under § 10(b) of the Exchange Act are governed by the limitations rule set forth in § 9(e) of the Exchange Act: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." *15 U.S.C. § 78i*(e). Allegations regarding the impact of the BBA on the goodwill of NovaCare's long-term care services division [**18] were first asserted by Appellants in their consolidated Complaint dated September 19, 2000. n3 Thus, to the extent that Appellants were on notice of the alleged overvaluation of goodwill prior to September 19, 1999, this claim of fraudulent misrepresentation is time-barred.

n3 Appellants do not dispute that September 19, 2000, is the appropriate date from which to measure the statute of limitations.

1.

Appellants argue that the district court improperly applied an "inquiry notice" standard to determine when the limitations period begins to run in a securities fraud action, and instead should have applied an actual notice standard. They primarily rely on the language of *Berry v. Valence Tech., Inc., 175 F.3d 699, 703 (9th Cir. 1999),* in which the court stated:

Plaintiffs contend that Lampf established an actual discovery standard for triggering the statute of limitations. Lampf does appear unequivocal on this point: "The 1-year period, by its terms, begins after discovery of the facts constituting [**19] the violation." *501 U.S. at 363* ... Moreover, in applying section 9(e)'s limitations period to actions under section 10(b), Lampf explicitly chose a provision requiring actual discovery over other provisions allowing inquiry notice. In contrast to section 9(e), section 13 of the Securities and Exchange






Act of 1933 ... stipulates that actions under that Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." *15 U.S.C. § 77m.* The Supreme Court in Lampf acknowledged the difference, and was clear about its choice: "The various 1-and-3-year periods contained in the 1934 and 1933 Acts differ slightly in terminology. To the extent that these distinctions in the future might prove significant, we select as the governing standard for an action under § 10(b) the language of § 9(e) of the 1934 Act." [*1325] *501 U.S. at 364 n.9 ....*

*Berry, 175 F.3d at 703* (emphasis omitted).

Although, the above passage indicates that court's preference for an actual notice standard when confronted with a securities [**20] fraud situation, the Berry court did recognize that [HN5] "courts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information in question." *Id. at 703 n.4.*

2.

This is an open question in this court. We have yet to determine [HN6] when the limitations period begins to run in a securities fraud action, although other courts of appeals, and district courts within this judicial circuit, have generally applied an inquiry notice standard, coupled with some form of reasonable diligence requirement in determining whether a plaintiff's securities claims are timely filed. Recently, we adopted an inquiry notice test for securities fraud claims in a RICO context. See *Mathews, 260 F.3d at 251.* We are not inclined to follow the analysis of the Court of Appeals for the Ninth Circuit, and accept the approach followed by the other Courts of Appeals and the district courts in this judicial circuit. n4

n4 See *Rothman v. Gregor, 220 F.3d 81, 97 (2d Cir. 2000)* ("We conclude that whether the [plaintiffs'] claim against defendant is time-barred turns on when, after obtaining inquiry notice ..., the [plaintiffs], in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud ...."); *Sterlin v. Biomune Sys., Inc., 154 F.3d 1191, 1199-1201 (10th Cir. 1998); Great Rivers Coop. v. Farmland Indus., Inc., 120 F.3d 893, 896 (8th Cir. 1997)* ("Inquiry notice exists when the victim is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the defendant's misrepresentations."); *Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 368 (7th Cir. 1997)* ("Inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit."); *Caviness v. Derand Res. Corp., 983 F.2d 1295, 1303 (4th Cir. 1993)* ("[§ 13] provides for the commencement of the one-year limitations period when the plaintiff knows of the facts on which the action is based or has such knowledge as would put a reasonably prudent purchaser on notice to inquire, so long as that inquiry would reveal the facts on which a claim is ultimately based."); *Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993)* ("When the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry."); *Rosen v. Comm. Servs. Group, Inc., 155 F. Supp. 2d 310 (E.D. Pa. 2001); Leach v. Quality Health Servs., 902 F. Supp. 554, 557 (E.D. Pa. 1995).*

[**21]

[HN7] To the extent a securities fraud plaintiff was on inquiry notice of the basis for claims more than one year prior to bringing the action, his or her claim is subsequently time-barred by the requisite statute of limitations.

[HN8] Under the "inquiry notice" standard, the one-year period begins to run when the plaintiffs "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim" against the defendant. *Gruber v. Price Waterhouse, 697 F. Supp. 859, 863 (E.D. Pa. 1988)* (citing *Hobson v. Wilson, 737 F.2d 1, 34 n.103 (D.C. Cir. 1984)).* Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had "sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." Id. at 864. The test for "storm warnings" is an objective one, based on whether a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning." n5 *Mathews, 260 F.3d at 252.* [*1326] Plaintiffs need not know all of the details or "narrow aspects" of the alleged [**22] fraud to trigger the limitations period; instead, the period begins to run from "the time at which plaintiff should have discovered the general fraudulent scheme." *In re Prudential Ins. Co. Sales Practices Litig., 975 F. Supp. 584, 599 (D.N.J. 1997)* (quoting *McCoy v. Goldberg, 748 F. Supp. 146, 158 (S.D.N.Y. 1990)).*





n5 As the Mathews court recognized:

> [HN9] Storm warnings may take numerous forms, and we will not attempt to provide an exhaustive list. They may include, however, substantial conflicts between oral representations of the brokers and the text of the prospectus, ... the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.

*Mathews, 260 F.3d at 252* (internal citations and quotations omitted).

[**23] [HN10]

"Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims, and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period." *Gruber, 697 F. Supp. at 864* (citing *Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127-128 (1st Cir. 1987); Mosesian v. Peat, Marwick, Mitchell & Co., 727 F.2d 873 (9th Cir. 1984); Robertson v. Seidman & Seidman, 609 F.2d 583 (2d Cir. 1979); Cook v. Avien, Inc., 573 F.2d 685 (5th Cir. 1978))*.

The district court correctly applied the inquiry notice test in determining that Appellants' claim that NovaCare had overstated the value of its long-term care services business was time-barred. The court reasoned that Appellants were on inquiry notice of that claim no later than June 16, 1999, when NovaCare filed a Form 8-K announcing the completion of the sale of the long-term care services business for nominal consideration. This announcement was the culmination of a series of disclosures that put Appellants on notice that NovaCare's long-term care services business [**24] was in trouble. These disclosures included a press release in September 1998, and Quarterly Reports in November 1998 and February 1999, indicating a material decline in the revenues and earnings of that business. Then, beginning in early May 1999, NovaCare issued a series of specific disclosures which revealed that the long-term care services business had no valuable goodwill:

1) On May 11, 1999, NovaCare issued a press release stating that it was writing off the goodwill of its long-term care services business.

2) On May 17, 1999, NovaCare filed a Form 10-Q explaining that it was writing off goodwill because it had concluded "that it will be unable to recover its investment in long-lived assets in the long-term care services segment."

3) In the May 17, 1999, Form 10-Q NovaCare also disclosed that it was considering abandoning the long-term care services business entirely.

4) On May 28, 1999, NovaCare issued a press release disclosing that it had agreed to sell the entire long-term care services business to Chance Murphy "for a nominal amount."

NAHC Appellees' Brief at 34-35.

Thus, the district court concluded, that by June 16, 1999, when NovaCare completed [**25] the sale of its long-term care services business for nominal consideration, Appellants, as reasonable stockholders, "were at least on inquiry notice of their claims ... and, in the exercise of reasonable diligence, should have discovered the basis for the claims within one year." D. Ct. Op. at [*1327] 18. The district court is correct in its analysis. Appellants conceded in their Complaint: "By April 1999, the financial markets had discounted the long-term care services segment entirely, and Novacare [sic] common stock reflected the valuation of Novacare's [sic] other lines of business." App. at 111. This, coupled with NovaCare's repeated disclosures that it was writing off the goodwill and selling the business for nominal consideration, constituted "'storm warnings' sufficient to place [Appellants] on inquiry notice that the previous valuations of goodwill had been overstated in derogation of GAAP." D. Ct. Op. at 18.

[HN11] Once the existence of storm warnings has been adequately established "the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." *Mathews, 260 F.3d at 252.* If plaintiffs do not [**26] investigate the storm warnings, they are "deemed ... on inquiry notice of their claims." Id. at n.16. Appellants did not allege any facts in their Complaint to show why, in the exercise of due diligence, they could not have discovered the overstatement of goodwill prior to September 19, 2000. However, they now contend before this court that because NovaCare did not separately report the value of goodwill for each acquisition NovaCare made during its rapid expansion, "[Appellants] could not have been able to assess

[Appellees'] failure to record losses in the value of its intangible assets." Appellants' Brief at 39-40.

Appellants' argument fails for a number of reasons. First, Appellants allege that the overstatement of goodwill arose from the BBA's impact on NovaCare's entire long-term care services business, not from any particular acquisition. Second, there is no reason to believe that if Appellees individually recorded the writing-off of goodwill of individual acquisitions, the problem would have been disclosed to Appellants any sooner. NovaCare wrote off all long-term care services goodwill in May 1999. Third, Appellants' claim is seriously undermined by their own admission [**27] that the financial markets had discounted the long-term care services business entirely by April 1999. Finally, Appellants cannot bolster their cause by arguing the difficulty of discovering the alleged fraud. This court has previously held that "excusing Appellant's lack of inquiry because, in retrospect, reasonable diligence would not have uncovered their injury ... would, in effect, discourage investigation ...." *Mathews, 260 F.3d at 252 n.16.*

3.

Therefore, because the claim regarding the overstatement of the long-term care services' goodwill was not asserted until September 19, 2000, this action was not commenced within the one-year limitations period. Consequently, the district court did not err in dismissing Appellants' BBA-related claims as time-barred.

V.

Appellants contend also that the district court erred when it: (1) dismissed Appellants' remaining § 10(b) allegations against NovaCare for failure to state a claim; (2) dismissed Appellants' § 14(a) claims against NovaCare for failure to demonstrate materiality and transactional causation; (3) dismissed Appellants' § 10(b) claims against PricewaterhouseCoopers LLP because they were time-barred and [**28] they failed to allege any material misrepresentations in their statements; (4) dismissed Appellants' § 10(b) and § 14(a) claims against Wasserstein Perella & Co., Inc. because any alleged misrepresentation was immaterial as a matter of law; (5) improperly took judicial notice of certain documents filed during the relevant period; [*1328] and (6) abused its discretion in denying Appellants leave to amend.

A.

The district court did not err in dismissing Appellants' remaining § 10(b) allegations against the NovaCare Appellees for failure to state a claim.

[HN12] To state a valid securities fraud claim under Rule 10b-5, a plaintiff must first establish that defendant, in connection with the purchase or sale of a security, "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. See *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997).* The plaintiff must additionally establish that the defendant acted with scienter and that plaintiff's reasonable reliance on defendant's misstatement proximately caused him injury. See *In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989).* [**29]

*Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000).*

In addition, [HN13] a party asserting a claim under the federal securities laws must meet the heightened pleading standard set forth under the PSLRA, enacted in 1997 to restrict abuses in securities class-action litigation. First, the PSLRA requires a party alleging a Rule 10b-5 violation to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 530 (3d Cir. 1999)* (quoting *15 U.S.C. § 78u-4*(b)(1)). Second, the PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id. at 531-532* (quoting *15 U.S.C. § 78u-4*(b)(2)).

Appellants initially attempt to attack the district court's dismissal of their § 10(b) claims by arguing that the court applied too stringent [**30] a standard when reviewing their allegations. Appellants contend that Rule 9(b), Federal Rules of Civil Procedure requires that a "'relaxed' pleading standard applies to securities fraud actions brought under the PSLRA." Appellants' Brief at 42. We do not agree.

We have recognized that [HN14] "complaints alleging securities fraud must also comply with Rule 9(b), which provides: 'In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *Advanta, 180 F.3d at 531* (quoting Rule 9(b), Federal Rules of Civil Procedure).

We have held that "Rule 9(b)'s provision allowing state of mind to be averred generally conflicts with the Reform Act's requirement that plaintiffs 'state with particularity facts giving rise to a strong inference' of scienter ... In that sense, we believe the Reform Act

supersedes Rule 9(b) as it relates to Rule 10b-5 actions." Id. at n.5 (internal citations omitted). The standard applied by the district court here was correct.

In an extremely thorough discussion, the district court dismissed Appellants' [**31] § 10(b) claims against NovaCare. We accept the reasoning and conclusion set forth in its opinion. D. Ct. Op. at 12-28.

B.

In addition to their Rule 10b-5 contentions, Appellants' argue that the proxy materials distributed by the NovaCare Appellees on August 13, 1999, and [*1329] September 10, 1999, violated § 14(a) and Rule 14a-9 because they had misrepresented the liquidation values of NovaCare. They further allege that the proxy materials failed to disclose fully the extent of bonuses that the Company executives had negotiated for themselves.

Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides, in pertinent part that:

[HN15] No solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time ... it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...

*17 C.F.R. § 240.14a-9.*

[HN16] "To prevail on a § 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff [**32] injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'" *Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992)* (citing *Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 385, 24 L. Ed. 2d 593, 90 S. Ct. 616 (1970)).*

Here, too, we agree with the district court's reasoning set forth in its opinion and its conclusion:

[HN17] Under the heightened pleading standard of the PSLRA, the complaint in a Section 14(a) action must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, all facts with particularity on which that belief is formed. See *15 U.S.C. § 78u-4*(b)(1). As explained above, plaintiffs have failed to allege particularized facts to support the allegation that the statements regarding the following issues were materially false when the NovaCare defendants issued the proxy materials: (1) the O & P divestiture; (2) the divestiture of the Company's long-term care [**33] services division; (3) the NCES divestiture; and (4) the PROH divestiture. Thus, I conclude that the plaintiffs' Section 14(a) claims with regard to these issues will be dismissed.

D. Ct. Op. at 39.

C.

In addition to their claim against the NovaCare Appellees, Appellants assert Rule 10b-5 claims against PwC which allege that: (1) PwC failed to reassess the long-term care services goodwill in NovaCare's 1998 Form 10-K and the goodwill of the company in NovaCare's 1999 Form 10-K as required under GAAP and generally accepted auditing standards ("GAAS"); and (2) PwC issued an unqualified audit report for the 1998 and 1999 Forms 10-K that were materially false and misleading. Both of these allegations were properly dismissed.

Considering Appellants' claim regarding the 1998 10-K, under an inquiry notice standard, Appellants, as reasonable stockholders "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim" against the PwC Appellees by June 16, 1999, when NovaCare filed a Form 8-K announcing the completion of the sale of the long-term care services business for nominal consideration. See *Gruber v. Price Waterhouse, 697 F. Supp. 859, 863 (E.D. Pa. 1988).* [**34] For the same reasons as discussed earlier, because the claim regarding the overstatement of goodwill in the 1998 Form 10-K was not asserted until September 19, 2000, it is time-barred pursuant to the one-year statute of limitations for securities fraud claims. [*1330]

Appellants' claim regarding the alleged misstatement of goodwill in the 1999 Form 10-K was also properly dismissed. As previously mentioned, [HN18] under § 10(b), a private cause of action arises when purchasers or sellers can identify a false representation of material fact or omission that makes a disclosed statement materially misleading. *Burlington, 114 F.3d at 1419.* However, a fact or omission is material only if "there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information" available to the investor. *Basic Inc. v. Levinson, 485 U.S. 224, 231-232, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988).* The proxy materials filed with the SEC on August 13, 1999, disclosed the impact of the proposed liquidation of the company. This disclosure rendered immaterial any subsequent misstatement regarding the goodwill of the company [**35] in the 1999 Form 10-K because it did not alter





the "total mix of information available" to Appellants. The district court did not err in dismissing Appellants' claims against PwC.

D.

Appellants also assert § 10(b) and § 14(a) claims against Wasserstein which allege that Wasserstein fraudulently omitted material information regarding the loss of the $ 13.4 million escrow for the NCES employment guarantee from the opinion letter included in the proxy materials dated September 10, 1999. Again, this claim was properly dismissed by the district court.

[HN19] To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events. *In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 586 (D.N.J. 2001).* Appellees are not obligated to predict future events unless there is reason to believe that they will occur. *Zucker v. Quasha, 891 F. Supp. 1010, 1017 (D.N.J. 1995).* The eventual loss of the NCES escrow occurred after the PROH sale was completed on November 19, 1999. Therefore, insofar as Appellants' claims are based on events that took place after Wasserstein's allegedly fraudulent [**36] statements, they are not actionable for securities fraud. Wasserstein cannot be held liable for not disclosing a loss that had not yet occurred.

Thus, we must turn to the contention that Wasserstein failed to disclose that the Company was required to escrow $ 13.4 million of the NCES proceeds to support the guarantee for the employment contract with PROH. The Wasserstein Appellees argue that this claim was properly dismissed because it is immaterial as a matter of law.

[HN20] "In ... an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock." *Burlington, 114 F.3d at 1425.* If the disclosure of certain information has no effect on stock prices, it follows that the information disclosed was immaterial as a matter of law. Id. As previously discussed, the need to escrow $ 13.4 million was disclosed November 2, 1999, in the SEC Form 8-K. According to the Dow Jones Interactive Quotes and Data Market, this disclosure had no negative effect whatsoever on the price of NovaCare stock on or immediately following November 2, 1999. App. at 1385. Accordingly, the district court was correct in dismissing Appellants' claim that [**37] Wasserstein's delay in releasing statements regarding the need to escrow $ 13.4 million was materially misleading.

Appellants further argue that even if their Rule 10b-5 claims against the Wasserstein Appellees are deemed immaterial, their § 14(a) claims are not precluded [*1331] because the test for materiality under § 14(a) is different than that for § 10(b). Appellants are mistaken. [HN21] Information is deemed material for purposes of a § 14(a) claim "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976).* The test for materiality is whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. This definition of materiality is the same for both § 10(b) and § 14(a) claims. See *Basic, 485 U.S. at 231-232* (adopting TSC standard for Rule 10b-5 claim). Consequently, in light of the foregoing information, the district court was correct in dismissing Appellants' [**38] § 10(b) and § 14(a) claims against Wasserstein.

E.

Appellants additionally argue that the district court erred in taking judicial notice of certain documents during the prior proceedings. Although this is Appellants' principal argument, it warrants only cursory consideration. The district court took judicial notice of three different categories of documents at the urging of the NovaCare Appellees in support of their motion to dismiss. The relevant documents included: (1) documents relied upon in the Complaint (thirty-two documents, comprising Company SEC filings and press releases); (2) documents filed with the SEC, but not relied upon in the Complaint (seven documents); and (3) stock price data compiled by the Dow Jones news service (two exhibits, including a printout of the historical prices of NovaCare stock and a corresponding graph).

[HN22] Rule 201(b), Federal Rules of Evidence permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably [**39] be questioned." Rule 201(b). Under Rule 201(d), Federal Rules of Evidence, a district court must take judicial notice "if requested by a party and supplied with the necessary information." Rule 201(d).

As was correctly pointed out by the district court, prior decisions of this court sufficiently support judicial notice of the three categories of documents urged by the NovaCare Appellees in this case. See, e.g., *Burlington, 114 F.3d at 1426* [HN23] (court may consider a document "integral to or explicitly relied upon in the complaint" on motion to dismiss); *Oran, 226 F.3d at 289* (taking judicial notice of properly-authenticated public

disclosure documents filed with SEC); *Ieradi v. Mylan Lab., Inc., 230 F.3d 594, 600 n.3 (3d Cir. 2000)* (taking judicial notice of stock prices reported by Quotron Chart Services).

On appeal, Appellants concede that the district court was entitled to take judicial notice of the aforementioned documents to ascertain their contents. However, they contend that the district court erred by accepting "for the truth of the matter asserted" certain statements in NovaCare's Proxy Statement filed with the SEC on August 13, 1999, and [**40] in its Quarterly Report (Form 10-Q) filed with the SEC on November 22, 1999. Appellants' Brief at 32-34.

We find no reversible error and completely accept the district court's discussion of this particular issue and all aspects of the judicial notice contention. D. Ct. Op. at 9-12. [*1332]

F.

Finally, Appellants challenge, as an abuse of discretion, the district court's decision to dismiss the Complaint with prejudice and to deny Appellants' request for leave to amend. Appellants maintain that under Rule 15(a), Federal Rules of Civil Procedure, "leave [to amend] shall be freely given when justice so requires." *Burlington, 114 F.3d at 1434* (citing *Glassman v. Computervision Corp., 90 F.3d 617, 622 (1st Cir. 1996))*. Appellants are correct in noting that [HN24] normally, leave to amend is granted when a complaint is dismissed on Rule 9(b) "failure to plead with particularity grounds." Id. at 1435. However, leave to replead is often denied on other grounds, such as undue delay, bad faith, dilatory motive, prejudice and futility. Id. at 1434.

This case presents a situation in which amendment of the Complaint would be futile. We have made it clear that [HN25] an amendment would [**41] be futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." Id; see also *Oran, 226 F.3d at 291* (affirming the district court's denial of leave to amend because of futility of amendment); *Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 188-189 (3d Cir. 2000)* (upholding district court's denial of leave to amend because it found that "it would be futile to amend the complaint to include a meritless claim").

Many claims asserted by Appellants would obviously be futile to amend. The claim alleging overstatement of goodwill in the 1998 Form 10-K is time-barred under the statute of limitations. The claims regarding the need for the NCES escrow and the overstatement of goodwill in the 1999 Form 10-K will not survive a Rule 12(b)(6) motion even if the claims had been made with more particularity. In its opinion, the district court noted that Appellants had made "no representation as to any new information that they might have received since filing the Complaint, nor did they provide proposed amendments or specific facts that would cure the Complaint's pleading deficiencies." D. Ct. Op. at 47; see also *Confederate Mem'l Ass'n v. Hines, 301 U.S. App. D.C. 395, 995 F.2d 295, 299 (D.C. Cir. 1993)* [**42] [HN26] ("[A] bare request in an opposition to a motion to dismiss -- without any indication of the particular grounds on which amendment is sought ... does not constitute a motion within the contemplation of Rule 15(a)"). Before this court, Appellants again do not specify what additional facts, if any, they would plead if given another opportunity to amend their Complaint.

Moreover, the district court adopted the reasoning of *In re Champion Enters., Inc., Sec. Litig., 145 F. Supp. 2d 871 (E.D. Mich. 2001)*, in which the court concluded that [HN27] the PSLRA limits the application of Federal Rule of Civil Procedure 15 in securities fraud cases. As the district court recognized, some factual distinctions exist between Champion Enters. and the case at bar; however, the underlying policy considerations apply equally to both situations. The district court noted:

> [HN28] The PSLRA's stay of discovery procedures was intended by Congress to protect innocent defendants from having to pay nuisance settlements in securities fraud actions in which a foundation for the suit cannot be pleaded; rather than lead to the conclusion that plaintiffs should receive more leniency in amending their pleadings, [**43] the stay of discovery procedures adopted in conjunction with the heightened pleading standards under the PSLRA is a reflection of the objective of Congress "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." [Champion Enters., 145 F. Supp. 2d] at 874 (quoting Selected Bill Provisions of the Conference Report to H.R. 1058/S. 240, 141 Cong. Rec. § 19152 [*1333] (daily ed. Dec. 22, 1995)). This objective would be thwarted if, considering the history of this case, plaintiffs were liberally permitted leave to amend again; this is particularly true where, as here, there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA.

D. Ct. Op. at 48.

Based on the foregoing considerations, we conclude that the district court did not abuse its discretion in denying Appellants leave to amend their deficient Complaint.

**** We have considered all contentions presented by the parties and conclude that no further discussion is necessary.

The judgment of the district court [**44] will be affirmed.

4

LEXSEE 2002 U.S. Dist. LEXIS 14155

**JOEL ROSENBAUM Plaintiff v. UNUM LIFE INSURANCE CO. OF AMERICA Defendant**

**CIVIL ACTION, NO. 01-6758**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

***2002 U.S. Dist. LEXIS 14155; 28 E.B.C. 2022***

**July 29, 2002, Decided**

**July 29, 2002, Filed**

**DISPOSITION:**
Defendant's Motion to Dismiss granted, in part, and denied, in part. Specifically, Counts II, IV, VI and VII are dismissed.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** After being denied disability insurance benefits, plaintiff insured sued defendant insurer, asserting, inter alia, various claims under state law. Arguing that the insured's claims were preempted by the Employee Retirement Income Security Act, the insurer moved to dismiss the insured's state-law claims.

**OVERVIEW:** The insured conceded that ERISA preempted all of his state-law claims but one, his bad faith claim under 42 Pa. Cons. Stat. § 8371. The key issue was whether § 8371 fell within ERISA's saving clause, ERISA § 514(b)(2)(A), *29 U.S.C.S. § 1144*(b)(2)(A). Existing precedent held that the statute did not fall within the saving clause; however, recent United States Supreme Court decisions had modified the analysis for determining whether a statute fell within the saving clause. Based on that newer case law, the court concluded that the statute did fall within the saving clause and, thus, ERISA did not preempt the insured's bad faith claim. First, a common sense view of ERISA's saving clause established that 42 Pa. Cons. Stat. § 8371 regulated insurance. Second, § 8371 met two of the three McCarran-Ferguson factors. The statute did not appear to spread the policyholder's risk. Section 8371, however, played an integral role in the policy relationship between the insured and the insurer; authorized imposition of special damages, so it gave the insured a remedy not originally bargained for. Section 8371 also was limited to entities within the insurance industry.

**OUTCOME:** The court granted, in part, and denied, in part, the motion to dismiss. The court dismissed those claims the insured conceded were preempted, but the court declined to dismiss the insured's bad faith claim against the insurer.

**LexisNexis(TM) HEADNOTES - Core Concepts**

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN1] The saving clause of the Employee Retirement Income Security Act (ERISA) exempts from preemption any law of any state which regulates insurance. ERISA § 514(b)(2)(A), *29 U.S.C.S. § 1144*(b)(2)(A). The United States Supreme Court has applied the following two prong approach in determining whether a statute "regulates insurance." First, the Court considers whether from a "common-sense view of the matter," the state statute in question regulates insurance. Second, the Court considers the following three factors in determining whether the regulation fits within the "business of insurance" as that phrase is used in the McCarran-Ferguson Act, 59 Stat. 33, as amended, *15 U.S.C.S. § 1011* et seq.,: (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; (3) whether the practice is limited to entities within the insurance industry.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN2] A state statute need not meet each of the McCarran-Ferguson factors in order to qualify for the Employee Retirement Income Security Act's saving clause. Rather, the McCarran-Ferguson factors are "considerations to be weighed" in determining whether a state law regulates insurance.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN3] A common-sense view of *29 U.S.C.S. § 1144*(b)(2)(A), the saving clause of the Employee Retirement Income Security Act, clearly establishes that Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. § 8371, "regulates insurance" and is specific to the insurance industry.

***Insurance Law > Bad Faith & Extracontractual Liability > Statutory Damages & Penalties***
[HN4] Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. § 8371, limits its application to actions arising under an insurance policy.

***Insurance Law > Bad Faith & Extracontractual Liability > Statutory Damages & Penalties***
[HN5] The Pennsylvania Supreme Court has recognized a distinction between those remedies available at common law and those available through Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. § 8371, with regard to bad faith claims.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN6] Regarding the McCarran-Ferguson Test for whether a statute falls within the Employee Retirement Income Security Act's savings clause, a statute plays an integral part in the policy relationship between the insurer and the insured where it affords the parties rights or remedies other than those originally bargained for, in effect creating a new mandatory contract term.

***Insurance Law > Bad Faith & Extracontractual Liability > Statutory Damages & Penalties***
[HN7] 42 Pa. Cons. Stat. § 8371 provides particular remedies for incidents of bad faith and was designed exclusively for use in the insurance industry. Specifically, it allows the court to award a particular amount of interest, assess attorney's fees and award punitive damages where breaches of insurance contracts are concerned.

**COUNSEL:**

[*1] For JOEL ROSENBAUM, M.D., PLAINTIFF: STEWERT L. COHEN, KESSLER, COHEN & ROTH, PHILADELPHIA, PA USA. WILLIAM D. MARVIN, KESSLER COHEN & ROTH, PHILADELPHIA, PA USA.

**JUDGES:**
Clarence C. Newcomer, S.J.

**OPINIONBY:**
Clarence C. Newcomer

**OPINION:**

NEWCOMER, S.J.

July 29, 2002

Presently before the Court is Defendant's Motion to Dismiss and Plaintiff's Answer. For the reasons outlined below, this Court will grant Defendant's motion, in part.

**BACKGROUND**

Plaintiff brought suit after being denied long-term disability insurance benefits under the Defendant's employee benefit plan, which is governed by the Employee Retirement Income Security Act (ERISA). Defendant moves to dismiss Plaintiff's state law claims by arguing ERISA preemption. With the exception of Count X, a bad faith claim brought under 42 Pa.C.S. § 8371 (Pennsylvania's bad faith statute for insurance claims), the parties agree that Plaintiff's state law claims under the employee benefit plan are preempted.

**DISCUSSION**

In his Answer to Defendant's Motion to Dismiss, Plaintiff concedes that, with the exception of his bad faith claim (Count X), his state law claims (Counts I, III, V, VII, IX) are preempted by ERISA. I, therefore, dismiss these claims [*2] without further discussion and turn to the key issue before this Court, that is, whether Pennsylvania's bad faith statute for insurance claims, 42 Pa.C.S. § 8371, is preempted by ERISA. While this issue has not been addressed by the Third Circuit, this Court has, in the past, consistently answered this question in the affirmative. In fact, no court has yet found to the contrary. However, a new trend in the federal law, led by the United States Supreme Court's decision in *Unum Life Insurance Co. of America v. Ward, 526 U.S. 358, 143 L. Ed. 2d 462, 119 S. Ct. 1380 (1999)*, and its recent decision in *Rush Prudential HMO, Inc. v. Moran, 153 L. Ed. 2d 375, 122 S. Ct. 2151 (2002)*, warrants a re-examination of this important question.

At the heart of this issue is [HN1] ERISA's saving clause, which exempts from preemption "any law of any State which regulates insurance." ERISA §

514(b)(2)(A), *29 U.S.C. § 1144*(b)(2)(A). The Supreme Court has applied the following two prong approach in determining whether a statute "regulates insurance." First, the Court considers whether from a "common-sense view of the matter," the state statute in question [*3] regulates insurance. *UNUM, 526 U.S. at 367.* Second, the Court considers the following three factors in determining whether "the regulation fits within the 'business of insurance' as that phrase is used in the McCarran-Ferguson Act," 59 Stat. 33, as amended, *15 U.S.C. § 1011* et seq.:

(1) Whether the practice has the effect of transferring or spreading a policyholder's risk;

(2) Whether the practice is an integral part of the policy relationship between the insurer and the insured;

(3) Whether the practice is limited to entities within the insurance industry.

*UNUM, 526 U.S. at 367.* UNUM marked a significant change in the application of the Common-sense/McCarran-Ferguson Test. For the first time, the Court explained that [HN2] a state statute need not meet each of the McCarran-Ferguson factors in order to qualify for ERISA's saving clause. n1 *Id. at 373* ("We reject UNUM's assertion that a state regulation must satisfy all three McCarran-Ferguson factors in order to 'regulate insurance.'") Rather, the UNUM Court found that the McCarran-Ferguson factors are "'considerations to be weighed' in determining [*4] whether a state law regulates insurance." Id. This decision clarified the Court's previous rulings (i.e., *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987); Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 85 L. Ed. 2d 728, 105 S. Ct. 2380 (1985)),* which have been solely interpreted to require compliance with each of the McCarran-Ferguson factors. *UNUM, 526 U.S. at 373.* Most recently, in Rush, the Supreme Court reaffirmed UNUM's holding by finding an Illinois State statute qualified under ERISA's saving clause by meeting two of the McCarran-Ferguson factors. *Rush, 122 S. Ct. at 2163.* We turn now to an application of the Common-sense/McCarran-Ferguson Test with regard to § 8371.

n1 Despite the guidance offered by UNUM and Rush, it is not clear

whether a statute must satisfy more than one of the McCarran-Ferguson factors in order to be covered by ERISA's savings clause. Further, the Third Circuit has not ruled on this issue.

[*5]

**I. Common-sense View**

[HN3] A common-sense view of ERISA's saving clause clearly establishes that Pennsylvania's bad faith statute "regulates insurance" and is specific to the insurance industry. In fact, one need look no further than the statute's title, "Actions on insurance policies," in discerning its scope. Furthermore, [HN4] the statute limits its application to "actions arising under an insurance policy...." Finally, [HN5] the Pennsylvania Supreme Court has recognized a distinction between those remedies available at common law and those available through the instant statute with regard to bad faith claims. *The Birth Center v. St. Paul Companies, Inc., 787 A.2d 376, 403 2001 Pa. LEXIS 2759 (Pa. 2001).* The Court's holding in Birth Center emphasizes the particular focus of this statute concerning the insurance industry. Thus, it is clear that the legislative intent behind § 8371 was to "regulate insurance."

**II. McCarran-Ferguson Test**

*A. Spreading Policyholder's Risk*

Because it serves solely as a special damages section, it is doubtful that the provisions of § 8371 spread a policyholder's risk. Since the McCarran-Ferguson factors are mere guideposts [*6] and need not be unanimously met, we shall move on to a consideration of the second factor. *Rush, 122 S. Ct. at 2163.*

*2. Integral Part of the Policy Relationship*

This Court is mindful of its previous finding that § 8371 did not play an integral part in the policy relationship between the insurer and the insured. *Zimnoch v. ITT Hartford, et al., 2000 U.S. Dist. LEXIS 2846,* Civ.A. No. 99-6594 at *18 (E.D.Pa. March 14, 2000) (Newcomer, J.). However, in light of the Supreme Court's recent holding in Rush and this Court's subsequent re-examination of UNUM, this Court concludes that its previous finding is no longer suitable.

In UNUM, the Supreme Court found that a California statute requiring an insurer to "prove prejudice before enforcing a timeliness-of-claim provision" created a mandatory contract term between the two parties. *UNUM, 526 U.S. at 375.* In Rush, the Court examined an Illinois statute requiring HMOs to provide independent review of disputes with primary care physicians, and to cover any costs deemed medically necessary by the independent reviewer. The Court found that the statute provided a "legal [*7] right to the insured" and an "obvious" contractual requirement which was "an

integral part of the policy relationship." *Rush, 122 S. Ct. at 2164.* These cases suggest that [HN6] a statute plays an integral part in the policy where it affords the parties rights or remedies other than those originally bargained for, in effect creating a new mandatory contract term.

Just as the statutory provisions in UNUM and Rush afford the parties rights or remedies other than those originally bargained for, § 8371 creates mandatory contract terms providing for special damages. Here, the insured gain the right to pursue the following remedies: punitive damages, attorney fees and a specified amount of interest. Therefore, the Court finds that the statute clearly plays an integral role in the policy relationship.

Although other Supreme Court cases, such as Pilot Life, address preemption of bad faith claim law, this Court cautions the reader not to confuse the case at hand with cases like Pilot Life. In Pilot Life the Supreme Court found that the Mississippi law of bad faith did not satisfy the second factor of the McCarran-Ferguson Test. *Pilot Life, 481 U.S. at 51.* [*8] However, Pilot Life dealt with common law claims of bad faith unspecific to the insurance industry, while the bad faith claim before this Court is derived from a statute specific to the insurance industry. Id. Consequently, the Pilot Life Court found the bad faith law's connection to the policy relationship to be "attenuated at best" based on the fact that it was "developed from general principles of tort and contract law available in any Mississippi breach of contract case." Id. In addition, "the common law of bad faith does not define the terms of the relationship ... it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages." Id. In contrast, [HN7] § 8371 provides particular remedies for incidents of bad faith and was designed exclusively for use in the insurance industry. Specifically, it allows the court to award a particular amount of interest, assess attorney's fees and award punitive damages where breaches of insurance contracts are concerned.

*C. Limited to Entities within the Insurance Industry*

The third factor, which requires [*9] the statute to be limited to entities within the insurance industry, is satisfied for many of the same reasons that the statute satisfies the requirements of the common-sense test. *Rush, 122 S. Ct. at 2164.*

**CONCLUSION**

In conclusion, this Court finds that the Common-sense View Test is easily satisfied by § 8371. Furthermore, factors two and three of the McCarran-Ferguson Test are also satisfied. Therefore, this Court holds that § 8371 is not preempted by ERISA as it falls under ERISA's saving clause.

AN APPROPRIATE ORDER WILL FOLLOW.

**ORDER**

AND NOW, this 29th day of July, 2002, upon consideration of Defendant's Motion to Dismiss (Document 2) and Plaintiff's Answer, it is hereby ORDERED that said motion is GRANTED, in part, and DENIED, in part. Specifically, Counts II, IV, VI and VII are DISMISSED.

AND SO IT IS ORDERED.

Clarence C. Newcomer, S.J.

5

LEXSEE 2000 U.S. Dist. LEXIS 21478

**KAREN NORMAN, Plaintiffs, v. PAUL REVERE LIFE INSURANCE COMPANY, a foreign insurer, Defendants.**

**Case No.C99-5463 JKA**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON, TACOMA DIVISION**

***2000 U.S. Dist. LEXIS 21478***

**May 12, 2000, Decided**

**May 12, 2000, Filed, Entered on Docket**

**DISPOSITION:**
[*1] Defendant's motion for partial summary judgment was granted in part and denied in part.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff employee was denied benefits under a long term disability insurance policy. She sued defendant insurance company on state law theories in federal court asserting diversity jurisdiction. Defendant insurance company moved for partial summary judgment claiming preemption under the Employee Retirement Income Security Act (ERISA).

**OVERVIEW:** The court found that the policy at issue was an employee welfare benefit plan subject to ERISA. The issue was whether or not the employee's claims were preempted or saved under *29 U.S.C.S. § 1144*. The court held that Washington's common law rule of bad faith was codified in the good faith requirements of Wash. Rev. Code § 48.01.030 regulating insurance which were clearly limited to the insurance industry and an integral part of the policy relationship between insurer and insured. Therefore, the employee's claim under Wash. Rev. Code § 48.01.030 and her common law bad faith claim were safe from preemption. On the other hand, because Wash. Rev. Code § 19.86 existed for the broader purpose of regulating competition and unfair or deceptive acts or practices generally and was not specifically directed to the insurance industry, the claim under that provision was preempted. The claims for breach of contract, breach of fiduciary duty, negligence, and fraud, all of which were based on legal theories not specifically directed to the insurance industry, were likewise preempted.

**OUTCOME:** The court granted in part and denied in part the insurance company's motion for partial summary judgment.

**LexisNexis(TM) HEADNOTES - Core Concepts**

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN1] The Employment Retirement Income Security Act of 1974 (ERISA) governs employee welfare benefit plans generally defined as those which are a plan, fund or program, established or maintained by an employer for the purpose of providing disability benefits to the participants. ERISA contains both a preemption clause and a savings clause. *29 U.S.C.S. § 1144* (a) provides that ERISA preempts state laws insofar as they relate to any employee benefit plan, subject to the savings clause set forth at *29 U.S.C.S. § 1144*(b)(2)(A).

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN2] See *29 U.S.C.S. § 1144*(b)(2)(A).

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN3] Whether a state law "regulates insurance," within the savings clause under the Employee Retirement Income Security Act, must be measured in context. Precedent requires a common sense determination as to whether the contested prescription regulates insurance. If so, it is necessary to consider the three following factors

to determine whether the regulation fits within the "business of insurance" as that phrase is used in the McCarran-Ferguson Act, at *15 U.S.C.S. § 1011:* 1) does the practice have the effect of transferring or spreading a policy holder's risk; 2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and 3) whether the practice is limited to entities within the insurance industry. These factors are considerations to be weighed, and no one is necessarily determinative in itself.

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN4] Washington's common law rule of bad faith insofar as it relates to the regulation of the insurance industry has been codified in the good faith requirements of Wash. Rev. Code § 48.01.030 regulating insurance. While it is fair to say that their purpose is not to regulate or "spread the risk," they are clearly limited to the insurance industry, and are an integral part of the policy relationship between insurer and insured. Therefore, a claim brought under Wash. Rev. Code § 48.01.030 and a common law bad faith claim are safe from the preemption provision of *29 U.S.C.S. § 1144.*

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***
[HN5] Wash. Rev. Code § 19.86, the Washington Consumer Protection Act exists for the broader purpose of regulating competition and unfair or deceptive acts or practices in the conduct of trade or commerce in general, and is not specifically directed to the insurance industry. Thus, a claim under Wash. Rev. Code § 19.86 is preempted by *29 U.S.C.S. § 1944.* Claims for breach of contract, breach of fiduciary duty, negligence, and fraud are based on legal theories not specifically directed to the insurance industry, and are likewise preempted.

**COUNSEL:**
For KAREN NORMAN, plaintiff: Deborah Nelson Willis, PORT ANGELES, WA.

For THE PAUL REVERE LIFE INSURANCE COMPANY, defendant: D. Michael Reilly, Kimberly M Meyers, LANE POWELL SPEARS LUBERSKY, SEATTLE, WA.

**JUDGES:**
J. Kelley Arnold, U.S. Magistrate Judge.

**OPINIONBY:**
Kelley Arnold J.

**OPINION:**

**ORDER re: DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS MATTER comes before the court on the Defendant's Motion for Partial Summary Judgment. The court has reviewed all materials submitted in support of and in response to said motion as well as the files and records herein.

Defendant seeks summary judgment establishing that 1) plaintiff's claims are governed by the Employment Retirement Income Security Act of 1974 (ERISA); 2) plaintiff's state law claims are preempted by ERISA; and 3) plaintiff has no right to a jury trial.

[*2] **FACTS**

It is undisputed that plaintiff was employed by Olympic Peninsula Kidney Center as a registered nurse. Olympic Peninsula Kidney Center procured from and paid the premiums to defendant for a long term disability insurance policy covering its employees (including plaintiff). It is further undisputed that plaintiff was involved in an automobile accident September 10, 1997; that she claimed benefits under the policy alleging that she is no longer able to perform the duties of her occupation -- a registered nurse; and that her claim was denied. Plaintiff then filed this lawsuit in federal court seeking jurisdiction based on diversity of citizenship and claiming sums in excess of the requisite jurisdictional limit. Plaintiff's causes of action are all alleged under state common law and statutory law.

**APPLICABILITY OF ERISA**

[HN1] ERISA governs *employee welfare benefit plans* generally defined as those "which are a plan, fund or program, established or maintained by an employer ... for the purpose of providing ... disability benefits . . to the participants ..." ERISA contains both a "preemption clause" and a "savings clause." *29 U.S.C. § 1144*(a) [*3] provides that ERISA preempts State laws insofar as they ***relate to*** any employee benefit plan, subject to the savings clause set forth at *29 U.S.C. § 1144*(b)(2)(A), which provides that:
[HN2]
"....nothing in this chapter shall be construed to exempt or relieve any person from any law of any State which ***regulates insurance***, banking, or securities." (emphasis supplied).

Clearly the policy at issue meets the criteria of an employee welfare benefit plan as contemplated under ERISA.

**ERISA PREEMPTION**

The question to be resolved by this motion is whether or not plaintiff's claims are preempted or saved under *29 U.S.C. § 1144.*

Defendant's rely heavily on *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987),* its companion case, *Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 65, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987),* and the reaffirming case of *Mertens v. Hewitt Associates, Inc. 508 U.S. 248, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993),* all of which address the broad preemptive force of ERISA with regard to state [*4] law claims.

The narrower issue defining the criteria of what escapes preemption is more thoroughly discussed in *Unum Life Insurance Company of America v. Ward, 526 U.S. 358, 119 S. Ct. 1380, 143 L. Ed. 2d 462 (1999),* which analyzes [HN3] whether a state law "regulates insurance" within the savings clause. Justice Ginsberg notes that these words must be measured in context, going on to note that precedent requires a common sense determination as to whether the contested prescription regulates insurance. If so, it is necessary to consider the three following factors to determine whether the regulation fits within the "business of insurance" as that phrase is used in the McCarran-Ferguson Act, at *15 U.S.C. § 1011:* 1) does the practice have the effect of transferring or spreading a policy holder's risk; 2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and 3) whether the practice is limited to entities within the insurance industry. These factors are considerations to be weighed, and no one is necessarily determinative in itself.

[HN4] It is clear that Washington's common law rule of bad faith insofar [*5] as it relates to the regulation of the insurance industry has been codified in the good faith requirements of RCW 48.01.030 regulating insurance. While it is fair to say that their purpose is not to regulate or "spread the risk," they are clearly limited to the insurance industry, and are an integral part of the policy relationship between insurer and insured. Therefore, plaintiff's claim under RCW 48.01.030 and her common law bad faith claim are safe from the preemption provision of *29 U.S.C. § 1144.*

On the other hand [HN5] RCW 19.86, the Washington Consumer Protection Act exists for the broader purpose of regulating competition and unfair or deceptive acts or practices in the conduct of trade or commerce in general, and is not specifically directed to the insurance industry. It therefore appears that plaintiff's claim under RCW 19.86 is preempted by *29 U.S.C. § 1144.* Furthermore, plaintiff's claims for breach of contract, breach of fiduciary duty, negligence, and fraud are based on legal theories not specifically directed to the insurance industry, and are likewise preempted.

**JURY TRIAL**

Although no jury demand has been filed, [*6] defendant asserts that no jury trial is available because the state law claims have been preempted by ERISA. Based on the courts analysis set forth above defendant's contention is rejected as to plaintiff's surviving claims.

**CONCLUSION**

***Defendant's Motion for Partial Summary Judgment is granted with regard to plaintiff's claims under RCW 19.86, and her claims for breach of contract, breach of fiduciary duty, negligence, and fraud . Defendant's Motion for Partial Summary Judgment is denied with regard to plaintiff's common law claim for bad faith and her good faith claim pursuant to RCW 48.01 et seq.***

May 12, 2000.

J. Kelley Arnold, U.S. Magistrate Judge

6

**RHOADS & SINON LLP**

ATTORNEYS AT LAW
TWELFTH FLOOR
ONE SOUTH MARKET SQUARE
P.O. BOX 1146
HARRISBURG, PA 17108-1146

TELEPHONE (717) 233-5731

FAX (717) 231-6698
rtribeck@rhoads-sinon.com
WEBSITE: www.rhoads-sinon.com

ROBERT H. LONG, JR.[2]
SHERILL T. MOYER
JAN P. PADEN
RICHARD B. WOOD
LAWRENCE B. ABRAMS III[2]
J. BRUCE WALTER
JOHN P. MANBECK
FRANK J. LEBER
PAUL A. LUNDEEN
JACK F. HURLEY, JR.
DAVID B. DOWLING
DAVID F. O'LEARY
DAVID O. TWADDELL
CHARLES J. FERRY
STANLEY A. SMITH
JENS H. DAMGAARD[2]
DRAKE D. NICHOLAS
THOMAS A. FRENCH
DEAN H. DUSINBERRE
DONNA M.J. CLARK
CHARLES E. GUTSHALL
PAUL F. WESSELL
SHAWN D. LOCHINGER
JAMES H. CAWLEY
DEAN F. PIERMATTEI
KENNETH L. JOEL[1]
DEBRA M. KRIETE
TODD J. SHILL
DAVID M. BARASCH
LORI J. McELROY
THOMAS J. NEHILLA
KEVIN M. GOLD
CARL D. LUNDBLAD
JAMES E. ELLISON
RICHARD E. ARTELL
ROBERT J. TRIBECK
TIMOTHY J. NIEMAN
PAUL J. BRUDER, JR.[4]
JOANNE BOOK CHRISTINE
AMY J. MENDELSOHN[2]
MICHAEL W. WINFIELD[3]
KATHRYN G. SOPHY[1]
STEPHANIE E. DIVITTORE
KATHLEEN D. BRUDER[4,5]
CHRISTYLEE L. PECK
JOHN M. COLES
HEATHER Z. KELLY
1 ALSO ADMITTED TO THE DISTRICT OF COLUMBIA BAR
2 ALSO ADMITTED TO THE FLORIDA BAR
3 ALSO ADMITTED TO THE MARYLAND BAR
4 ALSO ADMITTED TO THE NEW JERSEY BAR
5 ALSO ADMITTED TO THE NEW YORK BAR

OF COUNSEL
HENRY W. RHOADS
JOHN C. DOWLING

RETIRED
FRANK A. SINON

PAUL H. RHOADS
1907-1984
JOHN M. MUSSELMAN
1919-1980
CLYLE R. HENDERSHOT
1922-1980

DIRECT DIAL NO.
233-5731

FILE NO.
7583/01

October 1, 2002

**Re: Craig M. Howard v. Liberty Life Assurance Company of Boston**

William C. Foster, Esquire
Kelly, McLaughlin & Foster, LLP
1617 J.F.K. Boulevard, Suite 1690
Philadelphia, PA 19103

**VIA FACSIMILE (215) 985-0675**

Dear Mr. Foster:

I am writing to you in connection with the above-matter. As you will recall, I have assumed responsibility of this matter upon the retirement of John C. Dowling. Unfortunately, we have not been able to connect via telephone. Accordingly, I have determined to forward this correspondence to you, addressing the issues at hand.

As I indicated in my telephone message, I intend to contact the Court, regarding a recent decision on the issue of ERISA and bad faith claims. The purpose of my contacting the Court is to seek leave to amend our Complaint to add a bad faith claim based upon recent decisions of the United States Supreme Court and a decision for the United States District Court for the Eastern District of Pennsylvania. Essentially, as interpreted by the Eastern District, the United States Supreme Court decisions would permit the pursuit of a claim for bad faith where ERISA is implicated and ERISA does not preempt such a claim.

Please advise if you would concur in my Motion for Leave to Amend our Complaint. Otherwise, I will request a conference with the Court to advise it that we will be filing a Motion for Leave to Amend.

I look forward to hearing from you.

Sincerely,

RHOADS & SINON LLP

By: Robert J. Tribeck

cc: Craig Howard



YORK:
TELEPHONE (717) 843-1718, FAX (717) 232-1459

AFFILIATED OFFICE:
STE. 203, 1700 S. DIXIE HWY, BOCA RATON, FL 33432
TELEPHONE (561) 395-5595, FAX (561) 395-9497

LANCASTER:
TELEPHONE (717) 397-4431, FAX (717) 232-1459